1                 IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4   UNITED STATES OF AMERICA,    )

5                Plaintiff,  )   Docket No. 13 CR 312
                         )
6              vs.        )

7   EDWARD J. NOVAK, et al.,   )   Chicago, Illinois
                         )   February 26, 2015
8            Defendants.  )   9:25 a.m.
                         )
9

10                      VOLUME 18
                TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE MATTHEW F. KENNELLY, and a jury

12   APPEARANCES:

13

14   For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                         BY:   MR. JOEL M. HAMMERMAN
15                             MR. RYAN S. HEDGES
                             MS. KELLY GREENING
16                             MS. DIANE MAC ARTHUR
                        219 South Dearborn Street
17                        Chicago, Illinois  60604

18
   For the Defendant:    HINSHAW & CULBERTSON, LLP
19                         BY:   MR. SERGIO E. ACOSTA
                             MR. JOEL D. BERTOCCHI
20                        222 North LaSalle Street
                        Suite 300
21                        Chicago, Illinois  60601

22
                        DRINKER, BIDDLE & REATH, LLP
23                        BY:   MR. DANIEL J. COLLINS
                        191 North Wacker Drive
24                        Suite 3700
                        Chicago, Illinois  60606
25

```
 1                        MR. ROBERT G. CLARKE
                          123 West Madison
 2                        Chicago, Illinois   60603

 3
                   LAW OFFICES OF PATRICK E. BOYLE
 4                        BY:  MR. PATRICK E. BOYLE
                          155 North Michigan Avenue
 5                        Suite 562
                          Chicago, Illinois   60601
 6

 7                 COTSIRILOS, TIGHE, STREICKER, POULOS
                   & CAMPBELL, LTD.
 8                        BY:  MR. TERENCE H. CAMPBELL
                               MR. MICHAEL P. HOHENADEL
 9                        33 North Dearborn Street
                          Suite 600
10                        Chicago, Illinois   60602

11

12  Also Present:             MS. MARCI L. SAHINOGLU

13

14

15

16

17

18

19

20

21

22

23
            LAURA M. BRENNAN - Official Court Reporter
24          219 South Dearborn Street - Room 2102
                     Chicago, Illinois   60604
25                        (312) 435-5785
```

1    (The following proceedings were had in open court out of

2    the presence and hearing of the jury:)

3         THE CLERK:  13 CR 312, USA v. Novak, et al.

4         THE COURT:  Good morning.

5         MR. ACOSTA:  Good morning, your Honor; Sergio Acosta

6    and Dan Collins for Ed Novak, who is present.

7         MR. HAMMERMAN:  Good morning, your Honor; Joel

8    Hammerman, Ryan Hedges, Diane MacArthur and Kelly Greening on

9    behalf of the United States.

10        MS. SAHINOGLU:  And good morning, your Honor; Marcie

11   Sahinoglu, S-a-h-i-n-o-g-l-u, from the law office of Michael

12   J. Monaco, on behalf of witness Dr. Horia Stamboliu.

13   S-t-a-m-b-o-l-i-u.  First name is Horia, H-o-r-i-a.

14        THE COURT:  Dr. Stamboliu, I have been given a

15   petition that asks for an order granting you immunity and

16   directing you to testify.  So I'm signing an order here that

17   is going to say, as soon as I can find it --

18        Bear with me just a second.

19     (Brief interruption.)

20        THE COURT:  There it is.

21        So it's going to say that you will have to appear and

22   testify and provide evidence without asserting your privilege

23   against self-incrimination, what people sometimes call your

24   Fifth Amendment privilege, and that no testimony or evidence

25   that you provide can be used against you in any criminal case

 1    except for a prosecution for perjury or giving a false

 2    statement or for failing to comply with the order.

 3              Do you understand all that?

 4              DR. STAMBOLIU:  Yes.

 5              THE COURT:  Okay, fine.  All right.  Pam, I will

 6    email you the order and we'll get it entered.

 7              MS. SAHINOGLU:  Thank you very much.

 8              THE COURT:  Good, thanks.

 9              You can keep getting organized.  We've still got a

10    couple of minutes before 9:30.  I think we're still waiting on

11    one juror anyway.

12              MR. HAMMERMAN:  Your Honor, if you could give us just

13    two minutes.

14              THE COURT:  Yes, we've got more than two minutes.

15              MR. HAMMERMAN:  We have a --

16              Two of our agents have been driving for literally two

17    and a half hours, and they're still not here yet.  Two of our

18    witnesses are still not here yet.  We think we'll have a

19    witness at 9:30, but it's not the witness we intended to call,

20    so if you can give us just a quick chance to reorganize.

21              THE COURT:  Okay.

22           (Brief interruption.)

23              MR. HAMMERMAN:  We wanted to raise one other issue

24    with you.  We just had a quick conversation, as the Court

25    could have seen amongst counsel.  One of the witnesses the

1    government intends to call today is Randall Dei, who is

2    basically a custodian of records for the most part.  He is

3    going to introduce records obtained from the PRR, which the

4    Court heard about yesterday, the Podiatric Residency Resource.

5    It's the organization that maintains records for podiatric

6    residents nationwide.

7            One of the things that Dr. Dei spoke to us about when

8    we were preparing his testimony is that he was aware of

9    certain other programs, not ones in which he's involved, that

10   have paid individuals to work for their particular programs.

11   He himself is a director of a podiatric residency program.

12           THE COURT:  Say the first part of that sentence

13   again.

14           MR. HAMMERMAN:  Sure.

15           Maybe it will be better if I take one step back.  Dr.

16   Dei is the director of a podiatric residency program.  He is

17   paid for that position as those positions are required to be

18   paid.  There are attendings that are associated with his

19   program.  None of them are paid because, as he explained to

20   us, that would effectively look like a kickback, and they

21   don't do that.

22           He is aware, however, of another hospital in the same

23   town in which he resides that he is aware, he believes, of

24   paying at least two particular physicians to be basically the

25   director of education and teach in that program.

1  The basis of his knowledge is he has been told that.

2  We asked counsel whether they intend to go beyond the scope of

3  our examination of Dr. Dei and inquire into that.

4  THE COURT:  Because you're not going to be eliciting

5  anything about that on direct; you're just putting records in.

6  MR. HAMMERMAN:  Correct.

7  THE COURT:  Okay.

8  MR. HAMMERMAN:  They have informed us that they have.

9  We believe that that would be inappropriate for a number of

10  reasons.

11  First of all, it's beyond the scope, but we

12  understand there's been some, you know, ability to go beyond

13  the scope and go into what would effectively be a defense case

14  when we put witnesses on the stand.  But the testimony that

15  they would be seeking to elicit here we believe is anecdotal

16  hearsay evidence.

17  THE COURT:  Well, the anecdotal part really isn't

18  necessary to it; it's the hearsay part.

19  MR. HAMMERMAN:  Correct.

20  THE COURT:  It's overruled against anecdotal evidence

21  because most of it is.

22  MR. HAMMERMAN:  I'm just characterizing the hearsay,

23  your Honor, but it would be hearsay.  And because of that, it

24  would be inadmissible, and we don't think that counsel should

25  be allowed to go into it.

1    THE COURT:  Okay, go ahead.

2    MR. CAMPBELL:  Judge, we just got this report.

3    I think that it looks like it would be the only area

4    that I might ask him a question about.  And it is information

5    that he got in his job.  During the regular course of

6    business, he's talking to somebody who is an employee.

7    THE COURT:  There is no business communications

8    exception to the hearsay rule.

9    MR. CAMPBELL:  So, anyway, you know, I'm just looking

10   at this right now.

11   THE COURT:  Yes.

12   MR. CAMPBELL:  He has information that somebody who

13   was not the director of a podiatric residency program but was

14   hired to do some teaching or supervision of residents was paid

15   $12,000 a year.  And so the government, you know, their

16   position in this case is nobody who is not the director of the

17   program should be getting paid anything.  And they intend to

18   put on somebody later today that is going to talk about this

19   topic.

20   I have to think about what the basis would be to get

21   this in, but I don't want to foreclose it right now without

22   having had time to think about whether or not this gentleman,

23   who is a director of a podiatric residency program, is

24   qualified to say, yes, I have learned this in my professional

25   capacity.

1          THE COURT:  Is this the next witness?

2          MR. HAMMERMAN:  No, but --

3          THE COURT:  Is this one of the people who is stuck in

4   traffic?

5          MR. HAMMERMAN:  No, I think he's actually here.

6          The evidence that this particular witness needs is

7   actually still stuck in evidence -- in traffic.

8          THE COURT:  Oh.

9          MR. HAMMERMAN:  So that's why we're going to delay

10  his testimony.

11         THE COURT:  How could evidence be stuck in traffic?

12         MR. HAMMERMAN:  It's a disk.

13         THE COURT:  I see, okay.  Can we like use some other

14  disk?

15         MR. HAMMERMAN:  Well, I think it's one that he

16  signed.

17         THE COURT:  Okay.  That's why one of the agents is

18  coming.

19         MR. HAMMERMAN:  Yes.

20         MR. CAMPBELL:  If they want to use a substitute disk

21  to get going, we obviously have no problem with that.

22         MR. HAMMERMAN:  We have another witness.  I mean, we

23  can proceed.

24         THE COURT:  All right.  Well, I'm having a hard time

25  seeing how this gets in around the hearsay rule.  The fact

1    that he knows about something involving another hospital

2    because he's the director of a podiatric residency program I

3    don't think, to me, would not fit within any recognized

4    exception to the hearsay rule.

5           MR. CAMPBELL:  My only suggestion, Judge, would be

6    it's lay opinion testimony based on his experience.  He is a

7    director of a podiatric residency program.  He deals with

8    these things all the time.  He has somebody who works for him

9    who got paid $12,000 a year.

10          THE COURT:  Works for him?  I thought you said works

11   for another hospital.

12          MR. HAMMERMAN:  The program --

13          I'm sorry.  I didn't mean to interrupt.

14          MR. COLLINS:  Go ahead.

15          MR. HAMMERMAN:  The program was with another

16   hospital.  One of the two individuals became a partner of his,

17   and that partner told him that he had been paid.

18          But the problem with this, your Honor, is, of

19   course --

20          THE COURT:  No.  Stop arguing.

21          Unless there's like Rule 803-29 that I haven't read

22   yet that says, you know, something that you learned in your

23   capacity as a business person is admissible, I don't think

24   they passed that rule yet.  What's the exception to the

25   hearsay rule?

1      MR. COLLINS:  You know, Judge, I would like to think

2  through it as well.  Like I said, we just got this report.  I

3  just have one question in terms of understanding the complete

4  picture which is --

5      I'm sorry to ask questions in front of you.

6      THE COURT:  No, that's fine.

7      MR. COLLINS:  Are you eliciting that he has made the

8  choice as director of his program not to pay any stipends as

9  some, you know --

10      MR. HAMMERMAN:  No.

11      MR. COLLINS:  Okay.  I think --

12      THE COURT:  I thought I heard you saying that if he

13  was asked, he would say the reason he doesn't do it is that it

14  would be a kickback.

15      MR. HAMMERMAN:  But we're not going to ask him.

16      THE COURT:  Well, I mean, unless they put in the

17  stuff on cross.

18      MR. HAMMERMAN:  Then very much we would.

19      THE COURT:  Yes.

20      MR. COLLINS:  I guess, Judge, my point in asking that

21  question is with kind of a -- not knowing exactly what this

22  guy is going to say or not say, I don't think we ought to

23  foreclose a particular line of cross.  Obviously, we need to

24  understand.

25      THE COURT:  Well, I'm not asking you to give up on

1    it.  I'm just saying that if I'm called upon to rule on it,

2    I'm telling you, unless I'm hearing -- unless I'm missing

3    something really big, what my ruling is going to be.

4              MR. COLLINS:  Understood, understood.

5              THE COURT:  Okay.  Pam, do we know if the other juror

6    is here yet?

7              THE CLERK:  They're all here.

8              THE COURT:  The jurors are all here.

9              Do we have a witness?

10             MR. HAMMERMAN:  We do.

11             THE COURT:  Okay, let's go.

12             While he's getting the person, a couple of the jurors

13   have asked, unsurprisingly, how are we doing schedule-wise.

14   And so I want to have a discussion about that with them at the

15   end of the day today, and so think about it over the lunch

16   hour.  I'll just caucus with you briefly right after lunch.  I

17   want to try to give them some sort of a --

18             MR. HAMMERMAN:  We have been thinking about it, too,

19   your Honor, and we think we can give the Court a rough

20   schedule.

21             THE COURT:  Okay, good.  All right.

22        (Brief interruption.)

23        (The following proceedings were had in the presence and

24   hearing of the jury:)

25             THE COURT:  Okay.  Everybody other than the witness

1    can have a seat.  I'm going to swear him in.

2         Raise your right hand.

3      (Witness sworn.)

4         THE COURT:  Have a seat.  I will move that microphone

5    back where it was.

6         THE WITNESS:  Thank you, sir.

7         THE COURT:  Good morning, ladies and gentlemen.

8    Thanks for getting in today.

9         You can pull it closer to you.  Don't pull your

10   chair.  Pull the mike.

11        Did anybody read anything, hear anything, or see

12   anything about the case or anybody involved in the case?  If

13   so, raise your hand.

14        No hands.

15        I know people have been asking about how we're doing

16   schedule-wise.  I plan to have a discussion about that with

17   you at the end of the day.  I need to just sort of consult

18   with the lawyers first.

19        The other thing that we're probably going to do after

20   today, since there's only 14 of you now, is we're probably --

21   I know you really like that seat, but we're probably going to

22   move this thing out and --

23        No, we shouldn't do that?

24        A JUROR:  Don't do that.

25        THE COURT:  Okay, fine.  I won't do that.  You talked

Pallekonda - direct

1    me out of it.

2            A JUROR:  My back's really bad.

3            THE COURT:  Okay, that's fine.  Say nothing more.

4    We'll leave it that way.  Never mind.

5            Ms. Greening, you can go ahead.

6            MS. GREENING:  Thank you, your Honor.

7        VIJAY PALLEKONDA, PLAINTIFF'S WITNESS, DULY SWORN

8                    DIRECT EXAMINATION

9    BY MS. GREENING:

10   Q    Good morning.

11   A    Good morning.

12   Q    Please state and spell your name for the record.

13   A    First name is Vijay, V-i-j-a-y.  Last name is Pallekonda,

14   P, as in Peter, a-l-l-e-k-o-n-d-a.

15   Q    And how old are you?

16   A    I'm 48 years old.

17   Q    Where were you born?

18   A    In India.

19   Q    Did you move to the United States?

20   A    Yes.

21   Q    When did you move to the United States?

22   A    When I was ten years old.

23   Q    Are you a United States citizen?

24   A    Yes, I am.

25   Q    Please describe your educational background.

Pallekonda - direct

1    A    University of Georgia, after which I went to medical

2    school in the Caribbean, American University of the Caribbean.

3    Q    When did you graduate medical school?

4    A    1995.

5    Q    And what did you do after medical school?

6    A    I did residency.

7    Q    Where did you do your residency?

8    A    Cook County Hospital.

9    Q    When was that?

10   A    1995 to 1999.

11   Q    Did you complete the residency program?

12   A    Yes, I did.

13   Q    And are you a board certified physician?

14   A    I was board certified.

15   Q    In what specialty?

16   A    Internal medicine.

17   Q    I'm going to ask you to speak just a little bit slower, if

18   you don't mind.

19   A    Okay.

20   Q    What did you do after that residency program?

21   A    I worked for a group called Midwest Neo-Ped Associates.

22   Q    Where was that?

23   A    In Chicago, Illinois.

24   Q    What did you do?

25   A    I was a hospitalist for the group.

Pallekonda - direct

1    Q    What is a hospitalist?

2    A    A hospitalist is someone who takes care of patients once

3    they're admitted to the hospital.

4    Q    Did you complete any other residency programs in your

5    career?

6    A    Yes, I did.

7    Q    Where?

8    A    Rush University.

9    Q    And was that in any particular specialty?

10   A    Anesthesiology.

11   Q    When did you complete that program?

12   A    2010.

13   Q    Dr. Pallekonda, are you familiar with Sacred Heart

14   Hospital?

15   A    Yes, I am.

16   Q    How are you familiar with Sacred Heart?

17   A    I worked for Sacred Heart.

18   Q    When did you work for Sacred Heart?

19   A    January 2012 through February 2013.

20   Q    How did you first hear of the hospital?

21   A    Through my mother-in-law.

22   Q    Did your mother-in-law work there?

23   A    She was a nurse there.

24   Q    When was the first time that you discussed potentially

25   working at Sacred Heart Hospital with anybody from the

Pallekonda - direct

1   hospital?

2   A   It was during the summer of 2010.

3   Q   Who did you have that discussion with?

4   A   Mr. Nagelvoort and Mr. Castro.

5   Q   Where were you during that discussion?

6   A   I was at the hospital.

7   Q   What did Mr. Nagelvoort say to you about what position

8   might be available?

9   A   He had wanted me to work as a hospitalist for the

10  hospital.

11  Q   Did you begin working at Sacred Heart immediately after

12  that meeting?

13  A   I did not.

14  Q   What did you do?

15  A   I went to Hawaii, to work for four months in Hawaii.

16  Q   But you eventually went to work at Sacred Heart?

17  A   Yes, I did.

18  Q   And when did you start there?

19  A   January of 2012.

20  Q   Did you have an employment contract with Sacred Heart

21  Hospital?

22  A   Yes, I did.

23  Q   What was your position when you first started?

24  A   I was the ER physician as well as an anesthesiologist.

25  Q   How many days per week did you work as an ER physician?

Pallekonda - direct

1    A    Three days a week.

2    Q    How many days per week did you work as an

3    anesthesiologist?

4    A    One day per week.

5    Q    For a total of four days?

6    A    Yes.

7    Q    Were you compensated for your work as an ER physician and

8    anesthesiologist?

9    A    Yes, I was.

10   Q    What was your compensation?

11   A    It was $1,100 for anesthesia per day, and the salary was

12   $200,000 for working as the ER physician three days per week.

13   Q    What were your responsibilities under this contract when

14   you first started at Sacred Heart Hospital?

15   A    I was to care for patients who came into the emergency

16   room, evaluate them and, then depending on what the diagnosis

17   was, either admit them or discharge them home.

18   Q    Doctor, did you ever have any discussions with Sacred

19   Heart administrators about other potential job

20   responsibilities?

21   A    Yes.

22   Q    When was that?

23   A    It was October of 2011.

24   Q    And where did this conversation take place?

25   A    It took place at Maggiano's at Oak Brook mall.

1    Q    Who was present?

2    A    Myself, Mr. Castro, Ms. Sherri Peoples, Ernie Velasquez,

3   Anthony Puorro and Dr. Sawlani.

4    Q    Did someone lead this meeting?

5    A    Mr. Puorro.

6    Q    What did Mr. Puorro say to you about these other potential

7   job responsibilities at Sacred Heart Hospital?

8    A    He had wanted me to start up a hospitalist program for the

9   hospital.

10    Q    And what did that mean?

11    A    It means anyone who is admitted to the hospital from a

12   physician, I would be taking care of the patient until

13   discharged.

14    Q    Did he tell you any particular physicians that you would

15   be working with?

16    A    Dr. Kandala and Dr. Sawlani were the two physicians that

17   he mentioned.

18    Q    Who is Dr. Kandala?

19    A    He was a physician in Chicago who was potentially going to

20   admit patients to the hospital.

21    Q    What kind of doctor was he?

22    A    I believe he is an internist.

23    Q    Who was Dr. Sawlani?

24    A    He's another physician who is also an internist, I

25   believe.

Pallekonda - direct

1  Q   Did you have an additional meeting with Sacred Heart
2  administrators after this Maggiano's meeting about these other
3  potential job responsibilities?
4  A   Yes, I did.
5  Q   And when was that?
6  A   That was in December of 2011.
7  Q   Where did that meeting take place?
8  A   That took place in Mr. Puorro's office.
9  Q   Was anyone else there?
10  A   Mr. Castro was also there.
11  Q   Was Mr. Puorro there?
12  A   Yes, he was.
13  Q   What did Mr. Puorro say during that meeting?
14  A   He had said that he wanted me to head up the hospitalist
15  group and to admit patients for Dr. Kandala or Dr. Sawlani.
16  Q   What did you mean by admit patients for Dr. Kandala or Dr.
17  Sawlani?
18  A   They were going to send their patients to the emergency
19  room, and if the emergency room physician thought it was
20  necessary for admission, I would take care of the patient from
21  the admission point to the discharge point.
22  Q   So in addition to your responsibilities in the emergency
23  room, you would also be seeing Dr. Kandala and Dr. Sawlani's
24  patients inpatient at Sacred Heart, is that right?
25  A   Yes.

Pallekonda - direct

1  Q   So including those patients on the medical floors?

2  A   Yes.

3  Q   Who had already been admitted?

4  A   Yes.

5  Q   Did Mr. Puorro say whether these new responsibilities

6  would increase the amount of time that you worked at Sacred

7  Heart Hospital?

8  A   Yes.

9  Q   Did he say how much time?

10 A   He did not say how much time.

11 Q   Did Mr. Puorro instruct you on who would bill for the

12 services you provided to Dr. Kandala's patients or Dr.

13 Sawlani's patients?

14 A   The physicians would do the billing.

15 Q   Did you discuss your compensation during this meeting?

16 A   Yes, we did.

17 Q   What did Mr. Puorro say about your compensation?

18 A   He said the physicians would pay me as well as the

19 hospital would pay me.

20 Q   So why would the hospital and the physicians pay you?

21 A   The physicians were going to do the billing, and the

22 hospital, because they were inpatients, the hospital was also

23 going to pay me.

24 Q   Did you discuss the market rate of a hospitalist position?

25 A   Yes, we did.

Pallekonda - direct

1    Q    Please tell us what was discussed about a market rate.

2    A    The going rate for a hospitalist would probably be,

3    depending on the area, anywhere from $150,000 to $200,000 per

4    year.

5    Q    Did you discuss who would bill for the services that you

6    provided to Dr. Kandala's patients at the hospital?

7    A    Yes.

8    Q    You would not be billing for those services?

9    A    I would not be billing for the services.

10   Q    Did Mr. Puorro say what the benefit would be to the

11   hospital of this arrangement?

12   A    The hospital would get patients from Dr. Kandala.

13   Q    Did you take any steps to set up these arrangements with

14   the hospital, including the arrangement about Dr. Kandala's

15   patients?

16   A    I'm sorry.  I don't understand the question.

17   Q    Did you take any steps to set up this arrangement with Dr.

18   Kandala?

19   A    Yes, I did.

20   Q    Doctor, I'm handing you what has been marked as Government

21   Exhibit 3904A.

22          Do you recognize this document?

23   A    Yes, I do.

24   Q    What type of document is this?

25   A    This is an email.

Pallekonda - direct

1    Q    Is there a chain of emails between several people back and
2    forth?
3    A    Yes, it is.
4    Q    Who is on this email chain?
5    A    Myself, Mr. Puorro and Mr. Castro.
6    Q    Please turn to page 9 of this document.
7             MR. ACOSTA:  Your Honor, I'm sorry.  Can we have the
8    exhibit number?
9             THE COURT:  She said 3904A.
10            MR. ACOSTA:  Thank you.  I'm sorry.
11   BY MS. GREENING:
12   Q    Page 9, Dr. Pallekonda.
13   A    Yes, ma'am.
14   Q    What is the date on the email on page 9, the first email
15   in the chain?
16   A    December 20th, 2011.
17   Q    And please turn to the first page.
18            What is the date of the last email in the chain?
19   A    February 1st, 2012.
20   Q    Did you forward this email chain to your attorney?
21   A    Yes, I did.
22   Q    And is this forwarded chain the copy before you?
23   A    Yes.
24   Q    Is this a true and accurate copy of emails between
25   yourself, Anthony Puorro and Michael Castro?

Pallekonda - direct

1   A   Yes, it is.

2           MS. GREENING:  The government moves to admit

3   Government Exhibit 3904A.

4           MR. ACOSTA:  No objection.

5           THE COURT:  3904A is admitted without objection.

6   BY MS. GREENING:

7   Q   Okay, Dr. Pallekonda --

8           THE COURT:  Elmo or computer?

9           MS. GREENING:  I will do Elmo, your Honor.

10          THE COURT:  Okay.

11  BY MS. GREENING:

12  Q   Let's start on page 9.

13  A   Okay.

14          THE COURT:  And you will also see them on the screen

15  there in a second, the one is still to the left of you.

16      (Brief interruption.)

17  BY MS. GREENING:

18  Q   On the bottom half of the page, what is the date of this

19  email?

20  A   December 20th, 2011.

21  Q   Who is the email to?

22  A   To Mr. Puorro.

23  Q   And who is it from?

24  A   From myself.

25  Q   Please read the email.

1   A    "Good morning, Tony.  My family and I are out of the

2   Chicago area celebrating my daughter's birthday.  We should be

3   back in town later on today.  I have scheduled a meeting with

4   Michael Castro tomorrow morning at 10:00 a.m.  I am to bring

5   the paperwork that would be necessary for me to start at

6   Sacred Heart.

7            I will also pick up any paperwork that needs to be

8   filled out for medical staff privileges at Sacred Heart

9   Hospital at that time.  I will also speak to the chairman of

10  ER medicine at that time, if he has availability."

11  Q    Dr. Pallekonda, what paperwork are you referring to that

12  needed to be filled out for you to start at Sacred Heart?

13  A    The privileges paper that all hospitals have physicians

14  fill out.

15  Q    Okay.  Please turn to page 8, the next email in the chain.

16  What is the date of this email?

17  A    December 20th, 2011.

18  Q    Who is it from?

19  A    From Mr. Puorro.

20  Q    Who is it to?

21  A    It is to myself.

22  Q    Please read the email.

23  A    "Have you been contacted by Dr. Asgar?  He is the director

24  of the emergency room, and he is going to call you.  Please

25  advise.  Thanks."

Pallekonda - direct

1    Q    Who is Dr. Asgar?

2    A    He was the director of ER at Sacred Heart Hospital.

3    Q    Please turn to page 7, Doctor, at the bottom of the page.

4    What is the date of this email?

5    A    That is January 3rd, 2012.

6    Q    Is this the next email in the same chain?

7    A    Yes.

8    Q    Who is this email to?

9    A    This is to myself from Mr. Puorro.

10   Q    Okay.  Please read this email.

11   A    "I just spoke with Dr. Sawlani, and he indicated that he

12   would -- that he left you a voice message.  He is prepared to

13   begin admitting within the week.  Please give me a call at

14   your convenience to discuss.  Thanks."

15   Q    Did you understand Mr. Puorro to be referring to the same

16   Dr. Sawlani that you have previously mentioned from the

17   Maggiano's meeting and the meeting in Tony Puorro's office in

18   2011?

19   A    Yes.

20   Q    And 2012?

21        What was happening at this time regarding Dr.

22   Sawlani?

23   A    He was thinking about admitting patients to Sacred Heart

24   Hospital, but he hadn't sent any patients yet.

25   Q    Why not?

1    MR. ACOSTA:  Objection, to the extent it calls for
2  hearsay.
3    THE COURT:  As worded, as phrased, the objection is
4  sustained.
5  BY MS. GREENING:
6  Q   Dr. Pallekonda, are you aware of why Dr. Sawlani had not
7  yet sent patients to Sacred Heart?
8    THE COURT:  It's going to be the same problem.
9    MS. GREENING:  Okay.
10  BY MS. GREENING:
11  Q   Please turn to page 6, the top of the page.  What is the
12  date of this email?
13  A   This is January 26th, 2012.
14  Q   Who is the email to?
15  A   This is an e-mail to me.
16  Q   Who is it from?
17  A   From Mr. Puorro.
18  Q   Is anyone cc'd on this email?
19  A   Mr. Castro.
20  Q   Please read the body of this email.
21  A   It says:
22    "Vijay, please provide an update in your
23  communications with both Doctors Sawlani and Kandala.  Thanks.
24  Tony."
25  Q   Doctor, were you communicating with Doctors Sawlani and

Pallekonda - direct

1   Kandala at this time?

2   A   Yes, I was.

3   Q   Did you, in fact, enter into an agreement with Dr.

4   Kandala?

5   A   Yes, I did.

6   Q   What type of agreement?

7   A   It's an agreement for him to send patients to the hospital

8   and I would be admitting them if I was in the emergency room

9   and would take care of the patients until they were

10  discharged.

11  Q   Was there a contract?

12  A   Yes, there was.

13  Q   Written or oral?

14  A   It was a written contract between myself and Dr. Kandala.

15  Q   In that contract, what did Dr. Kandala agree to give you

16  in return for seeing his patients?

17  A   I'm not sure what the exact details were, but it would be

18  less than the market value.

19  Q   But an exact rate of pay was established?

20  A   I'm not really sure what the pay was.

21  Q   Did the contract establish who would bill for the services

22  you provided to Dr. Kandala's patients?

23  A   Yes, it did.

24  Q   Who would bill?

25  A   Dr. Kandala would do the billing.

Pallekonda - direct

1  Q   Did you speak with anyone at Sacred Heart about this
2  contract with Dr. Kandala?
3  A   Yes, I did.
4  Q   Who did you speak with?
5  A   Mr. Puorro, and I believe Mr. Castro was also in on the
6  meeting.
7  Q   Will you please turn to page 4 of Government
8  Exhibit 3904A.  What is the date of this email?
9  A   This is January 26th, 2012.
10 Q   Is this in the same email chain we have been discussing?
11 A   Yes, it is.
12 Q   Who is the email to?
13 A   This is to Mr. Puorro.
14 Q   Is anyone cc'd on the email?
15 A   Mr. Castro.
16 Q   Who is it from?
17 A   It's from me.
18 Q   Please read the first paragraph.
19 A   "As I told you last week, Dr. Kandala is adding me to his
20 corporation, and he is sending me the paperwork to fill out.
21 Dr. Sawlani has not responded to the emails I sent him last
22 week and this week.  You had suggested that I accept the
23 offers that these two physicians had made.
24        I have accepted Dr. Kandala's offer which you
25 recommended because you stated we could revisit the

Pallekonda - direct

1  compensation package down the road.  I don't think we should

2  do wait.  We should have a contract in place for the

3  hospitalist service between the hospital and myself before I

4  begin seeing the patients.  I would like to have everything in

5  writing so there is no misunderstanding in the future."

6  Q   Doctor, you stated, "I have accepted Dr. Kandala's offer

7  which you recommended."

8          What offer are you referring to?

9  A   The offer that I had signed with Dr. Kandala.

10  Q   Is that the contract that you just testified about?

11  A   Yes, it is.

12  Q   Who recommended that you accept that offer?

13  A   Mr. Puorro.

14  Q   You say Dr. Kandala was adding you to his corporation.

15  What did that mean?

16  A   That means I would work for him and he would pay me.

17  Q   What was his corporation?

18  A   I'm not sure what you mean by what was his corporation.

19  Q   Did he have a physician group?

20  A   Yes, he did.

21  Q   Is that the corporation you are referring to?

22  A   Yes.

23  Q   Why --

24          Or let me say this, Dr. Pallekonda.  Did Dr. Kandala

25  tell you why he wanted to add you to his corporation?

Pallekonda - direct

1   A    So that he could bill for my services.

2   Q    Will you please read the second paragraph?

3   A    "The compensation that these physicians are offering is

4   definitely not enough for the work that I'm going to be --

5   that is going to be required.  I would suggest the hospital

6   supplement my compensation with the start of work that is

7   going to begin very soon.  I would like for the compensation

8   to start at $200 per day for zero to five patients and

9   increase to $400 per day for six to ten patients and so on in

10  increments of $200 for each additional one to five patients.

11        This is much less than what a traditional hospitalist

12  compensation would be.  I have the ER and anesthesiologist

13  compensation, so I'm not as concerned.  This is to be for

14  every single day of the week as long as someone from the

15  hospitalist service sees the patients."

16  Q    Doctor, please turn to page 3, the next email in the

17  chain.

18        What is the date of this email?

19  A    January 27th.

20  Q    And what year?

21  A    2012.

22  Q    Who is this email from?

23  A    This is from Mr. Puorro.

24  Q    Who is it to?

25  A    This is to myself.

Pallekonda - direct

1    Q    Please read this email.

2    A    "I just received a voicemail from Dr. Kandala that he is

3    still awaiting documentation from you.  He is ready to refer

4    inpatients, however, will need to receive the necessary

5    documentation in order to begin.

6            As you know, this is a very important initiative for

7    Sacred Heart Hospital.  Please advise as to the status of

8    sending him the information.  Thanks."

9    Q    What documentation did you understand that Dr. Kandala

10   needed from you before he would refer inpatients to Sacred

11   Heart Hospital?

12   A    The documentation for the application that I had filled

13   out for his corporation and for the Medicare services.

14   Q    Is that a provider enrollment application?

15   A    Yes, it is.

16   Q    What was the important initiative that you understood Mr.

17   Puorro was referring to?

18   A    He was trying to get the hospitalist service off the

19   ground at Sacred Heart Hospital.

20   Q    Did you respond to Mr. Puorro's email?

21   A    I believe I did.

22   Q    Looking at the email on the top of this page, what is the

23   date?

24   A    This is January 27th, 2012.

25   Q    And who is this email from?

1  A   This is the email from me.

2  Q   Who is it to?

3  A   Mr. Puorro.

4  Q   Is anyone cc'd?

5  A   Mr. Castro is cc'd.

6  Q   Please read the first paragraph of this email.

7  A   "Hi, Tony.  Sorry that I was unable to meet with you

8  today.  I was sleeping when you called.  I spoke to Dr.

9  Kandala, and as you had stated, he has not received the

10  paperwork that I had sent him.  I left Leslie a message asking

11  her to fax the information to Dr. Kandala."

12  Q   What is the information that you had asked, you say,

13  Leslie to fax to Dr. Kandala?

14  A   The provider information from the application for

15  Medicare.

16  Q   Okay.  And who was Leslie?

17  A   She was one of the employees who worked at Sacred Heart.

18  She was -- I don't know what her title was.  I'm sorry.

19  Q   Do you recall her last name?

20  A   Ms. Muldrow-Thomas.

21  Q   Okay.  Please turn to page 2, the bottom email.  What is

22  the date of this email?

23  A   February 1st, 2012.

24  Q   And who is it from?

25  A   It's from Mr. Puorro.

Pallekonda - direct

1   Q   Who is it to?

2   A   This is to me.

3   Q   Please read the email.

4   A   "Please provide an update on recent communications with

5   Doctors Sawlani and Kandala.  Thanks."

6   Q   Turning to the top of the page is the next email in the

7   chain?

8   A   Yes, it is.

9   Q   And what is the date of this email?

10  A   February 1st, 2012.

11  Q   Who is it from?

12  A   It's from me.

13  Q   Who is it to?

14  A   To Mr. Puorro.

15  Q   And what does it say?

16  A   "Tony, I've spoken to Dr. Kandala, and he states that he

17  did not receive the materials that Leslie had sent out last

18  Monday.  He gave me a new fax number which I will forward to

19  Leslie.  I have again emailed Dr. Sawlani and he has not

20  responded as of yet to my communications."

21  Q   Okay.  And, finally, Dr. Pallekonda, looking at the email

22  on the bottom of the first page, is this the last email in

23  this chain?

24  A   It appears to be, yes.

25  Q   What is the date?

Pallekonda - direct

1   A   February 1st, 2012.

2   Q   And who is it from?

3   A   It's from Mr. Puorro.

4   Q   Who is it to?

5   A   It's to me.

6   Q   And what does it say?

7   A   It says:  "Thanks for the update."

8   Q   Doctor, I'm going to hand you what's been marked

9   Government Exhibit 3904C.  You can just hold onto that.

10  A   Okay.

11  Q   Do you recognize this email -- or excuse me -- this

12  document?

13  A   Yes, I do.

14  Q   What type of document is it?

15  A   It is an email correspondence.

16  Q   And turning to the second page, the last email in the

17  chain, what is the date of it?

18  A   March 6th, 2012.

19  Q   Turning back to the front page, what is the date of the

20  last email in the chain?

21  A   March 6th, 2012.

22  Q   Who is on this email chain?

23  A   Mr. Puorro and myself.

24  Q   Is this a true and accurate copy of emails between you

25  yourself and Mr. Puorro?

1    A    Yes.

2              MS. GREENING:   The government moves to admit

3    Government 3904C.

4              MR. ACOSTA:   No objection.

5              THE COURT:   3904C is admitted without any objection.

6    BY MS. GREENING:

7    Q    Okay.  Dr. Pallekonda, please turn to the second page in

8    the first email in the chain.

9              What is the date of this email?

10   A    March 6th, 2012.

11   Q    And who is it to?

12   A    It's to myself.

13   Q    Who is it from?

14   A    It's from Mr. Puorro.

15   Q    And please read the email.

16   A    "Please provide an update on receiving and completing the

17   package of information from Dr. Sawlani.  Also, please provide

18   an update on any recent activity with Dr. Kandala.  Thanks."

19   Q    Okay.  Turning to the bottom of page 1, the first part of

20   the next email in the chain there, what is the date?

21   A    March 6th, 2012.

22   Q    And who is this email to?

23   A    This is Mr. Puorro.

24   Q    Who is it from?

25   A    It's from me.

Pallekonda - direct

1  Q   Okay.  And turning to the second page for the body of the
2  email, please read it aloud.
3  A   "I have finished the application package and sent it back
4  to Dr. Sawlani yesterday.  I expect to hear -- I expect to
5  receive it in the next couple of days.  Dr. Kandala is waiting
6  to hear from Medicare.  He's already sent the application to
7  Medicare for their review."
8  Q   What do you mean when you say that Dr. Kandala is waiting
9  to hear from Medicare?
10  A   It's an application process.  We have to apply to get
11  Medicare privileges for different people if they work for a
12  corporation.
13  Q   Was Dr. Kandala, in your understanding, waiting to hear to
14  see if you had been approved as a Medicare provider under his
15  practice group?
16  A   Yes.
17  Q   Finally, please turn to the middle of page 1 for the final
18  email in this chain.
19        What is the date?
20  A   March 6th, 2012.
21  Q   And who is it from?
22  A   It's from Mr. Puorro.
23  Q   Is this to you?
24  A   Yes.
25  Q   What does Mr. Puorro say?

Pallekonda - direct

1  A    "Thank you."

2  Q    Dr. Pallekonda, at some point, did Medicare approve your

3  application to become a provider under Dr. Kandala's group?

4  A    Yes, they did.

5  Q    Did you begin to see Dr. Kandala's patients at Sacred

6  Heart?

7  A    Yes, I did.

8  Q    When did you begin to see Dr. Kandala's patients at Sacred

9  Heart?

10  A    In April of 2012.

11  Q    And at that point, how long had you been working at the

12  hospital?

13  A    Working at the hospital from January 2012.

14  Q    Had you observed any patients of Dr. Kandala's in the

15  hospital between January 2012 and April of 2012?

16  A    I had not.

17  Q    Between April 2012 and the time that you left Sacred

18  Heart, which I believe you testified was in 2013, where did

19  Dr. Kandala send patients at Sacred Heart?

20  A    Where did he send them from?

21  Q    Where did he send them to?

22  A    Oh, to Sacred Heart Hospital emergency room.

23  Q    And are you aware where Dr. Kandala's patients came from?

24  A    Yes.

25  Q    Where did they come from?

1   A   Nursing homes.

2   Q   How did they arrive at the hospital?

3   A   Through a private ambulance.

4   Q   Did you see Dr. Kandala's patients in the emergency room?

5   A   On the days I was working, yes.

6   Q   Did you also round on Dr. Kandala's patients who were

7   inpatients on the medical floors of the hospital?

8   A   Yes, I did.

9   Q   How many days per week were you scheduled to work at

10  Sacred Heart between April of 2012 and February of 2013?

11  A   I was scheduled to work three days a week in the emergency

12  room and one day a week in anesthesiology.

13  Q   How many days per week did you actually work at Sacred

14  Heart during that time?

15  A   Six to seven days a week.

16  Q   Why the difference?

17  A   Because Dr. Kandala had inpatients that I had to go see.

18  Q   Starting with your days that you were assigned to work in

19  the emergency room, please describe your average workday

20  between April of 2012 and January of 2013.

21  A   When I worked in the emergency room?

22  Q   Yes.

23  A   I would get to the emergency room around 7:00 o'clock or

24  so, and if there were any patients in the emergency room, I

25  would attend to their needs.

Pallekonda - direct

1      And if there was any break in between me and there
2   were no patients in the emergency room, then I would go see
3   patients on the floors for Dr. Kandala.
4      And if by the end of the day I didn't get a chance to
5   see all these patients, I would have to go back and finish
6   rounding on the patients.
7   Q   How long approximately would it take you to round on Dr.
8   Kandala's patients?
9   A   About 15 to 20 minutes for each patient.
10  Q   So did you round on Dr. Kandala's patients whenever you
11  had a moment to do so?
12  A   Yes.
13  Q   And when would that be?
14  A   When they were no patients in the emergency room, and I
15  would let the nurse know that I was going to be on the floors,
16  and if she needed me, she could call me on the floor or on my
17  cellphone.
18  Q   How quickly would you get back to the emergency room if a
19  patient came in during the time that you were rounding on Dr.
20  Kandala's patients?
21  A   Between one and two minutes.
22  Q   Turning to the days you were scheduled to work as an
23  anesthesiologist as Sacred Heart, please describe your average
24  workday.
25  A   The ORs start a little after 7:00 o'clock, so I would get

Pallekonda - direct

1  there by 7:00 and would wait until the end of the ORs before I

2  would go see any patients on the floors.

3  Q   Did you round on Dr. Kandala's patients?

4  A   Yes, I did.

5  Q   When would you do that?

6  A   After the ORs were closed.

7  Q   Between April 2012 and the beginning of 2013, how

8  regularly did Dr. Kandala have inpatients at the hospital?

9  A   He had patients there pretty much every day.

10 Q   What time of day would Dr. Kandala's patients arrive?

11 A   It would be -- there is no particular time, all hours of

12 the day.

13 Q   Did Dr. Kandala's patients ever arrive at the hospital

14 when you were not there?

15 A   Yes, they did.

16 Q   Did Dr. Kandala have inpatients at the hospital on days

17 that you were not scheduled to work at Sacred Heart?

18 A   Yes, he did.

19 Q   How did you cover Dr. Kandala's patients on those days?

20 A   I would have to come in or have one of my colleagues

21 substitute for me.

22 Q   Did you ever bill for the services you provided to Dr.

23 Kandala's patients?

24 A   I did not do any billing.

25 Q   Did you send any information to anyone about Dr. Kandala's

Pallekonda - direct

1  patients?

2  A    I forwarded the information to Mr. Puorro and to Dr.

3  Kandala.

4  Q    How often would you forward the information to Mr. Puorro?

5  A    About once every one -- one week or every other week.

6  Q    And you say "the information."  What kind of information

7  would you forward to Mr. Puorro?

8  A    I would send him the face sheets with the patient's

9  admitting diagnosis, the discharge diagnosis and the discharge

10  date.

11  Q    Why did you send this information to Mr. Puorro?

12  A    He had asked me to forward it to him.

13  Q    Did he tell you why?

14  A    Because Dr. Kandala was billing for me.

15  Q    Did you ever send this information directly to Dr.

16  Kandala?

17  A    Yes, I did.

18  Q    I'm now handing you what has been marked Government

19  Exhibit 3904D.

20        Do you recognize this document?

21  A    Yes, I do.

22  Q    What type of document is it?

23  A    It is a chain of emails.

24  Q    Who is this chain of emails between?

25  A    Myself, Mr. Puorro, and I think that's it.  Mr. Castro as

Pallekonda - direct

1   well.  Sorry.

2   Q   Please turn to page 5.  What is the first email date on

3   this chain?

4   A   June 6th, 2012.

5   Q   And is that email from someone else besides the people you

6   just named?

7   A   Yes, Ms. Karen Polewaczyk.

8   Q   Please turn to page 1.  What is the last email date on

9   this chain?

10  A   June 20th, 2012.

11  Q   Is this exhibit a true and accurate copy of emails that

12  you sent and received on those dates and in between those

13  dates?

14  A   Yes, it is.

15          MS. GREENING:  The government moves to admit

16  Government Exhibit 3904D.

17          MR. ACOSTA:  No objection.

18          THE COURT:  3904D is admitted without objection.

19  BY MS. GREENING:

20  Q   Dr. Pallekonda, please turn to the last page on the bottom

21  email.  What is the date of this email?

22  A   This is June 6th, 2012.

23  Q   And you mentioned the name Karen Polewaczyk.  Is that who

24  this email is from?

25  A   Yes, it is.

Pallekonda - direct

1    Q    Who was Karen Polewaczyk?

2    A    She was a coding specialist for Dr. Kandala.

3    Q    Did she bill for Dr. Kandala's services?

4    A    Yes, it appears she did.

5    Q    Who did she send this email to?

6    A    It's to Mr. Puorro.

7    Q    Are you on this email?

8    A    Not directly, but Mr. Puorro forwarded it to me.

9    Q    Please read the email.

10   A    "Dear Mr. Puorro.  I am Dr. Kandala's medical coding

11   specialist at Jackson Park Hospital.  I am asking you for

12   direction as to how to gain access to the information such as

13   face sheets, dates, times and level of service in the

14   hospital.  ( ICU, etc.)

15         I would appreciate your assistance in regards to this

16   matter.  Sincerely, Karen Polewaczyk."

17   Q    Please turn to page 4, the bottom of the page.  Is this

18   where Mr. Puorro forwarded you this email?

19   A    Yes.

20   Q    And is someone else cc'd on this email?

21   A    Mr. Castro.

22   Q    What is the date?

23   A    June 6, 2012.

24   Q    Please read this email.

25   A    "Dr. Pallekonda, do you have the billing information to

Pallekonda - direct

1   forward for Dr. Kandala's patients?  Please advise.  Thanks.

2   Tony."

3   Q   What billing information did you understand that Mr.

4   Puorro was looking for?

5   A   The face sheets, the admitting diagnosis and the discharge

6   diagnosis and the time that -- and the days that I saw the

7   patients.

8   Q   Following this email, are there two updates for Mr. Puorro

9   asking -- well, two additional emails for Mr. Puorro asking

10  for updates?

11  A   Yes.

12  Q   Was he asking you for updates?

13  A   Yes, he was.

14  Q   Okay.  Turning to page 3 at the top of the page, what is

15  the date of this email?

16  A   Monday, June 18th, 2012.

17  Q   And who is it to?

18  A   Mr. Puorro.

19  Q   Who is cc'd?

20  A   Mr. Castro.

21  Q   Who is it from?

22  A   It's from myself.

23  Q   Please read this email.

24  A   "Hi, Tony.  I have all the paperwork necessary to send to

25  Dr. Kandala, and I will as soon as I can.",

1    Q    What paperwork are you referring to?

2    A    The billing information that Mr. Puorro had asked for and

3    Ms. Polewaczyk had asked for.

4    Q    Please turn to page 2, the middle of the page.

5         What is the date of this email?

6    A    June 20th, 2012.

7    Q    Is this a response from Mr. Puorro?

8    A    Yes, it is.

9    Q    And what does Mr. Puorro say?

10   A    "Dr. Pallekonda, I just received another text message from

11   Dr. Kandala on the need for this data.  This information is

12   very important in retaining the relationship with him.  Please

13   forward as soon as possible and let me know when sent.

14   Thanks.  Tony."

15

16

17

18

19

20

21

22

23

24

25

Pallekonda - direct

1  Q  Turning to the top of the page, did you respond?

2  A  Yes, I did.

3  Q  When did you respond?

4  A  The same day at a later time, June 20th, 2012.

5  Q  And what did you say in response to Mr. Puorro?

6  A  "Hi, Tony:  I sent the forms to Dr. Kandala's office on

7  Monday."

8  Q  Finally, turning to page 1, the last email in the chain,

9  what's the date?

10 A  June 20th, 2012.

11 Q  And who is it from?

12 A  It's from Mr. Puorro.

13 Q  What does it say?

14 A  "Thank you."

15 Q  Dr. Pallekonda, sometime after you started working at

16 Sacred Heart, did you receive a change in title at the

17 hospital?

18 A  Yes, I did.

19 Q  What was your new title?

20 A  I was the acting director of the emergency room.

21 Q  How did your responsibilities change in your new role?

22 A  I was going to make the schedule for the physicians in the

23 emergency room.

24 Q  Are you familiar with a Dr. Venkateswara Kuchipudi?

25 A  Yes, I am.

Pallekonda - direct

1  Q  Did you treat Dr. Kuchipudi's patients at Sacred Heart?

2  A  Yes, I did.

3  Q  Where were Dr. Kuchipudi's patients from?

4  A  Nursing homes.

5  Q  And where in Sacred Heart would you treat Dr. Kuchipudi's

6  patients?

7  A  In the emergency room.

8  Q  So did you round on Dr. Kuchipudi's patients on the

9  medical floors?

10 A  I did not.

11 Q  How did Dr. Kuchipudi's patients arrive at the hospital?

12 A  By a private ambulance.

13 Q  Are you familiar with the term "direct admission"?

14 A  Yes, I am.

15 Q  Generally speaking, what does that mean?

16 A  Means the physician has already seen the patient in the

17 office or wherever the physician is practicing, and then after

18 seeing and evaluating the patient, he feels the patient needs

19 to go to the emergency room for evaluation and possible

20 admission.

21 Q  Are you familiar the term "direct admit to Room 200 A"?

22 A  Yes, I am.

23 Q  Where did you hear that term?

24 A  At Sacred Heart Hospital.

25 Q  Did a particular physician's patients arrive with that

Pallekonda - direct

1  instruction?

2  A    Yes.

3  Q    Which physicians?

4  A    Dr. Kuchipudi and Dr. Kandala.

5  Q    Did patients arrive with that instruction at night?

6  A    Yes.

7  Q    Did patients arrive with that instruction during the day?

8  A    Yes.

9  Q    Did that include weekdays?

10 A    Yes.

11 Q    At first when patients arrived with that instruction, what
12 did you understand that to mean?

13 A    That Dr. Kuchipudi had already seen the patient and had
14 evaluated the patient and he was asking the emergency room
15 physician to evaluate the patient and see if the patient
16 needed to get admitted to the hospital.

17 Q    Well, when you first saw Dr. Kuchipudi's patients in the
18 ER and you first saw that they were coming in as direct admits
19 to Room 200 A, did you think you were supposed to evaluate
20 them in the emergency room or just send them directly to their
21 rooms?

22 A    I understood it to mean that they were directly to go to
23 the room.

24 Q    And at some point during your year at Sacred Heart did
25 your understanding of what that was -- that instruction was to

Pallekonda - direct

1    mean change?

2    A    Yes, it did.

3    Q    When was that?

4    A    Probably a few weeks after I sent a few of the patients

5    home.

6    Q    Where were you when you had a discussion about this issue?

7    A    In the emergency room.

8    Q    And who was there?

9    A    Mr. Puorro and Dr. Kuchipudi.

10   Q    What -- who talked to you about what direct admit to Room

11   200 A meant?

12   A    Mr. Puorro.

13   Q    And what did he tell you it meant?

14   A    He meant that the patient was to be evaluated in the

15   emergency room and then sent to the floor.

16   Q    Dr. Pallekonda, what did you do first when any patient

17   arrived in the emergency room?

18   A    I would see the patient first, do a good history, do a

19   thorough physical exam and order any laboratory tests and

20   radiological tests that need to be done for the patient to

21   evaluate why the patient was there.

22   Q    Did you interview these patients?

23   A    Yes, I did.

24   Q    And conduct examinations?

25   A    Yes, I did.

Pallekonda - direct

1    Q    Did you ask patients why they were there?

2    A    Yes.

3    Q    Were some patients able to respond?

4    A    Yes, they were.

5    Q    Turning back to Dr. Kuchipudi's patients, of the

6    responsive patients, did some fail to give you a reason as to

7    why they were at the hospital?

8    A    Yes.

9    Q    Were there a number of patients that gave you similar

10   answers as to why they were there?

11   A    Yes.

12   Q    What type of common answer did you receive?

13   A    They didn't know why they were there.

14   Q    Did you make your own independent medical assessments of

15   patients' conditions in the ER?

16   A    Yes.

17   Q    And did you understand that to be part of your job as an

18   emergency room physician?

19   A    Yes.

20   Q    Did you sometimes determine that a patient needed to be

21   admitted?

22   A    Yes.

23   Q    Did you sometimes determine a patient did not need to be

24   admitted to a hospital?

25   A    Yes.

Pallekonda - direct

1    Q    Under what circumstances did you decide a patient did not

2    need to be admitted?

3    A    If there was no medical acuity of the patient and the

4    patient was going to be better off in the community rather

5    than in the hospital.

6    Q    What did you do when you determined that a patient of

7    Dr. Kuchipudi's did not need to be admitted to the hospital?

8    A    I would attempt to call him.

9    Q    Would you sometimes reach him?

10   A    Yes.

11   Q    And when you did reach Dr. Kuchipudi, what did you say?

12   A    I told him that the patient's name, the reason the patient

13   was there, and my evaluation of the patient.

14   Q    Did Dr. Kuchipudi give you a common response when you

15   called with that information?

16            MR. ACOSTA:  Objection.  Objection, foundation.

17            THE COURT:  Why don't you rephrase the question.

18   BY MS. GREENING:

19   Q    On the times that you reached Dr. Kuchipudi when you

20   called him after patients had come into the hospital and you

21   determined that they did not need to be admitted, was there a

22   common response that Dr. Kuchipudi gave you?

23   A    Yes.

24            MR. ACOSTA:  Objection.

25            THE COURT:  Overruled.  406.

Pallekonda - direct

1        You can go ahead.

2    BY THE WITNESS:

3    A    Yes, there was.

4    BY MS. GREENING:

5    Q    What was that common response?

6    A    That I could admit the patients for 23 hours if I didn't

7    think the patient needed to be admitted.

8    Q    Were there times that you could not get ahold of

9    Dr. Kuchipudi?

10   A    Yes.

11   Q    What would you do in those instances?

12   A    Attempt to get ahold of his nurse practitioners.

13   Q    Who were his nurse practitioners?

14   A    I'm not sure of their last names, but the first names were

15   Joanna and Myrline.

16   Q    Did you ever observe Joanna or Myrline working with other

17   physicians' patients besides Dr. Kuchipudi's?

18   A    No, I did not.

19   Q    Were there times between January of 2012 and the beginning

20   of 2013 that you reached out based on one of Dr. Kuchipudi's

21   patients but could not get ahold of anyone?

22   A    Yes.

23   Q    And what did you do then?

24   A    Depending on what my evaluation was, either admit the

25   patient or send them home or back to the nursing home.

Pallekonda - direct

1   Q   Did you ever discuss your sending patients back to the
2   nursing homes with Dr. Kuchipudi?
3   A   Yes, I did.
4   Q   How many times?
5   A   I'd say five or six times.
6   Q   Where were you when you had these conversations?
7   A   In the emergency room.
8   Q   What did Dr. Kuchipudi say to you?
9   A   He told me I should admit all his patients.
10  Q   Dr. Pallekonda, did you ever send a patient of
11  Dr. Kuchipudi's back to a nursing home that you believed
12  required a hospital admission?
13  A   No, I did not.
14  Q   Did you ever send one of Dr. Kuchipudi's patients back to
15  a nursing home without evaluating that patient?
16  A   I did not.
17  Q   Did you ever send any patient back to a nursing home or
18  from wherever they came without seeing and assessing that
19  patient?
20  A   I did not.
21  Q   Now, you've mentioned the term "23-hour observation."
22  What is that?
23  A   Normally that means when a patient comes in the emergency
24  room, you evaluate the patient and then, depending on what
25  your diagnosis is, keep the patient in the hospital for 23

Pallekonda - direct

1    hours.  The patient can be seen by their primary care

2    physician within 23 hours, and depending on what the physician

3    thought, either discharge them home or keep them in the

4    hospital for a longer period of time.

5    Q    Did you ever have a meeting with anyone at Sacred Heart

6    about 23-hour observations?

7    A    Yes.

8    Q    When?

9    A    October of 2012.

10   Q    Who was there?

11   A    Myself, Mr. Puorro, Dr. Kuchipudi and Dr. Jaleel.

12   Q    Where was this discussion?

13   A    It was in the board room of the hospital.

14   Q    And were specific patients discussed at this meeting?

15   A    There were two patients that Dr. Kuchipudi had brought up

16   in this discussion.

17   Q    What had happened generally with those specific patients?

18   A    I had sent them back to the nursing home, and

19   Dr. Kuchipudi wasn't happy about it, and he said that because

20   of their diagnosis I shouldn't have sent them back.

21   Q    Had you seen those patients before sending them back to

22   the nursing home?

23   A    Yes, I did.

24   Q    Had you evaluated them?

25   A    Yes, I did.

Pallekonda - direct

1    Q    Had you made a medical determination about them?

2    A    Yes, I did.

3    Q    What was that determination?

4    A    That they did not need to get admitted to the hospital.

5    Q    And had you spoken on the phone with Dr. Kuchipudi before

6    sending those patients back to the nursing homes?

7    A    I wasn't able to get ahold of him.

8    Q    Did Dr. Kuchipudi say anything else to you at this

9    meeting?

10   A    He told me to admit all his patients whenever they came

11   from wherever they came from.

12   Q    After this conversation were there instances that you did

13   in fact hold one of Dr. Kuchipudi's patients for 23-hour

14   observation?

15   A    Yes, I did.

16   Q    And under what circumstances would you hold a patient for

17   23-hour observation?

18   A    Depending on what their diagnosis was, and Dr. Kuchipudi

19   wanted me to hold them for 23 hours so he could evaluate them

20   the very next day.

21   Q    Were there instances that you did not hold one of

22   Dr. Kuchipudi's patients for 23-hour observation?

23   A    Yes, there was.

24   Q    Under what circumstances would you not hold that patient

25   for observation?

Pallekonda - direct

1  A  Depending on the acuity of the patient, if I didn't think

2  the patient was sick enough to be in the hospital, then I

3  would send them back to the nursing home.

4  Q  Dr. Pallekonda, turning back to Dr. Kandala, for how long

5  did you treat Dr. Kandala's patients at Sacred Heart?

6  A  April of 2012 through December of 2012.

7  Q  Why did you stop?

8  A  Because I had not gotten paid by Dr. Kandala for the work

9  that I did.

10 Q  By the time you stopped seeing Dr. Kandala's patients, had

11 you ever gotten any money from anyone for the work that you

12 did on his patients?

13 A  I did not.

14 Q  And how many months had you been rounding on and treating

15 Dr. Kandala's patients at Sacred Heart?

16 A  About eight months or so.

17 Q  When did you leave Sacred Heart Hospital?

18 A  February of 2013.

19 Q  Did you make a decision to do so?

20 A  Yes, I did.

21 Q  Why did you decide to leave?

22 A  My family was in Texas, and my kids had just moved there,

23 and I decided better for us to live as a family together.

24 Q  Did you inform anyone at Sacred Heart of your decision?

25 A  Yes, I did.

Pallekonda - direct

1    Q    How did you do that?

2    A    I wrote them a letter of resignation.

3    Q    To whom did you submit this resignation letter?

4    A    I submitted the letter to Ms. Leslie Thomas-Muldrow.

5    Q    Do you recall the dates that you sent the resignation

6    letter?

7    A    January 4th, 2013.

8    Q    Did you receive any further communication from Sacred

9    Heart Hospital?

10   A    Yes, I did.

11   Q    When was that?

12   A    That was later on in the month.

13   Q    What was the communication?

14   A    It was a certified letter which I didn't get till later.

15   Q    Who was it from?

16   A    It was from Mr. Puorro.

17   Q    And what did it say, generally speaking?

18   A    Basically said that they were not going to renew my

19   contract for the next year.

20   Q    What did you do after you left Sacred Heart?

21   A    Moved to Texas, and I was waiting for my Texas license to

22   get processed.

23   Q    Did you have any additional contact with anyone from

24   Sacred Heart?

25   A    Yes, I did.

1    Q    When was that contact?

2    A    That was in May, I believe, in 2013.

3    Q    And what was the contact?

4    A    It was a letter from Mrs. Muldrow-Thomas with some checks

5    that I had gotten.

6    Q    And you said this was May of 2013?

7    A    Yes, ma'am.

8    Q    So was this about four months after you had sent your

9    resignation letter?

10   A    Yes.

11   Q    I apologize.  One moment.

12          Dr. Pallekonda, I'm handing you what has been marked

13   Government Exhibit 3908.  Do you recognize this document?

14   A    Yes, I do.

15   Q    And what is this document?

16   A    These are two checks that I received at my home in Texas.

17   Q    Are these copies of two checks?

18   A    Yes, they are.

19   Q    And are these the checks that accompanied the letter that

20   you received in May of 2013?

21   A    Yes, they are.

22   Q    Are these true and accurate copies of those checks?

23   A    Yes.

24          MS. GREENING:  The government moves to admit

25   Government Exhibit 3098.

1          MR. ACOSTA:  If I could have just one second, Judge.

2          No objection.

3          THE COURT:  It's admitted without objection.

4    BY MS. GREENING:

5    Q   Dr. Pallekonda, from whose account were these checks

6    drawn?

7    A   Dr. Kandala.

8    Q   And how much are these checks for?

9    A   One is for $1,000; the other one is for $5,000.

10   Q   What was your understanding of what these checks were for?

11   A   It's for services at Sacred Heart.

12   Q   Were these the first payments you received from anyone for

13   work performed on Dr. Kandala's patients at Sacred Heart,

14   inpatients?

15   A   Yes.

16   Q   Did you receive any communication from Dr. Kandala along

17   with these checks?

18   A   I did not.

19   Q   During your tenure at Sacred Heart, did you ever round on

20   any other physician's inpatients besides Dr. Kandala's?

21   A   I did not.

22   Q   Did anyone at Sacred Heart ever ask you to round on other

23   physicians' inpatients?

24   A   They did not.

25   Q   Did you ever see Dr. Kandala's patients in the nursing

Pallekonda - direct

1    homes?

2    A    I did not.

3    Q    So when they came to Sacred Heart Hospital, was that the

4    first time that you saw his patients?

5    A    Yes.

6    Q    Did you ever observe Dr. Kandala round on his own patients

7    at Sacred Heart?

8    A    I did not.

9    Q    Are you aware of anytime that Dr. Kandala rounded on his

10   own patients?

11   A    I am not.

12   Q    Doctor, during your tenure at Sacred Heart, were you aware

13   of any cancer screening and prevention program?

14   A    No.

15   Q    Were you aware of any orthopedic education program?

16   A    No.

17   Q    Were you aware of any palliative care education program?

18   A    No.

19          MS. GREENING:  One moment, your Honor.

20          THE COURT:  Yes.

21          (Brief pause.)

22   BY MS. GREENING:

23   Q    Just two more questions, Dr. Pallekonda.

24          Do you know the date of the search of Sacred Heart

25   Hospital?

Pallekonda - cross

1    A    I do not know the date.

2    Q    Do you know the month?

3    A    April, May.  I'm not a hundred percent sure.

4    Q    April, May of what year?

5    A    Of 2013.

6    Q    Okay.  And what is the date on these checks?

7    A    4/29/2013.

8    Q    And the date on the bottom check?

9    A    5/6/2013.

10            MS. GREENING:  No further questions.

11            THE COURT:  Cross.

12                         CROSS EXAMINATION

13   BY MR. ACOSTA:

14   Q    Good morning, Dr. Pallekonda.

15   A    Good morning, sir.

16   Q    My name is Sergio Acosta.  I represent Ed Novak.

17   A    Okay.

18   Q    You knew Mr. Novak to be the owner of Sacred Heart

19   Hospital, correct?

20   A    Yes.

21   Q    Dr. Pallekonda, I'd like to follow up on a few matters

22   with you.

23            With respect to Government Exhibit 3904 A --

24            And I'm sorry.  Do you have a copy?

25            You talked about one of your email communications to

Pallekonda - cross

1   Mr. Puorro.

2          And, by the way, Michael Castro, you knew Mr. Castro

3   to be the director of nursing at Sacred Heart Hospital at the

4   time you were having these communications?

5   A   Yes.

6   Q   Mr. Castro was a friend of yours, right?

7   A   I met Mr. Castro on a couple of occasions when he was

8   introduced to me by my mother-in-law when I went to Sacred

9   Heart.

10  Q   Was he a friend of yours, sir?

11  A   I know him.  I don't communicate with him regularly.

12  Q   And, doctor, you know that Mr. Castro, Mr. Puorro, and

13  Mr. Velasquez were looking at the possibility of buying Sacred

14  Heart Hospital, right?

15  A   I had heard rumors about that, yes.

16  Q   And you heard that from Mr. Castro?

17  A   Yes.

18  Q   You were asked some questions, sir, about this email

19  communication which is dated January 26, 2012, from you to

20  Mr. Puorro with a copy to Mr. Castro, right?

21  A   Yes.

22  Q   And you say in here:  "As I told you last week,

23  Dr. Kandala is adding me to his corporation," right?

24  A   Yes.

25  Q   And this was a contract, a written contract that you

Pallekonda - cross

1  signed with Dr. Kandala, correct?

2  A   Yes.

3  Q   And it was for you to -- the agreement was he was going to

4  send patients that you would see for him, right?

5  A   Yes.

6  Q   I believe you testified, "I would work for him, and he

7  would pay me," correct?

8  A   Yes.

9  Q   So you were an employee of Dr. Kandala under this

10  agreement, correct?

11  A   Yes.

12  Q   Now, all of these communications that you testified about

13  were between you, Mr. Puorro and usually Michael Castro,

14  correct?

15  A   Yes.

16  Q   Let me talk to you just a little bit about your testimony

17  regarding Dr. Kuchipudi.

18        I believe you testified that at first you understood

19  a direct admit at Sacred Heart Hospital to mean the patient

20  should go directly to a room, correct?

21  A   Yes.  That's usually the case.

22  Q   Sir, were you aware of a long-standing policy at Sacred

23  Heart Hospital that when any patient arrived at the emergency

24  room they had to be evaluated?

25  A   I was not aware of that.

1  Q  You weren't told that that policy had existed since 2006?

2  A  After I had sent a few of Dr. Kuchipudi's patients home,

3  then Mr. Puorro and Dr. Kandala told me that.

4  Q  And were you the director of the emergency room?

5  A  I was made acting director in February, I believe, and

6  then sometime later on I was made the director.

7  Q  And you did make it your point as director to familiarize

8  yourself with policies of Sacred Heart Hospital?

9  A  I asked for the policies, but I never got a copy of it.  I

10  had asked for the policies from -- no.  I had asked for

11  policies.  I never got them.

12  Q  I believe you testified that with respect to the patients

13  that would arrive by ambulance, you would either admit them or

14  send them back; is that correct?

15  A  Yes.

16  Q  Sir, you understand there's a difference between holding

17  someone for observation and admitting them as an inpatient,

18  correct?

19  A  Yes.

20  Q  Those days that you did work in the emergency room, did

21  you work days or nights?

22  A  Both.

23  Q  Mostly days, I believe you testified on direct, correct?

24  A  Yes.

25  Q  You'd get in at 7 a.m., and if there was no one there,

Pallekonda - cross

1    you'd go do this rounding, right?

2    A    Yes.

3    Q    Isn't it a fact that Dr. Kuchipudi came to Sacred Heart

4    Hospital virtually every day?

5    A    I don't know.

6    Q    So you testified that you had these communications with

7    Mr. Puorro and Mr. Castro leading up to I believe it was

8    sometime in the spring of 2012 you start seeing Dr. Kandala's

9    patients?

10   A    Yes, sir.

11   Q    And your expectation was that Dr. Kandala was going to pay

12   you, correct?

13   A    Yes.

14   Q    And you had a verbal agreement with Mr. Puorro that at

15   some point Sacred Heart Hospital was going to pay you

16   something?

17   A    Yes.

18   Q    And that never happened, correct?

19   A    I never got that in writing, yes.

20   Q    You never got paid, right?

21   A    No, I did not get paid.

22   Q    Now, sir, I believe you also testified that you submitted

23   your letter of resignation to Sacred Heart Hospital on January

24   4, 2013?

25   A    Yes, sir.

Pallekonda - cross

1    Q    And that sometime later in January you received a letter

2    from Mr. Puorro, correct?

3    A    Yes.

4    Q    Sir, there were some other communications between you and

5    Mr. Puorro between January 4th of 2013 and the time you

6    received that letter, correct?

7    A    I'm sure there were.

8              MR. ACOSTA:  May I approach, Judge?

9              THE COURT:  Yes.

10   BY MR. ACOSTA:

11   Q    Doctor, I'm going to show you first what has been marked

12   for identification as Defense Exhibit A 80.  Do you recognize

13   that?

14   A    Yes, I do.  Yes.

15   Q    And what is that?

16   A    This is an email.

17   Q    Well, from who to who?

18   A    From myself to Mr. Puorro.

19   Q    And what's the date?

20   A    December 31st.

21   Q    Of what year, sir?

22   A    2012.

23   Q    Is that a true and accurate copy of the email you sent to

24   Mr. Puorro on December 31st, 2012?

25   A    Yes.

1          MR. ACOSTA:  Judge, I'd move for the admission of
2    Defense Exhibit A 80.

3          MS. GREENING:  Objection.  From our brief review,
4    your Honor, these appear to be hearsay.

5          THE COURT:  Need to see the lawyers at side bar,
6    please.  Bring the document.

7              (The following proceedings were had at sidebar in the
8              presence but out of the hearing of the jury:)

9          THE COURT:  Okay.  So what's the response?

10         MR. ACOSTA:  The response is they elicited testimony
11   on direct that from the time of his resignation letter to the
12   letter he received from Puorro that there was no
13   communications between them.

14         MS. GREENING:  That's not true, your Honor.  What we
15   elicited on direct was that there was a communication on
16   January 4th.  I asked if there were additional communications.
17   He mentioned one a few weeks later from Anthony Puorro.  He
18   didn't say that was the sole communication.

19         MR. ACOSTA:  In addition, your Honor, these all go to
20   the communications having to do with his arrangement at Sacred
21   Heart Hospital, what his understanding was, whether he was
22   going to get paid, as well as his arrangement with Kandala.

23         THE COURT:  Let me just take a look at it here for a
24   second.

25             It's a proposal for a new deal.  Now, there's

1    probably a little bit of hearsay contained in it, but looking

2    at it, the hearsay that's contained in it is he hasn't been

3    paid by Dr. Kandala, which you elicited.  The rest of it's a

4    proposal for a new contract, and, frankly, the statement that

5    he didn't get paid by Dr. Kandala is part of the reason for

6    the proposal.  That's not hearsay.

7            So why don't I go ahead and look at 81, 82 and 83 so

8    I can deal with those too.

9            81 is a statement about what's going to happen in the

10   future.  That's not hearsay.

11           82 is similar to 80.  It's basically saying I need

12   you to pay me, when am I going to get paid.  There's some

13   hearsay in it, namely, he hasn't gotten paid, but that's part

14   of the predicate for asking to get paid.

15           And it looks like -- yeah, 83 is, I think, 82 with a

16   response by Mr. Puorro, who basically says this is what I will

17   do.

18           None of it's hearsay.  The objection is overruled.

19           (The following proceedings were had in the presence

20           and hearing of the jury:)

21       THE COURT:  The objection is overruled.  A 80 is

22   admitted.

23       MR. ACOSTA:  Judge, with the Court's permission, let

24   me just approach.

25       THE COURT:  Yes.

Pallekonda - cross

1   BY MR. ACOSTA:

2   Q   Let me next show you what's been marked as -- for

3   identification as Defense Exhibit A 81.  Please take a moment

4   and review that.

5       Do you recognize it?

6   A   Yes, I do.

7   Q   What is it?

8   A   It's an email from myself to Mr. Puorro.

9   Q   What's the date on it, sir?

10  A   January 7th.

11  Q   January 7th?

12  A   2013.

13  Q   Thank you.

14      Is that a true and accurate copy of that email

15  communication?

16  A   Yes.

17      MR. ACOSTA:  Judge, I'd move for the admission of

18  Defense A 81.

19      THE COURT:  And based on the side bar, 81 is also

20  admitted.

21  BY MR. ACOSTA:

22  Q   I'm going to show you what's been marked as A 82.  Do you

23  recognize that?

24  A   Yes, I do.

25  Q   What is that?

Pallekonda - cross

1    A    It's another email from myself to Mr. Puorro, and it's

2    dated January 16th, 2013.

3    Q    Is that a true and accurate copy of that email

4    communication?

5    A    Yes.

6            MR. ACOSTA:  Judge, I'd move for the admission of A

7    82.

8            THE COURT:  Also admitted based on the side bar.

9    BY MR. ACOSTA:

10   Q    And finally, sir, please take a look at A 83 and tell us

11   whether you recognize that.

12   A    Yes, I do.

13   Q    What is it?

14   A    It's two emails, from myself to Mr. Puorro and Mr. Puorro

15   to me.

16   Q    What's the date on it?

17   A    January 16th, 2013.

18   Q    Is that a true and accurate copy of the email

19   communication from Mr. Puorro to you?

20   A    Yes.

21           MR. ACOSTA:  Judge, I'd move for the admission of A

22   83.

23           THE COURT:  That's also admitted based on the side

24   bar.

25           Before you go into the contents, we'll take our break

1    right here.  We'll break for ten minutes.

2              (Recess taken.)

3              (The following proceedings were had in the presence

4              and hearing of the jury:)

5              THE COURT:  Okay.  Everyone can have a seat.

6              Mr. Acosta, you can go ahead.

7              MR. ACOSTA:  Thank you, your Honor.

8    BY MR. ACOSTA:

9    Q    Dr. Pallekonda, I'd like to show you what's been admitted

10   as Defense Exhibit A 80.  All right, sir, this is an email

11   that you sent to Mr. Puorro on December 31st of 2012, correct?

12   A    Yes.

13   Q    This is just a few days before you sent your resignation

14   letter, correct?

15   A    Yes.

16   Q    And in this email what you are expressing to --

17             Well, let's just read the first part of it, if you

18   wouldn't mind.  Just read the first three or four sentences.

19   A    "This email is in regards to the concerns of the contract

20   between Sacred Heart Hospital and myself.  As you are aware,

21   the contract expires on January 2nd, 2013.  We have had

22   multiple conversations regarding the contract, and I have

23   major concerns regarding wages in the contract.  The contract

24   that we have is an initial one-year contract that is good for

25   one year."

Pallekonda - cross

1    Q    Okay.  Hang on right there.

2          The contract that you're referring to is a contract

3    you had with Sacred Heart Hospital for you to provide

4    emergency room services, correct?

5    A    Yes.

6    Q    And anesthesia services?

7    A    Correct.

8    Q    And you performed those services?

9    A    Yes.

10   Q    And you were paid for those?

11   A    Yes.

12   Q    And it was a one-year contract?

13   A    Yes.

14   Q    So what you're referencing here is a renewal of that

15   contract, correct?

16   A    Yes.

17   Q    And you wanted to be paid more in the renewal of the

18   contract than what you'd been paid the first year?

19   A    Yes.

20   Q    By the way, there's no one copied on this, correct?  It

21   was just you to Mr. Puorro?

22   A    Yes.

23   Q    Michael Castro was gone from Sacred Heart Hospital by this

24   time, correct?

25   A    Yes.

Pallekonda - cross

1   Q   Starting in the third paragraph, you indicate that you

2   want the emergency room wages to go up to $250,000 per year,

3   correct?

4   A   Yes.

5   Q   Let's look at the fourth paragraph, Dr. Pallekonda.  Could

6   you start reading that, please?

7   A   "I have yet to get paid for seeing the patients for

8   Dr. Kandala since April of 2012.  My license is at risk for

9   seeing and managing patients in the Medicare system.  He has

10  not paid me because he has not collected.  I don't know how

11  much more information he needs to collect.  He knows that his

12  patients were seen on a daily basis and managed via phone when

13  needed.  Dr. Kandala is billing for the primary care needs of

14  these patients I see for him.  You assured me on multiple

15  times when we met about these very issues that the hospital

16  would supplement my income for seeing the patients for

17  Dr. Kandala."

18  Q   Okay.  Hang on right there.

19          When you say "you assured me on multiple times,"

20  you're talking to Anthony Puorro, right?

21  A   Yes.

22  Q   He's the person who assured you?

23  A   Yes.

24  Q   Correct?

25  A   Yes.

Pallekonda - cross

1   Q   And you say "when we met about these very issues."  You're

2   talking about meetings you had with Mr. Puorro about these

3   issues?

4   A   Yes.

5   Q   And Mr. Castro was there at some of these meetings,

6   correct?

7   A   Yes.

8   Q   And that's it, correct?

9   A   Yes.

10  Q   Let's next take a look at Defense Exhibit A 81.  This is

11  another email that you sent on Monday, January 7th, correct,

12  of 2013?

13  A   Yes.

14  Q   And you sent it to Mr. Puorro?

15  A   Yes.

16  Q   No one else copied on this, correct?

17  A   No.

18  Q   And, now, you submitted your letter of resignation on the

19  4th of January; is that correct?

20  A   Yes.

21  Q   I'd like to direct your attention to the second paragraph

22  there.

23  A   Yes.

24  Q   Would you please read that?

25  A   "I fully expect you to keep your part of the bargain,

Pallekonda - cross

1    which is to make sure that the hospital and/or Dr. Kandala pay

2    me for the work that was done in the hospital by me as a

3    hospitalist from April 2012 to December 2012."

4    Q    All right.  Hang on for a second.

5          When you say, "I fully expect you to keep your part

6    of the bargain," you're again talking to Mr. Puorro, right?

7    A    As the COO of the hospital, yes.

8    Q    Well, he's the one who had a bargain with you, correct?

9    A    Yes.

10   Q    Now, when you talk about "work done in the hospital by me

11   as a hospitalist," you're talking about this rounding on

12   Dr. Kandala's patients, correct?

13   A    Yes.

14   Q    Would you read the last sentence of that paragraph,

15   please?  I'm sorry, the second paragraph, read the last

16   sentence for us.

17   A    "You promised that you would compensate me if he did not

18   pay.  He has not paid me."

19   Q    Again, that's Mr. Puorro who made that promise to you,

20   correct?

21   A    Yes.

22   Q    I'd like to next show you what's been admitted as

23   Defendant's A 82.  Now, this is an email that you sent to

24   Mr. Puorro on January 16th, 2013, correct?

25   A    Yes.

1   Q   And it looks like you sent it just a little bit after
2   midnight, correct?
3   A   Yes.
4   Q   12:07 a.m.?
5   A   Yes.
6   Q   If you could read the second paragraph, please.
7   A   "I certainly would want you as COO of Sacred Heart
8   Hospital honor the commitment that you made to me.  I made a
9   commitment to you and the hospital and kept it by coming to
10  work for the month of January."
11  Q   Again, you're talking about Mr. Puorro there, correct?
12  A   Yes.
13  Q   Can you read the third paragraph?
14  A   "I need to get paid for working during 2012, seeing
15  Dr. Kandala's patients as a hospitalist.  You promised me in
16  no uncertain terms that the hospital would pay me if
17  Dr. Kandala did not.  He has not paid me."
18  Q   Okay.  "You promised me in no uncertain terms," it was
19  Mr. Puorro who promised you in no uncertain terms, correct?
20  A   Yes.
21  Q   All right, sir.  If you could read the paragraph that
22  starts with the word "maybe"?
23  A   "Maybe I was naive not to have all the agreements in
24  writing, but I believed in you and in the promises that you
25  made."

Pallekonda - cross

1   Q   Sir, it was a mistake for you to have believed in Tony
2   Puorro, right?
3   A   Yes.
4   Q   It was a mistake for you to have trusted him, right?
5   A   Yes.
6   Q   And finally, sir, I'd like to show you what has been
7   admitted as Defense Exhibit A 83.
8           Now, this is an email from Mr. Puorro responding to
9   your email from just after midnight, correct?
10  A   Yes, I believe so.
11  Q   And he's responding to you it looks like 8:07 a.m.?
12  A   Yes.
13  Q   Would you please read that for us?
14  A   "Dr. Pallekonda, as you know, I am not privy to the
15  discussions with Dr. Kandala regarding the compensation
16  arrangements he made with you for his patients."
17  Q   Now, hang on a second.
18          You knew that not to be true, correct?
19  A   Yes.
20  Q   Okay.  Keep reading, please.
21  A   "We will make copies of the progress notes that you wrote
22  while taking care of these patient if this facilitates your
23  issue with Dr. Kandala.  Our conversation in the past centered
24  around payment for additional responsibilities at the hospital
25  such as taking over ER staffing with a group you established,

1    which would be subject to a review of overall hospital

2    compensation, review of industry payment standards, legal

3    review, to include tests on arm's length transactions."

4    Q    "Thanks, Tony," right?

5    A    Yes.

6    Q    He was aware of your discussions with Dr. Kandala about

7    the arrangement you had with him, right?

8    A    Yes.

9    Q    He made you part of the corporation; you signed the

10   employment contract and so forth.  You advised him of those

11   things, right?

12   A    Yes.

13   Q    He also talked in here about a review of industry payment

14   standards and legal review.  This is the first time Puorro

15   ever said any of those things to you, correct?

16   A    Yes.

17   Q    Sir, were you aware that on the morning of January 15th,

18   2013, that that was the first time the FBI had contacted

19   Mr. Puorro?

20   A    I was not.  2013.

21        MR. ACOSTA:  If I could have a moment, Judge.

22        THE COURT:  Sure.

23        MR. ACOSTA:  Nothing further.  Thank you.

24        THE COURT:  Mr. Clarke, anything?

25        MR. CLARKE:  No.

Pallekonda - cross

1    THE COURT:  Mr. Campbell.

2                    CROSS EXAMINATION

3  BY MR. CAMPBELL:

4  Q   Good morning, doctor.

5  A   Good morning, sir.

6  Q   My name is Terry Campbell.  I represent Clarence

7  Nagelvoort.

8        You don't know Mr. Nagelvoort, right?

9  A   I have met him on occasion when I went to the hospital.

10  Q   That's right.  And you were not hired by Mr. Nagelvoort?

11  A   I was not.

12  Q   Okay.  You started working at Sacred Heart in January of

13  2012?

14  A   Yes, sir.

15  Q   And, therefore, you would have no personal knowledge about

16  any cancer screening activities that occurred in 2009?

17  A   I do not.

18  Q   And no information about cancer screening activities that

19  were conducted by Dr. Jagdish Shah or anyone under his

20  supervision in 2010 or all the way up till April of 2011?

21  A   No, I do not.

22  Q   And, likewise, you wouldn't have any information from your

23  personal knowledge about work that Dr. Jagdish Shah did in

24  consulting on hematology at Sacred Heart, correct?

25  A   I do not know any, no.

Pallekonda - redirect

1  Q   You would not have any information about consultations

2  that Dr. Jagdish Shah did on oncology issues at Sacred Heart

3  in 2009 or 2010 or 2011, correct?

4  A   I do not.

5  Q   You wouldn't have any information about work that

6  Dr. Jagdish Shah did at Sacred Heart with respect to

7  consultations on difficult cases of blood transfusions in

8  2009, 2010, and 2011, correct?

9  A   I do not.

10  Q   You would not have any information about educational

11  programs or sessions that Dr. Jagdish Shah or anyone under his

12  authority had with respect to educating nurses on topics of

13  oncology in 2009, 2010, or up -- all the way up through April

14  of 2011 and beyond 2011?

15  A   I do not know any.

16          MR. CAMPBELL:  Okay.  Nothing further, Judge.

17          THE COURT:  Redirect.

18                   REDIRECT EXAMINATION

19  BY MS. GREENING:

20  Q   Dr. Pallekonda, I'd like to show you what has been

21  admitted as Defense Exhibit A 80, specifically this paragraph

22  at the top of page 2.

23          Can you please read that paragraph?

24  A   "I also asked for help, which was guaranteed when I was

25  first hired in January 2012, in managing patients for

1   Dr. Kandala and was assured by Mike Castro that either Joanna,

2   the PA for Dr. Kuchipudi, or Marlene, the NP for

3   Dr. Kuchipudi, would help with follow-up inpatient care and

4   management of patient care.  I understand that they both said

5   no and the whole thing did not get further mileage after that.

6   It is my understanding that Dr. Kelsick will no longer be

7   assisting in managing patients.  This is a lot for one

8   physician to be handling on a daily basis."

9   Q   Dr. Pallekonda, as far as you knew, were you the only

10  person rounding on Dr. Kandala's patients?

11  A   I had help when I was not in the hospital on vacation.

12  Q   You had asked for help from physician's assistants?

13  A   Yes.

14  Q   And nurse practitioners?

15  A   Yes.

16  Q   Did anyone tell you that these individuals would be

17  available to help you in the hospital?

18  A   When I initially signed on, Mr. Puorro and Mr. Castro told

19  me that they would help.

20  Q   And did you get that help?

21  A   I did not.

22  Q   I'd like to show you Defense Exhibit A 81.  You were asked

23  some questions about the second paragraph, and specifically

24  that you had this bargain with Anthony Puorro.  Do you

25  remember those questions?

Pallekonda - redirect

1    A    Yes.

2    Q    Who did you understand Anthony Puorro to be representing

3    during these conversations about a potential arrangement with

4    Dr. Kandala's patients?

5    A    He was representing the hospital and the owner of the

6    hospital.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pallekonda - redirect

1    Q.  While you were rounding for Dr. Kandala, did you ever see

2    Mr. Novak?

3    A.  Yes, I did.

4    Q.  And did he ask you what you were doing outside of the --

5             MR. ACOSTA:  Objection, your Honor.  Beyond the scope.

6             THE COURT:  State the -- well, give me the whole

7    question.  Don't answer it until I rule on it.

8    BY MS. GREENING:

9    Q.  While you were rounding, did you see Dr. -- or see Mr. Novak

10   while you were rounding for Dr. Kandala?

11            THE COURT:  Sustained.

12   BY MS. GREENING:

13   Q.  Dr. Pallekonda, were these meetings that you had with

14   Anthony Puorro where you talked about setting up this

15   arrangement with Dr. Kandala's patients secret?

16   A.  They were not secret.

17   Q.  Did Anthony Puorro tell you to conceal your work for

18   Dr. Kandala from Mr. Novak?

19   A.  He did not.

20   Q.  Did he tell you to conceal your work for patients of

21   Dr. Kandala from anyone else in the hospital?

22   A.  He did not.

23   Q.  Or anyone outside of the hospital?

24   A.  He did not.

25   Q.  Did he ever tell you that you should not tell Mr. Novak that

Pallekonda - redirect

1    the hospital would pay you for your work for Dr. Kandala's

2    patients?

3              MR. ACOSTA:  Objection, your Honor.  Form of the

4    question and relevance.

5              THE COURT:  It's argumentative.  Sustained.  You can

6    save this for argument.  I guess I could say a lot about this.

7    I could say that about a lot of questions by a lot of people.

8    Maybe I'll start saying it more often.

9    BY MS. GREENING:

10   Q.  Dr. Pallekonda, you were asked some questions about the

11   nature of your agreement with Dr. Kandala and whether or not you

12   considered yourself to be employed by Dr. Kandala.  Do you

13   remember those questions?

14   A.  Yes.

15   Q.  Did you receive a W-2 for your work that you did for

16   Dr. Kandala?

17   A.  I did not.

18   Q.  Did you receive a 1099?

19   A.  I did not.

20   Q.  Did you receive a paycheck?

21   A.  Just the ones you showed me.

22   Q.  Did you have an employment agreement with Sacred Heart

23   Hospital?

24   A.  Yes, I did.

25   Q.  Did you receive a W-2 from Sacred Heart Hospital?

Pallekonda - redirect

1   A.  Yes, I did.

2   Q.  Did you receive a 1099 from Sacred Heart Hospital?

3   A.  I did not.

4   Q.  Did you have a set schedule for your work at Sacred Heart

5   Hospital?

6   A.  Yes, I did.

7   Q.  Did you have a title for that work that you performed at

8   Sacred Heart Hospital?

9   A.  Yes, I did.

10  Q.  Did Sacred Heart Hospital pay you for the work that you did

11  at the hospital?

12  A.  Yes, they did.

13  Q.  Dr. Pallekonda, who was your employer from 2012 to 2013?

14  A.  Sacred Heart Hospital.

15      MS. GREENING:  One moment, your Honor.

16      THE COURT:  Yes.

17  (Brief pause.)

18      MS. GREENING:  Nothing further.

19      THE COURT:  Mr. Acosta, anything else?

20      MR. ACOSTA:  No, Judge.  Nothing further.

21      THE COURT:  The witness is excused.  You're excused.

22  (Witness excused.)

23      THE COURT:  Please call the next witness.

24      MS. MAC ARTHUR:  Your Honor, the government calls

25  Randall Dei.

Dei - direct

```
1        (Brief pause.)
2              THE COURT:  Would you raise your right hand?
3        (Witness duly sworn.)
4              THE COURT:  Have a seat.
5              RANDALL DEI, GOVERNMENT'S WITNESS, SWORN
6                     DIRECT EXAMINATION
7    BY MS. MAC ARTHUR:
8    Q.  Would you please state your full name and spell your last
9    name for the court reporter?
10   A.  Randall Lee Dei.  Last name D-e-i.
11   Q.  How are you employed?
12   A.  I'm employed in private practice in Milwaukee, Wisconsin, as
13   well as with Columbia St. Mary's Hospital in Milwaukee,
14   Wisconsin.
15   Q.  Are you a podiatrist?
16   A.  Yes.
17   Q.  How long have you been a practicing podiatrist?
18   A.  34 years.
19   Q.  Where did you go to podiatry school?
20   A.  The William M. Scholl College of Podiatric Medicine.
21   Q.  Did you do a podiatric residency program?
22   A.  Postgraduate training was in Milwaukee, Wisconsin, at
23   St. Anthony's Hospital.
24             THE COURT:  You need to slow down.
25
```

2813

Dei - direct

```
 1    BY MS. MAC ARTHUR:
 2    Q.  How long was the podiatric residency program that you
 3    attended?
 4    A.  One year.
 5    Q.  At the time that you attended the program, was that the
 6    typical length of the program?
 7    A.  Yes.
 8    Q.  Have the lengths of the programs increased since you
 9    attended?
10    A.  Yes.
11    Q.  I'm going to ask you some questions about what is known as
12    the Podiatry Residency Resource.  Are you familiar with that
13    entity?
14    A.  Yes.
15    Q.  Is it shortened by the letters PRR?
16    A.  Correct.
17    Q.  How is it that you are familiar with the PRR?
18    A.  I've been on the board of directors of PRR for four to
19    five years.  I'm the current president of PRR.
20    Q.  What is the PRR?  Can you tell us, please, in very general
21    terms what it is?
22    A.  It's a logging system for residents to log their cases.
23    They can also develop their curriculums using that product, keep
24    track of other activities that you do during the residency
25    program.
```

2614

Dei - direct

1    Q.  Is it generally a computer-based program?

2    A.  Yes, web-based.

3    Q.  Now, I mentioned that PRR is a company.  Is it a company, a

4    corporation of some sort?

5    A.  Yes.  Combined between American Board of Foot & Ankle

6    Surgery and the American Board of Podiatric Medicine.

7    Q.  Does that mean that PRR works in conjunction within various

8    boards within the podiatry industry?

9    A.  Yes.

10   Q.  Or podiatry profession.  Excuse me.

11          How long has PRR been available to podiatry residents

12   by means of logging in their information?

13   A.  I believe 1999.

14   Q.  Now, who uses the PRR within a residency program besides the

15   students themselves?

16   A.  Well, actually, the residents, not the students.  But the

17   program director also uses it.

18   Q.  What information generally is set forth in the PRR based

19   either through the residents' input or the director's input?

20   A.  They will log their cases that they perform during their

21   residency program.  The program can also use it for keeping

22   track of didactic activities, clinical activities, and other

23   activities going through the day of their residency program.

24   Q.  Are you familiar with requirements of what is known as the

25   Council on Podiatric Medical Education for podiatry residency

2815

Dei - direct

1    programs?

2    A.  Yes.  They're documents the CPME 320.

3    Q.  CPME 320 refers to a set of the guidelines?

4    A.  Correct.

5    Q.  Does the data maintained by the PRR correspond to those

6    guidelines in terms of the requirements for a particular

7    residency program?

8    A.  Correct.

9    Q.  Who is primarily responsible for inputting the information

10   into the computer-based system under the PRR?

11   A.  The residents.

12   Q.  Do all residents attending programs throughout the United

13   States use the PRR system?

14   A.  Not all.  They're not required to use it.  They agree to use

15   it.

16   Q.  Is the PRR system essentially standardized, though, for

17   whichever program chooses to use it?

18   A.  Correct.

19   Q.  Has the information input by residents and the directors of

20   their programs been maintained by PRR since PRR began to do this

21   in approximately 2000?

22   A.  Yes.

23   Q.  Now, have the types and lengths of residency programs

24   changed since 2000 since PRR has been up and running?

25   A.  Yes.

Dei - direct

1   Q.  Can the information that is input into the PRR be sorted

2   into different types of categories?

3   A.  Yes.

4   Q.  Is one way that the information can be sorted under the name

5   of the resident himself or herself?

6   A.  Correct.

7   Q.  Is another way the type of program, one of the earlier ones

8   or one of the current ones, under the system?

9   A.  Yes.  They've gone through a significant change based on the

10   type of program, the length of the program.

11   Q.  Is another way that the information input into the PRR can

12   be sorted is by the attending physician who may have worked with

13   a resident during the residency program?

14   A.  Yes.

15   Q.  Did PRR to your knowledge receive a request to provide

16   information in connection with this case?

17   A.  Yes.

18   Q.  Are you familiar with that request?

19   A.  Yes.

20   Q.  Did PRR compile information after receiving the request in

21   the form of two separate spreadsheets?

22   A.  Yes.

23   Q.  Were those spreadsheets placed onto a computer disk and

24   turned over to the government as a part of the case?

25   A.  Yes.

2817

Dei - direct

1    Q.  I'm handing you what has been marked as Government's Exhibit
2    Disk Number 5.  Have you had an opportunity to review the
3    contents of Disk Number 5 before your testimony today?
4    A.  Yes.
5    Q.  What is your understanding as to what Disk Number 5
6    contains?
7    A.  It contains two spreadsheets with the activities that were
8    available on the computer relating to the residency program.
9    Q.  Have you had an opportunity to review the two spreadsheets?
10   A.  Yes.
11   Q.  Does the disk containing those spreadsheets to your
12   knowledge contain the information maintained by PRR about the
13   residents in the Sacred Heart podiatry residency program between
14   approximately 2004 and 2013?
15   A.  Yes.
16   Q.  To your knowledge, was the information contained on that
17   disk transmitted by the participants in the Sacred Heart program
18   between 2004 and 2013?
19   A.  Would you state that again?
20   Q.  Sure.  Was the information that the disk contains to your
21   knowledge transmitted during the course of those residents and
22   their directors between 2004 and 2013?
23   A.  Yes.
24   Q.  And was the information transmitted during that time frame
25   maintained by PRR as a part of its regular business activities?

2918

Dei - direct

1    A.  Yes.

2    Q.  Now, how is the information on the first of the two

3    spreadsheets divided?

4    A.  I don't remember the specifics of it, but it was mostly

5    based on the residents' activities that they performed during

6    that time period.

7    Q.  Is there a tab or a category known as registrant log?

8    A.  Yes.

9    Q.  What is a registrant log?

10   A.  That really is not registrant log.  It's the residents and

11   has their information about where they were and what they

12   logged.

13   Q.  Is there also a category known as institutions?

14   A.  Yes.

15   Q.  What does that mean?

16   A.  That would be all the institutions that the residency

17   program had affiliation agreements with or that the residents

18   had performed procedures at.

19   Q.  Is there also a category known as attendings?

20   A.  Yes.

21   Q.  And what is contained in the attendings categories?

22   A.  That would be all the attendings that the residents may have

23   worked with during that time period.

24   Q.  Is the information on the second spreadsheet also divided

25   into certain categories?

Dei - direct

1    A.  Yes.

2    Q.  Do those categories represent the types of podiatry

3    residency programs in existence from 2004 to 2013?

4    A.  Yes.

5    Q.  Is one of the designations on that second spreadsheet what

6    is listed as PSR-12?

7    A.  Yes.

8    Q.  What is PSR-12?

9    A.  That's a podiatric surgical residency 12 months in length.

10   Q.  What does PSR-24 mean?

11   A.  That's podiatric surgical residency 24 months.

12   Q.  What about PPM -- I'm sorry.  PPMR.

13   A.  That is podiatric primary medicine residency program.

14   Q.  PM&S-36?

15   A.  That's podiatric medical and surgical residency program 36

16   months in length.

17   Q.  And lastly PMSR.

18   A.  That is our new way we describe our residency programs, and

19   that's podiatric medical surgical residence programs.

20   Q.  Now, do essentially all of those categories reflect a shift

21   from a 12-month podiatry program to the more current forms in

22   existence?

23   A.  Correct.

24   Q.  Is the information contained in the two spreadsheets on the

25   disk sortable into different sequencing of information?

Dei - direct

1    A.  Yes.

2    Q.  If that type of sorting occurs, does that change the

3    substance of the information itself in any way?

4    A.  As long as the categories on top are used properly on the

5    tabs.

6    Q.  Said another way, does sorting that may be done based on the

7    spreadsheets change only the order or the amount of information

8    that may be presented?

9    A.  Correct.

10         MS. MAC ARTHUR:  May I have just a moment, your Honor?

11         THE COURT:  Sure.

12    (Brief pause.)

13         MS. MAC ARTHUR:  Your Honor, a couple of loose ends, if

14    I may, please.

15         THE COURT:  Sure.

16         MS. MAC ARTHUR:  Your Honor, the government moves to

17    admit Disk Number 5 into evidence.

18         MR. COLLINS:  No objection.

19         THE COURT:  Disk 5 is admitted without objection.

20    BY MS. MAC ARTHUR:

21    Q.  And, Dr. Dei, I have just a few more questions of you.

22         Under the PRR system, I think you mentioned that the

23    director of the program can input certain information; is that

24    correct?

25    A.  Correct.

Dei - direct

1   Q.  Does the director of the program or one of his assistants

2   input information about the attendings that are associated with

3   a particular program?

4   A.  Yes, and/or an administrator that has the rights to do that.

5   Q.  Does that information once input appear in the system, the

6   PRR system, in the form of a drop down box?

7   A.  Currently it does, yes.  I'm not sure if it did in previous

8   versions.

9   Q.  Are residents participating in a program then once they log

10  on able to use that drop down box to choose the name of an

11  attending with whom they may have performed a particular

12  procedure?

13  A.  Yes.

14          MS. MAC ARTHUR:  I have nothing further.

15          I'm sorry.  Excuse me just one moment, please.

16      (Brief pause.)

17          MS. MAC ARTHUR:  I apologize, Judge.

18  BY MS. MAC ARTHUR:

19  Q.  Dr. Dei, I have the same questions concerning the locations

20  where a resident may perform certain procedures.  To your

21  knowledge, does the director also have the ability, either

22  himself or herself or through an assistant, to input information

23  about various locations where those procedures may be performed?

24  A.  Yes.

25  Q.  And does that information then ultimately result in another

Dei - direct

1   drop down box available to residents by way of choosing the

2   location where the procedure was done?

3   A.  Yes, currently that's the way it functions.

4          MS. MAC ARTHUR:  Nothing further, your Honor.  Thank

5   you.

6          THE COURT:  Mr. Collins.

7          MR. COLLINS:  Could I have a moment, Judge?

8          THE COURT:  Yes.

9      (Brief pause.)

10                    CROSS EXAMINATION

11  BY MR. COLLINS:

12  Q.  Sorry, Doctor.  Good morning.

13  A.  Good morning.

14  Q.  My name is Dan Collins, and I represent Ed Novak.  Just a

15  few questions.

16          You mentioned in your background discussion that you

17  are the director of a program at a particular hospital?

18  A.  Yes.

19  Q.  Okay.  And which hospital is that?

20  A.  Columbia St. Mary's Hospital in Milwaukee, Wisconsin.

21  Q.  Okay.  And that is a -- I'm sorry.  Could you say that a

22  little slower?

23  A.  Columbia St. Mary's Hospital in Milwaukee, Wisconsin.  It's

24  part of Ascension Health.

25  Q.  Got it.  That's a for-profit hospital, right?

Dei - cross

1    A.  I don't know that.

2    Q.  Okay.  Well, if it was, you know, there's nothing wrong with

3    a for-profit hospital, correct?

4    A.  Correct.

5    Q.  There's some that are not-for-profit.  There's some that are

6    for profit.  Right?

7    A.  Yes.

8    Q.  And as the director of the podiatry residency program at --

9    Columbia St. Mary's?

10   A.  Correct.

11   Q.  You receive compensation, correct?

12   A.  Yes.

13   Q.  And there's nothing wrong with you receiving compensation as

14   director of the program, is there?

15   A.  No.

16   Q.  Okay.  Now, one of the things that you were just asked about

17   the PRR is location.  It's fine for a resident to meet his or

18   her requirements by performing encounters or procedures at a

19   location other than the hospital that sponsors the residency

20   program, correct?

21   A.  Yes, as long as they have affiliation agreements with those

22   facilities.

23   Q.  So, you know, if you are a resident at Columbia St. Mary's,

24   you can meet the requirements imposed by CPME by going to a

25   clinic a couple miles down the block from the hospital, as long

4624

Dei - cross

1    as there's an affiliation agreement?

2    A.  Correct.

3    Q.  And that experience can be good for a resident because they

4    see patients in an office setting, correct?

5    A.  Correct.

6    Q.  And that's one of the things that is required by the CPME

7    320.  Office encounters.

8    A.  Yes, correct.

9            MR. COLLINS:  Your Honor, may I approach real quick?

10           THE COURT:  Yes.

11   BY MR. COLLINS:

12   Q.  I want to show you a couple documents that already were

13   identified as Defendants' Exhibits A01 and A02.  Would you take

14   a minute and leaf through them?

15   A.  Do you know what the dates of these documents are?

16   Q.  If you look on the back page, back lower.  Here.  I can show

17   you.

18   A.  Yes, I am familiar with these documents.

19   Q.  Pardon?

20   A.  I am familiar with these documents.

21   Q.  Okay.  And so -- and Defendants' Exhibit A02 is the CPME 320

22   for July -- or issued in July 2013?

23   A.  Yes.

24   Q.  And Defense Exhibit A01 is the CPME 320 issued in July 2007?

25   A.  Yes.

                              Dei - cross

1     Q.  And as you mentioned I think on direct examination, the CPME

2     320 essentially lays out the requirements for a residency

3     program?

4     A.  Correct.

5     Q.  As well as -- I'm sorry.  As well as the specific

6     requirements for the sponsor of the program?

7     A.  Yes.

8     Q.  Which would be the hospital?

9     A.  Yes.

10    Q.  As well as the residents who are participating in the

11    program itself, correct?

12    A.  Yes.

13    Q.  And it's fair to say that the requirements are fairly

14    detailed?

15    A.  Yes.

16          MR. COLLINS:  Your Honor, may I have a moment?

17          THE COURT:  Yes.

18       (Brief pause.)

19    BY MR. COLLINS:

20    Q.  Just one last question.  PRR itself, that's a for-profit

21    corporation, right?

22    A.  Yes, it is.

23    Q.  Okay.  Nothing wrong with that?

24    A.  No.

25          MR. COLLINS:  No further questions.  Thank you.

Dei - cross

```
 1              THE COURT:  Mr. Campbell.
 2   BY MR. CAMPBELL:
 3   Q.  Good morning, Doctor.
 4   A.  Good morning.
 5              MR. COLLINS:  Judge, I'm sorry.  I moved these in
 6   evidence, correct?
 7              THE COURT:  No.
 8              MR. COLLINS:  Okay.  I forgot to do that.  My
 9   apologies.
10              THE COURT:  I don't think you did.
11              MR. COLLINS:  I forgot to do that.  Can I move into
12   evidence Defense Exhibit A1 and A2.
13              MS. MAC ARTHUR:  Your Honor, I only object to it being
14   beyond -- I object to it being beyond the scope.
15              THE COURT:  Okay.  The objection's overruled.  They're
16   admitted.  A1 and A2, you said?
17              MR. COLLINS:  Yes, sir.
18              THE COURT:  Okay.
19   BY MR. CAMPBELL:
20   Q.  Good morning again, Doctor.
21   A.  Good morning.
22   Q.  You said that a podiatric resident can -- well, let me back
23   up a second.
24              During the residency program, the resident has to
25   complete a whole bunch of patient encounters in order to satisfy
```

Dei - cross

1    the requirements under the CPME, correct?

2    A.  Yes.  There's stated requirements of activity.

3    Q.  Okay.  And so, those would include patient encounters in an

4    office or clinical setting?

5    A.  Yes.

6    Q.  And those would include also surgeries, right?

7    A.  Correct.

8    Q.  In fact, they have to participate or assist in a whole bunch

9    of surgical procedures in order to satisfy the requirements of

10   any state board, correct?

11   A.  Can you restate that again?

12   Q.  Sure.  In order to satisfy their requirements during their

13   residency, podiatric residents have to participate in, assist a

14   podiatrist, in a whole bunch of surgical procedures, right?

15   That's required?

16   A.  Not specifically.  They could assist other physicians

17   besides podiatrists.  And it's not a state requirement.  It's a

18   requirement of the residency program.

19   Q.  Okay.  Whether it's a podiatrist they're assisting or a

20   different type of doctor, they have to participate and assist in

21   surgical procedures?

22   A.  Correct.

23   Q.  Okay.  And that's one of the things that the PRR, your

24   company, tracks, right?

25   A.  Correct.

Dei - cross

1    Q.   The PRR you said -- well, you said that it's fine to have a
2    resident satisfy some of either their clinical patient
3    encounters or their surgical requirements at locations other
4    than the hospital at which the residency program is based,
5    right?
6    A.   Correct.
7    Q.   And you said so long as they have an affiliation agreement
8    with that other location, correct?
9    A.   Correct.
10   Q.   And that could be a doctor's office, right?
11   A.   Correct.
12   Q.   It could be a surgical center?
13   A.   Correct.
14   Q.   It could be an outpatient clinic?
15   A.   Yes.
16   Q.   It could be another hospital, right?
17   A.   Yes.
18   Q.   All of those are perfectly acceptable, right?
19   A.   Yes.
20   Q.   And not every single location at which a podiatric resident
21   can accomplish their requirements is listed in the PRR database,
22   right?
23   A.   Restate, please.
24   Q.   Sure.  So, let's assume Hospital A has a podiatric residency
25   program.  Okay?

Dei - cross

1    A.   Um-hm.

2    Q.   And they have an affiliation agreement with Doctor M, okay,

3    who has an office a mile or so away from the hospital.  Okay?

4    Not every single doctor's office is on the PRR database, right?

5    A.   It should be, if they have an affiliation agreement with it

6    and it's been properly logged.

7    Q.   And you know that there are occasions where not every

8    affiliation agreement gets reported up to PRR timely, right?

9    A.   I'm not aware of that.

10   Q.   You're not aware of that?

11   A.   No.

12   Q.   Okay.  In this PRR database, there are a whole bunch of

13   fields, right?

14   A.   Yes.

15   Q.   In the spreadsheet.  One of the fields is the date on which

16   the case or the procedure occurred, correct?

17   A.   Correct.

18   Q.   And that's something that's filled in, right?

19   A.   Yes.

20   Q.   And then there's a date also in that database of the date

21   that that entry, that record, was created, right?

22   A.   Correct.

23   Q.   Okay.  And do you know how many fields there are in this

24   database?

25   A.   I do not know.

4830

Dei - cross

```
 1    Q.  Okay.  A bunch, right?

 2    A.  There are many, yes.

 3    Q.  And so, you can sort that data in a whole bunch of different

 4    ways to find the information you're looking for about a

 5    particular resident, right?

 6    A.  Correct.

 7    Q.  Or about a particular supervising or attending physician?

 8    A.  Correct.

 9    Q.  Or about the location at which the patient encounter or the

10    surgery occurred, right?

11    A.  Correct.

12    Q.  You could also find out information about the date that

13    record was created, right?

14    A.  I believe so, yes.

15    Q.  When the resident put in the information.  Yes?

16    A.  Yes.

17    Q.  Okay.

18            MR. CAMPBELL:  Nothing further, Judge.

19            THE COURT:  Mr. Clarke.

20            MR. CLARKE:  No.  No questions.

21            THE COURT:  Redirect.

22            MS. MAC ARTHUR:  No further questions, Judge.

23            THE COURT:  The witness is excused.

24        (Witness excused.)

25            THE COURT:  Please call the next witness.
```

Kumar - direct

```
1                 MS. GREENING:  The government calls Avi Kumar.
2            (Brief pause.)
3                 THE COURT:  Please raise your right hand.
4            (Witness duly sworn.)
5                 THE COURT:  Please have a seat.
6                 AVIJIT KUMAR, GOVERNMENT'S WITNESS, SWORN
7                          DIRECT EXAMINATION
8        BY MS. GREENING:
9        Q.  Good morning.
10       A.  Good morning.
11       Q.  Please state and spell your name for the record.
12       A.  My name is Avijit Kumar.  A-v-i-j-i-t.  Last name is Kumar,
13       K-u-m-a-r.
14       Q.  In what city do you live?
15       A.  Elmhurst, Illinois.
16       Q.  Are you currently employed?
17       A.  Yes.
18       Q.  How are you employed?
19       A.  I'm an independent contractor.
20       Q.  Do you work for any particular company?
21       A.  I do.
22       Q.  What company is that?
23       A.  Footcare at Home.
24       Q.  And what do you do for Footcare at Home?
25       A.  I'm a podiatrist.
```

Kumar - direct

1    Q.  Please describe your educational background.

2    A.  I went to Roosevelt University, where I got a Bachelor's of

3    Science.  Then I went to New York College of Podiatric Medicine,

4    where I got a doctor of podiatric medicine degree.

5    Q.  Did you ever do a residency program?

6    A.  I did.

7    Q.  Where did you do your residency program?

8    A.  At Sacred Heart Hospital.

9    Q.  How did you hear about the residency program at Sacred Heart

10   Hospital?

11   A.  During my time at New York College of Podiatric Medicine, we

12   were afforded a chance to do externships, and Sacred Heart was

13   one of the options to do an externship there.

14   Q.  Did you do an externship at Sacred Heart Hospital?

15   A.  I did.

16   Q.  When was that?

17   A.  In 2009.

18   Q.  What kind of externship was it?

19   A.  A podiatric externship.

20   Q.  Who was in charge of the externship program at Sacred Heart?

21   A.  Dr. Finkelstein.

22   Q.  What kind of work did you do during your externship?

23   A.  I saw patients at the Sacred Heart Clinic with residents, as

24   well as observed surgeries with the residents at Sacred Heart

25   Hospital.

Kumar - direct

1    Q.  And was this the Sacred Heart podiatry clinic?

2    A.  Yes.

3    Q.  How long was your externship program?

4    A.  One month.

5    Q.  Did you during your time in podiatry school research other

6    residency programs?

7    A.  I did.

8    Q.  Did you interview for various residency programs?

9    A.  I did.

10   Q.  When was that?

11   A.  In 2010.

12   Q.  Where did the interviews take place?

13   A.  In Texas.

14   Q.  Did you interview with representatives of Sacred Heart

15   Hospital during those interviews in 2010?

16   A.  I did.

17   Q.  Who did you interview with?

18   A.  Dr. Noorlag and Dr. Petenzi.

19   Q.  Was anyone else from Sacred Heart present at that interview?

20   A.  No.

21   Q.  Did you also interview with representatives of other

22   hospitals on the same trip?

23   A.  Yes.

24   Q.  Were you matched with a hospital?

25   A.  Yes.

Kumar - direct

```
 1    Q.  Which hospital?

 2    A.  Sacred Heart.

 3    Q.  Did you begin your residency program at Sacred Heart?

 4    A.  I did.

 5    Q.  When was that?

 6    A.  In June of 2010.

 7    Q.  When did you leave the residency program at Sacred Heart?

 8    A.  In June of 2013.

 9    Q.  Did you complete your residency at the hospital?

10    A.  Yes.

11    Q.  Did you receive a salary?

12    A.  I did.

13    Q.  How much per year?

14    A.  In my first year it was 30,000, in my second year it was 32,

15    and my third year it was 34,000.

16    Q.  When you first learned of the Sacred Heart podiatric

17    residency program, who did you understand was the director in

18    charge of the program?

19    A.  Dr. Noorlag.

20    Q.  And did that at some point change?

21    A.  Yes.

22    Q.  When did that change, approximately?

23    A.  My first year.

24    Q.  Who was the new director?

25    A.  Dr. Jacobsen.
```

Kumar - direct

```
 1    Q.  Who was the other first year resident that you started with
 2    in 2010?
 3    A.  Jeremy Schwartz.
 4    Q.  What were your main responsibilities as a first year
 5    resident at Sacred Heart?
 6    A.  My main responsibility was seeing patients at the Sacred
 7    Heart Clinic, and if there was time, then I would do some
 8    surgeries at the hospital, but mainly seeing patients in the
 9    Sacred Heart Clinic.
10    Q.  Did second and third year residents also see patients in the
11    Sacred Heart Clinic?
12    A.  Not really.
13    Q.  How many days per week did you work in the clinic?
14    A.  Five days.
15    Q.  Did anyone supervise your work?
16    A.  Yes.
17    Q.  Was there a general schedule of attending physicians who
18    supervised your work?
19    A.  Yes.
20    Q.  What was that schedule?
21    A.  On Mondays it was Dr. Sarros.  On Tuesdays it was Dr. Glick.
22    On Wednesdays it was Dr. Petenzi.  On Thursdays it was
23    Dr. Jacobsen.  And on Friday it was Dr. Finkelstein.
24    Q.  And this would have been from June/July of 2010 through
25    June/July of 2011?
```

Kumar - direct

```
 1   A.  Correct.

 2   Q.  What kind of work did you do in the podiatry clinic?

 3   A.  I saw podiatric patients.  It would include things like

 4   seeing patients for diabetic foot care, seeing patients with

 5   ulcers, seeing patients for surgical consults.

 6   Q.  You mentioned that you also observed or participated in

 7   surgical procedures during your first year when you were done

 8   with your clinic responsibilities?

 9   A.  Correct.

10   Q.  Where did those procedures take place?

11   A.  At Sacred Heart Hospital.

12   Q.  Are you familiar with the May Medical Center?

13   A.  Yes.

14   Q.  How are you familiar with the May Medical Center?

15   A.  I would go there on Wednesday with Dr. Finkelstein my first

16   year.

17   Q.  Generally speaking, which of the podiatry residents at

18   Sacred Heart went to the May Medical Center?

19   A.  The first years.

20   Q.  And how many times would you go?

21   A.  I myself probably went two Wednesdays a month.

22   Q.  How many hours per visit were you at the May Medical Center?

23   A.  Two to three hours.

24   Q.  How many patients did you and Dr. Finkelstein see each time

25   you went to the May Medical Center on average?
```

Kumar - direct

1   A.  I would say between two and four.

2   Q.  Were there times you didn't see any patients at the May

3   Medical Center during a visit?

4   A.  Yes.

5   Q.  And what generally did you do for the patients at the May

6   Medical Center?

7   A.  It mostly involved diabetic foot care.

8   Q.  Did the May Medical Center provide in any way a different

9   substantive clinical experience than the experience you got

10   every day in the Sacred Heart podiatry clinic?

11   A.  It was more basic care, I would say.

12   Q.  Turning to your second year of residency at Sacred Heart,

13   how did your responsibilities change?

14   A.  It was more focused towards podiatric surgery.

15   Q.  Are you familiar with the term chief resident?

16   A.  Yes.

17   Q.  What is a chief resident?

18   A.  A chief resident is responsible for scheduling where each of

19   the other residents will be for the day, as well as delegating

20   between the residents and the administration of the program.

21   Q.  Was there a chief resident at Sacred Heart during your third

22   year of residency?

23   A.  There was.

24   Q.  Who was that?

25   A.  It was me.

Kumar - direct

1    Q.  What were your responsibilities as chief resident?

2    A.  I would have to make the schedule for the day, as well as

3    really any issues between residents and attendings, as well as

4    between attendings and residents.

5    Q.  Did you have increased interaction with administrators in

6    the podiatric residency program when you became chief resident?

7    A.  Yes.

8    Q.  What kind of increased interaction?

9    A.  Again, it would be any kind of issues between residents and

10   attendings or between attendings and residents, and that's it.

11   Q.  Who did you have this increased interaction with?

12   A.  Mostly with Dr. Jacobsen, Dr. Finkelstein, and Dr. Petenzi.

13   Q.  Turning back to your general duties as a second and third

14   year resident at Sacred Heart, did you perform or assist in

15   surgical procedures outside of the hospital?

16   A.  I did.

17   Q.  Are there particular places that you went to the most often?

18   A.  There is.

19   Q.  What are some of those places?

20   A.  Mostly Dr. Caterino's clinic, Dr. Betman's clinic, as well

21   as Center for Surgery in Naperville and Dr. Noorlag's clinic.

22   Q.  Did you ever see patients at a clinic of a Dr. Noel Lasala

23   your residency at Sacred Heart?

24   A.  I did not.

25   Q.  How about Dr. Jacqueline Olivo?

Kumar - direct

1    A.  I did not.

2    Q.  Did you ever see patients at the Armitage Family Practice

3    Center during your residency?

4    A.  I did not.

5    Q.  How about the Chicago Hamlin Family Practice Specialists?

6    A.  I did not.

7    Q.  Dr. Kumar, did you keep track of the procedures that you

8    performed during your residency?

9    A.  Yes.

10   Q.  How did you do that?

11   A.  The council required us to keep it on this website called

12   Podiatric Residency Resource.

13   Q.  And what kind of procedures or patient encounters did you

14   log into the Podiatric Residency Resource system?

15   A.  Everything we did in residency.

16   Q.  What kind of information would you log for each procedure or

17   clinical encounter?

18   A.  The patient's age, the attending we worked with, what type

19   of procedure it was, the date the procedure was performed.

20   Q.  And also the location of where the procedure was performed?

21   A.  The location of the procedure.

22   Q.  Okay.  I'm going to hand you what has been marked

23   Government's Exhibit 4701, as well as Government's

24   Exhibit 4701A.  Starting with Exhibit 4701, do you recognize

25   this document?

Kumar - direct

1   A.  Yes.

2   Q.  What type of document is it?

3   A.  It's an e-mail.

4   Q.  Who is this e-mail from?

5   A.  It's from me.

6   Q.  Who is it to?

7   A.  To Serena Sumrell.

8   Q.  And what is the date of the e-mail?

9   A.  April 25th, 2013.

10  Q.  Are there attachments listed on this e-mail?

11  A.  Yes.

12  Q.  What are the attachments called?

13  A.  Avilogs.csv and avilogs2.csv.

14  Q.  Is this a true and accurate copy of the e-mail that you sent

15  to Ms. Sumrell on April 25th of 2013?

16  A.  Yes.

17          MS. GREENING:  The government moves to admit

18  Government's Exhibit 4701.

19          MR. ACOSTA:  No objection.

20          THE COURT:  4701 is admitted without objection.

21  BY MS. GREENING:

22  Q.  Dr. Kumar, please read the body of the e-mail.

23  A.  Hey, Serena.  Hey, here are my logs.

24  Q.  What logs are you referring to?

25  A.  These are the logs Serena requested that day of my Podiatry

Kumar - direct

1   RR cases.

2   Q.  How did you obtain the logs that you sent to Ms. Sumrell?

3   A.  I went on the website and downloaded it and put it in an

4   Excel format and e-mailed it to her.

5   Q.  Okay.  I'd now like you to look at what I had already handed

6   you, Government's Exhibit 4071A.

7   A.  Um-hm.

8   Q.  What is this document?

9   A.  It looks like a formatted version of my logs.

10  Q.  Is Government's Exhibit 4701A the same format as the

11  documents that you sent to Ms. Sumrell in April of 2013?

12  A.  No.

13  Q.  Did you review this document at the United States Attorney's

14  Office in preparation for your testimony here today?

15  A.  Yes.

16  Q.  And in your review did you compare this document to the

17  spreadsheets that you sent to Ms. Sumrell in April of 2013?

18  A.  Yes.

19  Q.  And does Government's Exhibit 4701A contain the same content

20  as those spreadsheets?

21  A.  Yes.

22          MS. GREENING:  Move to admit Government's Exhibit

23  4701A.

24          MR. ACOSTA:  No objection.

25          THE COURT:  It's admitted.

Kumar - direct

```
1    BY MS. GREENING:
2    Q.  Okay, Dr. Kumar.  Please read the columns across the top.
3    A.  Number, case date, resident, hospital, facility, attending
4    name, patient's age, that's just generic ICID, procedure one,
5    and diagnosis.
6    Q.  What is the first date of service listed on this document?
7    A.  7-8, 2010.
8    Q.  And when did you start at Sacred Heart?
9    A.  In June of 2010.
10   Q.  Turning to the last page, what is the last date of service
11   on this document?
12   A.  12-21, 2012.
13   Q.  Did you perform procedures in your last year of residency
14   between July of 2012 and July of 2013?
15   A.  I did.
16   Q.  Do you know why the logs that you sent to Ms. Sumrell
17   stopped in July of 2012?
18   A.  I do.
19   Q.  Why is that?
20   A.  At that time Podiatry Residency Resource and the Council of
21   Podiatric Medical Education decided to change a couple podiatric
22   requirements for the other residents, and they changed their
23   website.  So, the new logs were logged into a different website.
24   And when I went ahead and downloaded what Ms. Sumrell required
25   to send to her, I went on the website to download it, and I sent
```

Kumar - direct

1    her one copy from the old website, which was the logs up to

2    2012.  That was the, you know, document marked avi.csv.  Then I

3    was supposed to go on the new website to send her the new copy

4    marked avi csv2, but I must have download the same copy twice

5    and sent it to her accidentally.  So, that's what happened.

6    Q.  Does this log reflect the procedures and clinical

7    evaluations of patients that you completed during your first two

8    years at Sacred Heart?

9    A.  It does.

10   Q.  Who are some of the attendings that are listed the most

11   regularly on this log?

12   A.  Dr. Petenzi, Dr. Glick, Dr. Jacobsen, Dr. Sarros, and

13   Dr. Finkelstein.

14   Q.  Dr. Kumar, are you familiar with a Dr. Shanin Moshiri?

15   A.  I am.

16   Q.  Going back to your interview in Texas in 2010, was

17   Dr. Moshiri present?

18   A.  No.

19   Q.  Was his name raised as an administrator of the Sacred Heart

20   podiatric residency program?

21   A.  No.

22   Q.  And during your first year of residency at Sacred Heart, did

23   Dr. Moshiri supervise you or other first year residents that you

24   knew of in the clinic?

25   A.  No.

Kumar - direct

```
 1    Q.  Did you ever observe him working in the clinic?
 2    A.  No.
 3    Q.  Was there a journal club in the Sacred Heart podiatric
 4    residency program?
 5    A.  Yes.
 6    Q.  Who ran those meetings?
 7    A.  Dr. Petenzi.
 8    Q.  Did Dr. Moshiri ever host a journal club?
 9    A.  Yes.
10    Q.  How many did Dr. Moshiri host?
11    A.  Two.
12    Q.  Two during your three years at Sacred Heart?
13    A.  Correct.
14    Q.  When were those two journal clubs?
15    A.  In the summer of 2010 and 2011.  I'm sorry.  No.  Yes.  In
16    the summer of 2010 and 2011.
17    Q.  Where did those journal clubs take place?
18    A.  On his boat.
19    Q.  Both of them?
20    A.  Yes.
21    Q.  Were those journal clubs hosted on Dr. Moshiri's boat in any
22    way different from all the rest of the journal clubs that you
23    attended?
24    A.  They were -- usually at journal club we go over the journal
25    articles, and Dr. Petenzi discusses them, and the residents
```

Kumar - direct

1    discuss them, and there's a lot of, you know, questions raised
2    at the journal club.  The residents just went over the journal
3    articles, and that was the end of journal club.
4              THE COURT:  Changing topics?
5              MS. GREENING:  Yes, your Honor.
6              THE COURT:  We're going to stop for lunch here.  We'll
7    resume at 1:00 o'clock.
8         (The following proceedings were had in open court, out of
9            the presence and hearing of the jury:)
10             THE COURT:  So, when we get back at 1:00, we'll caucus
11   over at sidebar about scheduling, not on the record.  So, we'll
12   talk about it.  See you at 1:00.
13        (Whereupon, the within trial was recessed to 1:00 o'clock
14           p.m. of the same day.)
15
16
17
18
19
20
21
22
23
24
25

1      IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2      EASTERN DIVISION

3

4  UNITED STATES OF AMERICA,         )
                                     )
5                  Plaintiff,        )   Docket No. 13 CR 312
                                     )
6            vs.                     )
                                     )
7  EDWARD J. NOVAK, et al.,          )   Chicago, Illinois
                                     )   February 26, 2015
8                  Defendants.       )   1:00 p.m.
                                     )

9

10              VOLUME 18
          TRANSCRIPT OF PROCEEDINGS
11  BEFORE THE HONORABLE MATTHEW F. KENNELLY, and a jury

12
    APPEARANCES:
13

14  For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  MR. JOEL M. HAMMERMAN
15                             MR. RYAN S. HEDGES
                               MS. KELLY GREENING
16                             MS. DIANE MAC ARTHUR
                          219 South Dearborn Street
17                        Chicago, Illinois  60604

18
    For the Defendant:    HINSHAW & CULBERTSON, LLP
19                        BY:  MR. SERGIO E. ACOSTA
                               MR. JOEL D. BERTOCCHI
20                        222 North LaSalle Street
                          Suite 300
21                        Chicago, Illinois  60601

22
                          DRINKER, BIDDLE & REATH, LLP
23                        BY:  MR. DANIEL J. COLLINS
                          191 North Wacker Drive
24                        Suite 3700
                          Chicago, Illinois  60606
25

```
 1                         MR. ROBERT G. CLARKE
                               123 West Madison
 2                           Chicago, Illinois   60603

 3
                          LAW OFFICES OF PATRICK E. BOYLE
 4                           BY:  MR. PATRICK E. BOYLE
                               155 North Michigan Avenue
 5                           Suite 562
                               Chicago, Illinois   60601
 6

 7                        COTSIRILOS, TIGHE, STREICKER, POULOS
                          & CAMPBELL, LTD.
 8                           BY:  MR. TERENCE H. CAMPBELL
                                  MR. MICHAEL P. HOHENADEL
 9                           33 North Dearborn Street
                               Suite 600
10                           Chicago, Illinois   60602

11

12

13

14

15

16

17

18

19

20

21

22

23
                   LAURA M. BRENNAN - Official Court Reporter
24                   219 South Dearborn Street - Room 2102
                           Chicago, Illinois   60604
25                               (312) 435-5785
```

Kumar - direct

1    (The following proceedings were had in open court out of

2    the presence and hearing of the jury:)

3         THE CLERK:  13 CR 312, USA v. Novak, et al.

4         THE COURT:  Let's get the witness back in.

5         Mr. Campbell, is today the 4:45 day?

6         MR. CAMPBELL:  Yes.

7    (The following proceedings were had in the presence and

8    hearing of the jury:)

9         THE COURT:  Okay, everyone can have a seat.

10        We have some extra books over here at this point.  So

11   that's what's sitting on this thing.

12        All right.  Do you understand, sir, that you're still

13   under oath?

14        THE WITNESS:  Okay.

15        THE COURT:  All right.  Ms. Greening, you can go

16   ahead.

17        MS. GREENING:  Thank you.

18     AVIJIT KUMAR, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19                   DIRECT EXAMINATION

20   BY MS. GREENING:

21   Q   Doctor Kumar, before we broke, we were talking about

22   journal club.

23        Do you remember those questions?

24   A   I do.

25   Q   And I had asked you specifically about the two journal

Kumar - direct

1  clubs that you said took place on Dr. Moshiri's boat?

2  A   Yes.

3  Q   In July of 2010 and July of 2011?

4  A   Correct.

5  Q   How were those two journal clubs different from other

6  journal clubs that you attended?

7  A   Okay.  The journal clubs were different because usually

8  when we met for journal club, it was a lengthy discussion.

9  The residents would go over the journal articles that were

10 assigned to them, and then Dr. Petenzi would have questions.

11 She would ask us about those.  The residents would have

12 questions that they would ask each other about the journal

13 articles.

14         At the journal club, the journal clubs were discussed

15 and we just went over our journal articles, and that was the

16 end of journal club.  There was no questions that were asked,

17 and then we just --

18 Q   What did you do for the rest of the time on the boat?

19 A   We just hung out.

20 Q   Did Dr. Moshiri give any lectures to podiatric residents

21 while you were at Sacred Heart?

22 A   No.

23 Q   Let's turn back to Government Exhibit 4701A.  Do you still

24 have that in front of you?

25 A   Yes.

1   Q   Did you perform any procedures or clinical evaluations or

2   patient encounters with Dr. Moshiri during your time at Sacred

3   Heart?

4   A   Yes.

5   Q   Let's run through them quickly.  On page 4 --

6   A   Okay.

7   Q   -- entry 2/29.

8   A   Okay.

9   Q   What is the date of that procedure?

10  A   12/27/2010.

11  Q   Does that list Dr. Moshiri as the attending?

12  A   It does.

13  Q   And page 7, entry 403?

14  A   Yes.  That is on 5/9/2011.

15  Q   And does that list Dr. Moshiri?

16  A   It does.

17  Q   How about entry 405 on the same page?

18  A   That is on 5/11/2011.

19  Q   With Dr. Moshiri?

20  A   Yes.

21  Q   On page 8, entry 474, what is the date of that?

22  A   9/12/2011.

23  Q   Is that with Dr. Moshiri?

24  A   It is.

25  Q   Page 10, entries 619 and 620, are those with Dr. Moshiri?

1   A   Yes.

2   Q   And what are the dates of those?

3   A   4/13/2012.

4   Q   Both of them?

5   A   Both are, yes.

6   Q   Finally, on page 11, entry number 655, do you see that?

7   A   Yes, and that's on 5/25/2012.

8   Q   Is that with Dr. Moshiri?

9   A   Yes.

10  Q   Staying on the last page for a moment, how many entries

11  are there in your log?

12  A   There are 688.

13  Q   Of the 688 procedures or patient encounters that you had

14  at Sacred Heart that you logged on this PRR log between 2010

15  and 2012, how many were with Dr. Moshiri?

16  A   That would make seven.

17  Q   Have you reviewed the remaining entries of this log?

18  A   Yes.

19  Q   Are there procedures listed under the supervision of Dr.

20  Sarros?

21  A   Yes.

22  Q   Over 50?

23  A   Yes.

24  Q   Are there procedures listed under the supervision of Dr.

25  Petenzi?

Kumar - direct

1  A   Yes.

2  Q   Over 50?

3  A   Yes.

4  Q   Are there procedures listed under Dr. Finkelstein?

5  A   Yes.

6  Q   Again, over 50?

7  A   Yes.

8  Q   How about Dr. Jacobsen?

9  A   Yes.

10  Q   Over 50?

11  A   Yes.

12  Q   Doctor Glick?

13  A   Yes.

14  Q   Over 50?

15  A   Yes.

16  Q   Over 100?

17  A   Yes.

18  Q   This log doesn't reflect your third year of residency, but

19  how many procedures or clinical evaluations would you estimate

20  that you had with Dr. Moshiri between July 2012 and July

21  of 2013?

22  A   I would say between zero and two.

23  Q   Dr. Kumar, just a few final questions.

24      Did you participate in surgeries at Sacred Heart that

25  were not podiatric surgeries?

1    A    I did.

2    Q    By participate, I am also including surgeries that you may

3    have observed.

4    A    I did.

5    Q    What physicians did you assist or observe mainly outside

6    of podiatric procedures?

7    A    Mainly Dr. Guerrio and Dr. Stamelos.

8    Q    Did you ever perform a procedure or observe a procedure by

9    a Dr. Subir Maitra?

10   A    No.

11   Q    During your three years at Sacred Heart Hospital, were you

12   aware of a cancer screening and prevention program?

13   A    No.

14   Q    Were you aware of a palliative care education program?

15   A    No.

16   Q    Were you aware of an orthopedic education program?

17   A    No.

18          MS. GREENING:  One moment, your Honor.

19          THE COURT:  Yes.

20          MS. GREENING:  No further questions.

21          THE COURT:  Mr. Acosta.

22                    CROSS EXAMINATION

23   BY MR. ACOSTA:

24   Q    Good afternoon, Dr. Kumar.

25   A    Good afternoon.

Kumar - cross

1    Q    My same is Sergio Acosta.  I represent Ed Novak.

2              I have a few questions for you.

3              Dr. Kumar, you testified that Wednesday afternoons, a

4    first year resident would accompany Dr. Finkelstein to the May

5    Medical Clinic, right?

6    A    Yes.

7    Q    And when you were the chief resident, you were responsible

8    for preparing schedules?

9    A    Yes.

10   Q    And you would always schedule someone.  They wouldn't

11   always go, but you would always schedule someone for the May

12   Medical Clinic on Wednesdays, right?

13   A    I would not.

14   Q    You would not?

15   A    No.

16   Q    Okay.  Is it true, sir, that during the time of your

17   residency, there was a change in the CPME which added more

18   non-podiatry rotations for first and second year residents?

19   A    Correct.

20   Q    And for that reason, did residents not go to the May

21   Clinic as often as they had in the past?

22   A    Correct.

23   Q    With respect to the journal club, did other attendings

24   host the journal club?

25   A    No.

Kumar - cross

1   Q   Just Dr. Petenzi?

2   A   Correct.

3   Q   And then the two times with Dr. Moshiri, right?

4   A   Correct.

5   Q   You said that you did over 50 procedures or -- yes, I

6   believe 50 procedures with Dr. Sarros, Petenzi, Jacobson and

7   Glick, right?

8   A   Yes.

9   Q   And those were all podiatrists who had a day assigned to

10  them in the clinic at Sacred Heart Hospital, correct?

11  A   Yes.

12  Q   So they were there much more than any of the other

13  podiatrists, right?

14  A   Yes.

15  Q   Sir, do you recall that in 2012, Dr. Moshiri had surgery

16  performed on one of his hands?

17  A   I don't.

18  Q   And for this reason, it greatly reduced the number of

19  surgeries he performed.

20          Do you recall that?

21  A   No.

22  Q   You also did a lot of procedures with Dr. Betman, correct?

23  A   Yes.

24  Q   And those procedures that you did with Dr. Betman were

25  almost always at Dr. Betman's office?

Kumar - cross

1   A    Yes.

2        MR. ACOSTA:  Thank you, Judge.  If I could have a

3   second?

4        THE COURT:  Sure.

5      (Brief interruption.)

6        MR. ACOSTA:  Nothing further, Judge.

7        MR. CLARKE:  No questions, Judge.

8        THE COURT:  Mr. Campbell.

9   BY MR. CAMPBELL:

10  Q    Good afternoon, Doctor.

11  A    Good afternoon.

12  Q    My name is Terry Campbell.  I've just got a few questions

13  for you.

14       When did you start your residency program at Sacred

15  Heart?

16  A    In June of 2010.

17  Q    June of 2010, okay.

18       There is a difference between number of cases versus

19  number of procedures, right, that you keep track of as a

20  resident?

21  A    Correct.

22  Q    And so you might have one case, a case being a patient,

23  right?

24  A    Correct.

25  Q    Where you have multiple procedures; fair?

1    A    Yes.

2    Q    Okay.  And what your track on the PRR database is not

3    simply the number of cases but the number of procedures that

4    you do, right?

5    A    I don't understand that question.

6    Q    Okay.  If you had one patient and you had to do three

7    things, say you had to do a history and physical on them, you

8    had to do something because they had plantar fasciitis and

9    then you had to do a surgical procedure because they had a

10   hammer toe, that counts as three different experiences for

11   purposes of recording that in the PRR database, right?

12   A    Yes.

13   Q    Okay.  So one case might have multiple procedures, yes,

14   one patient?

15   A    Yes.

16   Q    All right.  Well, and let's take a look at Government

17   Exhibit 4701A.

18         Do you have that in front of you?

19   A    Yes.

20   Q    All right.  I will put --

21         Before I put it up there, you also record in the PRR

22   database kind of the simplest of face-to-face encounters with

23   a patient, right?

24   A    Yes.

25   Q    As well as the more complex things that you help a

1  podiatrist do?

2  A   Yes.

3  Q   And so a surgery would be a fairly complex experience with

4  a patient?

5  A   Yes.

6  Q   More so than trimming toenails or just doing a history and

7  physical?

8  A   Yes.

9  Q   Okay.  And the work that you did under Dr. Moshiri was

10 primarily assisting him in surgeries, correct?

11 A   Yes.

12 Q   Okay.  Let's take a look at a page from Government

13 Exhibit 4701A.  This is the spreadsheet that you downloaded

14 and prepared from the information on the PRR database, right?

15 A   Yes.

16 Q   Okay.  And I notice in this you went through the columns.

17         MS. GREENING:  Terry, which page?

18         MR. CAMPBELL:  It's the first page with the Moshiri,

19 so if you look for line item 229.

20         MS. GREENING:  Okay, thank you.

21 BY MR. CAMPBELL:

22 Q   The column at the top, you said -- it's the eighth column,

23 it says "procedure one", right?

24 A   Right.

25 Q   And does that --

1           Do you know from your experience with the PRR

2   database that there could be multiple procedures for a

3   particular patient?

4   A   Correct.

5   Q   Okay.  And so this just lists procedure one but not

6   necessarily all the procedures that were done with that

7   patient on that particular date?

8   A   Correct.

9   Q   Okay, and nothing wrong with that.  That information is on

10   the PRR database.  It's just not part of this document.

11   A   Correct.

12   Q   Okay.  So we could print out something that would have

13   procedure one, procedure two, procedure three, and so on if

14   there were multiple procedures?

15   A   Correct.

16   Q   Okay.  All right.  So let's go down.

17           This is the first page where you were shown that you

18   had done something with Dr. Moshiri.  Do you see that?

19   A   Um-hmm.

20   Q   Yes?

21   A   Yes.

22   Q   Okay.  Can you describe what that was?  What was the

23   procedure that was done?

24   A   With Dr. Moshiri?

25   Q   Yes, the one that is highlighted that you did with Dr.

1   Moshiri.

2   A   Yes.  That's a matricectomy, which is removal of a nail

3   for a patient.

4   Q   Then in the next column, the diagnosis, abscess right

5   hallux.  Explain what that is.

6   A   It's an infection of a nail.

7   Q   Is that something that requires a surgical procedure to

8   fix?

9   A   Yes.

10  Q   That is what you and Dr. Moshiri did, right?

11  A   Yes.

12  Q   A surgery?

13  A   Yes.

14  Q   Okay.  If you will turn to a couple pages later, same

15  spreadsheet, and we're looking at line items 403 and 405.  Are

16  you with me?

17  A   Yes.

18  Q   All right.  And, again, there's two entries for cases that

19  you did with Dr. Moshiri, correct?

20  A   Yes.

21  Q   Looking at the description, one is what we -- the same

22  description on a different patient that we just saw in the

23  previous example, right?

24  A   Um-hmm.

25  Q   Yes?

Kumar - cross

1   A    Yes.

2   Q    I'm only asking you to say that so that the court reporter

3   can hear a word.

4   A    Okay.

5   Q    That's another surgery, right?

6   A    That is a diagnosis for a surgery.

7   Q    Okay.  And then the next one, hammer toes, two and fifth

8   digit, right foot.

9            Hammer toe requires surgery to fix, yes?

10  A    Yes.

11  Q    And let's go to one more on the next page.  The next

12  example, again with Dr. Moshiri, this is line 474.  Are you

13  with me?

14  A    Okay, yes.

15  Q    And, again, that describes another surgery that is

16  necessary to treat this patient, right?

17  A    Yes.

18  Q    That's what was done with Dr. Moshiri.

19           What you described on direct was that you had seven

20  examples in this report that you printed out of cases with Dr.

21  Moshiri, right?

22  A    Yes.

23  Q    But that doesn't mean there were only seven procedures

24  with Dr. Moshiri, does it?

25  A    I did seven procedures with Dr. Moshiri.

Kumar - cross

1   Q   And when you use the word "procedures," do you mean cases
2   or do you mean procedures?  And do you understand the
3   difference or the distinction I'm drawing?
4   A   Yes, I do.
5   Q   Okay.
6   A   Cases meaning patients, procedures meaning something done
7   to the patient.
8   Q   Right.  And so what we have here is, in this spreadsheet,
9   seven cases?
10  A   Yes.
11  Q   Okay.  That's not necessarily the same number of
12  procedures because, as you testified earlier, this only
13  lists -- the only column here is procedure one, right?
14  A   Right.
15  Q   Okay.  Does it sound right that in 2011 --
16          Let me back up a step.
17  A   Um-hmm.
18  Q   You entered the data into the PRR system, correct?
19  A   Yes.
20  Q   And you were accurate and complete when you did that,
21  right?
22  A   Yes.
23  Q   And the data in the PRR database, you rely on, right?
24  A   I was what?
25  Q   You rely on it to show what you did as a resident.  It's

1  an accurate record of what you did?

2  A   Yes.

3  Q   Okay.  Does it sound right that in 2011 you did a total of

4  18 different procedures with Dr. Moshiri?

5  A   It shows seven here.  I don't recall.  I don't recall 18.

6  Q   Okay.  Do you think you did more than just seven in 2011

7  with Dr. Moshiri, procedures?

8  A   I don't know.  I would have to count them.

9  Q   You would have to look that up on the PRR database?

10  A   Yes.

11  Q   Right?

12  A   Yes.

13  Q   And that's easy for someone to do if they have access to

14  that database?

15  A   Yes.

16  Q   Does it sound right that in 2012, you did a total of ten

17  procedures with Dr. Moshiri?

18  A   I don't know.

19  Q   Okay.  That's, again, data that would be recorded in the

20  PRR database, right?

21  A   Yes.

22  Q   And over the years, 2010, 2011 and 2012, do you think that

23  you did over 30 procedures under the supervision of Dr.

24  Moshiri?

25  A   I don't know.

1   Q   That will be in the PRR database, though, right?

2   A   Yes.

3   Q   That's where we'll find the answer?

4   A   Yes.  Again, because it's been so long, I mean, I'm --

5           MR. CAMPBELL:  Nothing further, Judge.

6           MS. GREENING:  Can I have a moment, Judge?

7           THE COURT:  Sure.

8       (Brief interruption.)

9                    REDIRECT EXAMINATION

10  BY MS. GREENING:

11  Q   Dr. Kumar, just a couple questions.

12          Mr. Campbell asked you about the different cases that

13  are listed in the logs and whether it's possible that you did

14  additional procedures on individual cases that aren't listed

15  on this spreadsheet.  Do you remember those questions?

16  A   Yes.

17  Q   Is it also possible that there were additional procedures

18  for all of the other attendings that you worked with on these

19  other cases?

20  A   Yes.

21  Q   And the surgeries that Mr. Campbell went over with you for

22  Dr. Moshiri, are these surgeries that require hospitalization?

23  A   Usually not.

24          MS. GREENING:  Nothing further, your Honor.

25          THE COURT:  Is there cross to anything else?

1          MR. CAMPBELL:  No, Judge.

2          THE COURT:  Mr. Acosta.

3          MR. ACOSTA:  No.

4          THE COURT:  All right, you're excused.

5     (Witness excused.)

6          THE COURT:  Please call the next witness.

7          MR. HAMMERMAN:  Your Honor, the government calls Dr.

8  Horia Stamboliu.

9     (Brief interruption.)

10         THE COURT:  You're going to come right on up here.

11    (Brief interruption.)

12         THE COURT:  Please raise your right hand.

13    (Witness sworn.)

14         THE COURT:  Please have a seat.

15       HORIA STAMBOLIU, PLAINTIFF'S WITNESS, DULY SWORN

16                    DIRECT EXAMINATION

17 BY MR. HAMMERMAN:

18 Q    Good afternoon.

19 A    Good afternoon.

20 Q    Can you please state and spell your name for the court

21 reporter?

22 A    First name is Horia, H-o-r-i-a, and the last name is

23 Stamboliu, S-t-a-m-b-o-l-i-u.

24         THE COURT:  Hang on one second, Mr. Hammerman.  I'm

25 just going to move the microphone closer to you.

1          THE WITNESS:  That's fine.

2          THE COURT:  You don't have to lean forward.  We'll

3    just move the microphone closer.

4          THE WITNESS:  Thanks.  Thank you.

5    BY MR. HAMMERMAN:

6    Q    Are you currently employed, sir?

7    A    No.

8    Q    Have you previously been employed?

9    A    I'm sorry?

10   Q    How were you previously employed?

11   A    I was a self -- self-employed.

12   Q    In what field?

13   A    I'm trained as a doctor.  I'm a physician.

14   Q    Dr. Stamboliu, how long have you been taking off time

15   from medicine?

16   A    About two months.

17   Q    Is there a reason for that?

18         MR. CAMPBELL:  Judge, can I address something at

19   sidebar?

20         MR. HAMMERMAN:  I will withdraw the question.

21         THE COURT:  Okay.

22   BY MR. HAMMERMAN:

23   Q    Dr. Stambouli --

24   A    Do I have to answer?

25         THE COURT:  No, you're fine.

Stamboliu - direct

1      THE WITNESS:  Okay.

2      THE COURT:  He's going to ask another question.

3  BY MR. HAMMERMAN:

4  Q   Where were you educated, sir?

5  A   My initial education was in Romania where I was born.

6  Q   Did you complete medical school in Romania?

7  A   I did complete medical school in Romania.

8  Q   When did you come to the United States?

9  A   Around 1981, '82, something like that.

10 Q   Did you continue your medical training once you arrived in

11 the United States?

12 A   Yes, I did.

13 Q   Did you take medical boards here?

14 A   Medical -- I mean, qualification, examination, yes.

15 Q   When did you do that?

16 A   Oh, '83 and '84.

17 Q   Did you participate in a residency program after passing

18 your medical boards?

19 A   Yes, I did.

20 Q   Where did you do that?

21 A   It was at Edgewater Hospital.

22 Q   Were you --

23      How were you employed after your residency?

24 A   I had my -- initially I worked at Edgewater Hospital as a

25 teaching attendant, and after that, I had my private practice,

Stamboliu - direct

1    and I worked in different hospitals.

2    Q    Have you been self-employed since the time that you worked

3    for Edgewater Hospital?

4    A    Pretty much so, yes.

5    Q    Have you practiced medicine since coming to the United

6    States?

7    A    Yes, that's the only thing I do.

8    Q    Have you worked in a number of different hospitals?

9    A    Yes, I have.

10   Q    Do you have a specialty, sir?

11   A    I'm a -- I did complete my residency in internal medicine.

12   Q    Are you familiar with the hospital called Sacred Heart

13   Hospital?

14   A    Yes, I am.

15   Q    How are you familiar with Sacred Heart?

16   A    I started working there as an attending.

17   Q    When did you do that?

18   A    Around 2009.

19   Q    Around 2009.

20           Now, you said that you started working there as an

21   attending.  Did you also obtain kind of a different form of

22   employment with Sacred Heart.

23   A    I work in the -- in the outpatient clinic.

24   Q    Where was that clinic located?

25   A    North and Pulaski.

Stamboliu - direct

1    Q    Did the clinic have a name?

2    A    Golden Light.

3    Q    When did you start working in the Golden Light Clinic?

4    A    I recall sometime at the end of 2009.

5    Q    At the time that you first obtained privileges at Sacred

6    Heart, what type of medical practice did you have at that

7    time?

8    A    I worked -- I had outpatient.  I did consultant work in

9    the hospital, outpatient nursing homes.

10   Q    What hospitals were you working at prior to Sacred Heart?

11   A    I worked Martha Washington Hospital which closed, Thorek

12   Hospitals.

13   Q    Let me stop you for a second, Dr. Stamboliu.

14            Immediately preceding the time that you went to get

15   privileges at Sacred Heart, where did you have privileges at

16   that time?

17   A    Yes.  That's at St. Bernard Hospital and Loretto Hospital.

18            THE REPORTER:  I'm sorry.  What was the hospital?

19            THE WITNESS:  St. Bernard.

20   BY MR. HAMMERMAN:

21   Q    What was the other hospital, Dr. Stamboliu?

22   A    Loretto Hospital.

23   Q    Loretto?

24   A    Yes.

25   Q    You also said that you had a practice that involved

1    nursing homes.

2    A    Yes.

3    Q    What was that practice?  What does that mean?

4    A    I used to visit and care for patients in nursing homes.

5    Q    Did you have a clinic practice at the time prior to when

6    you joined Sacred Heart?

7    A    Yes, I had an outpatient clinic, yes.

8    Q    Where was that clinic?

9    A    At St. Bernard Hospital in the professional building.

10   Q    Was your clinic practice extensive at the time that you

11   joined Sacred Heart?

12   A    I wouldn't say so.

13   Q    You say yes or no?

14   A    No.

15   Q    Now, you said that you also practiced at Loretto.  Where

16   is Loretto Hospital located?

17   A    At Central and Flournoy.

18   Q    How far is that from -- approximately from Sacred Heart?

19   A    15, 20 minutes, I would guess.

20   Q    What kind of hospital is Loretto?

21   A    Loretto is a general hospital, I would call, community

22   hospital.

23   Q    Did Loretto offer psychiatric services in 2009 to 2013?

24   A    Yes, it did.

25   Q    Did it have a psychiatric ward?

1   A   Yes.

2   Q   Did it have multiple psychiatric wards?

3   A   On the two floors, yes.

4   Q   Did Sacred Heart have a psychiatric unit?

5   A   No, I'm not aware of that.

6   Q   What type of work did you perform at Loretto?

7   A   I did internal medicine on my own patients and consultant

8   as an internal medicine consultant for psychiatric patients.

9   Q   What does it mean to be a consultant for psychiatric

10  patients in internal medicine?

11  A   The patients are coming for psychiatric reasons, acute

12  psychiatric reasons, and obviously, besides their psychiatric

13  condition, they have also medical problems.

Stamboliu - direct

1  Q   And were you asked to work on those additional medical
2  problems?
3  A   Yes.  I was asked by the psychiatric attending to help
4  with the care of diabetes, high blood pressure, cholesterol
5  problems, medical problems in general.
6  Q   At the time that you joined Sacred Heart, were you looking
7  to expand your clinical practice?
8  A   Yes.
9  Q   Did you talk to anyone at Sacred Heart about working
10 within its clinics?
11 A   Yes.
12 Q   Who did you talk to?
13 A   Can you rephrase the question --
14 Q   Sure.
15 A   -- once again?
16 Q   When you first wanted to talk to somebody at Sacred Heart
17 about working in its clinics, with whom did you speak?
18 A   I was asked to work in the outpatient clinic.
19 Q   By whom?
20 A   By Mr. Nagelvoort.
21 Q   Is that Clarence Nagelvoort?
22 A   Yes, indeed.
23 Q   When did that conversation take place?
24 A   It 2009, but towards the end of 2009, September, October
25 maybe.  I'm not really sure.

1  Q   At some point did you have to interview for a position to
2  work in the clinic on North Avenue?
3  A   Yes.
4  Q   Where did you interview?
5  A   In the office at Golden Light.
6  Q   Who did you interview with?
7  A   With Ms. Noemi Velgara.
8  Q   Was anyone else there?
9  A   I'm not sure.  I'm not sure if somebody else was there.
10 Q   When you had your initial conversation with Mr. Nagelvoort
11 about working in the Golden Light Clinic, where was that?
12 A   I believe in his office.
13 Q   What was the nature of that conversation?  What did he say
14 to you?
15 A   That they need somebody to work in a outpatient clinic.
16 Q   And is it after that particular conversation that you
17 interviewed with Ms. Velgara?
18 A   Yes.  After that I was interviewed with Ms. Velgara
19 indeed.
20 Q   Were you offered a position with the Golden Light Clinics?
21 A   Yes.
22 Q   Did you begin working in those clinics?
23 A   I --
24 Q   In that clinic?
25 A   In that particular clinic, yes, I did.

1  Q   Did you work in any other clinics that were associated
2  with Sacred Heart?
3  A   Yeah.  When they needed some medical coverage, I worked in
4  other clinics too.
5  Q   Did you have a contract that governed your relationship
6  with Sacred Heart to work in its clinics?
7  A   I don't recall --
8  Q   Okay.
9  A   -- if I signed a contract or not.  I don't recall.
10 Q   How much were you paid to work in the Golden Light
11 Clinics?
12 A   70 dollars an hour.
13 Q   And what did you do when you worked in the clinics?
14 A   I used to take care of patients.
15 Q   What type of patients?
16 A   More precisely, adult patients.
17 Q   What kind of age range were they?
18 A   Middle aged, majority middle aged to I would say 75, 80.
19 Q   Okay.  What kind of insurance did these patients have?
20 A   Majority were public aid patients.
21 Q   Were some of them, particularly the older patients, also
22 insured by Medicare?
23 A   Some of -- yeah.  Very few I might say.
24 Q   Would you say that the majority of patients that you
25 treated were public aid patients?

Stamboliu - direct

1   A   Yes.

2   Q   And by public aid, do you mean Medicaid?

3   A   Medicaid, indeed.

4   Q   When those Golden Light Clinic patients you treated

5   required hospitalization, to where did you refer them for

6   hospitalization care?

7   A   To Sacred Heart.

8   Q   When you referred patients to Sacred Heart, would you

9   continue to treat those same patients within the hospital?

10  A   Yes, I was following those patients in the hospital.

11  Q   When you saw those patients in the hospital, how were you

12  paid for the care that you rendered to the patients you

13  referred to Sacred Heart?

14  A   I used to do -- submit my bills to my biller.

15  Q   What do you mean that you would submit your bills to the

16  biller?  What did you do?

17  A   On the face sheet of the patient, I indicated the day I've

18  seen the patient and the diagnosis.

19  Q   Would you give billing information to a biller?

20  A   Yes.

21  Q   Whose biller?

22  A   I'm sorry?

23  Q   Whose biller?

24  A   My biller which I have for 20 something years.

25  Q   Was your biller a Sacred Heart biller or someone you had

Stamboliu - direct

1    used on your own?

2    A    No.  That's my private biller.

3    Q    And were you reimbursed for the care that you provided to

4    the patients that you referred to Sacred Heart?

5         Let me try that again.

6         When bills were submitted to insurers for the work

7    that you performed for inpatients at Sacred Heart, did you

8    receive those payments?

9    A    Most of the time, yes.

10   Q    Were you paid for your work?

11   A    Most of the time, yes.

12   Q    Did you have any other responsibilities within Sacred

13   Heart at the time that you first gained privileges at the

14   hospital and began sending patients there?

15   A    Yes.  I was supervising the physician assistant.

16   Q    What was the name of the physician assistant?

17   A    I recall one by the name of Doug.

18   Q    Okay.

19   A    A lady by the name of Joanna.

20   Q    Did you supervise any physician assistants other than Doug

21   and Joanna?

22   A    Later on I supervised, but briefly, a lady by the name of

23   Jean.

24   Q    Did someone ask you to supervise these individuals?

25   A    Yeah.

Stamboliu - direct

1    Q   Who?

2    A   Mr. Nagelvoort.

3    Q   Were you paid anything to supervise these individuals?

4    A   No.

5    Q   How long did you supervise Doug and Joanna?

6    A   Doug left, and then Joanna I seen, and I talked to her

7    regarding the patients until 2013.

8    Q   Were you continually supervising Joanna into 2013?

9    A   Not directly supervising, but just having professional

10   relationship with her.

11   Q   The period that you were supervising, when did that end?

12   A   2010.

13   Q   What happened in 2010?  Who was supervising Joanna in

14   2010?

15   A   In 2010 she was seeing patients or following the patients

16   of another physician.

17   Q   Do you know the name of that physician?

18   A   Yeah.  Mr. -- Dr. Kuchipudi.

19   Q   Do you know Dr. Kuchipudi?

20   A   Yes, I do know.

21   Q   How do you know Dr. Kuchipudi?

22   A   I met him at -- at Loretto Hospital.

23   Q   How long had you known --

24           You say you knew him at Loretto.  Did Dr. Kuchipudi

25   have privileges at Loretto?

Stamboliu - direct

1    A    Yes, he did.

2    Q    Did you see him treat patients at Loretto?

3    A    Yes.

4    Q    Would you see him there when you treated patients at

5    Loretto?

6    A    Yes, I saw him there too.

7    Q    How long had you known Dr. Kuchipudi before you got to

8    Sacred Heart?

9    A    Three, four years, something like that.

10   Q    And during that entire period, had you known him to be a

11   doctor with privileges at Loretto?

12   A    I saw him being at the hospital, so I assumed that he has

13   privileges.  You can't work in a hospital unless you have

14   privileges.

15   Q    And we're talking about Loretto Hospital at this time?

16   A    Yes indeed, yes.

17   Q    At some point, Dr. Stamboliu, did you begin to treat

18   Dr. Kuchipudi's patients?

19   A    Yeah.  I covered for Dr. Kuchipudi, yes.

20   Q    Where?

21   A    At Sacred Heart Hospital.

22   Q    Did you cover for him at any hospital other than Sacred

23   Heart?

24   A    No.

25   Q    When did you begin covering for Dr. Kuchipudi?

Stamboliu - direct

1  A    I was asked to cover initially holidays around 2010, end
2  of 2010, beginning of 2011.
3  Q    Had you cared for Dr. Kuchipudi's patients prior to that
4  time?
5  A    No.
6  Q    Did you ever care for Dr. Kuchipudi's patients at a
7  location other than Sacred Heart?
8  A    No.
9  Q    You said that you were asked to cover for Dr. Kuchipudi's
10  patients?
11  A    Yes.
12  Q    Who asked you to do that?  Initially.  Let's start with
13  the first conversation.
14  A    Initially they tried to see if I'm available.  It was
15  Mr. Castro.
16  Q    And where did you have this conversation with Mr. Castro?
17  A    At Sacred Heart Hospital.
18  Q    And when did that conversation occur?
19  A    That I can't -- before the holidays, the winter holidays
20  of 2010.
21  Q    And what did Mr. Castro ask you in this meeting?
22  A    If I'm available or if I want to cover for Dr. Kuchipudi
23  on I think it was either Christmas and New Year's, or only New
24  Year.  I don't recall exactly, but it was the holidays.
25  Q    Did you agree in principle to this proposal?

1   A   Yes.  I did.

2   Q   Did you and Mr. Castro discuss billing for the work that

3   you would do covering for Dr. Kuchipudi's patients?

4   A   No, I didn't talk to Mr. Castro.

5   Q   After your initial conversation with Mr. Castro, did you

6   meet with any other administrator from Sacred Heart regarding

7   the issue of you treating Dr. Kuchipudi's patients within the

8   hospital?

9   A   Yes.

10  Q   Who did you meet with?

11  A   It was Mr. Nagelvoort.

12  Q   When did you meet with Mr. Nagelvoort?

13  A   Around end of 2010.

14  Q   Where did you meet with Mr. Nagelvoort?

15  A   I believe it was in his office.

16  Q   Was anyone else present?

17  A   I'm not sure if there was anybody else present.  I'm not

18  sure.

19  Q   As you sit here today, do you recall anyone else being

20  present?

21  A   At this time I can't recall anybody being present.

22  Q   What did Mr. Nagelvoort say to you in this conversation?

23  A   He said that, "You don't bill; we take care of you."

24  Q   Let's take that in part.

25          First of all, did he ask you to cover for

Stamboliu - direct

1    Dr. Kuchipudi's patients in this meeting?

2    A    He asked me just if I want to cover for Dr. Kuchipudi.

3    Q    Okay.  And did you ask him any questions about his

4    proposal in that conversation?

5         Let me ask you this, Dr. Stamboliu:  Do you remember

6    Dr. Kuchipudi being there?

7    A    No, he was not there.

8    Q    Did you ask whether Dr. Kuchipudi was aware of this

9    arrangement?

10   A    Yeah.  I asked him if -- if it's okay with everybody.  I

11   meant Dr. Kuchipudi.

12   Q    Why did you ask that?

13   A    Because Dr. Kuchipudi's quite territorial about his

14   patients.

15   Q    And did you want some verification that Dr. Kuchipudi had

16   authorized you to treat his patients?

17   A    I -- I assumed if he agrees for me to cover, that it's

18   okay with him.

19   Q    Well, did you ask Mr. Nagelvoort if Dr. Kuchipudi had

20   approved?

21   A    I asked a question, "Is it okay with everybody?"

22   Q    And how did Mr. Nagelvoort respond to that?

23   A    Yes.

24   Q    Now, did you also ask Mr. Nagelvoort how you would be paid

25   for the work that you were going to perform caring for

Stamboliu - direct

1   Dr. Kuchipudi's patients?

2   A   No, I didn't ask him that.

3   Q   Well, you said before that Mr. Nagelvoort had said it's

4   okay, we'll take care of you.

5   A   Yes.

6   Q   What was the it's -- "we'll take care of you"?  What was

7   that in reference to?

8   A   I assumed that they are going to pay me for the work I

9   will do.

10  Q   Well, who did you understand the "we" to be?

11  A   The hospital.

12  Q   Did Mr. Nagelvoort tell you how the hospital would take

13  care of you?

14  A   No.

15  Q   Did you have an understanding on how you would be taken

16  care of?

17          MR. CAMPBELL:  Objection.

18          THE WITNESS:  I'm sorry.  I'm sorry.

19          MR. HAMMERMAN:  Hold on one second.

20          MR. CAMPBELL:  Objection to foundation.  He just said

21  he didn't say anything.

22          THE COURT:  Okay.

23          THE WITNESS:  No, no.

24          THE COURT:  Why don't you start over again.

25  BY MR. HAMMERMAN:

Stamboliu - direct

1   Q   Did Mr. Nagelvoort tell you how the hospital was going to

2   take care of you?

3   A   That I have to -- to tabulate my hours and submit the

4   hours.

5   Q   Had you been tabulating -- or had you been paid previously

6   by Sacred Heart for the hours that you worked?

7   A   In the -- in the outpatient clinic.

8   Q   So the work that you had done in the Golden Light Clinics,

9   did you get checks for that?

10  A   Yes, I did.

11  Q   Were those Sacred Heart checks?

12  A   That I don't know.

13  Q   Well, who had paid you for the work you had done in the

14  clinics?

15  A   Sacred Heart, I guess.

16  Q   So you had been paid hourly to work for Sacred Heart

17  previously, right?

18  A   I don't look at the check.  My wife takes care of this.  I

19  just don't know where the checks are coming from.

20  Q   Fair enough.

21      Dr. Stamboliu, who did you understand you had worked

22  for when you were working in the Golden Light Clinics?

23  A   For Sacred Heart.

24  Q   Okay.  And had you been paid hourly for the work that you

25  had previously done for Sacred Heart in the Golden Light

Stamboliu - direct

1    Clinics?

2    A    On the check.

3    Q    Yes.  Had you been paid hourly?  Yes or no?

4    A    Yes.

5    Q    Okay.

6    A    Every two weeks.

7    Q    Now, when Mr. Nagelvoort said record the hours, what did

8    you understand that to mean?  What did you think you had to

9    do?

10   A    To -- to -- to note -- I mean to tabulate the hours I work

11   for coverage for Dr. Kuchipudi on the designated days.

12   Q    Okay.  And you also said that Mr. Nagelvoort told you not

13   to bill.

14   A    Yes.

15   Q    What does that mean?  What did you understand that to

16   mean?

17   A    That I should not bill the patients I see during the

18   coverage of Dr. Kuchipudi.

19   Q    Did you agree to this arrangement?

20   A    Yes.

21   Q    As a result of this meeting with Mr. Nagelvoort, did you

22   think you were now working for Dr. Kuchipudi?

23   A    No.

24   Q    Did you think you were going to be a Kuchipudi employee?

25   A    No.

1    Q   Did you think you were joining Dr. Kuchipudi's practice?

2    A   Not at all.

3    Q   Would you have agreed to do so?

4    A   Never.

5    Q   Why not?

6    A   Dr. Kuchipudi had some issues with previous doctors.

7    Q   In your conversation with Mr. Nagelvoort, did you make it

8 clear that you understood that you would be working for Sacred

9 Heart while taking care of Dr. Kuchipudi's patients?

10       MR. CAMPBELL:  Objection to the form, Judge.

11       THE COURT:  Put the question again, Mr. Hammerman.

12       MR. HAMMERMAN:  In this con --

13       I almost forgot my question, your Honor.

14 BY MR. HAMMERMAN:

15    Q   In your conversation with Mr. Nagelvoort, did you make it

16 clear that you considered that you would be working for Sacred

17 Heart?

18       THE COURT:  The objection is overruled.  You can

19 answer.

20 BY THE WITNESS:

21    A   I made clear to Mr. Nagelvoort that I don't want to work

22 for Dr. Kuchipudi.

23 BY MR. HAMMERMAN:

24    Q   Based on your conversation with Mr. Nagelvoort, did you

25 think that Dr. Kuchipudi was going to pay you for treating his

Stamboliu - direct

1  patients?

2  A    No.

3  Q    Did you begin seeing Dr. Kuchipudi's patients following

4  this meeting?

5  A    Yes, I did.

6  Q    How would you know when you were needed to cover for his

7  patients?

8  A    Initially I was asked to cover those particular holidays

9  which I mentioned, and then Mr. Castro called me:  Are you

10  available for subsequent, not holidays, weekends?

11  Q    And did you agree?

12  A    Yes, I did.

13       And then he asked me if I want to cover holidays.

14  Q    Okay.  Did you agree to do that?

15  A    I did agree to do that too, indeed.

16  Q    With respect to the weekends, did you begin to see

17  Dr. Kuchipudi's patients frequently?

18  A    Yes.  On a regular basis.

19  Q    How often were you working to -- how often were you

20  actually going to Sacred Heart to treat Dr. Kuchipudi's

21  patients?

22  A    For sure on weekends and when they -- they called me that

23  he's either on vacation or -- or he's not there.

24  Q    Did you effectively treat Dr. Kuchipudi's patients every

25  weekend?

Stamboliu - direct

1    A    Yeah.  I saw the patients, and I wrote the notes on

2    Dr. Kuchipudi's patients, made assessments and interacted with

3    the other doctors regarding --

4          I had delivered the care which I deliver to my

5    patients.

6    Q    So you covered on the weekends.  Did you also cover on

7    these holidays?

8    A    On holidays too.

9    Q    What was the longest period of time that you were asked to

10   cover for Dr. Kuchipudi's patients?

11   A    Seven, ten, twelve days.

12   Q    Was there a period where he was out of the office for up

13   to twelve days?

14   A    First of all, they told me that Dr. Kuchipudi would go on

15   vacation --

16   Q    Okay.

17   A    -- for a few days.  And then the date, they extended that

18   period until he came back.

19          MR. CAMPBELL:  Objection to foundation as to time.

20          THE COURT:  Ask that now.

21   BY MR. HAMMERMAN:

22   Q    Do you recall --

23          THE COURT:  What you just described, approximately

24   when that was.  When did that --

25   BY MR. HAMMERMAN:

Stamboliu - direct

1  Q   The question that the judge just asked was that period of

2  time when you ended up covering for a few weeks?

3  A   Yes.

4  Q   Okay.  Do you remember approximately when that period of

5  time was?

6  A   Hum.  Hum.

7        THE COURT:  What year?

8        THE WITNESS:  Summer of two thousand -- 2012.

9  BY MR. HAMMERMAN:

10 Q   Okay.

11 A   I'm not -- yeah.

12 Q   The period of time that you covered for Dr. Kuchipudi when

13 he was out for a few weeks?

14 A   Yes.

15 Q   Did he continue to have new patients come to the hospital

16 that you cared for during that period of time?

17 A   Yes.

18 Q   In addition, for the weekend work that you did covering

19 for Dr. Kuchipudi and the holiday work that you did covering

20 for Dr. Kuchipudi, did you do any additional work covering for

21 his patients?

22 A   Yeah.

23 Q   What did you do, Dr. Stamboliu?

24 A   I used to -- I used to cover for him nights.

25 Q   What does that mean?

Stamboliu - direct

1    A    From 7 to 7.

2    Q    What do you mean?

3    A    Or when they needed some doctor to answer for

4    Dr. Kuchipudi's patients, they called me.

5    Q    Did you have an on-call assignment to cover for

6    Dr. Kuchipudi's patients at night?

7    A    Yeah.  I was supposed to call Monday -- I mean cover -- on

8    the phone.  I didn't have to be in the hospital.  Monday,

9    Tuesday, Wednesday and Thursday.

10   Q    Okay.

11        MR. CAMPBELL:  Object to foundation as to the time.

12        THE COURT:  Just keep doing that, Mr. Hammerman.

13   BY MR. HAMMERMAN:

14   Q    Dr. Stamboliu, this period of time that you covered for

15   Dr. Kuchipudi at night, when did that begin?

16   A    That I don't recall.

17   Q    How long did it go?  Did it go up into the time that you

18   stopped working at Sacred Heart?

19        Well, did it go up to April of 2013?

20   A    That is more exact.

21   Q    And did this go on for over a year?

22   A    Yes.

23   Q    Over a year and a half?

24   A    Yes.

25   Q    This on-call assignment, was it for all of Dr. Kuchipudi's

1    patients, his nursing home patients, his clinic patients, or

2    his patients at Sacred Heart?

3    A    No.  That was -- if a patient of Dr. Kuchipudi came to

4    Sacred Heart and --

5    Q    So, let me ask it this way:  The calls, were they solely

6    from nurses or doctors at Sacred Heart?

7    A    Yes, indeed.

8    Q    It wasn't Loretto?

9    A    It was only for the patients from Sacred Heart.

10   Q    Okay.  How did you come to get this on-call assignment?

11   Did you have a conversation with anybody about it?

12   A    Well, they told me if I can answer because I was pretty

13   much every day in the hospital and --

14   Q    Well, let me ask you this:  You said they asked me if I

15   could cover.  Who's the "they" you're talking about?

16   A    Mr. Nagelvoort.

17   Q    Did Mr. Nagelvoort ask you to cover Dr. Kuchipudi's

18   nighttime telephone calls from Sacred Heart with respect to

19   Sacred Heart patients?

20   A    Yeah.  He told me to, when he doesn't -- if he doesn't

21   pick up the phone or if he's -- basically to cover for his

22   patients.

23   Q    When Mr. Nagelvoort asked you to do this, did he indicate

24   whether you would be paid for it?

25   A    Exactly I don't recall if he told me that.  I just saw one

Stamboliu - direct

1  additional hour on my paycheck.

2  Q   Well, what does that mean?  What do you mean?

3  A   Added to the hours from -- from the Golden Light Clinic.

4  One hour was added for the -- for the night calls.

5  Q   When you say an hour was added, was that an hour a day, an

6  hour a week?

7  A   It was an hour a day.

8  Q   So every --

9  A   For -- for four days.

10 Q   So for four days a week you were getting an extra hour of

11 time added to your paycheck?

12 A   Monday, Tuesday, Wednesday, Thursday -- five.

13 Q   Okay.

14 A   Five.

15 Q   For Monday through Friday was there an extra hour for each

16 one of those days added to your paycheck?

17 A   Yes.

18 Q   Was that for this on-call assignment seeing

19 Dr. Kuchipudi's patients at night?

20 A   Yes.

21 Q   Was that for the assignment that Mr. Nagelvoort asked you

22 to do?

23 A   Yes.

24 Q   Dr. Stamboliu, were you on call to cover telephone calls

25 from Sacred Heart nurses concerning any other doctors'

Stamboliu - direct

1  patients?

2  A   When I was called as a consultant.

3  Q   Let me -- this on-call assignment for which you were paid

4  70 dollars a day, were you on call to cover telephone calls

5  from Sacred Heart nurses concerning any other doctors'

6  patients?

7  A   No.

8  Q   Did Sacred Heart ask you to treat any other doctors'

9  patients on the weekends?

10  A   No.

11  Q   Your weekend coverage, your holiday coverage, your

12  nighttime call, was that all for Dr. Kuchipudi and only

13  Dr. Kuchipudi?

14  A   Yes, indeed.

15  Q   Now, at the time that you started seeing Dr. Kuchipudi's

16  patients on the weekends, would you call anybody associated

17  with Sacred Heart or Dr. Kuchipudi to find out the condition

18  of those patients before you would go in to treat them on the

19  weekends?

20  A   Yeah.  I called -- I called or even met with the physician

21  assistants to -- like a sign-out, on Fridays.

22  Q   So on Fridays you would talk to the physician assistants?

23  A   Yes.

24  Q   Who are the physician assistants you're talking about?

25  A   Jean to Joanna to, there was another lady, Jeudy or

1    Myrline.

2    Q    Myrline Jeudy?

3    A    Yeah.

4         Just asking about problems and if there is something

5    they can -- sign-off of the patient.

6    Q    So in preparation for treating Dr. Kuchipudi's patients on

7    the weekend, you would talk to the PAs.  Would you also talk

8    to Dr. Kuchipudi?

9    A    I think he -- I talked few times when he called me about

10   some patients which might need to be discharged if they are

11   stable.

12   Q    Okay.  Other than the patients that were going to be

13   discharged, did you talk to Dr. Kuchipudi about his patients'

14   condition in anticipation of treating them on the weekends?

15   A    No, I don't believe so.

16   Q    When you came to Sacred Heart to treat Dr. Kuchipudi's

17   patients on the weekends, what was your process of identifying

18   and then going to treat those patients?

19   A    I used to go to the admitting office and I got a census

20   sheet of Dr. Kuchipudi.

21   Q    What would you do next?

22   A    Then I would go and see the patients.  And as I see each

23   patient, as I've seen it, I solved the problems -- I hope I

24   solved the problems of the patient, and I just crossed out his

25   name.

1    Q    When you said you saw the patients, what would you do?

2    Literally, what was your process?

3    A    My process, I go to the nursing station.  I ask the nurses

4    about the patient's condition if they know something, which

5    I -- it's helpful for me.  And then I would go with the nurse

6    in the patient's room, talk to the patient.  If the family was

7    there, I was talking to the family.  And then examine the

8    patient, look at the labs, X-rays, whatever was available.

9    And then I used to write a note.

10   Q    Would you put those notes in the chart?

11   A    Yes.

12   Q    Did you ever then call Dr. Kuchipudi to report on the care

13   that you had provided or the condition of his patients?

14   A    No.  Only once or twice I discussed interesting or cases

15   which needed a little bit more attention, yes.

16   Q    Were those formal -- the once or twice that you did that,

17   was that a formal meeting?

18   A    Twice, I can't -- on few occasion, yes.  When there were

19   interesting patients or something, then I let him know.

20   Q    Was that a formal meeting or something that you would do

21   informally?

22   A    It was a informal meeting.

23   Q    Would you talk to the PAs, Myrline Jeudy, Joanna Szwajnos,

24   Jean Rush, those individuals, about the care that you had

25   provided over the weekend so that they could know the

Stamboliu - direct

1   patients' condition on Monday?

2   A    Yeah.  Yes, I would -- I wouldn't say consistently unless

3   they were -- but I sort of let them know about the patients'

4   condition.

5   Q    Was that your general practice?

6   A    Yeah.

7   Q    Dr. Stamboliu, did you bill for the care that you provided

8   to Dr. Kuchipudi's patients at Sacred Heart?

9   A    Never.

10  Q    Did you provide Dr. Kuchipudi face sheets so that he could

11  bill for the care that you provided his patients?

12  A    No.

13  Q    Did you provide him routing sheets that reflected the

14  level of care or service that you had provided his patients?

15  A    I don't know what you mean by "routing sheets."

16  Q    Did you give him any information so that he could bill for

17  the work that you had done?

18  A    I was supposed to, but my paperwork is lousy, so I haven't

19  given him.

20  Q    Dr. Kuchipudi, I want to -- Dr. Kuchipudi.

21       Dr. Stamboliu, I want to hand you what's been marked

22  as Government Exhibit 2520.  I want to just show it to you

23  briefly.

24       This has been admitted into evidence.

25       THE COURT:  2520?

```
 1          MR. HAMMERMAN:  Yes, your Honor.
 2    BY MR. HAMMERMAN:
 3    Q   Have you seen this document before?
 4    A   Yeah.
 5    Q   I'll give you a copy.
 6    A   Oh, okay.  Thanks.
 7    Q   Is this a document that you reviewed in anticipation of
 8    your testimony today when you came to the United States
 9    Attorney's Office?
10    A   This particular page, I don't recall if it was the
11    particular page but --
12    Q   Have you seen this form and document before?
13    A   Yes, this --
14          MR. HAMMERMAN:  Your Honor, can I publish on the
15    ELMO?
16          THE COURT:  Sure.  Yes, it's up.
17    BY MR. HAMMERMAN:
18    Q   And I'm going to just show you the first page of
19    Government Exhibit 2520.  And it's a document, first page,
20    that's entitled Sacred Heart Hospital Physician List for 12,
21    and then it's crossed off, and then 10 Monday.  Do you see
22    that?
23    A   Yes, I do.
24    Q   It's a Monday.  Do you see?
25    A   Yes.
```

Stamboliu - direct

1    Q    And you can see that on the right there's some handwritten

2    notes, 12/23, 12/24, 12/25, 12/26.

3    A    Yes.

4    Q    Do you recall actually in 2010 working and seeing

5    Dr. Kuchipudi's patients around Christmas?

6    A    That is -- so probably that's when I started.  I think so,

7    yes.

8    Q    Do you recognize this handwriting here?

9    A    Yeah.  It's Dr. Kuchipudi's handwriting.

10   Q    Do you recognize Dr. Kuchipudi's handwriting?

11   A    Yes, I do.

12   Q    How?

13   A    I've seen notes of his, and I know his handwriting, yes.

14   I have seen it many times before.

15   Q    You have to make sure you speak into the microphone,

16   doctor.

17   A    I have seen it before.

18   Q    Okay.  Dr. Stamboliu, I'm just going to turn to a few

19   random pages here.  For example, there's a page where there's

20   a physician list for 5/2/11 Monday.  Do you see that?

21   A    Yes.

22   Q    And once again, under the physician name there's the name

23   Kuchipudi.  Do you see that?

24   A    Yes, yes.

25   Q    And do you see that there's then two days, 4/30/11,

Stamboliu - direct

1   5/1/11, that are handwritten in?  Do you see that, sir?

2   A    Yes.

3   Q    And do you see that in the upper left-hand corner there's

4   a date of -- date run of 5/2/11 but the two is scratched out?

5   A    Yes.

6   Q    Did you write this information on the right of this

7   document?

8   A    No.  That is -- this is not my -- my handwriting, and I

9   have never seen this -- this particular document here.

10  Q    Did you -- and in preparation for your testimony I showed

11  you these pages -- some of these pages before, correct?

12  A    Yes.

13  Q    Okay.  All of these numbers that are reflected here, twos

14  and sometimes twos and threes and weekend dates, do you see

15  that, sir?  Did you ever --

16  A    All these weekends, you know, 3/3, 3/4, it's hard to tell.

17  I don't know.

18  Q    All those dates, did you ever tell Dr. Kuchipudi what

19  level of care you were providing to his patients?

20  A    No.

21  Q    Did you ever report back and say, Dr. Kuchipudi, I

22  performed this CPT code or that CPT code for these various

23  patients?

24  A    No.

25        My activity is reflected in the progress note.

Stamboliu - direct

1    Q    The progress note, that reflects the patient condition,
2    correct, Dr. Stamboliu?
3    A    No.
4    Q    The progress note doesn't --
5    A    No.
6    Q    -- reflect the patient's condition?
7    A    No.  The progress note reflects the patients' complaints,
8    what I find on the patients, impression and assessment.
9    Q    Okay.  Other than writing those notes in the charts, did
10   you provide any information independent of that to
11   Dr. Kuchipudi to let him know what you had done?
12   A    No.
13   Q    Did you ever talk to Dr. Kuchipudi at all about him
14   billing for your patient care?
15   A    No.
16           For my patient's care?
17   Q    For -- let me try that again.
18           Did you ever talk to Dr. Kuchipudi at all about him
19   billing for the care that you provided to his patients on the
20   weekend?
21   A    No.
22   Q    Did you ever provide Dr. Kuchipudi your MPI number so that
23   he could bill for your services?
24   A    No.
25   Q    Did anyone at Sacred Heart ever ask you for diagnoses or

1    CPT codes so that Sacred Heart could bill for the care that
2    you provided to Dr. Kuchipudi's patients?
3    A    No.
4    Q    Dr. Stamboliu, beginning in January of 2011 through April
5    of 2013, how many days a week on average were you at Sacred
6    Heart?
7    A    Well, pretty much every day except -- except vacations and
8    few family problems I have.
9    Q    What time of day would you go to the hospital?
10   A    Oh, that varied.  Either in the morning, but
11   preferentially in the afternoon, after the clinic.
12   Q    Would you on occasion see Dr. Kuchipudi at the hospital?
13   A    Yes.
14   Q    Generally what time of day would you see him there when
15   you saw him?
16   A    About one or two o'clock when I was there.
17   Q    Did you ever observe Dr. Kuchipudi making rounds on his
18   patients?
19   A    Yes.
20   Q    On those occasions that you observed him making rounds,
21   was he alone or was he with another person?
22   A    Both.  I saw him with other persons and one or twice
23   alone.
24   Q    Okay.  So once or twice you saw him alone; at other times
25   you saw him with another person?

Stamboliu - direct

1    A    With the physician assistants.

2    Q    Are we talking about Joanna Szwajnos?

3    A    Yes.

4    Q    Jean Rush, Myrline Jeudy again?

5    A    Yes.

6    Q    Other than the once or twice that you saw him rounding

7    alone, was there a mid-level practitioner with Dr. Kuchipudi?

8    A    Yes.

9    Q    During the period that Myrline Jeudy and Joanna Szwajnos

10   were working with Dr. Kuchipudi, did those mid-level

11   practitioners ever round on your patients with you?

12   A    No.

13         They rounded on my patients, but not with me.

14   Q    You say they rounded on your patients.  When did that

15   happen?

16   A    When I was out of town or on -- when I was not there

17   present.

18   Q    Did you ask somebody to round on your patients when you

19   were out of town?

20   A    Yes.

21   Q    Who did you ask to round on your patients that led to

22   Joanna Szwajnos or Myrline Jeudy rounding on your patients?

23   A    Well, at the beginning -- when I left town, I asked some

24   of my colleagues.

25   Q    Okay.

1    A    But then they couldn't do it.  And if they couldn't do it,
2    I asked Dr. Kuchipudi's service through the physician
3    assistants.
4    Q    Okay.  So on the occasions that you couldn't find somebody
5    to cover for you and you asked Dr. Kuchipudi, are those the
6    occasions that you're saying a PA rounded on your patients?
7    A    Yes.
8    Q    Other than those occasions where you asked Dr. Kuchipudi
9    for help and a PA was provided to you to round on your
10   patients, did the PAs round on your patients at Sacred Heart?
11   A    They didn't round, but I was in touch with them if I knew
12   that I have a problem patient and I couldn't get to the
13   patient right away, so I asked them please go and see the
14   patients and tell me.  Or if I didn't get enough information
15   from the nurse, then I needed this extra assurance from the
16   PA.
17   Q    Was this a regular occurrence?
18   A    When I needed it.
19   Q    How often was that, Dr. Stamboliu?
20   A    I can't tell you for sure.
21   Q    Did the PAs work with you on a regular --
22   A    No, no.
23   Q    -- consistent basis?
24   A    No.
25   Q    Who did Joanna Szwajnos work for?

Stamboliu - direct

1   A   She accompanied with doctor and worked for Dr. Kuchipudi.

2   Q   Who did Myrline Jeudy work for?

3   A   The same doctor.

4           MR. CAMPBELL:  Object to foundation.

5           THE COURT:  You're going to have to define what you

6   mean "work for."  It can mean a lot of things.

7   BY MR. HAMMERMAN:

8   Q   Who did you see Myrline Jeudy -- whose patients did you

9   see Myrline Jeudy treat on a regular basis?

10  A   Dr. Kuchipudi's patients.

11  Q   And who did you see Myrline Jeudy round with on a regular

12  basis?

13  A   Dr. Kuchipudi.

14  Q   These times that you were out of town and you asked

15  Dr. Kuchipudi to cover for you, when did that occur, and on

16  how many times did that occur?

17  A   Again, I have to refer to my wife because she's the one

18  planning vacations.  You know, my life is done by her, so --

19  Q   Unfortunately, Dr. Stamboliu, your wife isn't here, so

20  you've got to give it your best shot.

21          How many times do you recall taking vacation in 2012?

22          THE COURT:  Just give your best estimate.

23  BY THE WITNESS:

24  Q   Yeah, that's what I'm trying to --

25          Maybe four, five days maybe three times, four times a

1  year, something like that.

2  BY MR. HAMMERMAN:

3  Q   Okay.  And did Dr. Kuchipudi cover for you every one of

4  those four times in 2012?

5  A   No.  I had another doctor covering at that time too.

6  Q   Who was that other doctor?

7  A   Was Dr. -- hum.  Jaleel.

8  Q   Okay.  So, Jaleel covers at least once.  Did Kuchipudi

9  cover the other two or three times?

10  A   Dr. Jaleel asked me to cover her, so as a return I asked

11  her to cover for me too.

12  Q   Okay.  Other than the time that Dr. Jaleel covered for

13  you, did Kuchipudi cover for you the other two or three times?

14  A   Yes.

15  Q   And are those the times that his PAs would round on your

16  patients?

17  A   Yes.

18  Q   Other than that, in 2012 did the PAs round on your

19  patients?

20  A   No.

21  Q   The work that you did for Dr. Kuchipudi, do you know, or

22  did you know who was billing for it?

23  A   No.

24  Q   You said previously that you treated patients in nursing

25  homes?

1    A    Yes.

2    Q    Did you have patients in nursing homes in 2010?

3    A    Yes, I did.

4    Q    Did you have patients in nursing homes in 2011?

5    A    Yes.

6    Q    Did you on occasion if those patients needed

7    hospitalization have some of those patients come to Sacred

8    Heart?

9    A    Yes, I did.

10    Q    Did Mr. Nagelvoort ever ask you if you wanted a PA to

11    round on your patients in the nursing homes?

12    A    I can't recall if Mr. Nagelvoort asked me.

13    Q    Did anyone at Sacred Heart tell you that the PAs should

14    see your nursing home patients for continuity of care when

15    they came to the hospital?

16    A    I didn't understand the question.  Can you repeat it?

17    Q    Sure.

18         Did anyone at Sacred Heart tell you that mid-level

19    practitioners needed to see your patients or should see your

20    patients in nursing homes to aid in the continuity of care if

21    they ever were to come to Sacred Heart?

22    A    No, they didn't tell me that.

23    Q    So, Dr. Stamboliu, you said that from 2010 to April of

24    2013, other than vacations, you were at the hospital virtually

25    every day; is that right?

Stamboliu - direct

1    A    Yes.

2    Q    Are you aware of Sacred Heart having a cancer screening

3    and prevention program?

4    A    No, I am not aware.

5    Q    Are you aware of Sacred Heart having a orthopedic care

6    education program?

7    A    No, I'm not aware.

8    Q    Are you aware of Sacred Heart having a palliative care

9    program?

10   A    No.  I'm not aware but --

11   Q    Do you know of an individual by the name of Rajiv Kandala?

12   A    Yes, I know Dr. Kandala.

13   Q    Did you ever see him at Sacred Heart?

14   A    Yes, I did.

15   Q    Within the hospital?

16   A    In the hospital, in the hallways, yes.

17   Q    Okay.  Did you ever see him at Sacred Heart treating

18   patients?

19   A    I didn't see him treating patients.  I saw him in the

20   hallway.

21   Q    How many times in your tenure at Sacred Heart do you

22   recall seeing Rajiv Kandala in the hallway?

23   A    One time I saw him.

24   Q    Did you see him at other hospital functions?

25   A    Yes, I did.

Stamboliu - direct

1   Q   Where would you see him?

2   A   At the medical -- when we have our meetings, medical staff

3   meetings.

4   Q   Where are those?

5   A   At different locations, restaurants.

6   Q   They were at restaurants?

7   A   Yes.

8   Q   Were they at night?

9   A   Late afternoon.

10  Q   I'm sorry?

11  A   Late afternoon.

12  Q   Other than these restaurant meetings, did you see -- and

13  the one time you saw Dr. Kandala in the hallway, did you

14  otherwise ever see him at a Sacred Heart associated function

15  or entity?

16  A   No.  That's the only time I recall seeing him.

17  Q   Do you know Dr. Spiros Stamelos?

18  A   Yes, I know him.

19  Q   Were you aware of Dr. Stamelos ever educating patients or

20  nurses concerning orthopedic care?

21  A   No, I don't -- I'm not --

22  Q   Do you know of Dr. Stamelos holding classes in the

23  clinics?

24  A   No.  I don't know.

25  Q   Now, you said previously that based on your

Stamboliu - direct

1    conversation --

2            Well, let me try that again.

3            You stated previously that Mr. Nagelvoort told you to

4    record your hours taking care of Dr. Kuchipudi's patients; is

5    that right?

6    A   Yes, yes.

7    Q   Did you do that?

8    A   Yes, I did.

9    Q   How did you do that?

10   A   My -- when I left the hospital and when I remembered, so I

11   put it in a notebook.

12   Q   How long did you record your hours in that notebook, for

13   what period of time?

14   A   A year, a year or something.  A year I would say.

15   Q   Did you ever transfer the data that was in that notebook

16   to any other document?

17   A   Yes.

18   Q   What did you do?

19   A   Well, I put them in a -- in a spreadsheet.

20   Q   Dr. Stamboliu, I'm going to show you what's been marked as

21   Government Exhibit 6207.

22   A   Yes.

23   Q   You can just put that on the floor.

24   A   Okay.  I feel like at home here.

25           THE COURT:  The feeling will pass, I assure you.

Stamboliu - direct

1    BY MR. HAMMERMAN:

2    Q   What is Government Exhibit 6207, Dr. Stamboliu?

3    A   This is a spreadsheet which I handed -- yeah, I handed to

4    Mr. Puorro.

5    Q   Did you create that spreadsheet?

6    A   Yes, I did.

7    Q   What's reflected on that spreadsheet?

8    A   It's the day I saw the patients and the number of hours I

9    spent seeing Dr. Kuchipudi's exclusively.

10   Q   Okay.  Is that a true and accurate copy of the spreadsheet

11   you created?

12   A   Yes.

13        MR. HAMMERMAN:  The government would seek to move to

14   admit what's been marked as Government Exhibit 6207.

15        MR. CAMPBELL:  No objection.

16        THE COURT:  6207 is admitted.

17   BY MR. HAMMERMAN:

18   Q   Dr. Stamboliu, did you actually provide a copy of this

19   spreadsheet to agents and prosecutors when you met with us in

20   preparation of your testimony?

21   A   Yes.

22   Q   Is this the spreadsheet you gave us?

23   A   Yes, indeed.

24   Q   Showing you Government Exhibit 6207, you said that this

25   reflects the hours and dates?

1    A    Yes.

2    Q    I'm going to just start at the top left.  There's

3    basically two columns to this spreadsheet; is that right?

4    A    Yeah.

5    Q    What's reflected in the left-hand column?

6    A    The day, 2/5/11.

7    Q    And what's reflected in the right-hand column?

8    A    The number of hours I spent.

9    Q    Now, you'll see that your spreadsheet starts in February.

10   Do you see that?

11   A    Yes.

12   Q    Did you work in January?

13   A    Yes, I did.

14   Q    I'm going to turn you to the second page and kind of go on

15   the bottom.  Did you sort this by number so that January got

16   stuck with October, November and December?

17   A    You already notice that I'm not very familiar with Excel

18   and sorting out so --

19   Q    It's not a criticism, Dr. Stamboliu.  I just want to make

20   sure that we all understand how to read your spreadsheet.

21   A    Yes.

22   Q    Is that right?

23   A    Yes.

24   Q    Okay.  What is the total number of hours you spent in 2011

25   treating Dr. Kuchipudi's patients?

Stamboliu - direct

1   A   278.5.

2   Q   Did you ever treat your own patients at Sacred Heart on

3   the weekends?

4   A   Yes, I did.

5   Q   If you saw your own patients, did you include the time

6   that it took you to see those patients in this spreadsheet?

7   A   No, no.

8   Q   These 278.5 hours, is that the time that you spent seeing

9   Dr. Kuchipudi's patients, and only Dr. Kuchipudi's patients,

10  in 2011 at Sacred Heart?

11  A   Yes.

12  Q   There's a line here that says total 278.5 and then an

13  amount 208.  What is 208?

14  A   208, I adjusted it so, you know, if somebody says, well,

15  how come you don't go to the washroom, you don't make phone

16  calls, you don't eat?  So I fill it out.

17  Q   You decided to just shave some time off?

18  A   Exactly, so, you know --

19  Q   The actual time that it took you, though, is it that 278

20  hours?

21  A   278 hours, yes.

22           I went to the washroom, though, in between and talked

23  and --

24  Q   Noted.

25           Those 278 hours seeing patients, did you ever bill an

1    insurer for any of the work that you provided to those

2    patients, Dr. Stamboliu?

3    A    Never.

4    Q    Why not.

5    A    Because the understanding was very clear to not bill.

6    Q    Your understanding with who?

7    A    With Mr. Nagelvoort.

8    Q    At some point, in particular after 2011, did you change

9    the way in which you recorded the care that you provided to

10   Dr. Kuchipudi's patients?

11   A    Yes, indeed.

12   Q    What did you do?

13   A    I made it simpler.

14   Q    How did you do that?

15   A    On the census sheet I just marked down the day -- I mean

16   the time I came to the hospital and the time I left the

17   hospital.

18   Q    I'm going to show you what's been marked as Government

19   Exhibit 6206.

20   A    Yeah, this is --

21   Q    Is that what you're talking about, Dr. Stamboliu?

22   A    Yes, indeed.

23            THE COURT:  Actually, before we get into this, this

24   is about where we need to take a break, so we'll break for ten

25   minutes.

1    (The following proceedings were had in open court in the

2    presence and hearing of the jury:)

3              THE COURT:  Mr. Hammerman, go ahead.

4    BY MR. HAMMERMAN:

5    Q.  Dr. Stamboliu, I just handed you Government Exhibit 6206.

6    Do you still have that in front of you?

7    A.  Yes, I do.

8    Q.  You mentioned before that you would record -- you had a

9    simpler way to record the time that you spent seeing

10   Dr. Kuchipudi's patients and that you recorded on some of the

11   lists is I think what you said; is that right?

12   A.  Yes.

13   Q.  Is this what you were referring to?

14   A.  Yes.

15   Q.  Looking at Government Exhibit 6206, is that a document

16   that you provided to the government?

17   A.  Yes, I did.

18   Q.  Is that a document that was in your possession that you

19   gave in connection -- to the government in connection with

20   this case?

21   A.  Yes.

22   Q.  A true and accurate copy?

23   A.  Yeah, yeah.

24            MR. HAMMERMAN:  The government would seek to admit

25   what's been marked as Government Exhibit 6206.

1          MR. CAMPBELL:  No objection.

2          THE COURT:  It's admitted.

3     (Above-mentioned exhibit was received in evidence.)

4   BY MR. HAMMERMAN:

5   Q.  I will show you the first page of Government Exhibit 6206.

6   Do you see that, Dr. Stamboliu?

7   A.  Yes.

8   Q.  What's reflected on this page?  What is this?

9   A.  This is the census sheet which I referred to.

10  Q.  So you'd go to the hospital, you'd ask for the census

11  sheet?

12  A.  Yeah, which is either printed before I get to the hospital

13  or explain to them that I am asking it to be printed in front

14  of me.

15  Q.  Do you see that the names of the patients are all crossed

16  out?

17  A.  Yes.

18  Q.  Why?

19  A.  Because as I see the patient, I just crossed it out.

20  Q.  And then there's time stamps here of 12:15 p.m. to 3:30

21  p.m.  What is that?

22  A.  This is my -- 12:15 is the time I came in and I started to

23  see the patients and 3:30 is when I stopped.

24  Q.  Is this a process that you then adopted --

25  A.  Yes.

1    Q.  -- once you gave up on the notebook idea?

2    A.  Yes.  If I don't wrote it, you can tell, I crossed.  I

3    mean, I circled.

4    Q.  So here where it says 1639, is that when you started?

5    A.  Yes.

6    Q.  And 8:00 p.m., is that when you ended?

7    A.  Yes.

8    Q.  As you go through these sheets, can you see the hours that

9    you spent, like on this day starting at 2:00 p.m. and ending

10   at 8:00 p.m., and this is March 10th, 2013?

11              THE COURT:  The jury can't see the bottom of that

12   one, Mr. Hammerman.

13              MR. HAMMERMAN:  I'm sorry?

14              THE COURT:  The jury can't see the bottom of that.

15   You don't have it zoomed out enough.  You pointed to

16   8:00 p.m., but they couldn't see it.

17              Now you can see it.

18              MR. HAMMERMAN:  I apologize.

19   BY MR. HAMMERMAN:

20   Q.  Is that right?

21   A.  Yes.

22   Q.  Now, all of these sheets that we are looking at, the

23   physician that's identified in all of them is who?

24   A.  Dr. Kuchipudi.

25   Q.  Did you understand these to be all Dr. Kuchipudi patients

1    that you saw and treated?

2    A.  Yes.

3    Q.  Did you bill for caring for any of these patients?

4    A.  No.

5    Q.  Was this the new system that you adopted to more

6    adequately record your time?

7    A.  Yes.

8    Q.  It starts, as you can see here -- I will zoom in -- the

9    top page is April 14th of 2013.  Do you see that?

10   A.  Yes.

11   Q.  And the bottom page is July 27th of 2012.  Do you see

12   that?

13   A.  No, I have here 6/16.

14   Q.  I'm sorry.  You're right.

15   A.  That's my stack.

16   Q.  I apologize.

17          6/16/2012; is that right?

18   A.  Yes.

19   Q.  Is that the period of time that you used this system to

20   record your time?  Does it seem about right?

21   A.  About right, yes.

22   Q.  I want to show you just briefly a page -- and we will only

23   do this once -- from what's already been marked into evidence

24   as Government Exhibit 2520.  Do you see that?

25   A.  Yes.

Stamboliu - Direct

4917

1   Q.  I am going to show you a page --

2   A.  Okay.

3   Q.  -- with the dates that are written on the side are 7/21

4   and 7/22.  Do you see that, sir?

5   A.  Yes.

6   Q.  Once again, do you recognize this handwriting?

7   A.  Yes.

8   Q.  Whose handwriting is that?

9   A.  Dr. Kuchipudi's.

10  Q.  And now I want to show you from your documents, Government

11  Exhibit 6206, two pages, 7/21 and 7/22.

12  A.  Yes.

13  Q.  Do you see that, sir?

14  A.  I am trying to, yeah, yeah.  Yes.

15  Q.  7/22?

16  A.  Yes.

17  Q.  All those names are crossed out, right?

18  A.  Yes.

19  Q.  On 7/21, you got there at 8:45 in the morning and you

20  worked on Dr. Kuchipudi's patients until 3:00 in the

21  afternoon?

22  A.  Yes.

23  Q.  And on 7/22, you got there at 11:30 in the morning and you

24  worked until 4:30 in the afternoon?

25  A.  Yes.

 1  Q.  And you did that seeing Dr. Kuchipudi's patients?

 2  A.  Yes.

 3  Q.  Did you ever tell Dr. Kuchipudi about the work that you

 4  performed on those two days so that he could go ahead and bill

 5  his -- provide his biller information so that insurers could

 6  be billed for that work?

 7  A.  No, I never discussed this with Dr. Kuchipudi.

 8  Q.  Just so it's clear, all the names on Government

 9  Exhibit 6206, those are all Kuchipudi patients, correct?

10  A.  Yes.

11  Q.  Now, the hours that are reflected in Government

12  Exhibit 6207, the names that are on Government Exhibit 6206,

13  did you ever bill insurers for any of that work, the work that

14  you did treating Dr. Kuchipudi's patients?

15  A.  Can you repeat the question once again, please?

16  Q.  Sure.

17        All the hours that you kept, did you ever bill

18  insurers for treating Dr. Kuchipudi's patients?

19  A.  No.

20  Q.  Did you think you would be paid for that work?

21  A.  Yes.

22  Q.  By whom?

23  A.  Hospital.

24  Q.  Before you provided these patient sheets, 6206 and 6207,

25  to the government, had you ever provided in particular this

1 | document to anyone?

2 | A. Yes.

3 | Q. Who did you provide it to?

4 | A. Mr. Puorro.

5 | Q. Is that Tony Puorro?

6 | A. Yes, sir.

7 | Q. Why did you give it to him?

8 | A. So he can pay me.

9 | Q. These hours that are on 6207, this is just for 2011; is

10 | that right, Dr. Stamboliu?

11 | A. Yes, indeed.

12 | Q. When you started doing this work treating Dr. Kuchipudi's

13 | patients in the beginning of 2011 or the end of 2010, was

14 | Mr. Puorro working at the hospital at that time?

15 | A. No.

16 | Q. Who had his position?

17 | A. Mr. Clarence Nagelvoort.

18 | Q. Prior to the summer of 2012, had you received any payment

19 | for the work that you had done treating Dr. Kuchipudi's

20 | patients?

21 | A. No.

22 | Q. Why not?

23 | A. Because I didn't submit the hours.

24 | Q. You hadn't given these hours to the hospital yet?

25 | A. No.

1   Q.  What do you mean?

2   A.  I had to transcribe them from the notebook, put them in a

3   nice form like this, and then I had them done.

4   Q.  It had been a year and a half, right, by the summer of

5   2012?

6   A.  Yes.

7   Q.  Why hadn't you gotten around to it yet?

8   A.  I'm sorry?

9   Q.  Why hadn't you gotten around to giving the hours to the

10  hospital yet?

11  A.  Because I am not a very -- how should I put it?  I just

12  didn't put them together.  It just took too much time.

13  Q.  Let me ask you this, Dr. Stamboliu.  Did you want to get

14  paid?

15  A.  Yes.

16  Q.  Were you ever concerned that you wouldn't be paid?

17  A.  No, until 2012.

18  Q.  Let me ask you.  At the time that you put this together,

19  did you think you were going to be paid for your hours?

20  A.  Yes.  Yes.

21  Q.  Who did you think was going to pay you?

22  A.  The hospital.

23  Q.  Were you concerned at all that the hospital was going to

24  not make good on these hours?

25  A.  No.

1   Q.  Did you worry about it when you gave these hours to

2   Mr. Puorro?  Did you think I will get paid?

3   A.  When I gave them to Mr. Puorro, yes.

4   Q.  Did you actually eventually have a conversation with

5   Mr. Puorro about these hours in getting paid for the work that

6   you had done for Dr. Kuchipudi?

7   A.  Yes.

8   Q.  Do you recall when that conversation took place?

9   A.  In September in the conference room.

10  Q.  September of what year, sir?

11  A.  2012.

12  Q.  Who was present in that conference room?

13  A.  Mr. Puorro and Mrs. Noemi.

14  Q.  Is that Noemi Velgara?

15  A.  Yes, indeed.

16  Q.  At the time, did you know that that conversation was being

17  recorded?

18  A.  No.

19  Q.  Have you subsequently learned that Ms. Velgara recorded

20  that meeting for law enforcement at that time?

21  A.  Yes.

22  Q.  Have you reviewed that recording?

23  A.  Yes, I did.

24  Q.  Have you reviewed certain clips from that recording?

25  A.  Yes, I did.

1   Q.  Have you reviewed transcripts that go with those clips?

2   A.  Yes, I did.

3   Q.  I want to show you, Dr. Stamboliu, what's been marked as

4   Government Exhibit --

5           MR. HAMMERMAN:  I apologize, your Honor.  Just give

6   me one minute.

7      (Brief pause.)

8           MR. HAMMERMAN:  Once again, I apologize, your Honor.

9   If you could give me one more second.

10     (Brief pause.)

11  BY MR. HAMMERMAN:

12  Q.  All right.  Dr. Stamboliu, I am going to try to be a

13  little expeditious about this and hand you what's been marked

14  as Government Exhibit 16-A.

15          Do you see that, sir?

16  A.  Yes, sir.

17  Q.  I am going to hand you 16-BB.  I am going to hand you

18  what's been marked as Government Exhibit 90-A.

19  A.  16.

20  Q.  This one doesn't have the sticker on it, but you will note

21  that.

22  A.  Yes.

23  Q.  And then 88-B.  And I notice this one doesn't have your

24  initials on it, but let me ask you this, Dr. Stamboliu.

25          THE COURT:  I think it's double B.

1     MR. HAMMERMAN:  It is.

2     THE COURT:  You said B.

3     MR. HAMMERMAN:  I apologize, your Honor.

4  BY MR. HAMMERMAN:

5  Q.  I am also going to show you what's been marked Government

6  Exhibit Audio and Video Clip 16A, 16-BB, 90-A, and 88-BB.  Do

7  you see that?

8  A.  Yes.

9  Q.  Do you recognize your initials and the date on this disk?

10 A.  Yeah, that's my initials.  Date is there too.

11 Q.  And did you --

12     MR. HAMMERMAN:  Your Honor --

13     MR. CAMPBELL:  Do you want one with his initials?

14     MR. HAMMERMAN:  Thank you.

15 BY MR. HAMMERMAN:

16 Q.  There is 88-BB.

17     Do all of those transcripts have your initials on

18 them?

19 A.  Now, yes.

20 Q.  Okay.  You got them all?

21 A.  Yes.

22 Q.  And have you reviewed those transcripts?

23 A.  Yes.

24 Q.  Have you reviewed the recordings that are on this disk?

25 A.  Yes.

1   Q.  Are those transcripts true and accurate copies or

2   transcriptions of the recordings that are on this disk?

3   A.  Yes.

4   Q.  And are you one of the participants in each one of the

5   clips that you reviewed on this disk?

6   A.  Yes.

7   Q.  Do those transcripts contain on occasion a notation of UI?

8   Do you see that, sir?

9   A.  Yes.

10  Q.  Are those instances where it was unintelligible what was

11  exactly being said on the recording?

12  A.  Well, I would blame this on my heavy accent, as you can

13  tell.

14  Q.  Was it unintelligible for us?

15  A.  Yes.

16  Q.  Fair enough.

17          With that being said, are those true and accurate

18  transcripts?

19  A.  Yes.

20          MR. HAMMERMAN:  Your Honor, the government would seek

21  to admit what's been marked as 16A, 16-BB, 88-BB, and 90-A.

22          THE COURT:  You said 16-A I thought somewhere.

23          MR. HAMMERMAN:  16-A and 16-BB.

24          THE COURT:  Yes.  Okay.

25     (Above-mentioned exhibits were received in evidence.)

Stamboliu - Direct

4925

1    MR. HAMMERMAN:  Your Honor, we apologize.  There are

2    two sets of transcript binders that the jurors have.  16-A is

3    in one set of binders, and then the rest of the recordings are

4    in the second binders.

5              THE COURT:  They don't have both of them over there

6    right now?

7              THE JURY:  We do.

8              MR. HAMMERMAN:  I think they do, your Honor.

9              THE COURT:  They do, okay.

10             So you will find that some transcripts got added to

11   one of the binders at the end.

12             Which one are you going to play first?

13             MR. HAMMERMAN:  16-A, your Honor.

14             THE COURT:  You need to find the one that has 16-A in

15   it.  I believe that was the first one you got.

16             MR. HAMMERMAN:  Yes, your Honor.

17             THE COURT:  That has a whole bunch -- the one that

18   has more paper in it is the one that has 16-A.

19             MR. HAMMERMAN:  Your Honor, the government would also

20   seek to admit what's been marked as Government Exhibit Disk 6.

21             THE COURT:  Yes.  That's admitted as well.

22    (Above-mentioned exhibit was received in evidence.)

23             THE COURT:  You are going to need me to switch it

24   back over to the computer, right?

25             MR. HAMMERMAN:  Yes.

1        THE COURT:  It's done.

2        Has everybody found 16-A?  It sounds like a yes.

3        You can go ahead.

4   BY MR. HAMMERMAN:

5   Q.  Before we begin the recording --

6        THE COURT:  Again, let me just say -- let me just say

7   that you're -- some of these are videos -- are all of them or

8   some of them?

9        MR. HAMMERMAN:  The first two recordings, your Honor,

10  are audio, and these are the ones recorded by Ms. Velgara.

11       THE COURT:  You are going to be hearing audio and

12  then perhaps video recordings and seeing the video recordings.

13       Again, I will tell you, as I told you before, the

14  recordings are the evidence, the transcripts are just a guide,

15  and so if there is something that you can't make out on the

16  recordings, you have to disregard the transcripts, basically.

17       The one thing I didn't say before which concerns

18  these videos, and I don't know honestly know if this is a

19  factor in this situation, but you can use the videos and what

20  you see to help you interpret what is -- what the words are.

21       Okay.  Yes, Mr. Collins.

22       MR. COLLINS:  Ms. Velgara's statements?

23       THE COURT:  Thank you.  Let me just collect my

24  thoughts for a second here.

25       So as you just heard in the testimony -- is it all of

1    these recordings?

2         MR. HAMMERMAN:  The first two, your Honor, the

3    individual who made the recordings was Ms. Velgara.

4         THE COURT:  Okay.

5         MR. HAMMERMAN:  For the next two that follow, the

6    individual that made the recordings was Mr. Puorro.

7         THE COURT:  Okay.  So the first two that you're going

8    to see or hear were made by this Ms. Velgara.  And as I have

9    instructed you on other occasions, because Ms. Velgara was

10   cooperating with the government at the time, you can't take

11   her statements on the recording for their truth or as evidence

12   of guilt of any defendants.  On the last two that you're going

13   to hear, Mr. Puorro is doing the recording and he is also on

14   the conversations, and on those two, you can't take what he

15   says as true or as evidence of the guilt of the defendants.

16        Instead, in both of those situations, you're

17   considering the statements of the person who is making the

18   recording -- in other words, the cooperating witness -- in

19   order to put in context and help you understand what the other

20   people are saying.

21        Okay.  You can go ahead.

22   BY MR. HAMMERMAN:

23   Q.  Dr. Stamboliu, I'd ask you to look at what was marked as

24   Government Exhibit 16-A.  Is this the recording that you were

25   -- the meeting that you were talking about that occurred on

1   September 20th, 2012, in the boardroom at Sacred Heart
2   Hospital?
3   A.  Yes.
4   Q.  All right.
5   A.  Yes.
6          MR. HAMMERMAN:  Your Honor, we'd like to go ahead and
7   play this recording.
8          THE COURT:  That's fine.
9          The thing is moving, but we are not hearing anything
10  and all the sound is on.
11         MR. HEDGES:  Your Honor, could you take our screen
12  down for just a second, please.  Thank you.
13         It's back up.
14         MR. HEDGES:  Thanks, your Honor.
15         MR. HAMMERMAN:  I apologize for the technical
16  difficulty, Dr. Stamboliu.  I think we have it here.
17    (Recording played.)
18  BY MR. HAMMERMAN:
19  Q.  Dr. Stamboliu, first I apologize that we had a little
20  problem with the recording, but did you understand that
21  Mr. Puorro was saying to you that if doctors could bring more
22  patients in, that the hospital could then provide more
23  compensation or, as he put it, adjust our compensation levels
24  upward?
25  A.  Yes.

1    Q.  I'd like to skip ahead and go straight to the second clip.

2              THE COURT:  So this is the other book now?

3              MR. HAMMERMAN:  This is now the other book,

4    Government Exhibit 16-BB.

5              THE COURT:  I think you are going to find those at

6    the very end, probably the third from the end of that book.

7              Does everybody have one?

8              Okay.  We are good.

9              MR. HAMMERMAN:  Thank you, your Honor.

10   BY MR. HAMMERMAN:

11   Q.  Dr. Stamboliu, I am now going to turn you to Government

12   Exhibit 16-BB, which is the same recording, just a later clip;

13   is that right?

14   A.  16-BB, yeah, okay.

15   Q.  And you've listened to this clip also?

16   A.  Yes.

17   Q.  Once again, this is a conversation with Ms. Velgara and

18   Mr. Puorro?

19   A.  Yes.

20             MR. HAMMERMAN:  Why don't we go ahead and start the

21   recording.

22     (Recording played.).

23             THE COURT:  You just lost the sound.  It sounds like

24   it's a bad connection.

25             MR. HAMMERMAN:  Your Honor, can you give us just one

1    moment?

2             THE COURT:  Yes.

3       (Brief pause.)

4             MR. HEDGES:  Your Honor, we are now just back on the

5    court speakers, not this one.

6             THE COURT:  I will turn up the volume.

7             MR. HEDGES:  Thank you.

8             MR. HAMMERMAN:  Do you mind, your Honor, if we just

9    start from the beginning?

10            THE COURT:  That's fine.

11            MR. HAMMERMAN:  We, once again, really apologize.

12      (Recording played.)

13   BY MR. HAMMERMAN:

14   Q.  I am going to stop the recording for just a moment there,

15   Dr. Kuchipudi.

16   A.  I'm --

17   Q.  Dr. Stamboliu, sorry.

18            Looking at line 5 through 10 on page 2.

19   A.  On page 2?

20            THE COURT:  2.

21   BY MR. HAMMERMAN:

22   Q.  Page 2 at the top, Mr. Puorro says to you, When this was

23   first discussed probably by my predecessor, what did you guys

24   talk about?

25            Now, first, let me ask you, when you talked to

1  somebody, who is the predecessor of Mr. Puorro that he's

2  referring to?

3  A.  Mr. Nagelvoort.

4  Q.  You say, Uh, there was no money.  I said whatever goes.

5  Ms. Velgara then says, There should be.  And you said,

6  Whatever goes, so.

7        What do you mean by "whatever goes"?  What did you

8  mean at that time?

9  A.  The going rate for a doctor who works like me, like an

10  independent contractor.

11  Q.  And what was your going rate at that time?

12  A.  $70 an hour.

13  Q.  Then Mr. Puorro says, Well, typically the arrangement

14  would have been he bills out under his corporation.  The

15  dollars that are collected, it should have come over to you,

16  but that's not happening.

17        Now, when he says that, it sounds like you're

18  surprised.  Were you surprised at the time?

19  A.  Yes.

20  Q.  Why?

21  A.  Because Dr. Kuchipudi compensating has never been

22  discussed.

23  Q.  What was the discussion?  What did you understand at the

24  time of this recording on who was going to pay you?

25  A.  The hospital.

1   Q.  And did you make that clear to both Mr. Puorro and

2   Ms. Velgara at the time when you say --

3   A.  I did make it clear, but Mr. Puorro came to the hospital

4   as a new administrator as knowing everything and reviewing all

5   the contracts, and I thought that he's on top of everybody's,

6   you know, situation at work.

7   Q.  Well, did you -- at the time that this recording occurred,

8   was it clear to you that you were not going to be paid by

9   Dr. Kuchipudi?  You never expected that, right?

10   A.  I never expected -- I never thought that Dr. Kuchipudi is

11   going to pay.  If I knew that Dr. Kuchipudi -- I have to wait,

12   I would never work covering for him.

13          MR. HAMMERMAN:  All right.  Let's continue on with

14   the recording then.

15     (Recording played.)

16   BY MR. HAMMERMAN:

17   Q.  I am going to stop the recording for just a second.

18          In that recording, you say to Ms. Velgara that you

19   had already given the hours to Mr. Puorro; is that right?

20   A.  Yes.

21   Q.  Had you already provided him your hours for 2011?

22   A.  I am not sure at this point.

23   Q.  Look at lines 4 and 5, Dr. Stamboliu, on page 3.  You say,

24   He has the hours.  I didn't give the hours because I didn't

25   compute for this year because.  Do you see that?

1   A.  Yes, that was for '11, yes.

2   Q.  Let me show you what's been marked as Government

3   Exhibit 6205.  Do you recognize that, sir?

4   A.  Yes.

5   Q.  Is that the same spreadsheet that you had previously

6   identified for the jury as the hours that you had worked for

7   Dr. Kuchipudi in 2011?

8   A.  I am not sure if it was given before that.

9   Q.  Is that the same spreadsheet, sir?

10  A.  It's the same spreadsheet, yes.

11  Q.  Do you recognize the handwriting at the top of that

12  spreadsheet?

13  A.  Yes.

14  Q.  What does it say?

15  A.  It's my handwriting.

16  Q.  What does it say?

17  A.  Worked Dr. Kuchipudi, 2011.

18  Q.  Is this a true and accurate copy of a spreadsheet that you

19  provided to somebody at Sacred Heart?

20  A.  Yes.

21  Q.  Who did you provide this spreadsheet to?

22  A.  To Mr. Puorro.

23          MR. HAMMERMAN:  The government would seek to admit

24  what's been marked as Government Exhibit 6205.

25          MR. CAMPBELL:  No objection.

1    THE COURT:  6205 is admitted without objection.

2    (Above-mentioned exhibit was received in evidence.)

3    MR. HAMMERMAN:  Your Honor, we will wait to publish

4    it until we are through with the recordings.

5    THE COURT:  Okay.

6    MR. HAMMERMAN:  Can we continue on with the next

7    clip, please.

8    (Recording played.)

9    BY MR. HAMMERMAN:

10   Q.  So in that part of the recording, Mr. Puorro says that

11   he's going to speak to Mr. Novak and see, and then he says,

12   We'll have to do something for you.  Do you see that?

13   A.  Yes.

14   Q.  Did you understand Mr. Puorro saying that they were going

15   -- what did you understand "something for you" to mean?

16   A.  That they are going to -- he is going to talk to get -- to

17   get the money which I worked for Dr. Kuchipudi.

18   Q.  Okay.  And I have to ask.  You say, My wife is on top of

19   my head.  What does that mean?

20   A.  Well, I am going to have to refer to her personally.  You

21   see, this is a direct translation from Romania.  There the

22   women aren't like here.  They're on top of their husbands

23   head.

24   THE COURT:  Meaning they are the brain, right?

25   THE WITNESS:  No, no.  Here it's only back.  It's

1    just a method of control.  Do you understand?

2            THE COURT:  I led him into it, so he's stuck with it

3    now.

4    BY MR. HAMMERMAN:

5    Q.  Dr. Stamboliu, did your wife want you to go get paid?

6    A.  Yeah, because she has the bills.

7    Q.  Got it.

8            And were you asking to get paid for all the work that

9    you had done in 2011?

10   A.  I was, yes.

11           MR. HAMMERMAN:  Can we continue on with the next

12   clip, please.

13     (Recording played.)

14   BY MR. HAMMERMAN:

15   Q.  I want to ask you about this portion of the recording,

16   Dr. Stamboliu.  Here you say to Mr. Puorro -- and I will start

17   you on line 14 on page 4 -- I don't think so.  I mean, like,

18   it's because they might think the boss of the hospital is

19   trying to bribe you or pay you, whatever.  And Mr. Puorro

20   says, Pay you for your referrals.  And then you say, Yes, I

21   don't think so.

22           Now, what you're asking is that the check that they

23   owe you for 2011 be broken up.  Why did you want that check

24   broken up?

25   A.  Because, first of all, breaking it up would have assured

1   me a constant income.

2   Q.  Okay.

3   A.  Instead of a big lump sum, which just as it comes, it goes

4   in bills.

5   Q.  Did it -- were you afraid that it would look wrong if you

6   just got a big check from Sacred Heart?

7   A.  People might ask why did you get paid all of a sudden such

8   a big amount of money.

9           MR. HAMMERMAN:  Let's move on to next part of the

10  recording.

11    (Recording played.)

12  BY MR. HAMMERMAN:

13  Q.  All right.  Dr. Stamboliu, I am going to take you back to

14  the beginning of that clip on page 5, lines 26 and 27.

15          Mr. Puorro is trying to calculate the amount of time

16  that he's estimating you were spending for Dr. Kuchipudi, and

17  he says it's about five hours a week.

18          First of all, were you spending more or less than

19  five hours every Saturday and Sunday treating Dr. Kuchipudi's

20  patients?

21  A.  Three, four hours, three hours, something like that.

22  Q.  Is that every day?

23  A.  Every day on Saturday, Sunday.

24  Q.  So is more like six to eight hours a week, three and four

25  times two?

Stamboliu - Direct

4937

1    A.  Yes.

2    Q.  All right.  Mr. Puorro calculates it down to five, is that

3    right, in the recording?

4    A.  Yeah.  I mean, he's an administrator.  He does the

5    numbers.  I don't.

6    Q.  He's gone a little low on you, fair statement?

7    A.  Yeah.

8    Q.  Okay.

9    A.  Yeah.

10   Q.  Now, let's look at lines 35 and 36.  Mr. Puorro says, So

11   add another 10, add another 10 on top of it, on top of it.

12          What did you understand Mr. Puorro to be saying when

13   he was saying he's going to add 10 on top of it?

14   A.  I understand that on top of the original 10 hours for

15   night work.

16   Q.  Let's get to that.  Let's go actually to the next page,

17   the top of page 6, the first lines, 1 through 9.  Mr. Puorro

18   says, You're spending about 20 hours.  Ten hours a week is

19   what you're spending right now at the hospital.  Half of it is

20   being compensated, the other half is not being compensated.

21          You were already doing that night work; is that

22   right?

23   A.  Yes.

24   Q.  And you were doing night work being on call five days a

25   week; is that right?

1   A.  Five days a week, yes.

2   Q.  And you were being paid one hour for every night that you

3   were on call; is that correct?

4   A.  Yes.

5   Q.  So every pay period, that would be ten hours; is that

6   right?

7   A.  Yes.

8   Q.  Mr. Puorro had already calculated that you were spending

9   an extra five hours every weekend, correct?

10  A.  Yes.

11  Q.  Two weekends in a pay period, so that's another 10 hours,

12  right?

13  A.  Yes.

14  Q.  So when he says, You're spending about 20 hours, is that

15  Mr. Puorro saying, you're already doing the 10 hours of the

16  on-call and now there's the 10 hours that you're doing for

17  Kuchipudi, but you're only being paid for 10 of it, the

18  on-call.  Is that what you understood him to be saying in

19  lines 1 through 9?

20  A.  I just didn't pay attention of this calculation.  I mean,

21  it just went through one ear.  I just didn't pay attention.  I

22  knew that the numbers were there on the Excel sheet, and those

23  computations didn't mean much for me.

24  Q.  As you sit here and listen to it now, Dr. Stamboliu, is

25  that a fair statement, though, that you were getting paid only

1    for your night on-call work and not the work for Dr.

2    Kuchipudi, half the time, so to speak?

3    A.  That was only for the night work, yes.

4    Q.  Now, I want to move on to lines 11 through 30.

5         You say, Yeah, the other -- you know, during the week

6    when I just come sign these notes, I don't add those because

7    it's just -- it's their work, it's not mine.  When he goes on

8    vacation and stuff like that, but, uh, yeah, I mean, obviously

9    when they called that night because he doesn't answer, that's

10   the arrangement was, you know, they call at night, whatever,

11   emergencies.  So I want to divide that in half.

12        The first part where you say, When he's on vacation

13   and it's their work and I just sign the notes, what are you

14   talking about?

15   A.  That means that the PA did the rounds and I did the rounds

16   with the PA and I signed the notes.

17   Q.  Well, you say, That's not my work.  When were you signing

18   the notes of PAs?

19   A.  When I came -- when he was on vacation.

20   Q.  Who is he?

21   A.  Dr. Kuchipudi.

22   Q.  Did you come in during the weekdays when Dr. Kuchipudi was

23   out of the hospital and just sign those of the PAs that were

24   otherwise seeing his patients?

25   A.  Yes.

1  Q.  You here say, That doesn't count.  Why does that not
2  count?
3  A.  I didn't expect to put a stethoscope on the patient and
4  talk directly to them.  It was not the usual work I do.
5  Q.  Are you saying that when Dr. Kuchipudi was out of town,
6  the PAs would basically do the evaluations of the patients,
7  and you would just simply co-sign their notes because he
8  wasn't there?
9  A.  They did do the evaluation.  I mean, they write the notes,
10  and I come and talk to them, see if there is something which
11  needs to be taken care of, and then I sign the note.
12  Q.  Okay.  You distinguished that in the recording from the
13  rest of the work you do, including -- and stuff like, I mean,
14  obviously when they called that night because he doesn't
15  answer, that's the arrangement was, you know, they call at
16  night and whatever emergency.
17        What are you talking about there?  What's the calling
18  at night when there's emergencies?
19  A.  The nurses on the floor from the emergency room, if there
20  was some patients of Dr. Kuchipudi or if they needed some
21  doctor to answer for his patients.
22  Q.  Was that your on-call night assignment?
23  A.  Yes.
24  Q.  Is that what you're referring to here in this recording?
25  A.  Yes, it is.

1  Q.  Now, at the end of this recording, Mr. Puorro says again,

2  I will, uh, speak with Mr. Novak, and we will put something

3  additional in your check to compensate you.

4       Let me ask you this, Dr. Stamboliu.  Did there come a

5  time that you got paid for some of the work that you did for

6  Dr. Kuchipudi?

7  A.  Yes.

8  Q.  When did you get your first check for the work that you

9  did for Dr. Kuchipudi's patients?

10 A.  In November 2012.

11 Q.  I want to show you what's been entered into evidence as

12 Government Exhibit 5412.

13      MR. HAMMERMAN:  Your Honor, if I could have one more

14 quick moment.

15      THE COURT:  Okay.

16   (Brief pause.)

17 BY MR. HAMMERMAN:

18 Q.  I am going to show you --

19      MR. HAMMERMAN:  Can I have the ELMO for just a

20 moment, your Honor?

21      THE COURT:  Sure.

22 BY MR. HAMMERMAN:

23 Q.  Dr. Stamboliu, I am going to show you what's already been

24 entered into evidence as Government Exhibit 5412.  Do you see

25 that, sir?

Stamboliu - Direct

4942

1   A.  Yes.

2   Q.  Looking at what's been marked as Government Exhibit 5412,

3   is that a copy of a check stub?

4   A.  Yes.

5   Q.  Were you paid -- do you see your name up here in the upper

6   left-hand corner?

7   A.  Yes.

8   Q.  Did you receive a check for $1,686 on or about

9   November 15th of 2012?

10  A.  Yes.

11  Q.  Who gave you that check?

12  A.  Mr. Puorro.

13  Q.  What was that check for?

14  A.  Well, after submitting my tabulated hours I think the

15  second or the third time, it was for the work for

16  Dr. Kuchipudi for 2/11.

17  Q.  And you said previously -- and we entered this into

18  evidence -- you had provided him with a copy of your

19  spreadsheet?

20  A.  Yes, but it was not this one.

21  Q.  Is this your handwriting?

22  A.  Yes.

23  Q.  Is that one of the spreadsheets that you gave to

24  Mr. Puorro?

25  A.  Yes.

1   Q.  And did this have, once again, the total pages being two,

2   one and two, the 278.5 hours that you spent working for

3   Dr. Kuchipudi?

4   A.  Yes, sir.

5   Q.  And had you written on there, Worked for Kuchipudi, year

6   2011, and given this to Mr. Puorro?

7   A.  Yes.

8   Q.  I want to show you now what's been marked as Government

9   Exhibit 6210.  Have you seen a copy of that check before?

10  A.  Yes.

11  Q.  Do you recognize that check?

12  A.  Yeah, the check has my wife's signature.

13  Q.  Is that your wife's signature on the back of the check?

14  A.  Yes.

15          MR. HAMMERMAN:  The government would seek to admit

16  what's been marked as Government Exhibit 6210.

17          THE COURT:  It's admitted.

18    (Above-mentioned exhibit was received in evidence.)

19  BY MR. HAMMERMAN:

20  Q.  Did you receive -- is this the check that you received

21  from Sacred Heart?

22  A.  Yes.

23  Q.  It's got your name there in the lower left?

24  A.  Yes.

25  Q.  And is that what you said was your wife's signature?

1    A.  Yes.

2    Q.  Was this the check -- why did you get this check?  What

3    was it for?

4    A.  That was what was agreed in that meeting in September.

5    Q.  Now, Mr. Puorro says they're going to start paying you in

6    September, they being the hospital; is that right?

7    A.  He didn't say when.  He just said he's going to put

8    something together.  He didn't say when.

9    Q.  You get the first check on November 15th; is that right?

10   A.  Yes.

11   Q.  Did you understand that check to be the complete payment

12   for all the services that you had provided to Dr. Kuchipudi?

13   A.  No.

14   Q.  Did you expect to get more checks?

15   A.  Yes, I did.

16   Q.  Did you expect to get additional checks on a monthly

17   basis?

18   A.  Yes.

19   Q.  Were you paid in December?

20   A.  No.

21   Q.  Were you paid in January?

22   A.  No.

23   Q.  Were you paid in February?

24   A.  This is 2013 now?

25   Q.  Correct.

1  A.  No.

2  Q.  Did this begin to upset you?

3  A.  Yeah.

4  Q.  Why?

5  A.  I thought that he's taking advantage.

6  Q.  Did you talk to anybody about this?

7  A.  I told Dr. Kuchipudi, I explained to him.

8  Q.  When did you talk to Dr. Kuchipudi?

9  A.  The exact date, I don't know.

10  Q.  What month?

11  A.  Maybe February.

12  Q.  Okay.

13  A.  Maybe after.

14  Q.  What did you tell Dr. Kuchipudi?

15  A.  I enjoy seeing his patients and caring for his patients,

16  but they haven't paid me, and I think that, I don't know, I'm

17  taken advantage of.

18  Q.  Did you say, If they don't pay me, I can't work for you?

19  A.  I make other plans, that's what I said.

20  Q.  So you said, If they don't pay me, I will just make other

21  plans?

22  A.  Yes.

23  Q.  What did Dr. Kuchipudi say in response?

24  A.  That he would take care of it.

25  Q.  Did you have more than one conversation with

Stamboliu - Direct

4946

1    Dr. Kuchipudi?

2    A.  Yes.

3    Q.  Did he at some point tell you to talk to somebody else

4    again?

5    A.  Yeah, he said to go to Mr. Puorro.

6    Q.  Did he tell you why?

7    A.  To go tell him about this.

8    Q.  Did Dr. Kuchipudi indicate whether or not he had already

9    spoken to Mr. Puorro?

10   A.  Yes, I believe so.

11   Q.  From February to April of 2013, did you have a number of

12   conversations with Dr. Kuchipudi about this issue?

13   A.  Yes.

14   Q.  Did those conversations take place in person or by phone

15   or both?

16   A.  I remember one by phone.

17   Q.  Did you also talk to him in person?

18   A.  Yes.

19   Q.  In those conversations, did you tell Dr. Kuchipudi that

20   you still had not been paid?

21   A.  Yes, I told him that.

22   Q.  And how did he respond when you told him that you still

23   had not been paid?

24   A.  To be calm, that it's going to be taken care of.

25   Q.  I'm sorry.  What was that?

1    A.   To be calm, it's going to be taken care of.

2    Q.   Did he indicate how it was going to be taken care of?

3    A.   That he is going to talk to the administration.

4    Q.   Did you at some point receive a call from Dr. Kuchipudi --

5    let me ask you this.  In all of these conversations that you

6    had with Dr. Kuchipudi where you said I have not been paid for

7    the work that I have done for you and he says he will take

8    care of it, he will talk to the administration, did he ever

9    say to you, Dr. Stamboliu, don't worry, I'll pay you?

10   A.   No.  That would be a surprise, though.

11   Q.   I'm sorry?

12   A.   That would be a surprise.

13   Q.   Did it happen?

14   A.   No.

15   Q.   Did you ever have a telephone conversation with both

16   Dr. Kuchipudi and Mr. Puorro at the same time?

17   A.   Yes.

18   Q.   I want you to take a look at what has been marked as

19   Government Exhibit 90-A, which I think you already have in

20   front of you.

21            THE COURT:  So we are skipping over 88-B for the

22   moment?

23            MR. HAMMERMAN:  For the moment, your Honor.

24            THE COURT:  Okay.  So this should be the last one in

25   the book then, 90-A.

1          THE WITNESS:  Is this the 3/1/2013 date?

2          THE COURT:  That's the one.

3   BY MR. HAMMERMAN:

4   Q.  That's the one, Dr. Kuchipudi.

5          I just did it again.  Dr. Stamboliu, I apologize.

6          Once again, is this a recording that you've reviewed,

7   and you signed the transcript?

8   A.  Yes.

9   Q.  And did it occur on March 1st of 2013?

10  A.  Yes.

11  Q.  And was it based on a telephone call that you received?

12  A.  Yes, indeed.

13         MR. HAMMERMAN:  Can we go ahead and play what's been

14  marked as Exhibit 90-A.

15         MR. HEDGES:  Your Honor, we need the laptop.

16         THE COURT:  Okay.

17    (Recording played.)

18  BY MR. HAMMERMAN:

19  Q.  Okay.  Dr. Stamboliu, turning to the first page of this

20  transcript, beginning on line 34, Mr. Puorro says, We got,

21  well, we just met with Mr. Novak, Dr. Kuchipudi and I, and

22  Dr. Kuchipudi interrupts, We take care of it.  And Mr. Puorro

23  says, You, you tell him.  And Dr. Kuchipudi then says, We're

24  going to take care of your bill, no problem.  Okay, very good.

25  Very good is what you say in return.

1     Did you understand at that point that now that
2   Dr. Kuchipudi has gotten involved, you were going to get paid?
3   A.  Yes.
4   Q.  And Mr. Puorro then responds by saying, Mr. Novak gave us
5   the approval to generate a check.  You say, Fine.  Mr. Puorro
6   asks, How much was it?  And Dr. Kuchipudi says, $14,600.  And
7   Mr. Puorro interjects, $14,600 to you to cover the patients of
8   Dr. Kuchipudi's on weekends, right?  Dr. Kuchipudi says,
9   Right.  And then you say, And this is for which year, for
10  which year is this?
11      Why were you trying to distinguish the year?
12  A.  Because that's the only -- that's the only number of hours
13  I gave to him.
14  Q.  What do you mean?
15  A.  I submitted only the 2011 tabulated hours.
16  Q.  Did you believe that you were owed 16,000 for the work
17  that you had done in 2011?
18  A.  Yes.
19  Q.  Did you still expect to be paid for the additional work
20  that you had done in 2012?
21  A.  Yes.
22  Q.  So when you're having this conversation about Mr. Puorro
23  and Dr. Kuchipudi having spoken to Mr. Novak to get you a
24  check for $14,600, did you want to make clear to them, hey,
25  guys, this is only for 2011?

1   A.  I just wanted to make sure that that's all -- that's all

2   the number of hours which are tabulated, and the other hours I

3   didn't tabulate, and it's going to come.

4   Q.  So when Dr. Kuchipudi says beginning on line 16 of page 2,

5   Until December 31st of last year, from January, you give us

6   the billing, we will take care of it.  And you say, No, I gave

7   him the billing from the '11th, for 2011.  2012 I didn't give

8   him anything.  And Kuchipudi says, Oh, you didn't give him

9   anything for 2012?  And you respond, No, no, no, only 2011 I

10  give him that.

11          Then there is a conversation about what, again,

12  happened to your hours, and that you would, once again, get

13  your hours to Mr. Puorro.

14          And at the very end of the transcript, Dr. Kuchipudi

15  says at least with respect to you 2011 hours, Okay, give it to

16  him next week.

17  A.  Yes.

18  Q.  Do you recall that?

19  A.  Yes.

20  Q.  This wasn't the last conversation you had on this, though,

21  right?

22          I want to refer you to what has been marked as

23  Government Exhibit 88-B.  Did you have another conversation

24  with Mr. Puorro and Dr. Kuchipudi regarding your hours and the

25  fact that you had not yet gotten the new set of hours to

1   Mr. Puorro once again?

2   A.  Yes.

3        MR. HAMMERMAN:  Can we go ahead and play the video

4   clip.

5        Actually, let me do this first.  My colleague raises

6   a good point.

7   BY MR. HAMMERMAN:

8   Q.  Do you see the screen in front of you, Dr. Kuchipudi --

9   Dr. Stamboliu?  Do you see that, the video screen in front of

10  you?

11  A.  Yes.

12  Q.  Who are the individuals who are depicted in that shot

13  right there?

14  A.  Mr. Puorro I can identify.

15  Q.  Is that the gentleman on the right or the left?

16  A.  The bald-headed gentleman.

17  Q.  Is that the guy on the left?

18  A.  Yes.

19  Q.  Okay.  And the gentleman on the right?

20  A.  Dr. Kuchipudi.

21  Q.  That's Dr. Kuchipudi?

22  A.  Yes.

23  Q.  All right.  Now, let's go ahead and play the clip.

24     (Recording played.)

25  BY MR. HAMMERMAN:

1   Q.  Okay.  Dr. Stamboliu, did you, in fact, get another copy
2   of your hours to Mr. Puorro as he requested in that March 5th
3   recording?
4   A.  I am not sure when I gave him the requested copy.
5   Q.  But did you get him another copy after this?
6   A.  I did give him another copy, yes, indeed.
7   Q.  At some point, did you have a conversation with Mr. Puorro
8   about what would be necessary for you to be paid the money
9   that you were owed for 2011?
10  A.  Yeah.  He told me at one point that I have to talk to
11  Mr. Novak.
12  Q.  And when he told you that you needed to talk to Mr. Novak,
13  how did you respond?
14  A.  I didn't -- I thought that I made a deal or the agreement
15  with the administration.
16  Q.  Were you upset when Mr. Puorro was like now you got to go
17  talk to Mr. Novak?
18  A.  Yeah, I was a little bit upset by him.
19  Q.  Did you let Mr. Puorro know that you were a little upset?
20  A.  Yes, because they were jerking me -- he was jerking me
21  around.
22  Q.  At some point, did you have a conversation with Mr. Puorro
23  about the necessity of a contract?
24  A.  Me to tell him about a contract?
25  Q.  Did he talk to you about a contract?

Stamboliu - Direct

4953

1 A.  Yeah, he told me that the contract needed to be signed in

2 order for me to be paid for Dr. Kuchipudi's work.

3 Q.  I want to show you, Dr. Stamboliu, what's been marked as

4 Government Exhibit 6208.  Have you seen that document before?

5 A.  Yes, I did.

6 Q.  What is Government Exhibit 6208?  What is it?

7 A.  This is a physician independent contract agreement.

8 Q.  Is there signatures on the back page?

9 A.  Yes.

10 Q.  Do you recognize any of those signatures?

11      I will hand you back that one.

12 A.  It is my signature and Mr. Puorro's signature.

13 Q.  Okay.  What's the date on the front of the contract?

14 A.  January 2011.

15 Q.  Do you remember when you signed this contract?

16 A.  Yes, I do remember.

17 Q.  What day did you sign this contract?

18 A.  April, Friday -- it was the Friday before tax day; I

19 remember very clearly.

20 Q.  Did you say April 12th?

21 A.  Yeah.  April 12th, yes.

22      MR. HAMMERMAN:  Your Honor, the government would seek

23 to admit what's been marked as Government Exhibit 6208.

24      THE COURT:  6208 is admitted without objection.

25    (Above-mentioned exhibit was received in evidence.)

1      MR. HAMMERMAN:  Your Honor, I am going to the Elmo.

2      MR. CAMPBELL:  Judge, just so you know, I think it's

3   duplicative of an exhibit that was admitted already.

4      MR. HAMMERMAN:  I just ripped it off.

5      MR. CAMPBELL:  It's Defendants' Exhibit 874.

6      THE COURT:  Okay.  Elmo, there you go.

7   BY MR. HAMMERMAN:

8   Q.  Is this the contract that you signed the Friday before tax

9   day?

10  A.  Yes.

11  Q.  Now, you said that it's dated, and you can see that it's

12  dated January of 2011.  Do you see that?

13  A.  Yes.

14  Q.  There is actually a number that's written underneath

15  that 11.  Do you see that?

16  A.  Yes.

17  Q.  What was that number?  Was that a 3?

18  A.  It could be.

19  Q.  At the time that this contract was presented to you, had

20  you ever seen it before?

21  A.  No.

22  Q.  Had you ever had a conversation with Mr. Puorro that you

23  needed to negotiate a contract?

24  A.  He said when you came in, that he's going to go look over

25  contracts of all physician.

1  Q.  Did you know that you were going to be given this contract

2  at any time prior to April 12th of 2013?

3  A.  No, I don't know that.

4  Q.  Was the first time that you saw this contract also the

5  meeting where you signed it?

6  A.  Yes.

7  Q.  Did you review the contract at all at the time that you

8  signed it?

9  A.  I reviewed it briefly because he gave me the assurance it

10 has been reviewed by the -- drafted by the hospital lawyer.

11 Q.  I want to show you the bottom of page 2 under Board

12 Certification.  Do you see that?

13 A.  Yes.

14 Q.  It says, The physician is eligible for board certification

15 or board certified in anesthesiology, and that's crossed out.

16 A.  I did that.

17 Q.  Did you read that on April 12th and think that's not

18 right?

19 A.  Yes.

20 Q.  Did you cross it out at the time?

21 A.  Yeah, I thought that it might not be for me.

22 Q.  Did Mr. Puorro explain to you on April 12th why you needed

23 to sign this contract?

24 A.  This is for the money which the hospital owes me for

25 performing coverage for Dr. Kuchipudi.

1  Q.  Have you since the date that you signed this reviewed this
2  contract?
3  A.  Since the day I signed, no.
4  Q.  Have you come to my office --
5  A.  Yes.
6  Q.  -- in anticipation of your testimony?
7  A.  Yeah, I did.
8  Q.  And did you look at the contract?
9  A.  Yes.
10 Q.  Is the name Dr. Kuchipudi anywhere in this contract?  Do
11 you see his name anywhere in the contract?
12 A.  I couldn't find it.
13 Q.  I want to show you under the four A, B, C, D at the very
14 top under the witnesseth title.  In D it says, Hospital
15 desires to employ physician as a hospitalist, and physician
16 wishes to engage in the practice of medicine as a hospitalist
17 and contractor to hospital in accordance with the terms of
18 this agreement.  Do you see that?
19 A.  Yes.
20 Q.  Had you worked for Dr. Kuchipudi as a hospitalist seeing
21 all the patients of the hospital from January of 2011 through
22 April 12th of 2013?
23 A.  No, I just saw his patients.
24 Q.  Did you have an understanding of how much money Sacred
25 Heart still owed you at that time for 2011?

1    A.  It was the total amount minus 1600.  278 times 70 minus --
2    Q.  I want to show you -- there's a section here on page 2
3    that says Schedule.
4            Turn to page 2, Dr. Stamboliu.  Do you see that?
5    A.  Yes.
6    Q.  It says, Physician shall observe a schedule which shall
7    consist of full-day coverage on Saturday and Sunday for a
8    minimum of eight hours each day.  Physician acknowledges and
9    agrees that he shall not simultaneously be on call to any
10   other hospital or healthcare facility when scheduled to
11   provide services under this agreement, except as otherwise
12   approved in advance in writing by hospital.
13           Let me ask you this, Dr. Stamboliu.  Had you provided
14   eight hours of service on every Saturday and every Sunday for
15   those two-and-a-quarter years for Dr. Kuchipudi?
16   A.  No.
17   Q.  Had you been on call for at least eight hours a day for
18   Dr. Kuchipudi on every Saturday and Sunday going back to
19   January 2011?
20   A.  On the weekends, technically, yes.
21   Q.  You were on call for him?
22   A.  On the phone, seeing the patients and answering phone
23   calls.
24   Q.  Okay.  Had you provided eight hours inpatient care for his
25   patients on Saturdays and Sundays from January 2011 to April

1    2013?

2    A.  No inpatient care.

3    Q.  Okay.  If I can now ask you to move to, I believe, page 6.

4    A.  Page 6.

5    Q.  I'm sorry.  My copy is missing a page 6, Dr. Stamboliu.

6    Does yours have page 6?

7    A.  I have one.  I have one.  I think it has to be there, but

8    it's mixed up.  That's how I found myself, mine.

9    Q.  You're right.

10           There is a compensation section on page 6.  And

11   you're right, it's out of order, and I apologize for that.

12           It says, Commencing on the commencement date in

13   consideration for providing on-site hospitalists services

14   hereunder, physician shall be compensated at the rate of A,

15   $165 per full day of coverage on Saturdays and Sundays payable

16   monthly in arrears.  And then the 165 is crossed out and there

17   is a 235.  Do you see that?

18   A.  Yes.

19   Q.  And there is initials?

20   A.  Yes.

21   Q.  Whose initials are those?

22   A.  The initials are mine.  The numbers are not mine.

23   Q.  The numbers are what?

24   A.  Are not mine, the 235.

25   Q.  Okay.  At the time that you were given this contract, did

1    you have these numbers changed?

2    A.   I don't understand what you're asking.

3    Q.   Well, did the numbers -- were they changed at the time

4    that you first saw this contract on April 12th?

5    A.   They were changed in front of me, yes, indeed.

6    Q.   And what was the reason that they were changed?

7    A.   Because I felt 165 per day, so I counted -- usually I stay

8    about three, four hours, so that would be about $40 an hour.

9    Q.   Did you have a conversation with Mr. Puorro at the time

10   trying to recalculate the amount that you should be paid under

11   this contract to actually reflect the hours that you had

12   worked for Dr. Kuchipudi in 2011?

13   A.   Yes.  I told him that my hourly rate is $70 an hour and

14   times three or four, it's close to 235.

15   Q.   I want to just show you something, and I know we did this

16   when you came into my office.  I am going to put an iPhone

17   calculator up on the ELMO.

18           This contract says that you're going to work eight

19   hours a day every Saturday and Sunday, right?  That's 16

20   hours, do you see that?

21   A.   Yes.

22   Q.   Under this particular contract, it says that you're going

23   to be paid at a rate of $235 a day.  So if you were to look at

24   235 and divide that by 8, that's less than $30 an hour.  Do

25   you see that?

Stamboliu - Direct

4960

1    A.  Yes.

2    Q.  Did you ever agree to work for less than $30 an hour for

3    Dr. Kuchipudi or Sacred Heart Hospital?

4    A.  No, but then --

5    Q.  Was this contract just trying to get a number that would

6    somehow fit with the money that they already owed you?

7    A.  Yes.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4961

Stamboliu - direct

1    Q.  If you could take your contract and go to the very end.

2    There's a section that's called Physician A duties.  Do you see

3    that?

4    A.  That's on Page 13 you are referring to?

5    Q.  Correct.

6    A.  Yes, okay.

7    Q.  And it lists out the duties that the physician which has

8    your name next to it is responsible for under this contract, and

9    I just want to ask you if you did any of these things during the

10   two and a quarter years that you worked at Sacred Heart Hospital

11   on the weekends for Dr. Kuchipudi.

12          Starting at the top.  Did you accept patient referrals

13   and coordinate all aspects of care for hospital medical patients

14   referred by medical staff members, especially in family practice

15   and internal medicine sections, including admission, appropriate

16   placement within the hospital, discussion of end of life

17   preferences, consultations with subspecialists, timely and

18   proactive discharge planning, coordination of care with primary

19   care physician, discharge, including ensuring appropriate

20   follow-up is arranged, and patient management.

21          Let me ask you this.  Did you do those things from

22   January of 2011 through April of 2013 for all the patients of

23   Sacred Heart Hospital on the weekends?

24   A.  No.

25   Q.  Let's go to number two.  Function as the medicine consultant

Stamboliu - direct

1    to all areas of the hospital, including timely consultations to

2    the emergency department, surgeons, and other medical staff

3    members on request, behavioral health units, etc.

4            Did you do that for all of the patients of Sacred Heart

5    Hospital for those two and a quarter years?

6    A.   No.   Only patients I was consulting on.

7    Q.   Number three.   Provide on-call coverage 24 hours a day,

8    two days a week, on site or off site by telephone, responding

9    within the time frames established by the medical staff for

10   emergent,  urgent, and routine requests.

11           Did you do that for Sacred Heart?  Were you working

12   24 hours a day on the weekends on call for all patients in the

13   hospital?

14   A.   No.

15   Q.   Number four.   During hours of scheduled hospital attendance

16   on call respond to all code blue and other emergency calls, be

17   available to respond to and provide professional services for

18   emergencies on all inpatient, outpatient, and observation

19   patients.

20           Did you do any of this stuff?

21   A.   No.

22   Q.   Why did you sign this contract?

23   A.   Because I was told that that's how I get paid.

24   Q.   You signed it, you said, on April 12th; is that right?

25   A.   Yes.

Stamboliu - direct

1    Q.  Did you want to get paid?

2    A.  Very much so.

3    Q.  Did you want to get paid by April 15th?

4    A.  That was the urgency, yes.

5    Q.  Did you want the money to pay your taxes?

6    A.  Yes.  We all have to do that.  And yes.

7    Q.  I'm going to hand you what's been marked as Government's

8    Exhibit 6211, Dr. Stamboliu.  Do you recognize this check?

9    A.  Yes.

10   Q.  Who is the check made payable to?

11   A.  To me.

12   Q.  Do you recognize the signature on the back of the check?

13   A.  Yeah, that's my signature.

14          MR. HAMMERMAN:  Your Honor, the government --

15   BY MR. HAMMERMAN:

16   Q.  Did you see receive this check?

17   A.  Yes, I did.

18   Q.  Did you sign this check?

19   A.  Yes.

20          MR. HAMMERMAN:  The government could seek to admit

21   what's been marked as Government's Exhibit 6211.

22          THE COURT:  6211 is admitted with no objection.

23   BY MR. HAMMERMAN:

24   Q.  Dr. Stamboliu, do you see that this check is dated April

25   15th, 2013?

Stamboliu - direct

1    A.  Yes.

2    Q.  Did you receive this check on tax day?

3    A.  Yes.

4    Q.  How much is the check for?

5    A.  16,730.

6    Q.  Is this the check that you had been kind of hounding

7    Dr. Kuchipudi and Mr. Puorro for for a couple of months?

8    A.  Mr. Puorro.

9    Q.  I'm sorry?

10   A.  Mr. Puorro in particular.

11   Q.  Okay.  And you had also asked Dr. Kuchipudi to get paid,

12   right?

13   A.  I'm sorry?

14   Q.  You had also asked Dr. Kuchipudi to make sure you got paid,

15   correct?

16   A.  Yeah.

17   Q.  Did you seek to deposit this check?

18   A.  In the next two hours.

19   Q.  Do you know if this check cleared?

20   A.  No.

21   Q.  It bounced, right?  There was not enough funds.  It didn't

22   actually go into your account; is that correct?

23   A.  I know that the money was not there.  That's all I know.

24   Q.  Do you know what happened the next day at Sacred Heart?

25   A.  Yeah.

Stamboliu - cross

1    Q.  What happened the next day?

2    A.  It was searched.

3            MR. HAMMERMAN:  Can I have a moment, your Honor?

4            THE COURT:  Yes.

5        (Brief pause.)

6            MR. HAMMERMAN:  No further questions.

7            THE COURT:  Take a ten-minute break, and then we'll

8    start with the cross.

9        (Brief recess.)

10           THE COURT:  All right.  Everybody have a seat.

11           Mr. Campbell.

12           MR. CAMPBELL:  Thank you, Judge.

13                       CROSS EXAMINATION

14   BY MR. CAMPBELL:

15   Q.  Good afternoon, Doctor.

16   A.  Hello.

17   Q.  My name is Terry Campbell.  I represent Clarence Nagelvoort.

18   Okay?

19   A.  Yes.

20   Q.  Sir, you said that you first got privileges at Sacred Heart

21   sometime in 2009?

22   A.  Yes.

23   Q.  Did you say the fall or so of 2009?  September, October?

24   A.  Sometime in summer, I would say.

25   Q.  Summer.  Okay.

Stamboliu - cross

1            And at first when you had privileges, you were not an
2    employee of Sacred Heart, right?
3    A.   No.
4    Q.   You were just a doctor who had privileges at the hospital?
5    A.   At the hospital, yeah.
6    Q.   And that means -- I'm sorry.  Go ahead.
7    A.   And I was told to supervise the PAs.
8    Q.   Okay.  And at that time in the second half of 2009, you were
9    also on staff at other hospitals, right?
10   A.   Yes.
11   Q.   This Sacred Heart and Loretto.
12   A.   Yes.
13   Q.   And you had income from your work at those hospitals?
14   A.   It was from my private practice.
15   Q.   Right, right.  And then at some point Clarence Nagelvoort
16   told you that he thought that there was work for you to do at
17   the Golden Light Clinics, right?
18   A.   Yes.
19   Q.   And the Golden Light Clinics were outpatient clinics that
20   Sacred Heart operated?
21   A.   Yes.
22   Q.   And then you were hired.  Noemi Velgara hired you to work
23   at -- primarily at the North Avenue Golden Light Clinic?
24   A.   Yes, indeed.
25   Q.   And when you worked at the Golden Light Clinics, you said

Stamboliu - cross

1    typically if a patient needed additional medical care, you'd
2    send them to Sacred Heart Hospital, right?
3    A.  Yes, indeed.
4    Q.  You were asked about that by Mr. Hammerman.
5    A.  Yes.
6    Q.  If a patient came into the Golden Light Clinic when you were
7    working there and they needed mental health, you would send them
8    to Loretto, correct?
9    A.  I send them to Loretto because that's the hospital I know.
10   But that's not necessarily where they ended up.
11   Q.  Okay.  My only point is if there was a psychiatric patient
12   that came into the Golden Light Clinic, you would not send them
13   to Sacred Heart.  You would send them to Loretto?
14   A.  Definitely.
15   Q.  Okay.
16   A.  There was no reason to send them to Sacred Heart.  There was
17   no psychiatric unit at Sacred Heart.
18   Q.  Right.  Nobody told you, hey, you got to send even
19   psychiatric patients to Sacred Heart.
20   A.  No, no.
21   Q.  Okay.  In addition to your work at the Golden Light
22   Clinics -- and let me back up a step.
23          You worked a lot at the North Avenue location?
24   A.  Yes.
25   Q.  But also worked at some other of the Golden Light Clinic

Stamboliu - cross

1    locations from time to time, right?

2    A.  Yes.

3    Q.  In addition to your work at the Golden Light Clinics, you

4    also saw patients at Sacred Heart who needed clearance for

5    surgery, right?

6    A.  Yes.

7    Q.  And you said already you supervised physician's assistants

8    when they did rounds, right?

9    A.  Yeah.

10   Q.  And you were paid for your work at Sacred Heart when you

11   were working at the Golden Light Clinics, right?

12   A.  Yes.

13   Q.  You were also during that time seeing the patients of other

14   doctors who were at Sacred Heart but were not being seen at

15   Sacred Heart by their attending physician; is that true?

16   A.  Yes.

17   Q.  And that's the role of a hospitalist, right?  To see

18   patients in a hospital when their attending physician isn't

19   available or able to do that?

20   A.  Those patients were patients from the outside, and they were

21   admitted under my name.

22   Q.  Okay.

23   A.  So, those I considered they were my, I mean, like private

24   patients.

25   Q.  Okay.  And didn't some of those patients have attending

Stamboliu - cross

1    physicians other than you associated with them?

2    A.  In the hospital?

3    Q.  No.  Outside of the hospital.

4    A.  Yes.

5    Q.  And so, the patients that had a primary care physician or an

6    attending physician that wasn't you, they came to Sacred Heart,

7    and you were assigned to see the patient?

8    A.  Yes.

9    Q.  And these are patients not of Dr. Kuchipudi, correct?

10   A.  No.

11   Q.  Right.  Okay.

12       In going back to the very beginning of your association

13   with Sacred Heart, you did not bill for seeing the patients of

14   other doctors when you were called in to see them at Sacred

15   Heart, right?

16   A.  No, I billed for those patients.

17   Q.  Well, I'm talking about patients of other doctors.

18   A.  Yes, I billed for those patients myself.

19   Q.  You did bill?

20   A.  Yes.

21   Q.  Okay.  Now, you did see patients at Sacred Heart who were

22   not admitted under your name.

23   A.  Yes.

24   Q.  Okay.  And with respect to those patients that you saw who

25   were not admitted under your name, isn't it true that you did

Stamboliu - cross

```
 1    not bill for seeing those patients?
 2    A.  Sir, those patients belonged to other doctors, attendings at
 3    Sacred Heart, and I was seeing those patients only if I was
 4    called on consult, and I billed as a consultant for the
 5    different medical problems.
 6    Q.  Okay.  You --
 7    A.  And then I billed.
 8    Q.  You met with -- you've met with the government on a number
 9    of occasions; is that right?
10    A.  Yes.
11    Q.  And you understood that someone was there taking notes of
12    what you said, right?
13    A.  Yes.
14    Q.  One of the times that you met with them was on
15    February 28th of 2014?
16    A.  Um-hm.
17    Q.  Does that sound about right?
18    A.  Yeah.
19    Q.  Basically a year ago?
20    A.  Okay.
21    Q.  Isn't it true, Doctor, that on February -- well, let me back
22    up a step.
23          You wanted to be truthful when you were talking to the
24    government; is that fair?
25    A.  Yes.
```

4971

Stamboliu - cross

1   Q.  And you were truthful and accurate when you spoke with them,

2   yes?

3   A.  Yes.

4   Q.  Okay.  Isn't it true, sir, that on February 28th of 2014

5   that you told the prosecutors and agents sitting at this table

6   that you did not bill for the patients you saw at Sacred Heart

7   who were not admitted under your name?  Did you tell them that

8   on February 28th of 2014?

9   A.  Say it again.

10  Q.  Sure.

11  A.  It's a little bit -- I don't understand the question.

12  Q.  Did you tell these prosecutors and these agents on

13  February 28th of 2014 that you did not bill for the patients you

14  saw at Sacred Heart Hospital if those patients were not admitted

15  under your name?

16  A.  That is referring to Dr. Kuchipudi's patients.

17  Q.  I'm sorry?

18  A.  That was referring to Dr. Kuchipudi's patients.

19  Q.  Okay.  Did you tell the government and the agents that you

20  did not bill for seeing the patients you were called in to see

21  at Sacred Heart early on?

22  A.  No.  I don't understand.

23  Q.  No?

24  A.  I just don't understand.

25  Q.  Okay.

Stamboliu - cross

 1    A.  Just make it clearer for me so I can --

 2    Q.  I'm trying.  I'm trying.

 3    A.  Please.

 4    Q.  Did you tell these prosecutors and these agents on

 5    February 28th of last year that you did not bill for seeing

 6    patients that you were called in to see at Sacred Heart?

 7    A.  I just don't recall.

 8    Q.  Okay.  And, in fact, did you tell them again -- did you

 9    reiterate that you only billed for patients who were admitted

10    under your name?

11    A.  Yes.

12    Q.  Okay.

13         MR. CAMPBELL:  Your Honor, may I approach?

14         THE COURT:  Sure.

15    BY MR. CAMPBELL:

16    Q.  Here's what I'm going to ask you to do, Doctor, is just take

17    a look at this paragraph.  Read it to yourself.

18    A.  Yes, yes.  This might be the --

19         THE COURT:  He's not asking you a question.  Wait for

20    the question.

21    BY MR. CAMPBELL:

22    Q.  Having reviewed that report, does that refresh your memory

23    that, in fact, on February 28th of last year, you did tell the

24    government that you did not bill for patients you saw at Sacred

25    Heart -- for any patients you saw at Sacred Heart who were not

Stamboliu - cross

```
 1    admitted under your name?
 2    A.  Once again, I billed for patients on whom I was called on
 3    consult.  Consult means another doctor is the attending.
 4    Q.  I don't mean to interrupt you --
 5            THE COURT:  Yeah.  He's just asking you whether you
 6    told this to the government on a particular day.
 7    BY THE WITNESS:
 8    A.  I don't recall if I told that to the government.
 9    BY MR. CAMPBELL:
10    Q.  Having reviewed this paragraph I showed you, does that
11    refresh your memory that you told the government and the
12    agents --
13    A.  No.
14    Q.  -- a year ago that you did not bill for seeing any patients
15    you were called in to see at Sacred Heart?
16    A.  I don't recall that.
17    Q.  And do you recall reiterating to them during that meeting
18    that you only billed for patients admitted under your name?
19    A.  Yeah.
20    Q.  And the other Golden Light Clinics that you worked at in
21    addition to the North Avenue location, were a couple of them
22    known as the Sacred Heart Chen Medical Center?
23    A.  Yes.
24    Q.  And that had two locations.  One was in Chicago, one was in
25    Streamwood?
```

Stamboliu - cross

```
 1    A.  They were both -- okay.  Yeah.  Streamwood location I call
 2    that one, yeah.
 3    Q.  And you worked at those locations whenever needed?
 4    A.  I'm sorry?
 5    Q.  You worked at those locations whenever needed?
 6    A.  Yeah, they called me and they -- Saturdays, usually.
 7    Sundays.
 8    Q.  And let's talk about the arrangement for you to see
 9    Dr. Kuchipudi's patients, okay?
10    A.  Yes, please.
11    Q.  It was Mike Castro who first approached you with this idea
12    of you coming in to see Dr. Kuchipudi's patients when
13    Dr. Kuchipudi wasn't there or couldn't be there, right?
14    A.  He sort of asked me if I'm available --
15    Q.  Okay.
16    A.  -- on Saturday, Sundays, and if I can see Dr. Kuchipudi's
17    patients.  I mean, cover for the weekends.  Not weekends.
18    Particular holidays.
19    Q.  Okay.  And so, my only question is it was Mike Castro who
20    first approached you about this idea.
21    A.  Yeah.
22    Q.  Okay.  Now, do you recall a gentleman named Ernie Velazquez?
23    A.  I know Ernie.  I don't know Velazquez.  I'm not familiar
24    with Velazquez.  But Ernie I know.
25    Q.  Ernie.  Okay.
```

Stamboliu - cross

1    A.  Velazquez?  Yeah, maybe.

2    Q.  Respiratory therapy guy?

3    A.  Yes.

4    Q.  All right.  Do you recall a phone conversation with

5    Mr. Velazquez you may have heard that he was outside?  You could

6    hear maybe some parking lot noise?  Do you recall he calling you

7    to talk to you about working weekends to see Dr. Kuchipudi's

8    patients early on?

9    A.  I don't recall that.

10   Q.  You don't recall that?  Okay.

11   A.  No.

12   Q.  All right.  And then after the initial approach by

13   Mr. Castro, at some point after that, you spoke with

14   Mr. Nagelvoort, fair?

15   A.  Yes.

16   Q.  Okay.  Do you recall that Mr. Nagelvoort told you that he

17   thought highly of your skills as a doctor?

18   A.  Yes, he did.

19   Q.  And he told you -- well, let me back up a step.

20       You were at that time I think working three days a week

21   at the Golden Light Clinics?

22   A.  I thought it was more than three days.

23   Q.  Okay.

24   A.  I'm not very sure.

25   Q.  It wasn't ten hours a day, five days a week, right?  It was

Stamboliu - cross

1    part-time?

2    A.  Yeah, it was not every day.  At the beginning there were

3    more days.  Then they cut it down to maybe two or three days,

4    something like that.

5    Q.  Okay.  Do you recall that Mr. Nagelvoort when he talked to

6    you about this said he thought you were underemployed, meaning

7    you had room to do more work?

8    A.  Yes.

9    Q.  And he told you there's an opportunity here for you to do

10   more work treating patients, right?

11   A.  Yes.

12   Q.  And he told you that more work inside Sacred Heart would

13   give you more exposure to new patients, right?

14   A.  Yes.

15   Q.  That would be good for you, right?

16   A.  As a doctor, that's all I do is see patients, you know.

17   Q.  Now, you said that during this conversation -- did this

18   conversation happen in Mr. Nagelvoort's office or in a hallway?

19   A.  It's hard for me to --

20   Q.  Okay.  You don't remember the location?

21   A.  It's hard for me to locate where he was.

22   Q.  And I think what you testified on direct examination was

23   that Mr. Nagelvoort asked you if you were interested in doing

24   this, right?

25   A.  Yeah.

Stamboliu - cross

```
 1    Q.  Talked about the fact that he thought you were
 2    underemployed, and this would be a good thing for you to get
 3    exposure to more patients, right?
 4    A.  Yes.
 5    Q.  And then he -- what you testified to was he said something
 6    along the lines of "We'll take care of you."
 7    A.  Yes.
 8    Q.  It was a very general conversation; is that fair?
 9    A.  Indeed.
10    Q.  He didn't tell you how you would be taken care of?
11    A.  No.
12    Q.  He did not talk to you about how much you would be paid?
13    A.  He didn't tell me.
14    Q.  Right.
15    A.  I mean, specifically.  I assumed it's the same for which
16    rate I was working at Golden Light.
17    Q.  That's right.  And I'm not suggesting there's anything
18    wrong.  My only point is that was your assumption, right?  It
19    wasn't something that was actually spoken?
20    A.  Which kind of assumption you mean?
21    Q.  You assumed that you would be paid at the same rate that you
22    were being paid at the Golden Light Clinics, right?
23    A.  Yes.
24    Q.  But there were no specifics discussed in that conversation
25    with Mr. Nagelvoort about how much you were going to be paid
```

Stamboliu - cross

1   exactly, right?

2   A.  Right.

3   Q.  And there was no specifics about who was going to pay you in

4   that conversation, right?

5   A.  We.

6   Q.  Right.  And it wasn't even we'll pay you.  It was we'll make

7   sure you're taken care of?

8   A.  Yes.

9   Q.  There was no -- and now we're talking about a conversation

10  that happened either late December of 2010 or early January

11  2011, that time period?

12  A.  Around that time.

13  Q.  Okay.  There was no written contract, right?

14  A.  Right.

15  Q.  And what Mr. Nagelvoort said to you at some point was keep

16  track of your hours, right?

17  A.  Yes.

18  Q.  And turn them in?

19  A.  Yes.

20  Q.  And that's a process, you know, you keeping track of your

21  hours and turning them in, that you were doing at the Golden

22  Light Clinic, right?

23  A.  No.

24  Q.  No?

25  A.  Somebody else was doing the hours at the Golden Light.

Stamboliu - cross

1    Q.   Somebody else was keeping track of your hours?

2    A.   Yes.

3    Q.   Okay.  But you knew that that was a process that was in

4    place, that whatever hours you worked were recorded on some

5    document and turned in to the payroll department so that you got

6    paid, right?

7    A.   The process I'm not familiar, but Ms. Velgara counted -- had

8    the time sheets.  That's all I know.

9    Q.   All right.  So, you knew that time sheets were actually

10   being created for your time at the Golden Light Clinics?

11   A.   I was told, yes.

12   Q.   Did you take any steps to ask the person who was creating

13   those time sheets for you to also create a time sheet for you

14   for the work that you did for Dr. Kuchipudi?

15   A.   No.

16   Q.   And, again, I'm not suggesting there's anything wrong with

17   that.

18        Let me ask you this, Doctor.  Is it fair to say that

19   you are not someone who focuses on the business side of

20   medicine?

21   A.   The money, it's not important for me, as far as medicine's

22   concerned.

23   Q.   You're someone who enjoys treating patients, right?

24   A.   That's all I know.

25   Q.   You enjoy the practice of medicine, yes?

4980

Stamboliu - cross

1   A.  Indeed.

2   Q.  You enjoy interesting cases, right?

3   A.  Yes.

4   Q.  The money is not something you've ever focused on, right?

5   A.  It's not a primary factor.

6   Q.  All right.  Now, in the beginning when you started -- so,

7   early 2011, January of 2011 -- your work covering for

8   Dr. Kuchipudi was limited; is that fair?

9   A.  Yes.

10  Q.  And then as time went on, the requests for you to cover for

11  did Dr. Kuchipudi became more frequent, more regular?

12  A.  Yes.

13  Q.  And after a number of weeks or so, it became your practice

14  to call Mike Castro on Friday if you hadn't heard from anybody

15  about whether or not they wanted you to come in on Saturday or

16  Sunday, right?

17  A.  Yeah.  Because it happened on a few occasions that call's

18  late.

19  Q.  I'm sorry?

20  A.  He was calling late.

21  Q.  Mr. Castro?

22  A.  Yeah.  He was calling late.  So, in order to avoid, said do

23  you need me on the weekends.

24  Q.  I see.

25  A.  So, for me to be able to avoid those, you know -- so, the

Stamboliu - cross

```
 1    idea was I just didn't want to give Dr. Kuchipudi the impression
 2    that I'm going to take care of -- I mean, I'm going to take over
 3    his patients.
 4    Q.  Right.  And so, going forward, you know, in January of 2011
 5    and going forward, it was Mike Castro who you would talk to or
 6    who would call you to tell you whether or not he wanted you to
 7    come in?
 8    A.  He either called or I called him.
 9    Q.  Okay.  Mike Castro is the person you dealt with on this?
10    A.  Yeah.
11    Q.  And after you started coming in to cover for Dr. Kuchipudi
12    to see his patients on weekends, you never came back to Clarence
13    Nagelvoort and told him what hours you had worked, right?
14    A.  No.
15    Q.  You never turned in any hours for that work?
16    A.  No, I did not.
17    Q.  Not to Clarence Nagelvoort, right?
18    A.  No.
19    Q.  Or anyone else at Sacred Heart?
20    A.  No.
21    Q.  Okay.  And you never went to Mr. Nagelvoort and said, hey,
22    I'm not getting paid for this?
23    A.  No, I didn't tell him that.
24    Q.  You recall that Mr. Nagelvoort left Sacred Heart just a few
25    months after you started doing this, right?
```

Stamboliu - cross

 1    A.   Yes.

 2    Q.   And so, never in January of 2011 did you go to

 3    Mr. Nagelvoort and say here are my hours or here's how much I

 4    think I should be paid, right?

 5    A.   Right.

 6    Q.   Not in February or March of 2011, right?

 7    A.   Yes.

 8    Q.   Not in April of 2011?

 9    A.   Yes.

10    Q.   And, in fact, the first time that you ever said to someone

11    in the management at Sacred Heart, hey, I've been working these

12    hours, and I want to be paid was two years later in late 2012,

13    right?

14    A.   One year.

15    Q.   Okay.  Well, it was in November of 2012 was the first time

16    that you ever submitted your time to Mr. Puorro, correct?

17    A.   I mentioned to him about working with Dr. Kuchipudi, but

18    yeah.

19    Q.   Okay.  So, I don't want to quibble over whether it was

20    November or July, but it was more than a year after you had been

21    doing this?

22    A.   Yes.  Indeed, yes.

23    Q.   That was the first time you ever went to someone and said

24    hey, I've been working these hours, and I think I deserve to be

25    paid.

Stamboliu - cross

1    A.  Yes.

2    Q.  And this goes back to one of the things that we touched on

3    earlier.  The reason or at least a reason that you never turned

4    in any hours or ever asked anyone to be paid was because

5    receiving payment for those few hours of work each week was not

6    an issue for you.

7    A.  No.  I mean, I knew I'm going to get paid.  It was the

8    hospital.

9    Q.  But am I correct, sir, that you didn't report the hours that

10   you had worked?

11   A.  Yes.

12   Q.  Because receiving payment for those hours was not an issue

13   for you?

14   A.  I was not concerned that I'm not going to get paid.

15   Q.  All right.  Going back to the meeting you had with the

16   government a year ago on February 28th of 2014, do you recall

17   telling them that you went the full year of 2011 without

18   reporting any of the hours you worked because receiving payment

19   for that was not an issue for you?

20   A.  Yes.

21   Q.  Okay.  And that was true, right?

22   A.  Yes.

23   Q.  And, in fact, on a professional level, you enjoyed the

24   medical cases that Dr. Kuchipudi's patients presented, fair?

25   A.  Yeah.  They were nice cases, yes.

Stamboliu - cross

```
1    Q.  And you enjoyed the pathology that you saw with those
2    patients and had to deal with, right?
3    A.  Right.
4    Q.  Yes?
5    A.  Yes.
6    Q.  Okay.  You liked seeing Dr. Kuchipudi's patients on a
7    professional level because they were interesting cases to you,
8    correct?
9    A.  Yes.
10   Q.  It wasn't because you were getting paid an hourly wage.  It
11   was because this was a very interesting thing for you as a
12   doctor who likes to treat patients.
13   A.  Yes.
14   Q.  And during this time, you know, the work on a Saturday or
15   Sunday for Dr. Kuchipudi was not the only work you were doing,
16   right?
17   A.  Yes.
18   Q.  You had your own patients?
19   A.  Yes.
20   Q.  And you obviously had income from that, correct?
21   A.  Yes.
22   Q.  And you were paid a decent wage by Sacred Heart for your
23   regular work at the Golden Light Clinics, right?
24   A.  Yeah.  What they paid to me.  Yes.
25   Q.  You also had your own patients at nursing homes, right?
```

Stamboliu - cross

1    A.  Yes.

2    Q.  A few of them?

3    A.  Yes.

4    Q.  A few different nursing homes that you regularly saw

5    patients at?

6    A.  Yes.

7    Q.  That were your patients?

8    A.  Yes.

9    Q.  Now, isn't it true, Dr. Stamboliu, that starting in January

10   of 2011 -- let me back up.

11        Is it your recollection that in 2011 -- let's take the

12   time period from January of 2011 through April of 2011.  Okay?

13   Do you recall that you were typically working three days a week

14   for five hours a day at the Golden Light Clinic?

15   A.  I don't recall how many days I was working at -- I know more

16   than towards the end of my working at Sacred Heart.

17   Q.  Okay.  And do you recall that starting right after this

18   arrangement was made where you were going to also come in on a

19   weekend day or maybe sometimes both weekend days to cover for

20   Dr. Kuchipudi, that starting in January of 2011 Sacred Heart

21   added extra pay to your paychecks?

22   A.  It was later on, not exactly on that particular.

23   Q.  Okay.

24        MR. CAMPBELL:  May I approach, Judge?

25

Stamboliu - cross

```
 1    BY THE WITNESS:
 2    A.  I'm not very sure when they added that extra hours.
 3    BY MR. CAMPBELL:
 4    Q.  Okay.  Do you recall, sir, that you were paid every two
 5    weeks?
 6    A.  From Golden Light, yes.
 7    Q.  And do you recall that whenever it started, there was an
 8    extra ten hours every paycheck for this extra work?
 9    A.  Yes.
10          MR. CAMPBELL:  May I approach, Judge?
11          THE COURT:  Yes.
12    BY MR. CAMPBELL:
13    Q.  I'm going to show you what I've marked as Defendants'
14    Exhibit B221, and if you would flip through that and see if you
15    recognize that as the records reflecting your time worked at the
16    Golden Light Clinic and the payroll records showing how much you
17    were paid, the hours you were paid for, during those pay
18    periods.
19    A.  You asked if I recognize this?  This is the first time I've
20    seen this paper.
21    Q.  Okay.  So, you don't recognize this as --
22    A.  I have not seen this.
23    Q.  Take a look at Page 2.
24    A.  Yeah.
25    Q.  Do you recognize that as the time sheet that was filled out
```

Stamboliu - cross

1    for you for your work at Golden Light Clinics?

2    A.  I didn't see this format ever.

3    Q.  Okay.

4    A.  The hours they sound okay.

5    Q.  I'm sorry?

6    A.  The hours, 9:00 to 2:00, that's my schedule.  But I'm not --

7    I have never seen this format.

8    Q.  Let me ask you this way then.  Take a look at the second

9    page of this exhibit.  Okay?

10   A.  (Indicating.)

11   Q.  Yes, sir.  Review that, and then I'm going to ask you if

12   having reviewed that, does that refresh your recollection that

13   in January of 2011 your typical schedule was to work 9:00 a.m.

14   to 2:00 p.m. three days a week at the Golden Light Clinic.

15   A.  Yes, that does.

16   Q.  Okay.  And if you'll go to the first page, does looking at

17   this refresh your recollection that you were paid an extra

18   ten hours every pay period once you started doing this extra

19   work seeing patients, inpatients at the hospital, on the

20   weekends.

21        MR. HAMMERMAN:  Your Honor, I'm going to object.  The

22   witness hasn't said that he doesn't recall what he's now having

23   his recollection refreshed on.  He's already testified to this.

24        THE COURT:  Rephrase the question.

25        MR. CAMPBELL:  Okay.

Stamboliu - cross

```
 1   BY MR. CAMPBELL:
 2   Q.  So, putting aside the document for a moment, do you recall,
 3   Dr. Stamboliu, that beginning not later than January of 2011
 4   Sacred Heart started paying you an extra ten hours every pay
 5   period for this extra work?
 6   A.  The extra work was for night calls, for night coverage.
 7   Q.  Okay.  So, my question is starting in January of 2011, you
 8   do recall that Sacred Heart started paying you an extra ten
 9   hours of time every paycheck?
10   A.  Yes.  I was told that --
11   Q.  And I don't mean to interrupt you.
12          THE COURT:  Wait for the whole question.
13          THE WITNESS:  Yeah.
14   BY MR. CAMPBELL:
15   Q.  And I'm going to try to ask just a yes or no question so we
16   can move forward.
17   A.  Okay.
18   Q.  Do you recall that starting in January of 2011, based on
19   extra duties, you were paid an extra ten hours of time every
20   paycheck?
21          MR. HAMMERMAN:  Your Honor, I'm going to object
22   because --
23          THE COURT:  The objection's overruled.
24          THE WITNESS:  What am I doing?
25          THE COURT:  You're answering.  Do you remember the
```

Stamboliu - cross

1    question at this point?
2            THE WITNESS:  Yeah.  If I remember if I was paid --
3    BY MR. CAMPBELL:
4    Q.  Extra ten hours --
5    A.  Extra ten hours.
6    Q.  -- every paycheck starting in January of 2011.
7    A.  Yes.
8    Q.  Okay.  And if you'll turn to the fourth page of this
9    exhibit, does that refresh your memory that you were working
10   15 hours a week, consisting of five hours a day, three days a
11   week at the Golden Light Clinics?
12   A.  Yes.
13   Q.  In February of 2011.
14   A.  According to the time sheet, it shows, yes.
15   Q.  And that was your regular schedule in January, February,
16   March, and April of 2011; isn't that true?
17   A.  Yes.
18   Q.  All right.  And three days a week at five hours a day is
19   15 hours a week, correct?
20   A.  Yes.
21   Q.  All right.  Each paycheck you got, in addition to the
22   30 hours for the two weeks, additional money from Sacred Heart
23   for these extra duties, right?
24   A.  Ten hours.
25   Q.  Ten hours.  Okay.

Stamboliu - cross

1          Now, at some point -- I don't remember the exhibit
2     numbers.  They're in the 6000s or so.  At some point in 2012 is
3     the first time you created this spreadsheet, right?
4     A.  Yes.
5     Q.  And you first created that spreadsheet more than a year
6     after you had started doing this work?
7     A.  Yes.
8     Q.  And more than a year after Clarence Nagelvoort had no longer
9     been at Sacred Heart, correct?
10    A.  Yes.
11    Q.  Okay.  I want to, if I can, pull up that exhibit.  This is
12    Government's Exhibit 6207.
13          MR. CAMPBELL:  This is admitted, right?
14          MR. HAMMERMAN:  Yes.
15    BY MR. CAMPBELL:
16    Q.  All right.  I don't know if you have that in front of you,
17    but --
18    A.  I just have the sticker, yes.
19    Q.  You do have it or you don't?
20          THE COURT:  He can see it.
21    BY THE WITNESS:
22    A.  Yes.
23    BY MR. CAMPBELL:
24    Q.  Okay.  Great.  And, Doctor, I'm glad to know there's someone
25    other than me that doesn't know how to use Excel precisely.

Stamboliu - cross

1          This column, this first column, is the date column; is

2     that right?

3     A.  Yes.

4     Q.  All right.  And so, this one at the top is --

5     A.  2-5-11.

6     Q.  -- February 5th of 2011?

7     A.  Yes.

8     Q.  All right.  And so, I've tried to highlight all the dates in

9     2011 where you worked seeing patients that were not yours at

10    Sacred Heart.  Okay?

11    A.  Saw the patients which I seen for Dr. Kuchipudi.

12    Q.  Yes, right.  That's what this spreadsheet is?

13    A.  Yes.

14    Q.  All right.  So, I think we're going to start -- I'm going to

15    try and go in date order, and you can tell me if I've got all

16    the dates right.  We've got January 15th of 2011?

17    A.  Yes.

18    Q.  January 16 of 2011?

19    A.  Yes.

20    Q.  January 18 of 2011?

21    A.  Yes.

22    Q.  All right.  January 23 of 2011?

23    A.  Yes.

24    Q.  January 24 of 2011?

25    A.  Yes.

Stamboliu - cross

1    Q.  All right.  And then coming onto this sheet, January 30th of

2    2011?

3    A.  Yes.

4    Q.  And then we go up here to catch February 5th of 2011?

5    A.  Yes.

6    Q.  All right.  And then these remaining dates, February 6th,

7    March 5th, March 6th, right?

8    A.  Yes.

9    Q.  We've got dates down here in February.  February 12th and

10   13th, February 19th, February 20th of 2011?

11   A.  Yes.

12   Q.  And then up here March 5th, March 6th.  Down here

13   March 12th, March 26, March 27 of 2011.  Correct?

14   A.  Yes.

15   Q.  And then we've got April 2nd and 3rd, April 10th, April 17,

16   and April 24.

17   A.  Yes.

18        MR. CAMPBELL:  Judge, I've written down those records

19   on a piece -- or those dates and the times on a piece of paper.

20   May I use that as a demonstrative?

21        THE COURT:  That's fine.  As a demonstrative.

22   BY MR. CAMPBELL:

23   Q.  All right.  So, these are the numbers based on Government's

24   Exhibit 6207, and we see the first date January 15th, and I'll

25   represent to you --

4093

Stamboliu - cross

1           THE COURT:  Can we try to get to the bottom line
2    here --
3           MR. CAMPBELL:  Yeah.
4           THE COURT:  -- given the hour of the day?
5           MR. CAMPBELL:  Yes.
6    BY MR. CAMPBELL:
7    Q.  Is it fair to say, sir, that if you look at the time that
8    you worked January 15th and 16th -- that was a Saturday and
9    Sunday -- that totals eight hours, right?
10   A.  Yes.
11   Q.  The next weekend you only worked on the Sunday, correct?
12   A.  Yes.
13   Q.  For three hours?
14   A.  Yes.
15   Q.  January 30th you worked only on that Sunday, and it was
16   five hours, correct?
17   A.  Yes.
18   Q.  Yes?
19           THE COURT:  He said yes.
20           MR. CAMPBELL:  Oh, he said yes?  Okay.
21   BY MR. CAMPBELL:
22   Q.  The next weekend it was six hours.
23   A.  Yes.
24   Q.  Okay.  And so, when this started, typically you were working
25   sometimes three, sometimes six, sometimes a little more,

Stamboliu - cross

1    sometimes a little less, right?

2    A.  Whenever it was necessary, yes.

3    Q.  And you were getting paid ten hours every paycheck by Sacred

4    Heart?

5    A.  Yes.

6    Q.  All right.  I want to talk to you next about the decision to

7    discharge a patient.  Okay?

8    A.  Um-hm.

9    Q.  Am I correct, sir, that you rarely sent -- if a patient came

10   from a nursing home, was sent to Sacred Heart by a nursing home

11   on a weekend, you rarely sent that person home immediately?

12   A.  Yes.

13   Q.  Okay.  And that was because you understood that

14   Dr. Kuchipudi wanted to -- if a nursing home had sent his

15   patient to the hospital, he wanted to see that patient before a

16   decision was made about whether the patient needed to be

17   admitted or should be sent back home?

18   A.  Yes, at the beginning that's the way it was.  Yes.

19   Q.  Okay.  And, also, it was common and reasonable to do some

20   diagnostic tests on patients who had been sent from the nursing

21   home to the hospital?

22   A.  Yes.

23   Q.  And there are a number of diagnostic tests that take some

24   time to get the results back?

25   A.  Yes.

4895

Stamboliu - cross

1    Q.  And based on your personal observation, your work dealing

2    with Dr. Kuchipudi's patients, it's your opinion that

3    Dr. Kuchipudi didn't send patients to Sacred Heart for no

4    reason, right?

5    A.  Yes.

6    Q.  I'm correct?

7    A.  The patients were sent to the hospital, they were evaluated

8    in the emergency room, and they were admitted.

9    Q.  Yeah.  He didn't send his patients to Sacred Heart for no

10   reason.

11          MR. HAMMERMAN:  Objection.  I'm sorry.  I didn't

12   realize you weren't done.  Objection foundation as to the

13   reasons Dr. Kuchipudi's doing anything.

14          THE COURT:  Well, no.  And we'll talk about that later.

15   Overruled.  You can answer.

16   BY MR. CAMPBELL:

17   Q.  Based on your observations and your work with his

18   patients --

19          THE COURT:  He's not asking for somebody else's

20   intention.  Okay?  He's asking based on his observation.

21   BY MR. CAMPBELL:

22   Q.  It was your view that Dr. Kuchipudi did not send his

23   patients to Sacred Heart for no reason.

24   A.  No.  They had medical reasons, yes.

25   Q.  They had a medical issue, right?

Stamboliu - cross

1    A.  They had medical issues, yes.

2    Q.  And based on your interaction with these patients and your

3    treatment of these patients, Dr. Kuchipudi had very complex

4    patients, right?

5    A.  Yes.

6    Q.  Many of Dr. Kuchipudi's patients had chronic medical

7    problems, right?

8    A.  I would say all.

9    Q.  All?

10   A.  I would say all.

11   Q.  These were patients with serious medical problems?

12   A.  They were chronic problems (inaudible).

13   Q.  And is it also true, Doctor, based on your work, your own

14   work at nursing homes, that sometimes even if a patient's

15   condition isn't acute that they are better suited to be treated

16   in a hospital rather than a nursing home?

17   A.  Yes, I would say so.

18   Q.  And that's because sometimes what a patient needs is a more

19   controlled environment, right?

20   A.  I'm talking now from my experience.

21   Q.  Yes, sir.

22   A.  I mean, the nursing homes are not all the time staffed with

23   the best nursing personnel.  So, as a doctor, in order to keep

24   the patient safe, you feel much more comfortable having the

25   patient evaluated and, if necessary, admitted.

4897

Stamboliu - cross

1   Q.  And part of that evaluation process could be if you have

2   someone at the nursing home who recognizes a problem with the

3   patient and thinks it's significant enough to send them or

4   suggest that they go to the hospital holding that patient in

5   23-hour observation to see if there's any big problem?

6   A.  Yeah.

7   Q.  And it's your general practice that --

8   A.  I'm sorry?

9   Q.  I'm sorry.

10  A.  No.  Go ahead.

11  Q.  Your professional practice is to defer to the attending

12  physician on a discharge decision.  Is that fair?

13  A.  In my practice I discharged the patient.

14  Q.  It's your habit, it's your routine that if you're seeing the

15  patient of another doctor, it's the attending physician who

16  makes the decision about whether to discharge a patient?

17  A.  Yeah, it's safer.  The doctor has, you know, more -- a

18  different relationship with the patient than myself, who is

19  covering only weekends.

20  Q.  Right.  You would defer to the judgment of the doctor --

21  A.  I would say yes.

22  Q.  -- who's treating that patient?

23  A.  Yes.

24  Q.  And that was true not just with respect to Dr. Kuchipudi,

25  but that would be true with respect to any doctor's patients you

Stamboliu - cross

1    saw?

2    A.  Yes.

3    Q.  And it was your understanding that Dr. Kuchipudi had been

4    seeing many of these patients he had at the nursing homes for

5    years, right?

6    A.  Yes.

7    Q.  He had a long history with them?

8    A.  Yes.

9    Q.  And it was also your observation that Dr. Kuchipudi was

10    generally reserved and cautious in how he diagnosed a patient?

11    A.  I haven't seen the way he practices and how he diagnosed it.

12    I cannot make any comments about it.

13    Q.  Okay.

14    A.  He knew his patients, definitely.  He knew, I mean, that

15    they didn't -- were not very -- he didn't talk to me very much,

16    but he knew every time I talk to him about the patient, he knew

17    about the patient.

18    Q.  All right.  So, he knew a lot about his patients, right?

19    A.  Yeah.

20    Q.  And isn't it true, sir, that Dr. Kuchipudi, based on your

21    personal experience, Dr. Kuchipudi was generally reserved and

22    cautious when making a diagnosis?

23    A.  No, I cannot make any comment about that.

24    Q.  Do you recall meeting with the government on March 7 of last

25    year?

4999

Stamboliu - cross

1    A.  Yes.

2    Q.  On March 7 of 2014, did you tell these prosecutors and these

3    agents that Dr. Kuchipudi was generally reserved and cautious

4    when making a diagnosis?  Do you recall telling them that?

5    A.  Reserved?  That's not me.  Maybe that's the conclusion.  But

6    what I told them is that, yes, indeed, Dr. Kuchipudi knew his

7    patients.

8    Q.  Okay.  And that's true?

9    A.  Yeah.

10   Q.  And you talked about the fact that there were times when

11   Dr. Kuchipudi called you to talk about patients of his at Sacred

12   Heart who you could discharge, right?

13   A.  Yes.

14   Q.  He didn't try to keep all patients at Sacred Heart, right?

15   A.  That I don't know, if he wanted to keep all the patients at

16   Sacred Heart.

17   Q.  He certainly didn't want to keep the ones he was telling you

18   to discharge, right?

19   A.  Yeah, but your question was if he wanted to keep all his

20   patients at Sacred Heart.

21   Q.  Okay.  When you saw patients on the weekends at Sacred Heart

22   for Dr. Kuchipudi, you didn't create any documentation that was

23   intended to be used by Dr. Kuchipudi to bill for that, right?

24   A.  It's my progress notes.

25   Q.  Right.  The only thing you did was write progress notes in

Stamboliu - cross

1    the chart, correct?

2    A.  Yes.  That was to document that I saw the patient and what I

3    did and the patient's condition, yes.

4    Q.  You never talked to Dr. Kuchipudi about this term level of

5    care?

6    A.  No.

7    Q.  You never saw any of these sheets with Dr. Kuchipudi's

8    handwriting on them with the numbers?

9    A.  No.

10   Q.  Nobody at Sacred Heart ever told you they wanted you to

11   record level of care numbers on the charts of these patients?

12   A.  No.

13   Q.  Nobody ever told you they wanted you to identify CPT codes

14   for the services that you had rendered, correct?

15   A.  No.

16   Q.  And nobody from Dr. Kuchipudi's office ever called you and

17   said, hey, we want to know what level of care.  Was it a level

18   two or a level three.  Nobody from Dr. Kuchipudi's office called

19   you to ask you those questions, either, right?

20   A.  Yeah.  You got this right, yes.

21   Q.  And the first time that you ever heard that Dr. Kuchipudi

22   might be billing for the services you had provided, the first

23   time you ever heard that was in a meeting with Tony Puorro in

24   September of 2012, right?

25   A.  Yeah.  He said typically it's done like that.

5001

Stamboliu - cross

1    Q.   Okay.  He didn't even know himself whether that was going

2    on?

3    A.   Indeed.

4    Q.   And you certainly didn't know if that was going on.

5    A.   Definitely.

6            THE COURT:  Find a place to stop.

7            MR. CAMPBELL:  This is as good as any.

8            THE COURT:  Okay.  We need to stop a little bit early

9    today.  I've told the lawyers we're not going to stop before

10   5:00 anymore, and I'm going to ask the jurors whether -- and we

11   don't have to -- we'll talk about this on Monday.  I'd like to

12   make up these 15 minutes maybe on Tuesday by going 15 minutes

13   more, but if that poses a problem for train schedules for

14   anyone, I won't do it.  So, you'll let me know on Monday.  So,

15   just think about that.

16           So, I said I'd talk a little bit about where we are in

17   the schedule.  So, if you'll recall when we started, I said six

18   to eight weeks, and I was hoping to hit the low end of that.  We

19   lost two and a half days.  The jury selection took one day

20   longer than I expected.  I expected it to finish Monday, and it

21   took two days.  We lost a snow day.  And then we lost that half

22   day when one of the previous jurors got sick.

23           We're still going to be within the six to eight-week

24   estimate.  We're not going to be at the low end.  I'm hopeful

25   that we've got basically two more weeks to go, next week and the

1    following week.  Now, that's not a guarantee.  It's best
2    estimate based on discussions I've had with the lawyers and, you
3    know, trying to go through what's left and so on.  And that will
4    still have us within the six to eight.  It's seven, but it's not
5    really seven.  It's more like six plus a little bit given the
6    couple of days that we lost.
7            So, thank you again for being here and continuing to
8    stick it out.  Have a good weekend.  Drive carefully.  It got a
9    little snowy out there.  Don't discuss the case with anyone or
10   each other, and we'll see you on Monday morning.
11          (The following proceedings were had in open court, out of
12          the presence and hearing of the jury:)
13          THE COURT:  Okay.  9:30 Monday.  So, we are not
14   stopping before 5:00 o'clock anymore, just so everybody
15   understands that.  Whatever arrangements you got to make, make
16   them now.  We won't stop before 5:00 anymore.  See you Monday.
17          (Whereupon, the within trial was adjourned to Monday,
18          March 2, 2015, at 9:30 o'clock a.m.)
19
20
21
22
23
24
25