830

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )   Docket No. 13 CR 312
                                     )
4                  Plaintiff,        )   Chicago, Illinois
                                     )   June 4, 2015
5           v.                       )   1:37 p.m.
                                     )
6   RAJIV KANDALA and SHANIN         )
    MOSHIRI,                         )
7                                    )
                   Defendants.       )
8

9           TRANSCRIPT OF PROCEEDINGS-TRIAL
      BEFORE THE HONORABLE MATTHEW F. KENNELLY
10                  VOLUME 4-B

11

    APPEARANCES:
12

13  For the Plaintiff:   HON. ZACHARY T. FARDON
                         United States Attorney by
14                       MR. JOEL M. HAMMERMAN
                         MS. KELLY MATTEA GREENING
15                       MR. BRIAN S. WALLACH
                         219 South Dearborn, Suite 500
16                       Chicago, IL  60604
                         (312)353-5300
17
    For the Defendant
18  Rajiv Kandala:       COTSIRILOS, TIGHE, STREICKER, POULOS &
                         CAMPBELL, LTD., by
19                       MR. THEODORE THOMAS POULOS
                         MR. MARTY BASU
20                       33 North Dearborn Street, Suite 600
                         Chicago, Illinois 60602
21                       (312)263-0345

22

              JENNIFER DUNN, RMR, CRR
23             Contract Court Reporter
           79 West Monroe Street, Suite 1324
24             Chicago, IL 60603
                 312-578-9323
25           jennifer@real-timereporters.com

1    APPEARANCES CONTINUED:

2    For the Defendant
     Shanin Moshiri:        MR. CARL PETER CLAVELLI
3                           53 W. Jackson Blvd., Suite 733
                            Chicago, IL  60604
4                           (312)953-8165

5                           MS. JUSTINA SHOBAT,
                            53 West Jackson Blvd., Suite 1603
6                           Chicago, IL 60604
                            (312)353-2118

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

832

1                           I N D E X

2      WITNESS                                        PAGE

3      Maria Santiago
            Direct (Resumed) By Mr. Hammerman ........ 833
4           Cross By Mr. Poulos ..................... 841
            Cross By Mr. Clavelli .................... 866
5           Redirect By Mr. Hammerman ................ 869

6      James Bailey
            Direct By Ms. Greening .................. 873
7           Cross By Mr. Poulos ..................... 884
            Redirect By Ms. Greening ................ 893
8
       Vijay Pallekonda
9           Direct By Ms. Greening  ................. 894

10

11

12                        E X H I B I T S

13     NUMBER                                       ADMITTED

14     Government Exhibit

15          No. 5465  ................................ 833
            No. 5434  ................................ 841
16          No. 3901  ................................ 897
            No. 3904A  ............................... 903
17          No. 3915  ................................ 915
            No. 3904B  ............................... 916
18          No. 3904C  ............................... 917
            No. 3918  ................................ 921
19          No. 3905  ................................ 922
            No. 3909D  ............................... 927
20          No. 3904D  ............................... 932
            No. 3917  ................................ 937
21          No. 3909A  ............................... 940
            No. 3913  ................................ 946
22          No. 3911B  ............................... 951

23     Defendants' Exhibit

24          No. 1032  ................................ 886
            No. 1033  ................................ 889
25          No. 1020  ................................ 893

833

Santiago - Direct (Resumed) by Hammerman

1    THE COURT:  Okay.  Sorry for the late start.

2    Everybody's present, including the two defendants.

3        And Mr. Hammerman, you can proceed.

4        MARIA SANTIAGO, GOVERNMENT WITNESS, PREVIOUSLY SWORN

5        DIRECT EXAMINATION (Resumed)

6    BY MR. HAMMERMAN:

7    Q   Ms. Santiago, I'm going to show you, once again, when you

8    go back to the first two checks we looked at on the time

9    sheets, if you remember, it's these checks for April and May

10   2012, and then for June of 2012 that were issued on July 25th,

11   2012, and then the second check on August 2nd, 2012.

12       And I want to show you, maybe you can see a little

13   better.  I want to show you now what's been marked Government

14   Exhibit 5465.  And it's an email correspondence that you had

15   with Tony Puorro.  Do you see that?

16   A   Yes.

17   Q   And do you recognize this as an email exchange that you had

18   with Mr. Puorro?

19   A   Yes.

20       MR. HAMMERMAN:  The government would seek the

21   admission of Government Exhibit 5465.

22       THE COURT:  5465 you said?

23       MR. HAMMERMAN:  Yeah.

24       THE COURT:  That's admitted without objection.

25      (Government Exhibit 5465 admitted in evidence.)

Santiago - Direct (Resumed) by Hammerman

1    BY MR. HAMMERMAN:

2    Q    I want to focus on the first email in the chain,

3    Ms. Santiago.  Can you read what's written here on the bottom

4    half of the government exhibit, the email from Mr. Puorro to

5    you?

6    A    "Gladys, received three months worth of invoices from

7    Dr. Kandala.  I will place them in your box for processing.

8    Please generate a check for the first two invoices ASAP and

9    process the remaining one week next."

10   Q    Okay.  And when was that sent to you?

11   A    It says July 24.

12   Q    What day?

13   A    Oh.  July 23.  Sorry.

14   Q    Okay.  And I want to show you, once again, we looked at the

15   invoices that Mr. Puorro provided you; and what was the date?

16   Is it that same date?

17   A    Yeah.  July 27, I guess.

18   Q    Well, can you see it here also?

19   A    Yes.

20   Q    And then here?

21   A    Yes.

22   Q    Maybe this last one, the one that's attached to the letter

23   that's signed under the July 1st date is the easiest to read.

24   Can you read the date on that one?

25   A    July 23rd.

Santiago - Direct (Resumed) by Hammerman

1  Q   Going back to Government Exhibit 5465 you responded.  Do

2  you see that?

3  A   Yes.

4  Q   What did you write?

5  A   "We received three months worth of invoices from

6  Dr. Kandala."

7  Q   No.  What did you respond at the top?

8  A   Oh, sorry.  "Check No. 32291 mailed 7/25/12 for $8,000,

9  paid May and June invoices."

10  Q   Okay.  And I want to put that invoice that we looked at,

11  the first invoice in your testimony today for Dr. Kandala.  Do

12  you see that?

13  A   Yes.

14  Q   Okay.  And you see here -- just a second.  What's the date

15  on the check at the bottom?

16  A   It doesn't show it.

17  Q   Can you see it?

18  A   7/25/12.

19  Q   Same date as in your email?

20  A   Yes.

21  Q   All right.  It's easier if I just do this.  Okay.  This is

22  the amount of the check?

23  A   Yes.

24  Q   Same amount as the stub -- as referenced in the email?

25  A   Yes.

Santiago - Direct (Resumed) by Hammerman

1    Q    What's the check number that you wrote in your email?

2    A    Oh.  32291.

3    Q    What's the check number?

4    A    32295.  It was just five away.

5    Q    Now I'd like to go back to where we left off before lunch.

6    We were looking at some copies --

7             THE COURT:  If you could not breathe right into the

8    thing --

9             THE WITNESS:  I'm sorry.

10            THE COURT:  -- we all get the heavy breathing.

11            THE WITNESS:  I'm sorry.  I forgot about that.

12            THE COURT:  You remember it from the last time?

13            THE WITNESS:  Yes.

14   BY MR. HAMMERMAN:

15   Q    Looking back at Government Exhibit 5447 and the first page

16   of that is, once again, a check stub.  Do you see that?

17   A    Yes.

18   Q    And what's the date of service that's reflected in the note

19   here?

20   A    December 2012.

21   Q    And what's the check date?

22   A    February 28th, '13.

23   Q    Okay.  I want to show you now page 2 of Government

24   Exhibit 5774 [sic].  Do you see that?

25   A    Yes.

Santiago - Direct (Resumed) by Hammerman

1  Q   Is it, once again, one of these letters from Dr. Kandala?

2  A   Yes.

3  Q   What's the note that you see here?

4  A   "Hold payment until Dr. Kandala provides SHA with a report

5  requested.  Thanks, Tony."

6  Q   And then there's some handwriting right here.  Do you see

7  that?

8  A   Yes.

9  Q   Do you recognize that handwriting?

10 A   Yes.

11 Q   Whose handwriting is this?

12 A   I think that's mine.

13 Q   And what did you write?

14 A   "Released 2/28/13."

15 Q   Is that the same date as the check stub that we just looked

16 at on the front page of Government Exhibit 5447?

17 A   Yes.

18 Q   And is this, once again, a sheet showing hours that was

19 sent under the signature of Dr. Ravjit Kandala?

20 A   Yes.

21 Q   And turn to the third page of Government Exhibit 5.

22         THE COURT:  Can you put that -- can I see that

23 previous page for a second there?

24         MR. HAMMERMAN:  Absolutely.

25         THE COURT:  That's good.  You're okay.  Go ahead.

Santiago - Direct (Resumed) by Hammerman

1    BY MR. HAMMERMAN:

2    Q    Let me show you the third page of Government Exhibit 5447.

3    Do you see that?

4    A    Yes.

5    Q    Is this, yet again, another check stub?

6    A    Yes.

7    Q    What's the date of this check?

8    A    December 6th, 2012.

9    Q    Okay.  And what's the invoice date?

10   A    November 30th, 2012.

11   Q    I apologize.  I took them out of order, but that's the

12   order I had them in.

13   A    That's okay.

14   Q    Do you have yet another invoice here for dates in November?

15   A    Yes.

16   Q    And what's the date of the letter?

17   A    December 1st, 2012.

18   Q    Okay.  And does it say -- what's the note that's written on

19   the top left?

20   A    "Gladys, please process.  Thanks, Tony.  December 5th,

21   2012".

22   Q    And is there, once again, a letter from Dr. Kandala with

23   hours showing the time worked?

24   A    Yes.

25   Q    All right.  And finally, is there -- that's the check,

Santiago - Direct (Resumed) by Hammerman

1   then -- I'm sorry.  What date did you -- did Tony sign this?

2   A   December 5th, 2012.

3   Q   And is that the day before, then, a check was issued here

4   for the same month?

5   A   Yes.  December 6th.

6   Q   And I want to go back and show you one last thing,

7   Ms. Santiago, before we leave; these invoices and check stubs.

8   Going back one last time to Government Exhibit 5411, this was

9   that check stub, the third page of the fax that came from

10  Ravjit Kandala on July 12th.  There's a small note written in

11  the lower left-hand corner.  Do you see that?

12  A   Yes.

13  Q   Let me see if I can make it larger.  What does that note

14  read?

15  A   "41720950 okay per Roy, same as Dr. Maitra," I think, or

16  Moshiri.  I don't know for sure what -- I don't know.

17  Q   You said Maitra?

18  A   I'm not --

19  Q   Do you want to look at the original?  Would it help?

20  A   Yeah, maybe.  I don't remember.  I can't remember what I

21  wrote.  Looks like "Same as Dr. Maitra."

22  Q   What's the date there?

23  A   August 1st, 2012.

24  Q   And that long number sequence, what was that number

25  sequence?

Santiago - Direct (Resumed) by Hammerman

1    A    41720950.

2    Q    What is that?

3    A    That's the DL number.

4    Q    Is that the number that you would then code the checks that

5    you were writing for Dr. Kandala into the general ledger?

6    A    Yes.

7    Q    Who told you to code the checks to Dr. Kandala as general

8    ledger code 41720950?

9    A    If I wasn't sure where to code it, I asked Roy Payawal.

10   Q    And does your note here actually say that this was the code

11   per Roy?

12   A    Yes.

13   Q    Did Mr. Payawal tell you to code the invoices for

14   Mr. Kandala under that particular GL code?

15   A    It says like I asked, and he said okay.

16   Q    Is that what your note reflects?

17   A    Yes.

18        THE COURT:  Can I see the note again?  Thank you.

19   7/1/12.  Okay.  Thanks.

20   BY MR. HAMMERMAN:

21   Q    One more exhibit I'd like to show you, Ms. Santiago.  Let

22   me show you what's been marked as Government Exhibit 5434.  Is

23   this, once again, the accounts payable records that you would

24   put together the 1099s for payees at the end of the year?

25   A    Yes.

Santiago - Cross by Poulos

1   Q   I'm going to show you -- we have this and then, once again,

2   do you recognize these kind of markings on the area of the form

3   for Dr. Kandala?

4   A   Yes.

5   Q   And who made those types of marks when putting -- when

6   trying to compile the information for the 1099s?

7   A   I did.

8           MR. HAMMERMAN:  Your Honor, we'd seek the admission of

9   Government Exhibit 5434.

10          THE COURT:  Any objection to that one?

11          MR. POULOS:  No objection.

12          THE COURT:  It's admitted.

13      (Government Exhibit 5434 admitted in evidence.)

14  BY MR. HAMMERMAN:

15  Q   What was the total amount that was paid in fiscal year 2012

16  to Dr. Ravjit Kandala?

17  A   32,200.

18          MR. HAMMERMAN:  One moment, your Honor.

19          THE COURT:  Sure.

20          MR. HAMMERMAN:  No further questions.

21          THE COURT:  Mr. Poulos.

22                      CROSS-EXAMINATION

23  BY MR. POULOS:

24  Q   Good afternoon, ma'am.  I want to start with Government

25  Exhibit -- what's already admitted into evidence as Government

Santiago - Cross by Poulos

1    6344.   You remember Mr. Hammerman showed you this email from

2    Serena Sumrell to Tony Puorro from June 25th -- I'm sorry, June

3    27th?  Do you see that?

4    A    Yes.

5    Q    And you see here Serena Sumrell told Tony Puorro, "Attached

6    are the three time sheets you needed scanned for Dr. Kandala."

7    Do you understand that?

8    A    Yes.

9    Q    And those three time sheets, according to this document,

10   are attached to this email, correct?

11   A    It seems.

12   Q    And do you remember Mr. Hammerman comparing these -- these

13   time sheets from June 27th to the time sheets that were in your

14   file for those first three months; do you remember that?

15   A    Yes.

16   Q    Now, one of the other things that you had in your file, and

17   it's part of Government Exhibit 5411 is you kept a copy of the

18   actual contract between Sacred Heart and Dr. Kandala in your

19   file as well, right?

20   A    Yes.

21   Q    And I will put that on the screen.  This is the contract

22   that's part of Government Exhibit 5411.  And you see that's --

23   is that your handwriting, Gladys?

24   A    That might be the person that was going to give it to me.

25   Q    Okay.  But you've reviewed the file and you know you had a

Santiago - Cross by Poulos

1   copy of the contract, correct?

2   A    Yes.

3   Q    Okay.  Now, one thing I want to point to here is under the

4   scope of duties for Dr. Kandala do you see under paragraph 2A

5   it says that "On a schedule and at locations to be agreed upon

6   by hospital and physician, physician shall provide no more than

7   23 hours per month of education to hospital patients and staff

8   on issues concerning palliative care and treatment of hospice

9   or terminally ill patients."  Do you see that?

10  A    Yes.

11  Q    And two sentences later it says, "Physician shall also

12  perform such other services as hospital may from time to time

13  reasonably request," correct?

14  A    Yes.

15  Q    And it says that "Physician shall prepare and submit

16  monthly record of services rendered and time extended in

17  performing the services under this agreement in a format

18  provided by the hospital."  Do you see that?

19  A    Yes.

20  Q    Okay.  Now, this language talks about palliative care.  Do

21  you see that, and treatment of hospice, correct?

22  A    Yes.

23  Q    Okay.  Now, if we go back to the first invoices, the one

24  from January 27th, there are no dates of service that are

25  reflected on here, right?

Santiago - Cross by Poulos

1   A    Right.

2   Q    And the largest number of hours here is for "Hospice new

3   program development, 15 hours."  Do you see that?

4   A    Yes.

5   Q    This is on the invoice for May 1st, correct?

6   A    Yes.

7   Q    Now I'm going to go to the original.  When we go to the

8   original -- I'm sorry.  Now I'm going to show you the ones out

9   of your file, which the three -- you remember the three

10  invoices were faxed all on July 12th, correct?

11  A    Yes.

12  Q    Okay.  And you see that the original -- when I say

13  "original," I mean the June 27th.  It had "Hospice new program

14  development, 15 hours," correct, on the invoice dated May 1st,

15  correct?

16  A    Yes.

17  Q    And then this one that was faxed by Dr. Kandala on July

18  12th it still had "Hospice new development program," correct,

19  with some -- some amount of time under there; do you see that?

20  A    Yes.

21  Q    And on the invoice that -- that -- after this got faxed in,

22  do you remember if Tony Puorro is the one who gave you these

23  faxed invoices?

24  A    I'm sorry?

25  Q    Do you remember if Tony Puorro is the one who gave you

Santiago - Cross by Poulos

1    these three faxed invoices?

2    A    They would come from Tony, yes.

3    Q    And you didn't scratch out the amount of time that Mr. --

4    that Dr. Kandala entered for hospice new development program,

5    did you?

6    A    No.  I would not make changes.

7    Q    This would have been scratched out by the time it was given

8    to you?

9    A    Yes.

10   Q    But both invoices that Dr. Kandala submitted have --

11   reflect time for the hospice new program development, correct?

12   A    Yes.

13          MR. POULOS:  Just want to try and make sure I keep

14   these in order, Judge.

15   BY MR. POULOS:

16   Q    And then the same thing for the June -- the same thing for

17   the faxed June 1st dated invoice for May time.  Again, the time

18   references that Dr. Kandala submitted for hospice new

19   development program, somebody scratched those out before it was

20   given to you to pay, correct?

21   A    It seems so, yes.

22   Q    Is that right?

23   A    Yes.

24   Q    Ma'am, I just want to go through the invoices and line them

25   up one at a time by check, if we may, okay?

Santiago - Cross by Poulos

1    A    Okay.

2    Q    Bear with me.  So this -- this is out of 5411.  Remember at

3    5411 you had a fax for April time dated May 1st, correct?

4    A    Yes.

5    Q    And then you have a fax for May time dated June 1st,

6    correct?

7    A    Yes.

8    Q    And then you issued a check for those two invoices on July

9    25th, correct?

10   A    Yes.

11   Q    And you're the one who decided what to put in this column

12   under "Date" on the check stub, correct?

13   A    That's according to what the invoice says for what month

14   the -- the hours are.

15   Q    I understand, but you decided to put May 1st there,

16   correct?

17   A    Yes.

18   Q    And you decided to put April 1st there, correct?

19   A    Yes.

20   Q    All right.  Okay.  So that's the time for April and May

21   paid on July 25th, correct?

22   A    Yes.

23   Q    Okay.  And we get to the third faxed invoice.  This is for

24   June time.  Also, this is the third faxed invoice for June

25   time, correct?

Santiago - Cross by Poulos

1   A    Yes.

2   Q    Dated July 1st, correct?

3   A    Yes.

4   Q    Did you know who wrote in the handwritten entry of June

5   5th, "Critical Care Meetings"?

6   A    I would not know that.

7   Q    Okay.  And ma'am, in your file, there are two copies of --

8   of this invoice.  Do you see it?

9   A    Yes.

10  Q    So I'm going to put the second one up there.  As you see,

11  it's the exact same signature with the same handwritten entry

12  on critical care meeting.  Do you see that?

13  A    Yes.

14  Q    Okay.  But the notations on here are a little different,

15  right?

16  A    Yes.

17  Q    Do you know why it is you had two copies of this?

18  A    They were both sent to me at different times.  I don't

19  know.

20  Q    Okay.  So you don't know?

21  A    They were sent to me.  I don't --

22  Q    Okay.  Now, let me point out that on the one that has the

23  fax header on, it's for June time.  You see that it refers to

24  April?

25  A    Yes.

Santiago - Cross by Poulos

1   Q    And then on this one somebody handwrote in June.  Is that
2   Tony Puorro's handwriting?
3   A    I don't remember who wrote it, but it seems like this is
4   the corrected one from the previous one is what it looks like
5   to me.
6   Q    Ms. Santiago, I think you've identified Mr. Puorro's
7   handwriting umpteen time times for Mr. Hammerman.  Do you
8   recognize that as Mr. Puorro's handwriting?
9           THE COURT:  You're talking about the June there?
10          MR. POULOS:  Yes.
11          THE WITNESS:  The June, yeah, I'm not sure.
12  BY MR. POULOS:
13  Q    You can't say for sure?  Okay.  That's fine.
14          Now, so we have the two copies of the June invoice
15  dated July 1st, and then there's a third copy of the June
16  invoice dated July 1st.  Do you see that?
17  A    Yes.
18  Q    Now, it is this copy that has the note that you made to
19  yourself about having spoken to Roy, correct?
20  A    Yes.
21  Q    And Tony Puorro having signed off on July 23rd, correct?
22  A    Yes.
23  Q    And you see that the signature signoffs by Tony Puorro
24  are --
25  A    Yes.

Santiago - Cross by Poulos

1   Q   -- the same?  So do you recognize this as an additional

2   copy of that same document with the Puorro signoff?

3   A   Yes.

4   Q   Okay.  And then you entered this.  This is your

5   handwriting; is it not?

6   A   Yes.

7   Q   And you wrote July -- "July hold for invoice"?

8   A   Yes.

9   Q   "July entered but waiting for invoice."  Do you see that?

10  A   Yes.

11  Q   Now, ma'am, when you wrote July here, you were talking

12  about the period after the period on this invoice, correct,

13  because this covers June, correct?

14  A   No.  I'm saying I have time into July, the amount for July,

15  but I have to wait for the invoice.

16  Q   And you made that notation on July 25th?

17  A   Yes.

18  Q   Okay.  So this is talking about the period of July; in

19  other words, when you say the July invoice, you're not talking

20  about this period, the July 1st dated invoice covering June.

21  You're talking about the period for July?

22  A   Yes.

23  Q   The services for July?

24  A   I believe so.

25  Q   Okay.  And then just to go back to where we were, you have

Santiago - Cross by Poulos

1   Puorro signing off on these two documents, correct?  Let me get

2   them up there.

3   A   They would come signed already.

4   Q   Right.  And it's the one without his signature on there

5   that has the June -- the April date turned -- changed to June.

6   Do you see that?

7   A   He signed that one too, but . . .

8   Q   Do you recognize whose handwriting is on the lower

9   right-hand corner of this version of that invoice?

10  A   It could be -- it could be Tony Puorro, but --

11  Q   You're not sure?

12  A   I can't say for sure.

13  Q   Okay.  Now, again, for the June time period you got all

14  these invoices on the same day, correct?

15  A   Yes.

16  Q   And then when Puorro gave you these invoices, he sent you

17  this email reflected in Government Exhibit 5465, right?

18  A   I don't know if they came together.  I'd have to look at

19  the dates.

20  Q   Okay.  Well, let me -- let me just review that with you.

21  So for the record, we're now looking at the email, which is

22  Government Exhibit 5465 -- I'm sorry for moving that around,

23  Judge -- on July 23rd.  That's what it's dated, correct?

24  A   Um-hmm.

25  Q   And remember all those handwritten notations approving

Santiago - Cross by Poulos

1   those first three months of payments were signed off on July

2   23rd, correct?

3   A    It's --

4   Q    Let me refresh your recollection.  Remember July 23rd?

5   A    Yes, okay.

6   Q    And he sent you this email on the same date saying, "We

7   received three months worth of invoices for Dr. Kandala.  I

8   will place them in your box for processing," right?

9   A    Yes.

10  Q    So from that you know that he's the one who gave you these

11  three faxed invoices, correct?

12  A    Yes.

13  Q    Okay.  And then he told you to generate a check for the

14  first two ASAP and process the remaining one next week, right?

15  A    Yes.

16  Q    Do you know why he told you to do that?

17  A    No.

18  Q    So for the first two we're going back to the check stub for

19  the May and -- April and May service periods.  You issued that

20  check on July 25th, two days after he authorized it, correct?

21  A    Yes.

22  Q    And then for the period of June, the July 1st invoice for

23  the period covering June, you issued that as reflected in the

24  checks that related to that check on August 2nd, correct?

25  A    Yes.

Santiago - Cross by Poulos

1   Q   That would be exactly 7 days after July 25th of the first
2   two checks, correct?
3   A   Correct.
4   Q   Okay.  When you wrote -- now I'm going to get -- staying
5   within Exhibit 5411 now, we're going to get to the July
6   invoice, okay?  Do you see that?
7   A   Yes.
8           THE COURT:  By "the July invoice," you mean the
9   invoice for the month of July --
10          MR. POULOS:  Correct.
11          THE COURT:  -- not the one dated July?
12          MR. POULOS:  Yes.  Thank you, Judge.
13  BY MR. POULOS:
14  Q   So it's dated August 1st, correct?
15  A   Yes.
16  Q   And then it reflects service dates or a number of entries
17  during the month of July, correct?
18  A   Yes.
19  Q   Now, going back to the note you made on the June -- one
20  version of the June invoices, you said, "July entered but
21  waiting for invoice," right?
22  A   Yes.
23  Q   Why did you enter the July in on or before July 25th?  What
24  does that mean by "entered it"?
25  A   Because if we -- we were trying to get everything done for

Santiago - Cross by Poulos

1    July and if -- I don't know.  Maybe it was asked to enter it

2    because it's the same amount anyway, get it in there but don't

3    pay anything because I need the invoice.

4    Q    Okay.  Did anybody instruct you to do that, or you were

5    just trying to be efficient?

6    A    I don't recall if I was asked to do it or -- I'm sure I

7    talked to somebody about it.

8    Q    No.  I don't want you to guess.  Do you recall why you did

9    that?

10   A    I don't recall at this moment, but I wouldn't do anything

11   without speaking to someone first.

12   Q    Okay.  So now we're back to what I'm going to call the July

13   invoices dated August 1st and the check stub for that.  Again,

14   you entered July 1st, correct --

15   A    Yes.

16   Q    -- as the service date?

17        And you issued that check on August 8th --

18   A    Yes.

19   Q    -- correct?

20   A    Yes.

21   Q    That's just about -- and the June check you had issued on I

22   think we established August 2nd, correct?

23   A    Yes.

24   Q    Here it is for June again.  Just to refresh, it's August

25   2nd.  Six days later you're issuing one for July, correct?

Santiago - Cross by Poulos

1   A    Yes.

2   Q    Now, the checks that Dr. Kandala received didn't include

3   this kind of data, right, for what service time period

4   you're -- the date you put on here, does it?

5   A    Yes.

6   Q    It does include that?  Okay.  We'll see that later.

7           MR. POULOS:  If I could have a moment, your Honor.

8   BY MR. POULOS:

9   Q    So going back to the July period, do you see that the July

10  invoice ends with the last date chronologically for any time

11  entry is July 17th?  Do you see that?

12  A    19th.

13  Q    Did I say -- July 19th.  I'm sorry.  Yes, of course.  It

14  says July 19th, correct?

15  A    Yes.

16  Q    Okay.  Now I need to go back into Mr. Hammerman's original

17  file.  And you recall -- so July ends on July 19th, then there

18  was a version of the August invoice that added on two dates

19  after July 19th through the August date of June 20th and June

20  21st.  Do you see that?

21  A    Yes.

22  Q    Okay.  And there's an original signature on that and Tony

23  Puorro's initial, correct?

24  A    Yes.

25  Q    Now, the first check that Mr. Kandala -- that you caused to

Santiago - Cross by Poulos

1    be issued to Mr. Kandala, again, you said was July 25th.  Do

2    you recall that?  That was for the first two months?

3    A    Yes.

4    Q    And then he received that check and here he adds the 20th

5    and the 21st to the August invoice, but then on the second one

6    there's nothing about July added in here, correct?

7    A    Correct.

8    Q    And this gets changed.  Tony Puorro had already seen this

9    one, as reflected by his initials on this, correct?

10   A    Yes.

11   Q    Do you know who instructed or who caused those July dates

12   to be removed, ma'am?

13   A    I have no idea.

14   Q    Okay.  Now, staying with Exhibit 5411, I've placed on the

15   screen the September invoice.  Do you see that?

16   A    Yes.

17   Q    Now, this one is dated October 1st, correct?

18   A    Yes.

19   Q    And it covers dates in September, correct?

20   A    Yes.

21   Q    And this is the invoice -- can you tell -- can you make out

22   the date that Tony Puorro dated his note to you?  It looks like

23   10/1.

24   A    Yes.

25   Q    Okay.  And he wrote, "Gladys, do we already have -- do we

Santiago - Cross by Poulos

1    already receive invoices for Dr. Kandala?  Please advise.

2    Thanks, Tony."  Do you see that?

3    A    Yes.

4    Q    Do you know what he meant by that?  Do you recall?

5    A    I guess he's asking me if we receive invoices --

6    Q    I'm sorry, ma'am?

7    A    He's asking me if we received invoices for Dr. Kandala.

8    Q    Okay.  But in any event, the September invoice, the check

9    for September was then issued on October 17th -- oops, I'm

10   sorry -- on October 17th, according to the check stub, correct?

11   A    Yes.

12   Q    Now, here, ma'am, for that time period, you entered a date

13   of September 30th.  All the prior ones had the first of the

14   month, correct?

15   A    Yes.

16   Q    Was that just an error on your part?

17   A    Yeah.  That was just -- I don't know why I used the 30th,

18   but . . .

19   Q    Okay.  And then the October -- I'm showing you now the

20   October time period.  That's where Mr. Hammerman pointed out

21   some things had been scratched out.  Do you see that?

22   A    Yes.

23   Q    And this one is dated November 1st, correct?

24   A    Yes.

25   Q    Okay.  Now -- and I'm going to zoom in on this notation.

Santiago - Cross by Poulos

1   Ma'am, is it -- do you -- can you make out that date?  Is it
2   12/12 or 12/2?
3   A    To me, it's 12/2/2012, I believe.
4   Q    Okay.  Is that your handwriting?
5   A    Yes.
6   Q    Okay.
7          THE COURT:  Can you show me that date on the top of
8   the invoice again, Mr. Poulos?  Thanks.
9          MR. POULOS:  I'm sorry, Judge.
10         THE COURT:  No, I see it.
11  BY MR. POULOS:
12  Q    It's dated November 1st for the October time period,
13  received on 12/2 of '12, right?
14  A    Correct.
15  Q    And ma'am, this is the invoice, it's for October -- it's
16  for the October time period.  And for this one you entered
17  10/1, correct?
18  A    Yes.
19  Q    And that check was issued on 12/12 of '12, correct?
20  A    Yes.
21  Q    Okay.  Now we're going to move to November.  Ma'am, the
22  November -- this November invoice dated December 1st, you see
23  the time -- the entries being for services in November dated
24  December 1st of 2012?  Do you see that?
25  A    Yes.

Santiago - Cross by Poulos

1    Q    And this is the one where Mr. Puorro wrote you a note

2    saying, "Gladys, please process," correct?

3    A    Yes.

4    Q    And it's dated December 5th.  Do you see that?

5    A    Yes.

6    Q    And then the check that -- the check stub that goes along

7    with that, again, here you entered November 30th.  That was

8    another error?

9    A    The thing is if it was November, sometimes, you know, I put

10   November 1st --

11   Q    Okay.

12   A    -- or November 30th.  I just want to make sure it's

13   November.

14   Q    Okay.

15   A    Okay?

16   Q    So sometimes you might put November 1st, sometimes you

17   might put November 30th, correct?

18   A    It seems that way, yeah.

19   Q    Okay.  But either -- okay.  I mean, no one told you to put

20   those dates on there, right?

21   A    I think it may be when I received it.  I don't recall why I

22   did, you know.

23   Q    But again, he said, "Please process" on a note dated

24   December 5th, and you issued this check on December 6th,

25   correct?

Santiago - Cross by Poulos

1   A    It looks like it's a 6.

2   Q    I can zoom in for you.

3   A    Yes.  December 6th.

4   Q    That's December 6th.

5         Now, ma'am, this invoice for December -- dated

6   December 1st for a November time period with a check issued on

7   December 6th, this invoice was in Exhibit -- Government

8   Exhibit 5447.  All the other ones were in 5411.  If I

9   understood you correctly on direct examination, some months

10  after the government executed the search warrant, they asked

11  you to go find more -- for more stuff?

12  A    Yes.

13  Q    Do you recall where you found those materials, ma'am,

14  specifically?

15  A    They would have to be in the files.

16  Q    Okay.  And the check issued on December -- so on December

17  6th, a check was issued for November, correct?

18  A    Yes.  I think if I got it early, I might have dated it the

19  1st; if it was already that late.  I thought it was --

20  Q    Ms. Santiago, please don't speculate.  I just want your

21  best recollection, okay?

22  A    Okay.

23  Q    If you know why things happened, please tell us, but --

24  yeah.

25  A    I don't recall exactly though.

Santiago - Cross by Poulos

1   Q    Okay.  Let me just make this point:  These materials in

2   Exhibit 5447, the November time period, that check, again, was

3   approved December 5th.  It's issued December 6th, correct, for

4   November?

5   A    Yes.

6   Q    Going back to 54 -- material from 5411, the October date,

7   according to your service dates, that check was issued at a

8   later time on -- on December 12th, correct?

9   A    Yes.

10  Q    Do you know why that happened?

11  A    It has to do with when I received the invoice, most likely.

12  Q    And finally December.  Now, ma'am, there are -- the first

13  three invoices that Dr. Kandala submitted in June -- something

14  around June 27th and then faxed later in July, do you remember

15  those?

16  A    Yes.

17  Q    Different versions, correct?

18  A    Yes.

19  Q    And with respect to the February time period, there are two

20  different invoices as well, correct?

21  A    Yes.

22  Q    So in Exhibit -- Government Exhibit 5447, there's this

23  invoice.  Do you see that?

24  A    Yes.

25  Q    This one's dated 12/31 of '12, and it has two very general

1   entries in there.  Do you see it?

2   A    Yes.

3   Q    This says from 12/3 to 12/14, "Hospice and Palliative Care

4   New Program Development, 20 hours," correct?

5   A    Yes.

6   Q    And then the second entry is 12/3/2012, "Nursing Review of

7   Patients, 2 hours."  Do you see that?

8   A    Yes.

9   Q    Signed by Dr. Kandala, correct?

10  A    Yes.

11  Q    And it is on this invoice that you wrote -- you made a hand

12  entry of "Released 2/28 of 2013," correct?

13  A    Yes.

14  Q    And you released it on 2/28 of 2013 after Tony Puorro had

15  issued you a note that says, "Gladys, hold payment until

16  Dr. Kandala provides SHH with a report requested."  Do you see

17  that?

18  A    Yes.

19  Q    Do you know what the report requested was, ma'am, from this

20  note?

21  A    I don't know what the report requested was.

22  Q    Let me ask you this:  You often communicated with Serena

23  Sumrell, didn't you?

24  A    Yes.

25  Q    She often conveyed messages to you for Tony Puorro, did she

Santiago - Cross by Poulos

1    not?

2    A    Yes.

3    Q    She had basically the authority of Tony Puorro when she

4    said something to you, did she not?

5    A    I don't think so.

6            MR. HAMMERMAN:  Objection.

7            THE COURT:  Overruled.  The answer can stand.

8    BY MR. POULOS:

9    Q    Let me rephrase that.

10           If Serena called and told you that Tony Puorro issued

11   a particular instruction, you followed that if Serena Sumrell

12   told you Tony Puorro issued an instruct, didn't you?

13   A    It depends.

14   Q    It depends?  Sometimes you did?

15   A    Well, no.  I meant if she gave an instruction like -- I'm

16   sorry.  Can you repeat the question?

17   Q    If Serena Sumrell called and told you -- let me withdraw

18   that.  There are many times that Serena Sumrell passed along

19   information to you, correct?

20   A    Yes.

21   Q    If she called you and told you something, you relied on it,

22   didn't you?

23   A    Yes, but I -- also I would say --

24   Q    Let me finish.

25   A    -- not authorizing me to do something.

Santiago - Cross by Poulos

1    Q    Hold on.

2    A    Yes.

3    Q    Here's my question, ma'am:  When she gave you information,

4    you relied on her information, did you not?

5    A    Yes, but mostly it would be in writing.

6    Q    Okay.  I understand mostly in writing.  When it wasn't in

7    writing, you relied on what she told you, did you not?

8    A    If she gave me a message, I believe it.

9    Q    Okay.  Now, so in the materials you later brought to the

10   government and located that are Exhibit 5447, it was in those

11   materials that is found a check stub, correct, and it's dated

12   and it reflects that for the December period the check was

13   issued dated February 28 of 2013, correct?

14   A    Yes.  I believe this is a copy from the other file, though.

15   No?

16   Q    May I have original 5447?

17   A    I'm not sure.

18        MR. POULOS:  May I approach the witness, your Honor?

19   BY MR. POULOS:

20   Q    Ma'am, this is the Government's Exhibit 5447.

21   A    Oh.  I thought there was a copy in there.

22   Q    And do you see -- okay.

23        And then finally when we go back to -- just to clean

24   that up for the record, I'm putting what the government has

25   handed me as what they've marked as Government Exhibit 5447,

Santiago - Cross by Poulos

1    and it contains the check stub for the -- with the service date

2    beginning 12/3/12 showing a check with the date -- issued date

3    of 2/28/13.  Do you see that, Ms. Santiago?

4    A    Yes.

5    Q    Okay.  And then finally, I'm going to go back to -- I'm

6    going to put the December invoice in Government Exhibit 5457

7    back on the screen just to refresh your recollection.

8    A    Okay.

9    Q    It was those entries.  Do you see that?

10   A    Yes.

11   Q    And then in 5411 there's a different version of the

12   December dates.  Do you see that?

13   A    Yes.

14   Q    And this one has other information in it that wasn't in the

15   other one.  Do you recall that?

16   A    Yes.

17   Q    And it is on this version that Tony Puorro wrote a note

18   dated -- on the original do you recall it was a big yellow

19   Post-it?

20   A    Yes.

21   Q    And it's dated January 7 of 2013, correct?

22   A    Yes.

23   Q    And he wrote this entry, "Please hold payments on

24   Dr. Kandala to prepare a report on palliative care."  Do you

25   see that?

Santiago - Cross by Poulos

1   A    Yes.

2   Q    "These hours appear excessive.  We are reviewing the dates

3   to be more certain."  Do you see that?

4   A    Yes.

5   Q    But the one on which you issued the check, ma'am, it only

6   referenced the 20 hours for the palliative care over a period

7   of time, correct?

8   A    Yes.

9   Q    And the one on which you issued the check didn't have any

10  entries about medical education, correct?

11  A    Well, I'm not going to say that I issued the check on --

12  because sometimes I keep them all together if they give me

13  different things, I'd put them together with the check.

14  Q    Ms. Santiago, no one's accusing you of doing anything

15  wrong.

16  A    No, but I'm just saying I don't know that --

17  Q    Let me -- let me -- I thought you made it quite clear when

18  the government lawyer was asking you --

19  A    Yeah.

20  Q    -- questions, ma'am --

21  A    Yes.

22  Q    -- that when you issued the check, you took that check stub

23  and attached it to the invoice that you were paying, correct?

24  A    Yes.  Yes.  Yes.

25  Q    And that check stub went with that invoice, correct, the

Santiago - Cross by Clavelli

1   one that had the more general information as you brought it to

2   the government, according to your own testimony, correct?

3   A   As I brought it? I'm sorry.

4   Q   You brought the exhibits in Government Exhibit 5447. I

5   thought you said you went and found and brought them to the

6   government at their request a few months after the search

7   warrant, right?

8           MR. HAMMERMAN: Object to the form.

9           THE WITNESS: I gather the information --

10         THE COURT: The objection is overruled. The objection

11   is overruled. And don't try to suggest an answer, so have a

12   seat. I overruled your objection.

13         THE WITNESS: I gathered information as it was

14   requested, and I sent it. I'm not going to say specifically

15   how. I don't recall how I -- you know, at that time what I

16   sent, but I know that I -- this looks like it's part of it.

17   I'm sorry. I just can't testify what I sent that day.

18         MR. POULOS: Thank you, ma'am. No further questions.

19         THE WITNESS: Thank you.

20         THE COURT: Mr. Clavelli?

21         MR. CLAVELLI: Yes, Judge.

22                 CROSS-EXAMINATION

23   BY MR. CLAVELLI:

24   Q   Ms. Santiago, I'm going to show you a document, which I've

25   marked Moshiri Defense Exhibit 9 for identification. I'm

Santiago - Cross by Clavelli

1   basically going to ask you if you recognize it?

2   A   I recognize it, but I didn't write this one.

3   Q   And what do you recognize it to be?

4   A   It's a list of names.

5   Q   What's at the very top?

6   A   A date.

7   Q   Oh.  I'm sorry.  I keep on forgetting we have this Elmo.

8   A   Okay.

9          THE COURT:  Yeah, because it's so unnoticeable.

10  BY MR. CLAVELLI:

11  Q   I imagine that says, "FY" at the very top, fiscal year?

12  A   Yes.

13  Q   What is -- fiscal year '08 would be from what to what?

14  A   To the end of June 30th.  July 1st to the 30th of June.

15         THE COURT:  July 1st of '07 to June 30th of '08?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.

18  BY MR. CLAVELLI:

19  Q   These numbers on the left, the CCW or CCN, what do they

20  signify, if you know?

21  A   I don't know.

22  Q   I mean, we've talked about, you know, the podiatry

23  department having an accounting number and all of that.  You

24  recognize the four names that are below Clarence are

25  podiatrists, right?

Santiago - Cross by Clavelli

1    A    Yes.

2    Q    The 440, could that be short for that accounting?

3    A    Yes.

4    Q    That's the accounting number for the podiatrists?

5    A    Yes, um-hmm.

6    Q    So then you know that according to this document in fiscal

7    year of '08, these four podiatrists were getting payments from

8    Sacred Heart?

9    A    I believe so.

10   Q    I have only one other question, or it might take two, but

11   when you issued these 1099s that we've seen for Dr. Moshiri and

12   Dr. Kandala even, is that on -- that's not on the fiscal year,

13   right?  Isn't that the annual year?

14   A    Annual.

15   Q    Okay.  So we have to convert the information -- you have to

16   convert the information from the fiscal year records to the

17   annual records, correct?

18   A    No.  The computer generates the report from the beginning

19   for the year.

20   Q    Oh, all right.

21   A    Yes.

22   Q    Okay.  So the hospital works in terms of fiscal year, but

23   for tax purposes it's the annual year?

24   A    The 1099 is done from the beginning of the year to the end

25   of the current year, yes.

Santiago - Redirect by Hammerman

1  Q   But the -- not fiscal year, the actual year?

2  A   Yes.

3          MR. CLAVELLI:  Thank you.  No further questions.

4          THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6  BY MR. HAMMERMAN:

7  Q   Ms. Santiago, these records that you reviewed with both

8  Mr. Poulos and myself have been marked as Government

9  Exhibit 5447.  Do you see that?

10 A   Yes.

11 Q   Do you see at the very bottom of the document there's a

12 little series of numbers here?  See 509?

13         THE COURT:  Just so it's clear when somebody looks at

14 this, there's actually two sets of numbers, so you're talking

15 about the one that says "Sacred Heart Hospital" spelled out

16 right?

17         MR. HAMMERMAN:  Yes.

18 BY MR. HAMMERMAN:

19 Q   The first one is 5908, next one is 5909, 5910?

20 A   Yes.

21 Q   5911?

22 A   Yes.

23 Q   Did you place those numbers on here?

24 A   No.

25 Q   When you were asked after the search to gather records,

Santiago - Redirect by Hammerman

1    were you asked to do that by me or somebody else?

2    A    I know it was requested, and I think --

3    Q    Let me ask it this way:  Was it requested before you and I

4    had ever met one another?

5    A    Yes.

6    Q    Did you personally bring over these records with these

7    little stamped numbers to me?

8    A    No.

9    Q    Did you just at someone's request at Sacred Heart gather

10   records so that they could be provided to the government?

11   A    Yes.

12   Q    I'm now showing you what's been marked as -- well, this is

13   part of Government Exhibit 5411, and it's a copy of part of

14   that exhibit.  Do you recognize, first of all, this exhibit,

15   the contract?

16   A    Yes.

17   Q    And Mr. Poulos showed you this.  Is this the agreement

18   pursuant to which -- or a copy of the agreement that you kept

19   in your files for Ravjit Kandala for his contract?

20   A    Yes.

21   Q    And you've seen this before, correct?

22   A    Yes.

23   Q    And do you recognize the signature that's in the upper

24   left-hand column on the last page of the page 7?

25   A    Yes.

Santiago - Redirect by Hammerman

1   Q    Whose signature is that?

2   A    Mr. Anthony Puorro.

3   Q    And what is the date that's written on the first line of

4   that contract?

5   A    April 1st, 2012.

6           MR. HAMMERMAN:  No further questions.

7           Your Honor, I did show this to Ms. Santiago as part of

8   Government Exhibit 5411 at the front end, but it's included as

9   part of it, and this is a true and accurate --

10  BY MR. HAMMERMAN:

11  Q    Ms. Santiago, is this a true and accurate copy of that

12  contract?

13  A    Yes.

14          THE COURT:  Mr. Poulos, do you have any further

15  questions?

16          MR. POULOS:  No further questions.

17          THE COURT:  Mr. Clavelli?

18          MR. CLAVELLI:  No further questions.

19          THE COURT:  So what's your best recollection of who

20  asked you to gather the records after the search had been done?

21          THE WITNESS:  I'm remembering that there was like a

22  memo or a list sent.

23          THE COURT:  You got a memo?

24          THE WITNESS:  Yeah.  And I -- I don't remember if it

25  came from, you know, the people that were managing at the time

Santiago - Redirect by Hammerman

1    or it came from personnel.  And I was told, you know, "Here's

2    the list"; it was coming from that agent.  "You need to gather

3    whatever you have."

4              THE COURT:  Okay.

5              THE WITNESS:  And I put it in some folders and gave

6    it --

7              THE COURT:  So as best you can recall it was from

8    somebody that was connected with the hospital?

9              THE WITNESS:  Yes.

10             THE COURT:  Whether it was whoever was managing it at

11   the time or whether it was from personnel, it was somebody

12   connected with the hospital?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Do you have any idea who asked them

15   to do that?

16             THE WITNESS:  I believe it was for the FBI.

17             THE COURT:  Okay.

18             THE WITNESS:  Is what I understood.

19             THE COURT:  That's what you were aware of anyways?

20             THE WITNESS:  I'm thinking I might have given it to

21   the person -- it could have been Thomas Abraham because he was

22   going to send a package.

23             THE COURT:  Who?

24             THE WITNESS:  Thomas Abraham or Sherry Hendricks.

25             THE COURT:  Thomas -- Sherry Hendricks or Thomas --

Bailey - Direct by Greening

1        THE WITNESS:  Thomas.

2        THE COURT:  -- Abraham?  Abraham?

3        THE WITNESS:  Yes, because they were going to send

4    like a whole package.

5        THE COURT:  Okay.

6        THE WITNESS:  So I just gathered what I could find,

7    and I put it together --

8        THE COURT:  Okay.

9        THE WITNESS:  -- and gave it to whoever was sending

10   it.

11       THE COURT:  Thanks.  Does anybody have any follow up

12   based on the questions that I asked?

13       MR. HAMMERMAN:  No, your Honor.

14       MR. POULOS:  No.

15       THE COURT:  Thanks.  You're excused.

16       THE WITNESS:  Thank you, so much.

17   (Witness excused.)

18       THE COURT:  Please call the next witness.

19       MS. GREENING:  The government calls James Bailey.

20       THE COURT:  Raise your right hand, please.

21   (Witness duly sworn and takes the stand.)

22       THE COURT:  Have a seat.

23       JAMES BAILEY, GOVERNMENT WITNESS, SWORN

24                DIRECT EXAMINATION

25   BY MS. GREENING:

Bailey - Direct by Greening

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    Please state and spell your name for the record.

4    A    James Bailey, J-A-M-E-S; B, as in boy, A-I-L-E-Y.

5    Q    Can I ask you to -- oh.  Go ahead.

6           THE COURT:  Well, you sat back, so I didn't know you

7    were going to sit back, so I'm just going to move it closer to

8    you.

9    BY MS. GREENING:

10   Q    Mr. Bailey, what do you do for a living?

11   A    I'm retired.

12   Q    And what did you do for a living?

13   A    I've been a nurse for 31 years.

14   Q    Where did you work last?

15   A    Sacred Heart Hospital.

16   Q    How long did you work at Sacred Heart?

17   A    December of 2012 through July of 2013.

18   Q    And what was your position at Sacred Heart Hospital?

19   A    Chief nursing officer.

20   Q    Where are some of the places that you worked before Sacred

21   Heart?

22   A    Lakeland Community Hospital in Michigan, Patient's Choice

23   Hospital in Belzoni, Mississippi.

24   Q    And have you held positions in the administration as chief

25   nursing officer at other hospitals?

875

Bailey - Direct by Greening

1    A    Yes.

2    Q    At Sacred Heart, who did you report to as chief nursing

3    officer?

4    A    I actually had two reports.  One would be to Ed Novak

5    because he was the CEO of the corporation, of the hospital, but

6    I also reported to Tony Puorro.  Multiple times a day I saw

7    Tony.

8    Q    How often did you interact with Edward Novak?

9    A    Couple times a week.

10   Q    What were your duties and responsibilities as chief nursing

11   officer?

12   A    As the CNO, I was responsible for the entire nursing

13   division, so implementation of care, delivery of care, the

14   culture of the nursing staff.  Everything that touched the

15   patient, I ultimately was responsible for.

16   Q    Who did you supervise directly?

17   A    I had three nurse managers.

18   Q    Who were those nurse managers?

19   A    Tanya Smith, who was a nurse manager for ER and special

20   care unit, intensive care; Marilou Gimenez who was a nurse

21   manager for med surge; and then Jenna Pulaski was nurse manager

22   for surgery.

23   Q    Did you also supervise the nurses at Sacred Heart?

24   A    Indirectly.

25   Q    Can you please describe your typical workday?

Bailey - Direct by Greening

1  A    I usually get to the office about 6:30, 7:00 in the

2  morning.  I'd make rounds, see the night staff, talk to

3  patients.  I'd make rounds maybe once more in the afternoon,

4  talk to the day shift going off.  Lots of meetings.

5  Q    Did you ever see doctors while doing rounds?

6  A    Occasionally.

7  Q    Did you communicate with those doctors?

8  A    Occasionally.

9  Q    And you mentioned meetings.  Did you attend any regular

10 meetings as chief nursing officer?

11 A    There was a weekly administrative team meeting, admin team.

12 There were monthly meetings that were scheduled, medical

13 executive committee, utilization review, lots of meetings.

14 Q    Okay.  Start with the medical executive committee meeting.

15 Who generally would attend?

16 A    Those were the chiefs of service, so the medical director

17 for ER, chief of surgery, so forth.

18 Q    Did you attend those meetings?

19 A    Yes, I did.

20 Q    When did you begin attending those meetings?

21 A    December of 2012.

22 Q    Okay.  Turning to the utilization review meetings, who

23 generally would attend those?

24 A    Utilization review nurse, utilization review physician,

25 myself, Mr. Puorro.

Bailey - Direct by Greening

1    Q    What is -- oh, I'm sorry.  Go ahead.

2    A    I'm sorry.  And occasionally some other doctors.

3    Q    What is utilization review?

4    A    Utilization review is pretty much what it says it is.  We

5    look at the services rendered to see if they were appropriate.

6    It's kind of a retrospective to see if we did the right things

7    for the patient in a timely fashion.  It's also a little bit

8    prospective in regards to what are we going to do to get this

9    patient out of here, to get them into the appropriate venue.

10   Q    And the department head meetings, did you ever attend

11   those --

12   A    Yes.

13   Q    -- department managers meetings?

14   A    Yes.

15   Q    Who would attend those meetings?

16   A    All of the department managers throughout the hospital.

17   Q    Did you attend?

18   A    Yes.

19   Q    When did you begin attending those meetings?

20   A    December of 2012.

21   Q    And finally, I believe you said administrative team

22   meetings?

23   A    Correct.

24   Q    Who generally would attend those?

25   A    Myself, Tony, Roy Payawal Noini, and occasionally Ed Novak.

Bailey - Direct by Greening

1    Q    Mr. Bailey, are you familiar with a Dr. Ravjit Kandala?

2    A    Yes, by name.

3    Q    Was Dr. Kandala at any committee, department, or

4    administrative meetings that you ever attended at the hospital?

5    A    Not that I can recall.

6    Q    Are you familiar with a Dr. Shanin Moshiri?

7    A    By name.

8    Q    Do you know what his specialty was?

9    A    No.

10   Q    Was Dr. Moshiri at any committee, department, or

11   administrative meeting that you attended at Sacred Heart

12   Hospital?

13   A    Not that I can recall.

14   Q    Have you ever met Dr. Moshiri?

15   A    No.

16   Q    Have you ever met Dr. Kandala?

17   A    Yes.

18   Q    When was that?

19   A    Late December of 2012 I met him in the physician's lounge.

20   It was a meet and greet; shook hands, "Hi."

21   Q    Who else was there?

22   A    Tony Puorro.

23   Q    And what did Tony Puorro say?

24   A    He introduced me to Dr. Kandala, said, you know -- told me

25   who he was, "He's one our biggest admitters, good guy."  We

Bailey - Direct by Greening

1    shook hands, "Hi, how are you," and that was it.

2    Q    Did you ever see Dr. Kandala again?

3    A    Not that I can recall.

4    Q    What is your understanding of the type of practice that

5    Dr. Kandala had?

6    A    Primary care.

7              MR. POULOS:  Objection.

8              THE COURT:  The objection is sustained.  No foundation

9    at this point.

10   BY MS. GREENING:

11   Q    Mr. Bailey, were you aware whether Dr. Kandala was

12   admitting patients to Sacred Heart Hospital?

13   A    Yes.

14   Q    Are you aware based on your experience as chief nursing

15   officer at Sacred Heart?

16             THE COURT:  Let's ask non-leading questions.

17             MS. GREENING:  I apologize, your Honor.

18   BY MS. GREENING:

19   Q    Were podiatrists able to admit inpatients to the hospital?

20   A    Not directly.

21   Q    Were you aware of whether podiatrist patients were ever

22   admitted in other ways?

23   A    Yes.

24   Q    How?

25   A    They were admitted to the service of another physician.

Bailey - Direct by Greening

1  Q   Was that a common practice?

2  A   Yes.

3  Q   Which physicians admitted podiatrist patients under their

4  names?

5  A   I'm sorry.  Rephrase or --

6  Q   Which physicians admitted podiatrist patients --

7  A   Oh, okay.

8  Q   -- under their names?

9  A   Yeah.  Sometimes they were admitted directly to the

10 surgeon, Dr. Guerrero, Dr. Carusco, Stamboliu, some of the

11 internal medicine physicians.

12 Q   Switching topics, Mr. Bailey.  What is palliative care?

13 A   Palliative care is taking care of symptoms.  For example,

14 relief of pain, but not really fixing the cause of the pain,

15 but providing relief for pain.

16 Q   When you arrived at Sacred Heart in 2012, what, if any,

17 palliative care program did Sacred Heart have?

18 A   None that I'm aware of.

19 Q   Did you have any conversation with Mr. Puorro about a

20 palliative care education program?

21 A   Not that I can recall.

22 Q   Did Mr. Puorro ever discuss with you any particular

23 physician that was going to implement the palliative care

24 education program?

25 A   Not that I can recall.

Bailey - Direct by Greening

1   Q    As chief nursing officer, you supervised the nursing staff?

2   A    Indirectly, yes.

3   Q    Were you ever aware of trainings for nurse at Sacred Heart?

4   A    Trainings, yes.

5   Q    Have you ever heard of Passages?

6   A    By name, yes.  I'm familiar with the name.  I know the

7   name.

8   Q    Are you aware of the nature of Passages' relationship with

9   Sacred Heart Hospital, if any?

10  A    No.  No, I'm not.

11  Q    So were you aware of Passages establishing a hospice

12  program at Sacred Heart?

13  A    That was -- my understanding was that they were a hospice

14  organization, and that's it.

15  Q    I'd like to show you what's been admitted as Defense

16  Exhibit 7A.

17  A    Okay.

18  Q    It appears to be an email, a calendar entry.

19  A    Right.

20          THE COURT:  Is it Kandala 7A or --

21          MS. GREENING:  Sorry, your Honor.  Kandala 7A.

22          THE COURT:  Thanks.  Okay.

23  BY MS. GREENING:

24  Q    Do you see your name in the "to" line?

25  A    Yes.

Bailey - Direct by Greening

1    Q    And it says, "Passages Hospice and Palliative Training"?

2    A    Correct.

3    Q    Do you have any recollection of this training?

4    A    No.

5    Q    Did you attend this training?

6    A    No, I did not.

7    Q    Do you know if this training actually occurred?

8    A    No, I do not.

9    Q    Do you recall any Passages training at Sacred Heart

10   Hospital?

11   A    No, I do not.

12   Q    You've testified that you attended several different types

13   of regular meetings?

14   A    Yes.

15   Q    Do you recall ever discussing a palliative care program at

16   any of those meetings?

17   A    Not that I can recall.

18   Q    Were you aware of a palliative care or hospice wing at

19   Sacred Heart?

20   A    No.

21   Q    Were you aware of any patient beds at Sacred Heart that

22   were specifically delineated for hospice or palliative

23   patients?

24   A    No.

25   Q    Mr. Bailey, were you aware of Dr. Kandala doing

Bailey - Direct by Greening

1    administrative consultation on the topic of palliative care?
2    A    No.
3    Q    Were you aware of Dr. Kandala teaching and presenting on
4    palliative care?
5    A    No.
6    Q    Did Dr. Kandala attend the utilization review meeting in
7    December of 2012, to your recollection?
8    A    Not that I can recall.
9    Q    To your knowledge, was Dr. Kandala involved in bringing a
10   hospice program to Sacred Heart?
11   A    Not that I can recall.
12   Q    And to your knowledge, was Dr. Kandala at all involved in
13   any educational activities with patients or staff related to
14   palliative care?
15   A    To my knowledge, no.
16            MS. GREENING:  May I have one moment, your Honor.
17            THE COURT:  Okay.
18   BY MS. GREENING:
19   Q    Mr. Bailey, you testified that you were aware of some
20   trainings for nurses.  To your knowledge, were any of those
21   trainings for hospice care?
22   A    No.
23   Q    How about for palliative care?
24   A    No.
25            MS. GREENING:  No further questions.

Bailey - Cross by Poulos

1      THE COURT:  Mr. Poulos?

2                           CROSS-EXAMINATION

3    BY MR. POULOS:

4    Q    Good afternoon, sir.

5    A    Sir.

6    Q    Sir, you don't recall anything about a hospice program --

7    A    Correct.

8    Q    -- at Sacred Heart Hospital; that's your testimony?

9    A    Yes.

10   Q    You don't recall Dr. Kandala being involved in the hospice

11   program and palliative care program at the hospital?

12   A    That's correct.

13   Q    Before you testified here, sir, did anybody from the

14   government show you emails, correspondence that you were on

15   from January of 2013?

16   A    No.

17   Q    Sir, I'm going to put on the screen a couple of

18   different -- a few different emails that I'll represent to you

19   were retrieved from the Sacred Heart email system, okay?

20   A    Okay.

21   Q    I'm going to start with a document that we have marked as

22   Defendant's Exhibit Kandala 1032.  I'm going to ask you to take

23   a moment and review that email, sir.

24   A    Okay.

25   Q    Do you recognize that as an email from Tony Puorro to

885

Bailey - Cross by Poulos

1    Dr. Kandala on which you and Noreen Binkowski were copied?

2    A    Correct.

3    Q    Does the subject, sir, say "Hospice Patient Staff

4    Education"?

5    A    Yes, it does.

6    Q    And Noreen Binkowski -- you testified about the utilization

7    review committee, correct?

8    A    Correct.

9    Q    And she was head of that department, was she not?

10   A    Yes.  She was the utilization review nurse.

11   Q    And it was her job to participate and determine how to

12   coordinate the care, the palliative care of patients, right?

13   A    Yes.

14   Q    And in this email on January 17th, Tony Puorro said to

15   Ravjit Kandala, you, and Noreen Binkowski, "Dr. Kandala, I

16   forwarded a text message earlier to inform you that I was

17   advised by case management that we are about to get a hospice

18   patient."  Did I read that correctly?

19   A    Yes.

20   Q    "We'll need your assistance in educating staff as part of

21   the comprehensive palliative care program.  Let me know when

22   you can be available.  Thanks."  Do you see that, sir?

23   A    Yes, sir.

24   Q    Do you recall a patient by the name of Christine Hudson?

25   A    Yes.

Bailey - Cross by Poulos

1   Q   Sir, I'm now going to put on the screen a document we've

2   marked as Defendant's Exhibit Kandala 20.  I'm going to pull

3   that out for you.  These are from the medical records of Sacred

4   Heart Hospital.  Do you recognize this type of document?  Just

5   tell us what type of document it is, first.

6   A   Yeah.  It's a consult.  It's written by a physician.  It's

7   a consult.  The physician was requested by another physician to

8   give an opinion --

9   Q   Okay.

10  A   -- to see the patient and give an opinion.

11  Q   And it's dated January 17th, correct?

12  A   Correct.

13          MR. POULOS:  Your Honor, I -- let me back up.  I'm

14  going too fast.

15          I move to admit Defendant's Exhibit Kandala 1032.

16          MS. GREENING:  No objection.

17          THE COURT:  It's admitted.

18      (Defendant's Exhibit 1032 admitted in evidence.)

19  BY MR. POULOS:

20  Q   And so this document, the consult notes, which is

21  Defendant's Exhibit Kandala 20, again, it bears the date of

22  January 17th, correct?

23  A   Correct.

24  Q   And if we flip all the way down to the bottom right-hand

25  corner, I'll blow that up for you, sir.  Do you see that this

Bailey - Cross by Poulos

1    is patient Christine Hudson?

2    A    Yes.

3    Q    And do you see that the referring physician here was

4    Dr. Nave; the referred to doctor was Dr. Kandala, correct?

5    A    Correct.  Um-hmm.

6    Q    And this, in fact, relates -- and let me back up.  The

7    reason for the consult, palliative care/hospice, correct?

8    A    Correct.

9    Q    And you understand, do you not, from this document, sir,

10   that Dr. Kandala responded to that email as the referring

11   physician and, in fact, did a palliative care hospice consult

12   for a patient that wasn't his own at Sacred Heart Hospital.  Do

13   you see that?

14   A    I can't -- I can't attest to that because I'm not sure that

15   that's Dr. Kandala's signature.

16   Q    Okay.  The signature right here?

17   A    Correct.

18   Q    Well, we've just seen a bunch of invoices that he signed.

19   I'll just let that stand.  But again, bottom right-hand corner

20   next to the signature -- the date in the bottom left-hand

21   corner next to the signature in the bottom right-hand corner is

22   January 17th, correct?

23   A    Correct.

24              THE COURT:  Can you move the document up so I can see

25   the bottom of it, please.

Bailey - Cross by Poulos

1          MR. POULOS:  Yes, Judge.

2          THE COURT:  Thank you.

3          Your Honor, we move to admit Defendant's

4    Exhibit Kandala 20, if I haven't already.

5          MS. GREENING:  Objection, your Honor, foundation.

6          THE COURT:  You're going to need to lay a foundation

7    for it.  You haven't done it through him.  So it's going to

8    have to be done somewhere.  Maybe you can come up with a

9    stipulation later.

10          MR. POULOS:  We'll ask for a stipulation at some other

11   point, Judge.

12   BY MR. POULOS:

13   Q    And sir, in terms of Dr. Kandala's involvement with

14   Passages, you don't recall that either, right?

15   A    Correct.

16   Q    Okay.  I'm now going to show you what I've marked as

17   Defendant's Kandala 1033.  I will represent to you that this is

18   an email from Sacred Heart's email system.  Do you see, sir,

19   that there are two different emails on there?

20   A    Yes.

21   Q    One is an email from Tony Puorro to Noreen Binkowski and

22   you, subject "Christine Hudson, Passages patient."  Do you see

23   that?

24   A    I see that.

25   Q    And in that first email, Tony Puorro sent an email to

Bailey - Cross by Poulos

1    Noreen copying you subject "Christine Hudson, Passages

2    patient," and he says, "Noreen, is patient Christine Hudson our

3    first Passages patient?  Tony."  Do you see that?

4    A    Yes, I do.

5    Q    And Noreen didn't respond to that, did she?

6    A    No.

7    Q    You did, right?

8    A    Yes.

9    Q    And you said "I believe so."

10   A    I see that.

11            MR. POULOS:  Your Honor, I'd move to admit Defense

12   Exhibit Kandala 1033.

13            MR. HAMMERMAN:  One moment, your Honor.

14            Your Honor, the only thing that I'd ask of Mr. Poulos

15   is these are coming out without Bates numbers, and he's

16   representing they came from our system.  We'll take their

17   representation, but we just -- we're trying to figure out where

18   they came from.

19            MR. POULOS:  We'll corroborate that with them

20   overnight, Judge.

21            THE COURT:  Okay.  So it's admitted subject to a

22   motion to strike.

23        (Defendant's Exhibit 1033 admitted in evidence.)

24   BY MR. POULOS:

25   Q    And finally, sir, I'm going to put on the screen an exhibit

Bailey - Cross by Poulos

1   marked as Defendant's Exhibit Kandala 1020.  This is another

2   set of emails.  This is from January 21st and January 22nd of

3   2013.  Do you see that, sir?

4   A   Okay.

5   Q   And with respect to the first email, do you see that you

6   are a recipient on the Cc?

7   A   Yes, I do.

8   Q   Okay.  But now the first email was sent by Susan

9   Von Nordheim, correct?

10  A   Correct.

11  Q   Do you know who that is?

12  A   Yes.

13  Q   Who is that?

14  A   She was a risk manager.

15  Q   I'm sorry?

16  A   She's a risk manager.

17  Q   Okay.  Who worked with Sacred Heart Hospital?

18  A   Yes.  She was in private practice but consulted with Sacred

19  Heart as a risk manager.

20  Q   Okay.  And she sent an email to Noreen Binkowski copying

21  Mr. Puorro, yourself, and Renee Demarchi, correct?

22  A   Correct.

23  Q   Who was Renee Demarchi?

24  A   She worked with Noreen.

25  Q   Okay.  And in that email that was copied to you,

Bailey - Cross by Poulos

1    Ms. Von Nordheim wrote "Noreen, pursuant to my discussions with

2    Tony Puorro, we are going to have an internal meeting on

3    Wednesday morning, January 23rd, in Jim Bailey's office to

4    discuss communication with the family; two, hospice care;

5    three, selection of a point person to communicate on a regular

6    basis with the patient's family regarding the patient's status

7    and prognosis, as well as other issues."  Do you see that?

8    A    Yes, I do.

9    Q    She went on to say, "Dr. Nave; Jim Bailey; Tanya, manager

10   of ICU; Renee, social work; and myself will be present.  We

11   also request your presence.  Are you available to attend?

12   Thank you."  Did I read that correctly?

13   A    Correct.

14   Q    And then Mr. Puorro responded to that on January 22nd,

15   according to the top.  You were copied on that along with the

16   others, and here he Cc'd Dr. Kandala on his response.  Do you

17   see that?

18   A    Yes.

19   Q    And there he wrote, "Noreen, please make sure that

20   Dr. Kandala is updated, as he is responsible for developing the

21   hospice program at Sacred Heart Hospital initially through

22   Passages.  Thanks."  Did I read that correctly?

23   A    Yes.

24   Q    Sir, does that refresh your recollection that Dr. Kandala

25   was, in effect, involved in developing a hospice program at

Bailey - Cross by Poulos

1    Sacred Heart Hospital?  You don't recall receiving any of these

2    emails?

3    A    No, sir.

4    Q    And so when you testified on direct examination as you did,

5    you simply did not recall those emails, correct?

6    A    I don't recall these emails.

7    Q    Even now?

8    A    Even now.

9           THE COURT:  We're going to break right here for about

10   ten minutes.  You're on cross-examination, so don't discuss

11   your testimony with anyone.

12           You can take a break, but don't discuss your

13   testimony.

14       (Recess at 3:00 p.m., until 3:15 p.m.)

15           THE COURT:  Okay.  Everybody ready to go?

16           MR. HAMMERMAN:  Yes, your Honor.

17           MR. POULOS:  Judge --

18           THE COURT:  You can go ahead.

19           MR. POULOS:  Judge, I have nothing further of this

20   witness --

21           THE COURT:  Okay.

22           MR. POULOS:  -- except to move into evidence.

23           THE COURT:  1020?

24           MR. POULOS:  Yes.  Kandala 1020.

25           MS. GREENING:  No objection.

Bailey - Redirect by Greening

1    THE COURT:  1020 is admitted.

2    (Defendant's Exhibit 1020 admitted in evidence.)

3    Mr. Clavelli?

4    MR. CLAVELLI:  No questions.

5    THE COURT:  Redirect?

6    MS. GREENING:  Just briefly, your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. GREENING:

9    Q   Mr. Bailey, Mr. Poulos talked to you about a flurry of

10   emails, which I'm going to hand to you right now.  Can you

11   please state the dates of these communications?

12   A   The first one --

13   Q   If you could read the exhibit number for each one, please.

14   A   Oh, okay.  1033, Kandala 33, is Monday, January 21st, 2013;

15   Kandala 1032 is Thursday, January 17th, 2013; and Kandala 1020

16   is Tuesday, January 22nd,2013.

17   Q   Mr. Bailey, what is the date on this record that Mr. Poulos

18   showed you, which is Defense Exhibit Kandala 20?

19   THE COURT:  That's the one that you objected to?

20   MS. GREENING:  Yes.

21   THE COURT:  Okay.  Just want to be sure.

22   THE WITNESS:  January 17thish, 2013.

23   MS. GREENING:  No further questions.

24   MR. POULOS:  Nothing further, Judge.

25   THE COURT:  You're excused.

Pallekonda - Direct by Greening

1      (Witness excused.)

2              THE COURT:  Next witness, please.

3              MS. GREENING:  The government calls Vijay Pallekonda.

4              THE COURT:  Come right around the corner.  Please

5      raise your right hand.

6      (Witness duly sworn and takes the stand.)

7              THE COURT:  I'm going to adjust your microphone.

8              VIJAY PALLEKONDA, GOVERNMENT WITNESS, SWORN

9                      DIRECT EXAMINATION

10     BY MS. GREENING:

11     Q    Good afternoon.

12     A    Good afternoon.

13     Q    Please state and spell your name.

14     A    Vijay Pallekonda, V-I-J-A-Y, P-A-L-L-E-K-O-N-D-A.

15     Q    Please briefly describe your educational background.

16     A    Went to undergrad at University of Georgia.  I went to

17     medical school at University of the Caribbean and graduated in

18     1995.

19     Q    What did you do after you graduated?

20     A    I did a residency at Cook County Hospital from 1995 to

21     1999.

22     Q    Did you then become a board certified physician?

23     A    Yes, I did.

24     Q    In what speciality?

25     A    Internal medicine.

Pallekonda - Direct by Greening

1   Q    What did you do after your residency program?

2   A    I worked as a hospitalist.

3   Q    What is a hospitalist?

4   A    A hospitalist is a physician who, once a patient is

5   admitted to the hospital, takes care of a patient until the

6   patient is discharged from the hospital.

7   Q    Dr. Pallekonda, are you familiar with Sacred Heart

8   Hospital?

9   A    Yes, I am.

10  Q    Were you ever employed with Sacred Heart?

11  A    Yes, I was.

12  Q    When was the first time you discussed potentially working

13  at Sacred Heart Hospital with someone from the hospital?

14  A    It was in the summer of 2010.

15  Q    Who did you have this discussion with?

16  A    Discussion with Mr. Castro and Mr. Nagelvoort.

17  Q    Where were you during this discussion?

18  A    In Mr. Nagelvoort's office.

19  Q    And when you say "Mr. Nagelvoort," who was Mr. Nagelvoort

20  at Sacred Heart?

21  A    He was the chief operating officer at Sacred Heart

22  Hospital.

23  Q    And who was Mr. Castro?

24  A    Mr. Castro was the director of nursing.

25  Q    Is that Michael Castro?

Pallekonda - Direct by Greening

1    A    Yes.

2    Q    What type of position did you discuss?

3    A    Being a hospitalist.

4    Q    Did you begin working at Sacred Heart immediately after

5    that meeting in the summer of 2010?

6    A    I did not.

7    Q    What did you do after that meeting?

8    A    I went to work in Hawaii for four months.

9    Q    Did you eventually work at Sacred Heart?

10   A    Yes, I did.

11   Q    From when to when?

12   A    From January of 2012 through February of 2013.

13   Q    Did you work at any other hospital during that time period?

14   A    I did not.

15   Q    Did you have an employment contract with Sacred Heart

16   Hospital?

17   A    Yes, I did.

18   Q    I'm going to show you now what's been marked as Government

19   Exhibit 3901.  Do you recognize this document?

20   A    Yes, I do.

21   Q    What is this document?

22   A    This is the employment agreement I signed with Sacred Heart

23   Hospital.

24   Q    Okay.  I'm going to turn to the eighth page of the

25   document.  Do you see signatures on this page?

Pallekonda - Direct by Greening

1    A    Yes, I do.

2    Q    Is your signature one of the signatures on this page?

3    A    Yes, it is.

4    Q    Is Government Exhibit 3901 a true and accurate copy of the

5    contract that you signed with Sacred Heart Hospital?

6    A    Yes, it is.

7         MS. GREENING:  Government moves to admit Government

8    Exhibit 3901.

9         MR. POULOS:  No objection.

10        THE COURT:  3901 is admitted.

11    (Government Exhibit 3901 admitted in evidence.)

12   BY MS. GREENING:

13   Q    What is the date on this contract, Dr. Pallekonda?

14   A    13th of December 2011.

15   Q    What was your position when you first started at Sacred

16   Heart?

17   A    He was an emergency room physician as well as an

18   anesthesiologist.

19   Q    And what did your duties include?

20   A    They included evaluating patients in the emergency room

21   when they presented themselves and diagnosing them and possibly

22   sending them home or admitting them to the facility.  And one

23   day a week I worked as an anesthesiologist in the operating

24   rooms.

25   Q    How many days per week did you work in the ER?

Pallekonda - Direct by Greening

1    A    Three days per week.

2    Q    Was that for a total of four days per week?

3    A    Yes.

4    Q    Were you compensated for your work in the ER and as an

5    anesthesiologist?

6    A    Yes, I was.

7    Q    What was the compensation under this contract with Sacred

8    Heart Hospital?

9    A    It was $1,100 per day for anesthesia and $200,000 per year

10   for the emergency room work.

11   Q    So you testified as to some of your job responsibilities.

12   Did you ever have a discussion with Sacred Heart administrators

13   about any additional job responsibilities?

14   A    Yes, I did.

15   Q    When was that?

16   A    That was in October of 2011.

17   Q    Was it prior to signing this employment contract?

18   A    Yes, it was.

19   Q    Where was this meeting?

20   A    It was at Maggiano's in Oak Brook Mall.

21   Q    Who was there?

22   A    Myself, my wife, Mr. Tony Puorro, Mr. Michael Castro,

23   Mr. Ernie Velasquez, Ms. Sherry Peoples, and Dr. Sawalini.

24   Q    Did someone lead this meeting?

25   A    Mr. Tony Puorro.

Pallekonda - Direct by Greening

1  Q   What did Mr. Puorro say?

2  A   He had said that he wanted me to start a hospitalist group

3  at Sacred Heart Hospital and physicians were going to send

4  patients to the hospital.

5  Q   Would you see those patients?

6  A   Yes.

7  Q   Which physicians did he say would be sending patients to

8  the hospital?

9  A   At that time, it was Dr. Sawalini and Kandala.

10 Q   Who is Dr. Kandala?

11 A   He was a physician --

12     MR. POULOS:  Your Honor, I object at this point.

13 There's no foundation.  We get -- who was -- who was making

14 these statements?

15     THE COURT:  He testified it was Mr. Puorro.

16     MR. POULOS:  Okay.

17     THE COURT:  So the objection is overruled.

18     THE WITNESS:  I'm sorry.  Could you repeat the

19 question, please?

20     MS. GREENING:  Sure.

21     THE COURT:  The question was who was Dr. Kandala?

22     THE WITNESS:  Dr. Kandala was a physician based out of

23 Jackson Park Hospital.

24 BY MS. GREENING:

25 Q   And who is Dr. Saldahna?

Pallekonda - Direct by Greening

1   A   He was an internist who was planning on sending patients to

2   Sacred Heart Hospital.

3   Q   Did you have an additional meeting with Sacred Heart

4   administrators about potentially seeing these physicians'

5   patients?

6   A   Yes, I did.

7   Q   When was that?

8   A   That was in December of 2012 -- I mean 2011.  I'm sorry.

9   Q   Where did that meeting take place?

10  A   That meeting took place in Mr. Tony Puorro's office.

11  Q   Who was there?

12  A   Mr. Michael Castro, Mr. Tony Puorro, and myself.

13  Q   What did Mr. Puorro say at that meeting?

14  A   He had said he wanted me to head up the hospitalist group

15  and that he was asking physicians to send patients to the

16  hospital for me to take care of.

17  Q   Again, did he say any specific physicians during this

18  meeting?

19  A   Yes, he did.  Dr. Kandala and Dr. Sawalini.

20  Q   When Mr. Puorro said that you would be seeing these

21  physicians' patients at the hospital, did you understand that

22  to mean the patients in-patient at the hospital?

23  A   Yes.

24  Q   So that would be in addition to your responsibilities in

25  the ER --

Pallekonda - Direct by Greening

1    A    Yes.

2    Q    -- and as an anesthesiologist?

3    A    Yes.

4    Q    Did Mr. Puorro say whether this would increase the amount

5    of time that you worked in the hospital?

6    A    Yes.

7    Q    Did he say by how much?

8    A    He did not.

9    Q    Did Mr. Puorro tell you whether he had spoken with

10   Dr. Kandala about this arrangement prior to your meeting?

11   A    I don't remember if he said he spoke to Dr. Kandala.

12   Q    Did Mr. Puorro say who would bill for the services that you

13   provided to Dr. Kandala's patients?

14   A    The physician would do the billing.

15   Q    Did you also discuss your compensation during this meeting

16   with Mr. Puorro?

17   A    Yes, I did.

18   Q    What did Mr. Puorro say about your compensation?

19   A    He said Dr. Kandala would do the billing, and he would

20   provide me, depending on the number of patients that I saw, a

21   part of the payment from Medicare and Medicaid and that the

22   hospital would also provide me compensation.

23   Q    Did Mr. Puorro say why both the hospital and Dr. Kandala

24   would be providing you compensation?

25   A    Because the compensation that Dr. Kandala was providing was

1    going to be less than what the market rate for being a

2    hospitalist would be.

3    Q    Did Mr. Puorro say when Sacred Heart would begin seeing you

4    or, excuse me, paying you for seeing Dr. Kandala's patients?

5    A    As soon as Dr. Kandala started admitting patients to the

6    hospital.

7    Q    Did Mr. Puorro say what the benefit would be to the

8    hospital of this arrangement?

9    A    The hospital would get patients from others -- from other

10   places rather than just the people in the neighborhood.

11   Q    And did Mr. Puorro say what type of patients Dr. Kandala

12   had?

13   A    Nursing home patients.

14   Q    Okay.  Dr. Pallekonda, I'm now going to show you what's

15   been marked as Government's Exhibit 3904A.  I'm turning to the

16   last page or second to last page in this exhibit.  Do you

17   recognize this document?

18   A    Yes, I do.

19   Q    What is it?

20   A    It is an email from Mr. Puorro to myself -- no.  From me to

21   Mr. Puorro.

22   Q    And does this exhibit look to be a chain of emails?

23   A    Yes, it does.

24   Q    What is the date on this first email?

25   A    December 20th, 2011.

903

Pallekonda - Direct by Greening

1   Q    And turning to the next page of the exhibit, what's the
2   date on the last email in the chain?
3   A    February 1st, 2012.
4   Q    Dr. Pallekonda, did you forward this chain of emails to
5   your attorney?
6   A    Yes, I did.
7   Q    And is this a true and accurate copy of the emails that you
8   sent and received with Anthony Puorro in December of 2011
9   through February of 2012?
10  A    Yes, it is.
11          MS. GREENING:  The government moves to admit
12  Government Exhibit 3904A.
13          MR. POULOS:  No objection.
14          THE COURT:  Mr. Clavelli?
15          MR. CLAVELLI:  None.
16          THE COURT:  It's admitted.
17      (Government Exhibit 3904A admitted in evidence.)
18  BY MS. GREENING:
19  Q    So what is the date of this first email in the chain?
20  A    December 20th, 2011.
21  Q    Who's it to?
22  A    It is to Mr. Puorro.
23  Q    Who's it from?
24  A    It is from me.
25  Q    Please read the email.

Pallekonda - Direct by Greening

1    A    "Good morning, Tony.  My family and I are out of the

2    Chicago area celebrating my daughter's birthday.  We should be

3    back in town later on today.  I have scheduled a meeting with

4    Mike Castro tomorrow morning at 10:00 a.m. I am to bring the

5    paperwork that would be necessary for me to start at Sacred

6    Heart.  I will also pick up any paperwork that needs to be

7    filled out for medical staff privileges at Sacred Heart at that

8    time.  I will also speak to the chairman of ER medicine at that

9    time, if he has availability."

10   Q    Okay.  Turning to page 7, what is the date of this email?

11   A    January 3rd, 2012.

12   Q    And is it to you?

13   A    Yes, it is.

14   Q    From Tony Puorro?

15   A    Yes.

16   Q    Please read the email.

17   A    Dr. Pallekonda, I just spoke with Dr. Sawalini, and he

18   indicated that he left you a voice message.  He is prepared to

19   begin admitting within the week.  Please give me a call at your

20   convenience to discuss.  Thanks, Tony."

21             THE COURT:  What do you understand to be the

22   correct -- is that the correct spelling for Dr. Sawalini?

23             THE WITNESS:  Yes, it is.

24             THE COURT:  S-A-W-I-L-I-N-I [sic]?

25             THE WITNESS:  S-A-W-A-L-I-N-I.

Pallekonda - Direct by Greening

1    THE COURT:  Okay.  Because I've been spelling it wrong

2    for about six months now.  Okay.  Thanks.

3    BY MS. GREENING:

4    Q   Dr. Pallekonda, did you understand Mr. Puorro to be

5    speaking about the same Dr. Sawalini that he talked about

6    during the Maggiano's meeting?

7    A   Yes.

8    Q   How did you first meet Dr. Kandala?

9    A   I met him at Sacred Heart Hospital.

10   Q   Where in Sacred Heart?

11   A   It was in the room across from Mr. Puorro's office.

12   Q   Okay.  When was that meeting?

13   A   That was in December of 2011.

14   Q   Who was present at that meeting?

15   A   That was Mr. Puorro, Mr. Mike Castro, myself, and my wife.

16   Q   What was discussed?

17   A   We discussed the possibility of Dr. Kandala sending his

18   patients to the hospital so that I could take care of the

19   patients while they were in-house and then send them back to

20   the facility they came from.

21        In addition, we also talked about --

22        MR. POULOS:  Your Honor, I object.  May we just hear

23   who said what?  He's characterizing the --

24        THE COURT:  Yeah.  Don't characterize.  Let's -- I'm

25   going to strike that answer.  Let's go back.  You're going to

Pallekonda - Direct by Greening

1   have to try to do a better of job of trying to elicit who said

2   what rather than just kind of summarizing the whole situation.

3            MS. GREENING:  Sure.

4            THE COURT:  The way he started off is saying, "We

5   discussed," so who said what, in other words.

6   BY MS. GREENING:

7   Q   Dr. Pallekonda, do you remember what Tony Puorro said

8   during this meeting?

9   A   Mr. Puorro had said that he wanted me to start the

10  hospitalist program at Sacred Heart Hospital.

11  Q   And do you remember what Dr. Kandala said during this

12  meeting?

13  A   He had said that he would be willing to send patients to

14  the hospital as long as someone, especially me, would be

15  willing to take care of his patients while they're in the

16  hospital.

17  Q   Did you discuss compensation with either Mr. Puorro or

18  Dr. Kandala in this meeting?

19  A   Yes, we did -- I did.

20  Q   And what did you say?

21  A   I said that I would like to be compensated fairly for the

22  work that I was going to be putting in.

23  Q   Did Dr. Kandala indicate that he would pay you?

24  A   Yes, he did.

25  Q   And what did he say about what he would pay you?

Pallekonda - Direct by Greening

1  A    I'm not sure of the exact words, but he said that he would

2  be willing to pay me half of -- roughly half of what the

3  Medicare and Medicaid rates would be.

4  Q    What did Mr. Puorro say about compensation?

5  A    He said because I was going to get paid less than the fair

6  market value for seeing Dr. Kandala's patients that he would --

7  the hospital would be willing to pay me the moneys that -- for

8  seeing Dr. Kandala's patients.

9  Q    Now, you mentioned that, I believe, Dr. Kandala had raised

10  a concern about making sure his patients got seen in the Sacred

11  Heart Hospital; is that right?

12  A    Yes.

13  Q    Did Mr. Puorro at all address who would see Dr. Kandala's

14  patients when you were not there?

15  A    Yes, he did.

16  Q    What did he say?

17  A    He said that he would have either the nurse practitioners

18  or PAs or other physicians cover the patients while I was not

19  in the hospital.

20  Q    Did you talk to Dr. Kandala again after this meeting but

21  before entering into any arrangement?

22  A    Yes, I did.

23  Q    When was that?

24  A    That was approximately one to two weeks after the meeting.

25  Q    And by what means did you speak; on the phone, in person?

Pallekonda - Direct by Greening

1    A    We spoke on the phone.

2    Q    What did Dr. Kandala say in this phone call?

3    A    Dr. Kandala's big concern, again, was somebody following up

4    the patients that he was going to be sending to make sure that

5    they were seen every single day; and to make sure that once

6    they were seen and diagnosed properly and treated properly that

7    they be sent back to the nursing home where they came from.

8    Q    And what did you say in response?

9    A    I said I will do my best to take care of all the patients

10   that he was sending and that I would take care of his patients

11   as if they were my patients.

12   Q    Did you also mention compensation to Dr. Kandala on this

13   phone call?

14   A    Yes, I did.

15   Q    What did you say?

16   A    I said I would need to be compensated fairly for the work

17   that I was going to be putting in.

18   Q    And what did Dr. Kandala say in response?

19   A    Dr. Kandala agreed that I should be paid for the work that

20   I was going to put in and that he would only pay me when

21   Medicare and Medicaid paid him.

22   Q    Did you, in fact, enter into an agreement with Dr. Kandala?

23   A    Yes, I did.

24   Q    Was it a contract?

25   A    Yes, it was.

Pallekonda - Direct by Greening

1    Q    Was it written or oral?

2    A    It was a written contract.

3    Q    When did you enter into this correct?

4    A    It was February, I believe.

5    Q    Of 2012?

6    A    Yes.

7    Q    Did you receive the contract electronically or in paper

8    form?

9    A    I received the contract in paper form.

10   Q    Did it come by mail or in person?

11   A    It came by mail.

12   Q    And in that contract, what do you recall the terms were

13   that Dr. Kandala was going to pay you in return for seeing his

14   patients?

15   A    Once again, I'm not a hundred percent sure what the terms

16   were, but I believe he was going to pay me roughly half of what

17   Medicare was going to pay him and roughly half of what Medicaid

18   was going to pay him.

19   Q    Was that, in your mind, below market rate for the services

20   that you were going to provide?

21   A    Yes.

22   Q    What did you consider to be market rate for the services

23   you would be providing?

24   A    As a hospitalist in the Chicago area, they make roughly

25   around 150 to $200,000 per year.

910

Pallekonda - Direct by Greening

1    Q    What's your basis for coming up with that number?

2    A    I worked as a hospitalist when I initially finished my

3    residency in 1999 and the first contract I signed was for

4    $150,000 per year.

5    Q    Did the contract with Dr. Kandala establish who would bill

6    for the services that you provided to his patients?

7    A    Yes.

8    Q    Who was going to bill?

9    A    Dr. Kandala was going to do the billing.

10   Q    Dr. Pallekonda, who did you consider to be your employer

11   between April of 2012 and January of 2013?

12   A    Sacred Heart Hospital.

13   Q    Did you consider Dr. Kandala to be your employer?

14   A    I considered him to be a partner in this endeavor.

15   Q    Okay.  I'm going to turn now to page 4 of Government

16   Exhibit 3904A.  Is this another email in the chain?

17   A    Yes, it is.

18   Q    Who's it to?

19   A    It is to Tony Puorro.

20   Q    Who's it from?

21   A    It's from me.

22   Q    And is anyone Cc'd on this email?

23   A    Michael Castro.

24   Q    If you can read the first paragraph, please.

25   A    "Tony, as I told you last week, Dr. Kandala is adding me to

Pallekonda - Direct by Greening

1  his corporation, and he is sending me the paperwork to fill

2  out.  Dr. Sawalini has not responded to the emails I sent to

3  him last week and this week.  You had suggested that I accept

4  the offers that these two physicians have made.  I have

5  accepted Dr. Kandala's offer, which you recommended because you

6  stated we could revisit the compensation package down the road.

7  I don't think we should wait.  We should have a contract in

8  place for the hospitalist service between the hospital and

9  myself before I begin seeing patients.  I would like to have

10  everything in writing so there is no misunderstanding in the

11  future."

12  Q    You said, "I've accepted Dr. Kandala's offer, which you

13  recommended."  What offer are you referring to?

14  A    The contract that Dr. Kandala and I were talking about.

15  Q    And you also say, "Dr. Kandala's adding me to his

16  corporation."  What was his corporation that you were referring

17  to?

18  A    It is a physician's group.

19  Q    Please read the second paragraph of this email.

20  A    The compensation that these physicians are offering is

21  definitely not enough for the work that is going to be

22  required.  I would suggest the hospital supplement my

23  compensation with the start of the work that is going to begin

24  very soon.  I would like for the compensation to start at $200

25  per day for 0 to 5 patients and increase to $400 per day for 6

Pallekonda - Direct by Greening

1  to 10 patients and so on in increments of 200 for each

2  additional 1 to 5 patients.  This is much less than what a

3  traditional hospitalist's compensation would be.  I have the ER

4  and anesthesia compensation, so I am not as concerned.  This is

5  to be for every single day of the week as long as someone from

6  the hospitalist service sees the patient."

7  Q   So you say "I have the ER and anesthesia compensation, so I

8  am not as concerned."  Are you saying here that -- well,

9  what --

10         MR. POULOS:  Objection.

11         THE COURT:  She was about to rephrase it herself.

12  BY MS. GREENING:

13  Q   Dr. Pallekonda, what did you mean by that?

14  A   I meant I don't need to be paid 150 to $200,000 per year,

15  which the traditional hospitalist would make.  I was willing to

16  take less because I have the ER compensation as well as the

17  anesthesia compensation.

18  Q   Okay.  Turning to page 5, the last paragraph to read in

19  this email starts with, "I have received my paycheck."

20  A   Yes.  "I have received my paycheck for the first two weeks

21  of employment at Sacred Heart Hospital.  I believe the pay

22  structure is different than what I had agreed to.  Please

23  examine the agreement that I had signed and let me know whether

24  I am understanding the agreement differently than what I had

25  signed."

Pallekonda - Direct by Greening

1   Q    Okay.  Now, turning to page 3, the email marked January

2   27th, 2012, just read that email, please.

3   A    "Dr. Pallekonda, I just received a voicemail from

4   Dr. Kandala that he's still awaiting documentation from you.

5   He is ready to refer in patients; however, will need to receive

6   the necessary documentation in order to begin.  As you know,

7   this is a very important initiative for Sacred Heart Hospital.

8   Please advise as to the status of sending him the information.

9   Thanks.  Tony."

10  Q    What documentation did you understand that Dr. Kandala

11  needed from you before he would refer in patients to the

12  hospital?

13  A    The Medicare and Medicaid applications for patients.

14  Q    Is that a Provider Enrollment Application?

15  A    Yes.

16  Q    What was the important initiative that you understood

17  Mr. Puorro to be referring to?

18  A    The hospitalist service program.

19  Q    Had you sent your Provider Enrollment Application to

20  Dr. Kandala by this time?

21  A    I don't remember if I sent it or not.

22  Q    Okay.  The next email here at the top of the page, just

23  read the first paragraph, please.

24  A    "Hi Tony.  Sorry I was unable to meet with you today.  I

25  was sleeping when you called.  I spoke to Dr. Kandala and, as

1    you had stated, he has not received the paperwork that I had

2    sent him.  I left Leslie a message asking her to fax the

3    information to Dr. Kandala."

4    Q    So does this refresh your recollection as to whether you

5    had sent the Provider Enrollment Form Application to

6    Dr. Kandala by this point?

7    A    Yes, it does.

8    Q    But he hadn't received it?

9    A    He had not received it.

10   Q    And you say you left Leslie a message asking her to fax it

11   over.  Who's Leslie?

12   A    She was a person employed at Sacred Heart who took care of

13   applications for physicians when they apply to the hospital.

14   Q    Turning to the email marked February 1st, 2012, can you

15   read that email, please?

16   A    "Tony, I've spoken to Dr. Kandala, and he states that he

17   did not receive the materials that Leslie had sent out last

18   Monday.  He gave me a new fax number, which I will forward to

19   Leslie.  I have given the emails to Dr. Sawalini, and he has

20   not responded as of yet to my communications."

21   Q    I'm now showing you what's been marked as Government

22   Exhibit 3915.  Does this appear to be an email?

23   A    Yes, it does.

24   Q    Who's it to?

25   A    It is to me.

Pallekonda - Direct by Greening

1    Q    Who's it from?

2    A    Anthony Puorro.

3    Q    And what's the date?

4    A    February 10, 2012.

5    Q    Is this a true and accurate copy of an email that you

6    received from Anthony Puorro in February 2012?

7    A    Yes.

8         MS. GREENING:  The government moves to admit

9    Government 3915.

10        MR. POULOS:  No objection.

11        THE COURT:  It's admitted.

12        (Government Exhibit 3915 admitted in evidence.)

13   BY MS. GREENING:

14   Q    Dr. Pallekonda, please read this brief email aloud.

15   A    "Were you able to contact Dr. Kandala about signing the

16   necessary forms that he said were sent to you?  Please advise.

17   Thanks."

18   Q    Okay.  I'm now showing you what's been marked as

19   Government's Exhibit 3904B.  Does this also appear to be a

20   chain of emails?

21   A    Yes, it does.

22   Q    And what is the email on the top here?  What's the date?

23   A    February 20th, 2012.

24   Q    Who's it to?

25   A    It's to Anthony Puorro.

Pallekonda - Direct by Greening

1  Q   Who's it from?

2  A   It is from me.

3  Q   Is it a true and accurate copy of a chain of emails between

4  you and Anthony Puorro in February of 2012?

5  A   Yes, it is.

6       MS. GREENING:  The government wishes to admit

7  Government Exhibit 3904B.

8       MR. POULOS:  No objection.

9       THE COURT:  It's admitted.

10     (Government Exhibit 3904B admitted in evidence.)

11 BY MS. GREENING:

12 Q   Dr. Pallekonda, if you can just read the first paragraph

13 under the first email, please.

14 A   "Hi, Tony.  I filled out the paperwork for Dr. Kandala

15 today and gave it to Leslie to mail out via Fed Ex today, per

16 our previous conversation."

17 Q   Okay.  I'm now showing you what's been marked as Government

18 Exhibit 3904C.  Is this another chain of emails?

19 A   Yes, it is.

20 Q   Does it look to be between you and Anthony Puorro?

21 A   Yes.

22 Q   And what is the date of this top email?

23 A   March 6, 2012.

24 Q   Is this a true and accurate copy of a chain of emails

25 between you and Anthony Puorro in March of 2012?

Pallekonda - Direct by Greening

1    A    Yes.

2             MS. GREENING:  The government moves to admit

3    Government Exhibit 3904C.

4             MR. POULOS:  No objections.

5             THE COURT:  It's admitted.

6         (Government Exhibit 3904C admitted in evidence.)

7    BY MS. GREENING:

8    Q    Dr. Pallekonda, very briefly looking at this first email in

9    the chain, it's dated March 6, 2012.  Do you see that?

10   A    Yes.

11   Q    Please read the email.

12   A    Dr. Pallekonda, please provide an update on receiving and

13   completing the panel of information from Dr. Sawalini.  Also,

14   please provide an update on any recent activity with

15   Dr. Kandala.  Thanks.  Tony."

16   Q    And then turning to your response, what's the date?

17   A    March 6th, 2012.

18   Q    Please read your response.

19   A    "I've finished the application package and sent it back to

20   Dr. Sawalini yesterday.  I expect him to receive it in the next

21   couple of days.  Dr. Kandala is waiting to hear from Medicare.

22   He's already sent the application to Medicare for their

23   review."

24   Q    What did you mean when you said, "Dr. Kandala is waiting to

25   hear from Medicare"?

Pallekonda - Direct by Greening

1  A    You have to apply for -- for taking care of Medicare

2  patients.  It's an application process that all physicians have

3  to fill out.

4  Q    And did Medicare approve your application to become a

5  provider under Dr. Kandala's group?

6  A    Yes.

7  Q    When did you begin to see Dr. Kandala's patients at Sacred

8  Heart?

9  A    Around April of 2012.

10  Q    At that point, how long had you been working at the

11  hospital?

12  A    I started in January of 2012.

13  Q    Had you observed any patients of Dr. Kandala's at Sacred

14  Heart before April of 2012?

15  A    I had not.

16  Q    Dr. Pallekonda, where in Sacred Heart did Dr. Kandala send

17  patients between April 2012 and January of 2013?

18  A    The patient would come to the emergency room.

19  Q    Are you aware of where Dr. Kandala's patients came from?

20  A    Yes.

21  Q    How -- where were they from?

22  A    They were from nursing homes.

23  Q    How did they arrive at the hospital?

24  A    Via private ambulance.

25  Q    Are you aware of what kind of insurance Dr. Kandala's

Pallekonda - Direct by Greening

1   patients typically had?

2   A    I was not.

3   Q    Did you receive advanced notice that a patient of

4   Dr. Kandala's was coming to the hospital?

5   A    Initially, no; but after awhile, yes.

6   Q    Are you familiar with the name Doris Huang?

7   A    Yes.

8   Q    Who is Doris Huang?

9   A    Doris Huang is Dr. Kandala's nurse practitioner.

10   Q    Can you spell her last name, if you recall the spelling?

11   A    I think it's H-O-A-N-G [sic].  That's a wild guess.

12   Q    Did you ever communicate with Ms. Huang about Dr. Kandala's

13   patients?

14   A    Yes, I did.

15   Q    How would you two communicate?

16   A    Usually via text message.

17   Q    When did you begin to communicate with Ms. Huang?

18   A    Probably June of 2012.

19   Q    How did you first become introduced to her?

20   A    Dr. Kandala had introduced her when she came by the

21   hospital -- when she came by Sacred Heart Hospital.

22   Q    Did you communicate by text message?

23   A    Yes.

24   Q    How did you get her phone number?

25   A    Dr. Kandala gave it to me, or she might have given it to

Pallekonda - Direct by Greening

1    me.

2    Q    Did you communicate regularly?

3    A    Yes.

4    Q    About what?

5    A    About which patients were coming to the hospital and which

6    patients were being discharged.

7    Q    Did you see Dr. Kandala's patients in the Sacred Heart ER?

8    A    Yes.

9    Q    And did you also round on Dr. Kandala's patients who were

10   inpatient on medical floors at the hospital?

11   A    Yes.

12   Q    Now, showing you what's been marked as Government

13   Exhibit 3918, do you recognize this document?

14   A    Yes.

15   Q    Is this a chain of emails?

16   A    Yes.

17   Q    Who are the emails to and from?

18   A    The message -- the emails are to Anthony Puorro from myself

19   with Michael Castro as Cc.

20   Q    What is the date on both of these emails?

21   A    It is April 30th, 2012.

22   Q    Is this a true and accurate copy of emails between you and

23   Mr. Puorro and Mr. Castro in April of 2012?

24   A    Yes.

25             MS. GREENING:   The government moves to admit

921

Pallekonda - Direct by Greening

1    Government Exhibit 3918.

2              MR. POULOS:  No objection.

3              THE COURT:  It's admitted.

4         (Government Exhibit 3918 admitted in evidence.)

5    BY MS. GREENING:

6    Q   Dr. Pallekonda, please read the bottom email.

7    A   "Dr. Pallekonda, please provide an update on any

8    communication with Dr. Kandala.  I am concerned that we'll need

9    to ensure accommodations for his patient and frequent

10   conversations with him to make him comfortable with referrals

11   to Sacred Heart Hospital.  Please let me know if I can help in

12   any way.  Thanks."

13   Q   Was this email sent within the first month that you started

14   seeing Dr. Kandala's patients?

15   A   Yes.

16   Q   Was it pretty early on?

17   A   Yes.

18   Q   Do you recall what Dr. Kandala's concerns were?

19   A   His concerns were mostly about who was going to be taking

20   care of his patients, if the bill sheets were going to --

21   Q   Did you share those concerns?

22   A   Yes, I did.

23   Q   Please read the top email.

24   A   "Tony, I spoke to Dr. Kandala today, and he has concerns

25   about the care of his patients and the follow-up they should be

Pallekonda - Direct by Greening

1   receiving at Sacred Heart Hospital.  I will speak to you

2   tomorrow, as I have questions as well.  I also have questions

3   about the ER schedule.  Thank you for your concern and help

4   thus far."

5   Q   I'm now showing you what's been marked Government

6   Exhibit 3909C.  Is this one email?

7   A   Yes, it is.

8   Q   And who's it from?

9   A   It's from me.

10  Q   Who does it appear to be to?

11  A   It's to Mr. Puorro and to Mike Castro.

12  Q   What's the date of the email?

13  A   May 21st, 2012.

14  Q   Is this a true and accurate copy of an email that you sent

15  to Mr. Puorro and Mr. Castro in May of 2012?

16  A   Yes, it is.

17          MS. GREENING:  The government moves to admit

18  Government Exhibit 3909C.

19          MR. POULOS:  No objection.

20          THE COURT:  It's admitted.

21      (Government Exhibit 3905 admitted in evidence.)

22  BY MS. GREENING:

23  Q   Dr. Pallekonda, please just read the first four short

24  paragraphs of this email.

25  A   "Hi, Tony and Mike.  I hope you are aware, again, that the

Pallekonda - Direct by Greening

 1   patients that Dr. Kandala is sending are not being seen on the

 2   days that I am off.  We have talked about the situation

 3   occurring in the past, and the situation still persists.  I

 4   have discussed this with Dr. Kandala two days prior, and he, as

 5   should be the norm, expects to get standard of care for his

 6   patients on the days that I have off.  This is one of the big

 7   concerns that both my wife and I expressed before this process

 8   started, and we were assured that this would be addressed

 9   before physicians started sending their nursing home patients.

10           "Mike had stated that I would get help from nurse

11   practitioners, PA's during the week, and cross-coverage from

12   other attendings on the weekends.  I have spoken to nurses who

13   state that a physician had stated that he does not cover my

14   patients."

15   Q   Dr. Pallekonda, how, if at all, were these concerns about

16   coverage for Dr. Kandala's patients resolved?

17   A   I would come in on my days off.

18   Q   Was there anyone else that Sacred Heart assigned to cover

19   Dr. Kandala's patients when you were not at the hospital?

20   A   Dr. Kelsick helped out at times.

21           THE COURT:  Spell the name.

22           THE WITNESS:  K-E-L-S-I-C-K.

23           THE COURT:  Thanks.

24   BY MS. GREENING:

25   Q   How many days per week were you scheduled to work at Sacred

Pallekonda - Direct by Greening

1   Heart between April of 2012 and, let's say, December of 2012?

2   A    Four days per week.

3   Q    How many days per week did you actually end up working at

4   Sacred Heart between those dates?

5   A    Six to seven days a week.

6   Q    Why the difference?

7   A    Because Dr. Kandala had inpatients, and I didn't feel that

8   they should be left alone on the days that I was off.

9   Q    Did you make yourself available for patient calls on off

10  days?

11  A    Yes, I did.

12  Q    If you received a call on your cellular phone about a

13  patient, did you answer that phone?

14  A    Yes, I did.

15  Q    Did you do so on vacation?

16  A    Yes.

17  Q    Starting with your days that you were assigned to work in

18  the emergency room, please describe a typical day in the ER

19  between April 2012 and December of 2012.

20  A    The day started about 7:00 in the morning.  I would get

21  there, check with the nursing staff to make sure that if there

22  were patients there, that they were seen by the physician who

23  was working the night shift.  And if they were seen, I would

24  evaluate them to make sure that they were okay, whether they

25  were sent home or whether they were admitted to the hospital,

Pallekonda - Direct by Greening

1   and then I would -- if they were patients waiting to be seen in

2   the emergency room, I would take care of those patients; and if

3   there was any down time in the emergency room, I would go to

4   the floors to take care of patients that were in-patients for

5   the hospitalist service.

6   Q    And by "patients for the hospitalist service," are you

7   referring to patients of Dr. Kandala's?

8   A    Yes.

9   Q    You would round on Dr. Kandala's patients?

10  A    Yes, I would.

11  Q    How long would that take you?

12  A    Roughly 15 to 20 minutes per patient.

13  Q    You said you would do that when there was free time in the

14  emergency room?

15  A    Yes.

16  Q    Was that fairly regular?

17  A    It was a small emergency room.  It was fairly regular that

18  I would have some down time to go round on patients.

19  Q    On the days that you were scheduled to work as an

20  anesthesiologist at Sacred Heart, what was your average work

21  day?

22  A    Once again, the day started about 7:00 in the morning.  We

23  would go to the operating room about 7:30 or so.  And if there

24  were patients that needed anesthesia from me, I would provide

25  the services until the OR shut down, including making sure that

Pallekonda - Direct by Greening

1  there were no patients in the post-recovery area; and if there

2  were no patients there, then the physicians -- the other

3  anesthesiologists would be free to go, and it would roughly be

4  about 3:00 in the afternoon.

5  Q   What would you do at 3:00 in the afternoon?

6  A   If there were patients in the hospital, I would go round on

7  them.

8  Q   And by "patients in the hospital," are you referring to a

9  specific doctor's patients?

10 A   Dr. Kandala's patients.

11 Q   Between April 2012 and December 2012, how regularly did

12 Dr. Kandala have patients in the hospital, generally speaking?

13 A   He would have them very regularly.

14 Q   What times of day would his patients arrive?

15 A   24 hours a day.

16 Q   Did your responsibilities in the emergency room ever

17 change?

18 A   Yes, they did.

19 Q   How did they change?

20 A   I was made the acting director of the emergency room.

21 Q   Do you recall when that was?

22 A   That was after the EMTOLA violation of Sacred Heart

23 Hospital, I believe, in February of 2012.

24 Q   Did that lead to an increase in responsibilities?

25 A   Yes.  I made the schedule for the emergency room

Pallekonda - Direct by Greening

1    physicians.

2    Q    I'm going to show you now what's been marked as Government

3    Exhibit 3909D.  Do you recognize this?

4    A    Yes.

5    Q    What is it?

6    A    It is an email from myself to Tony Puorro.

7    Q    And what's the date?

8    A    May 7th, 2012.

9    Q    Is this a true and accurate copy of an email that you sent

10   to Mr. Puorro in May of 2012?

11   A    Yes.

12        MS. GREENING:   The government moves to admit

13   Government Exhibit 3909D.

14        MR. POULOS:   No objection.

15        THE COURT:   It's admitted.

16   (Government Exhibit 3909D admitted in evidence.)

17   BY MS. GREENING:

18   Q    Dr. Pallekonda, just read the first paragraph, please.

19   A    "Thank you for naming me the director of the emergency room

20   at Sacred Heart Hospital.  It is, indeed, an honor.  I would

21   like to know what the expectations are; and if there are

22   written directives for the director of the ER, please forward

23   them via email or interoffice mail, so I can familiarize myself

24   with the duties that the hospital expects of their director."

25   Q    And actually, please read the next two paragraphs as well.

Pallekonda - Direct by Greening

1   A   "Dr. Kandala has been sending his nursing home patients

2   and, as contracted, I have been seeing his patients or getting

3   phone calls about them every day since the process started.

4   You and I agreed verbally that my compensation would increase

5   when there was a regularity of patients.  There is a regularity

6   of patients now.  There are at least two to three patients

7   in-house at all times.  Once Dr. Sawalini starts sending his

8   patients, there will be even more.

9        "I propose my compensation to go to 1,400 per day for

10  anesthesia; for the ER duties as well as for being the director

11  of the emergency room, I propose that my salary increase to

12  $150 per hour."

13  Q   Dr. Pallekonda, you refer here to a verbal agreement with

14  Mr. Puorro that your compensation would increase when there was

15  a regularity of patients.  Whose patients were you referring

16  to?

17  A   Dr. Kandala's patients.

18  Q   You also refer to a compensation increase.  Is this a

19  reference to what you previously testified was Mr. Puorro's

20  promise to make up the difference between what Dr. Kandala was

21  going to pay you and the market rate?

22  A   Yes.

23  Q   You also mention two to three patients in-house at all

24  times.  Whose patients are you referring to?

25  A   Dr. Kandala's patients.

Pallekonda - Direct by Greening

1    Q    And you were acting director of the ER at this point in May

2    of 2012.  Did you attend administrative meetings in that role?

3    A    No, I did not.

4    Q    Did you attend any committee meetings at the hospital?

5    A    Yes.

6    Q    Which meetings?

7    A    I don't remember the name of the heading the department was

8    under.  It was just physicians getting together to discuss

9    patient care, and Dr. Jaleel was the head of the committee at

10   that time.

11   Q    Do you recall how often those meetings took place?

12   A    I only attended one or two meetings.

13   Q    Was Dr. Kandala at either of those meetings?

14   A    He was not.

15   Q    I'd like to turn now to the topic of billing.  Did you ever

16   bill Medicare or Medicaid for the services that you provided to

17   Dr. Kandala's patients?

18   A    I did not.

19   Q    Did you send billing information to Dr. Kandala's practice

20   on the services that you provided?

21   A    Yes, I did.

22   Q    When did you begin to send billing information?

23   A    About a week or two after his patients started coming to

24   the hospital.

25   Q    Who did you send that information to at first?

Pallekonda - Direct by Greening

1    A    I sent the information to Dr. Kandala.

2    Q    And by what means did you send that information?

3    A    I sent it via fax.

4    Q    How did you obtain Dr. Kandala's fax number?

5    A    He had given it to me.

6    Q    Did Dr. Kandala tell you whether he received the

7    information that you faxed over?

8    A    He initially said he did not receive the information.

9    Q    Did you resend the information?

10   A    Yes, I did.

11   Q    By what means?

12   A    Via fax and via Fed Ex.

13   Q    Who Fed Ex'd the billing documents to Dr. Kandala?

14   A    Leslie Thomas Muldro.

15   Q    And the billing information that Ms. Thomas Muldro faxed to

16   Dr. Kandala, was that the same information that you had

17   attempted to fax him previously?

18   A    Yes, it was.

19   Q    What kind of information did it include?

20   A    It included face sheets for the patients, for the

21   admission, the admitting diagnosis, the discharge diagnosis,

22   and the dates that I had seen the patients.

23   Q    And Leslie Thomas Muldro, is that the same Leslie that you

24   mentioned earlier who had helped you with the Provider

25   Enrollment Forms?

Pallekonda - Direct by Greening

1  A   Yes, it was.

2  Q   I'm now going to show you Government Exhibit 3904D.  Do you

3  recognize this document?

4  A   Yes.

5  Q   Does it look to be a chain of emails?

6  A   Yes.

7  Q   And looking at the last page, what is the date?

8  A   June 6th, 2012.

9  Q   Turning to the first page of the exhibit, what's the first

10 date of the first email?

11 A   June 20th, 2012.

12 Q   Who are these emails to and from?

13 A   These are emails --

14 Q   Well, let me rephrase that question.  This particular email

15 that you can see your name starting here at the bottom of the

16 first page of Government Exhibit 3904D and continuing with the

17 heading at the top of the second page of the exhibit, who was

18 that email to?

19 A   That was emailed to Tony Puorro.

20 Q   Was anyone Cc'd?

21 A   Michael Castro.

22 Q   Who was it from?

23 A   It is from myself.

24 Q   And what's the date?

25 A   It's June 20th, 2012.

Pallekonda - Direct by Greening

1   Q   Is this a true and accurate copy of a chain of emails that

2   you received, either forwarded to you or responding to and from

3   at the end in June of 2012?

4   A   Yes.

5        MS. GREENING:   The government moves to admit

6   Government Exhibit 3904D.

7        MR. POULOS:   No objection.

8        THE COURT:   It's admitted.

9   (Government Exhibit 3904D admitted in evidence.)

10  BY MS. GREENING:

11  Q   Looking at page 5 of the exhibit, Dr. Pallekonda, who is

12  this first email in the chain to?

13  A   It's to Tony Puorro.

14  Q   Can you read the email, please.

15  A   "Dear Tony, I'm Dr. Kandala's medical coding specialist at

16  Jackson Park Hospital.  I am asking you for direction as to how

17  to gain access to information, such as face sheets, dates,

18  times, and levels of service in the hospital ICU, et cetera.  I

19  would appreciate your assistance in regards to this matter.

20  Sincerely, Karen Polewaczyk."

21  Q   Who is Karen Polewaczyk?

22  A   She was Dr. Kandala's coding specialist at Jackson Park.

23  Q   Was she his biller?

24  A   I'm guessing, yes.

25  Q   Were you on this email?

Pallekonda - Direct by Greening

1    A    I was not.

2    Q    Was it forwarded to you in this email chain?

3    A    Yes, it was.

4    Q    And the date is June of 2012; is that right?

5    A    Yes.

6    Q    Is this before or after Leslie Thomas Muldro had Fed Ex'd

7    the billing information to Dr. Kandala?

8    A    It would be after.

9    Q    Turning now to page 4 of the same exhibit, what is the date

10   of this email?

11   A    June 6th, 2012.

12   Q    Who's it to?

13   A    It is to me.

14   Q    Who's it from?

15   A    From Anthony Puorro.

16   Q    And what does it say?

17   A    "Dr. Pallekonda, do you have the billing information to

18   forward to Dr. Kandala's patients?  Please advise.  Thanks.

19   Tony."

20   Q    Turning to the third page of the exhibit, do you see this

21   email up here?

22   A    Yes.

23   Q    In between are there a couple of emails between the one you

24   just read and this email here on the top of page 3 where Tony

25   is asking for updates?

934

Pallekonda - Direct by Greening

1    A    Yes.

2    Q    Do you respond?

3    A    Yes.

4    Q    What's the date?

5    A    June 18th, 2012.

6    Q    And what do you say?

7    A    "Hi, Tony.  I have all the paperwork necessary to send to

8    Dr. Kandala, and I will as soon as I can."

9    Q    Turning to page 2 of the exhibit, do you see this email

10   here in the middle of the page?

11   A    Yes.

12   Q    What's the date?

13   A    June 20th, 2012.

14   Q    What is the message?

15   A    "Dr. Pallekonda, I just received another text message from

16   Dr. Kandala on the need for this data.  This information is

17   very important in retaining the relationship with him.  Please

18   forward as soon as possible and let me know when sent.  Thanks.

19   Tony."

20   Q    Did you respond?

21   A    Yes.

22   Q    On Wednesday June 20th, 2012?

23   A    Yes.

24   Q    So the same day that Mr. Puorro sent that email?

25   A    Yes.

Pallekonda - Direct by Greening

1   Q   What do you say in your response?

2   A   "Hi, Tony.  I sent the forms Dr. Kandala's billing office

3   on Monday."

4   Q   When you say you had sent the forms to Dr. Kandala's

5   billing office, how had you sent the forms?

6   A   I had sent them via Fed Ex.

7   Q   And was it you who sent them via Fed Ex, or was it Leslie

8   Muldro Thomas or someone else?

9   A   It was Leslie.

10   Q   Approximately how many times did you submit billing

11   information through Leslie Thomas Muldro to send to

12   Dr. Kandala?

13   A   I'm not sure the exact number, but it would be every two

14   weeks I would give her the information, and she would send it

15   to him.

16   Q   Did you, at some point, change who you gave the billing

17   information to, to send to Dr. Kandala?

18   A   Yes.

19   Q   Who did you start giving the billing information to?

20   A   I started giving it to Anthony Puorro.

21   Q   When did you start giving it to Anthony Puorro?

22   A   Around June of 2012.

23   Q   Why did you start giving it to Mr. Puorro?

24   A   Because Dr. Kandala was sending Mr. Puorro messages saying

25   he did not get the billing information and Mr. Puorro was

Pallekonda - Direct by Greening

1  asking me to send the information and I was sending it, but he

2  was not receiving it.

3  Q   And when you say you were sending, you were giving it to

4  Ms. Thomas Muldro and she was Fed Ex'ing it?

5  A   Yes.

6  Q   How did you give Mr. Puorro the billing information?

7  A   I would give it to him personally, hand it to him; or if he

8  was not there in his office, I would leave it on his office

9  door.

10  Q   What kind of information did you provide?

11  A   The same information that Dr. Kandala had wanted:  The

12  admitting diagnosis, the discharge diagnosis, the levels of

13  service, and the dates that I had seen the patients.

14  Q   Did you send this information to Mr. Puorro regularly?

15  A   Yes.

16  Q   Did this process work for a while?

17  A   Yes.

18  Q   I'm now showing you what's been marked Government

19  Exhibit 3917.  Do you recognize this document?

20  A   Yes.

21  Q   What is it?

22  A   It is a email from Anthony Puorro to me.  No.  I'm sorry.

23  To Dr. Kandala with me as CC.

24  Q   And does this look to be a chain of emails?

25  A   Yes.

Pallekonda - Direct by Greening

1  Q   It was forward to you?

2  A   Yes.

3  Q   Is this a true and accurate copy -- well, let me go back,

4  Dr. Pallekonda.  What's the date on the top email?

5  A   November 27th, 2012.

6  Q   Is this a true and accurate copy of a chain of emails that

7  was forwarded to you on November 27th of 2012?

8  A   Yes.

9       MS. GREENING:  The government moves to admit

10  Government Exhibit 3917.

11       MR. POULOS:  No objection.

12       THE COURT:  It's admitted.

13     (Government Exhibit 3917 admitted in evidence.)

14  BY MS. GREENING:

15  Q   This date at the top of the email, is this five months

16  after -- or how many months is this after the last set of

17  emails?  And I'll pull it back out for you so you can see for

18  yourself.

19  A   Five months after the last email.

20  Q   Please read the top email.

21  A   "Dr. Kandala, attached please find a listing of admissions

22  from July 2012.  I'm forwarding this information in order to

23  provide some assistance related to billing.  Please let me know

24  if Dr. Pallekonda has provided the necessary support and

25  billing documentations on these accounts or if additional

Pallekonda - Direct by Greening

1    efforts are needed.  Thanks.  Tony."

2    Q    And turning to page 5 of the exhibit is this the

3    attachment?

4    A    Yes.

5    Q    What does this appear to be?

6    A    It appears to be a list of patients with the admission

7    dates and the physician's name and the patient number.

8    Q    What's the top date here?

9    A    That would be the admission date, July 2nd, 2012.

10   Q    And turning to the last page, what's the last date listed?

11   A    Is December -- hold on.  November 25th, 2012.

12   Q    Dr. Pallekonda, had you continued to give Mr. Puorro your

13   billing information to send to Dr. Kandala between July and

14   November of 2012?

15   A    Yes, I did.

16   Q    Do you know why Mr. Puorro was sending this billing

17   information to Dr. Kandala?

18   A    I'm not a hundred percent sure, but Dr. Kandala was sending

19   patients, and some were getting diverted, and I'm not sure --

20           MR. POULOS:  Your Honor, I object to this testimony.

21           THE COURT:  Hang on one second.

22           Yeah.  You need to lay -- the answer is stricken.  You

23   need to lay the foundation.  "Do you know why" isn't good

24   enough.

25   BY MS. GREENING:

Pallekonda - Direct by Greening

1   Q   Dr. Pallekonda, was it important to you to submit billing

2   information to Dr. Kandala in a timely manner?

3   A   Yes, it was.

4   Q   Why?

5   A   Because if he got paid, I got paid.  If he didn't get paid,

6   then I wouldn't get paid.

7   Q   Did you submit that information for patients you saw in a

8   timely manner to Mr. Puorro?

9   A   Yes.

10  Q   And did you understand Mr. Puorro would pass along that

11  information?

12  A   Yes.

13  Q   Did you ever see the Medicare billing records of what ended

14  up being billed or reimbursed for services you provided to

15  Dr. Pallekonda's patients or, excuse me, Dr. Kandala's

16  patients?

17  A   I did not.

18  Q   Do you know for which services of yours Dr. Kandala was

19  reimbursed?

20  A   No.

21  Q   During the time you saw Dr. Kandala's patients, did you

22  continue to discuss your compensation with Mr. Puorro?

23  A   Yes, I did.

24  Q   Okay.  Showing you now what's been marked Government

25  Exhibit 3909A, what does this appear to be?

Pallekonda - Direct by Greening

1    A    It's an email.

2    Q    Is it a chain of emails?

3    A    Yes, it is.

4    Q    And starting with the email on the second page of the

5    exhibit, who is it to?

6    A    It is to Tony Puorro.

7    Q    Who is it from?

8    A    It is from me.

9    Q    And what's the date?

10   A    July 1st, 2012.

11   Q    Is this exhibit a true and accurate copy of emails between

12   you and Anthony Puorro in July of 2012?

13   A    Yes.

14        MS. GREENING:   The government moves to admit

15   Government Exhibit 3909A.

16        MR. POULOS:   No objection.

17        THE COURT:   It's admitted.

18   (Government Exhibit 3909A admitted in evidence.)

19   BY MS. GREENING:

20   Q    Dr. Pallekonda, what is the date again of this email on the

21   second page?

22   A    July 1st, 2012.

23   Q    Please read the first two paragraphs of the email.

24   A    "Hello, Tony.  I have sent you an email and have talked to

25   you and attempted to talk to you regarding the compensation

Pallekonda - Direct by Greening

1  package that I am receiving at Sacred Heart Hospital.  I was

2  satisfied as long as I was working in the ER and doing

3  anesthesia one day a week.  Since Dr. Kandala started admitting

4  patients, I have been the primary care physician for the

5  patients.  I enjoy doing primary care, but it is taking a lot

6  more of my time and energy than anticipated by you or me."

7  Q    At this point, Dr. Pallekonda, had you been compensated by

8  Sacred Heart for seeing Dr. Kandala's patients?

9  A    I had not.

10 Q    Had you been compensated by Dr. Kandala for seeing

11 Dr. Kandala's patients?

12 A    I had not.

13 Q    Please read the next two paragraphs.

14 A    "I am getting phone calls at all hours of the day and night

15 for all the patients' needs.  You and Michael had told me that

16 I would be getting help; that has not materialized.  I believe

17 an adjustment to my compensation is needed if I am to continue

18 these additional duties."

19 Q    I'd like to switch topics, Dr. Pallekonda.  Are you

20 familiar with the term "direct admission"?

21 A    Yes.

22 Q    Generally speaking, based on your experience, what is a

23 direct admission?

24 A    A direct admission is when a person is seen by a physician

25 either in the office or in a nursing home and he has evaluated

Pallekonda - Direct by Greening

1    the patient and he feels that the patient needs to be cared for

2    in an acute care facility.  Then the patient would be seen --

3    be sent to the hospital to be admitted.

4    Q    Does that patient go to the ER, in your experience?

5    A    They may come to the emergency room, but they're not

6    evaluated by the physician there.

7    Q    Are you familiar with the term "direct admit to room 200A"?

8    A    Yes.

9    Q    Where did you hear that term?

10   A    At Sacred Heart Hospital.

11   Q    Did patients ever arrive at the hospital with that

12   instruction?

13   A    Yes.

14   Q    At what times did they arrive with that instruction?

15   A    They would arrive morning, noon, and night.

16   Q    At first when patients arrived with that instruction, what

17   did you understand the instruction to mean?

18   A    I understood it to mean that the patient was already seen

19   by the physician and that they were to go directly to the

20   floor.

21   Q    At some point, did your understanding of what that

22   instruction meant change?

23   A    Yes.

24   Q    When was that?

25   A    That was in the summer of 2012.

Pallekonda - Direct by Greening

1   Q   Where were you when you had a discussion about this issue?

2   A   I was in the emergency room.

3   Q   Who was there?

4   A   Mr. Anthony Puorro and Dr. Kuchipudi.

5   Q   What did Mr. Puorro tell you about direct admit to room

6   200A?

7   A   That patients --

8              MR. POULOS:  Your Honor, I'm going to object to the

9   relevance of this, in light of the participants.

10             THE COURT:  Hang on a second.

11             What's the relevance?

12             MS. GREENING:  Your Honor, there's going to be plenty

13  of evidence coming in showing that Dr. Kandala's patients were

14  sent to the hospital with this instruction, that this

15  instruction was used specifically so that Dr. Kandala's

16  patients would not be diverted to other hospitals and that it

17  was administrators from the hospital who informed Dr. Kandala

18  that he should use that code.

19             THE COURT:  Mr. Poulos?

20             MR. POULOS:  Well, let them offer the evidence, your

21  Honor.  This was a --

22             THE COURT:  Let me just look back at the questions

23  that preceded this.

24             MR. POULOS:  Your Honor, I have no --

25             THE COURT:  I think it goes to weight, not

Pallekonda - Direct by Greening

1    admissibility.  I'm overruling the objection.

2            THE WITNESS:  I'm sorry.  Could you repeat the

3    question, please?

4            MS. GREENING:  Yes.

5            THE COURT:  It's the meeting in the summer of 2012 in

6    the emergency room.  You said you were with Mr. Puorro and

7    Dr. Kuchipudi.  The question is what did Mr. Puorro tell you

8    about direct admits?

9            THE WITNESS:  Patients are to be evaluated in the

10   emergency room; and once the evaluation takes place, then

11   they're to go to -- they're to get admitted to the hospital.

12   BY MS. GREENING:

13   Q   Were you ever aware of a patient of Dr. Kandala's being

14   diverted on the way to Sacred Heart and ending up at another

15   hospital?

16   A   Yes.

17   Q   Did this happen often?

18           MR. POULOS:  Do we have foundation, your Honor?

19           THE COURT:  Yeah.  You're going to have to give me

20   some time frame here.

21   BY MS. GREENING:

22   Q   Dr. Pallekonda, between April 2012 and December 2012, were

23   you aware of any patient of Dr. Kandala's being diverted on the

24   way to Sacred Heart?

25   A   Yes.

945

Pallekonda - Direct by Greening

1  Q    How were you aware?

2  A    I was made aware by Dr. Kandala's nurse practitioner who

3  would tell me a patient is coming; and when the patient did not

4  show up, he would call the ambulance company to see where the

5  patient was, and the patient was diverted to a different

6  facility because of the acuity of their illness.

7  Q    How often did that happen?

8  A    I'm not sure how often it happened, but it happened on,

9  let's say, five or ten occasions.

10 Q    I'm now showing you what's been marked as Government

11 Exhibit 3913.  Do you recognize this document?

12 A    Yes.

13 Q    What is it?

14 A    It is an email from Anthony Puorro.

15 Q    Who's it to?

16 A    It's to Dr. Kandala.

17 Q    Who's Cc'd on the email?

18 A    I am Cc'd on the email.

19 Q    And what's the date?

20 A    September 4th, 2012.

21 Q    Is this a true and accurate copy of an email that you

22 received on September 4th of 2012?

23 A    Yes.

24      MS. GREENING:  The government moves to admit

25 Government Exhibit 3913.

Pallekonda - Direct by Greening

1          MR. POULOS:  No objection.

2          THE COURT:  It's admitted.

3      (Government Exhibit 3913 admitted in evidence.)

4  BY MS. GREENING:

5  Q    Dr. Pallekonda, please read this email.

6  A    "Dr. Kandala, I just wanted to suggest an alternative for

7  consideration related to patients diverted from Sacred Heart

8  Hospital.  Perhaps if we inform the transport company that this

9  is a direct admission to room 200 at Sacred Heart Hospital, the

10  ambulance will transport the patient directly to us.  Our ER

11  team understands that when patients arrive with these

12  instructions that a full assessment of the patient will be

13  performed in the ER upon arrival.  This seems to work well with

14  avoiding diversions in other cases.  Thanks.  Tony."

15  Q    After Dr. Puorro sent this to Dr. Kandala, did transporters

16  operate with the direct instruction to admit to room 200A?

17  A    Yes.

18  Q    Dr. Pallekonda, what did you do when a patient first

19  arrived in the emergency room?

20  A    When a patient arrived in the emergency room, I would take

21  a thorough history if the patient was able to communicate, and

22  I would look at the transfer sheets from the nursing home that

23  they came from; or if they presented from outside the hospital,

24  then I would find out why they came to the emergency room.  And

25  once a thorough history was taken or the information was

Pallekonda - Direct by Greening

1   gleaned from the transfer sheets, then I would examine the

2   patient.  And once the patient was examined, I would order

3   laboratory tests and/or radiological studies to further

4   diagnose the patient.  And once a diagnosis was made, I would

5   either send the patient home or admit the patient to the

6   hospital.

7   Q   Would you make your own independent medical assessment of a

8   patient's condition?

9   A   Yes, I did.

10  Q   Did you understand that to be part of your job as an ER

11  physician?

12  A   Yes.

13  Q   Did you sometimes determine a patient needed to be

14  admitted?

15  A   Yes.

16  Q   Did you sometimes determine a patient did not need to be

17  admitted?

18  A   Yes.

19  Q   Under what circumstances did you decide a patient did not

20  need to be admitted to the hospital?

21  A   If the medical acuity was not -- did not deem the patient

22  to be sick enough to be in the hospital, then I would send the

23  patient home.

24  Q   What did you do when you determined a patient did not need

25  to be admitted to the hospital?

Pallekonda - Direct by Greening

1    A    If the patient walked in, then we would send the patient

2    out walking; but if the patient came via private ambulance,

3    then we would call the ambulance company back and send the

4    patient back to the respective nursing home where they came

5    from.

6    Q    Would you ever attempt to contact the primary care

7    physician?

8    A    Yes.

9    Q    Did you ever contact Dr. Kandala about a patient you

10   believed did not need to be admitted?

11   A    I did not call him directly.

12   Q    Who did you call?

13   A    I would contact Doris Huang.

14   Q    Did you ever send any patient away that you believed, in

15   your medical judgment, required hospital care?

16   A    I did not.

17   Q    Did you ever send a patient away without seeing or

18   assessing them at all?

19   A    No.

20   Q    When did you stop treating Dr. Kandala's patients at Sacred

21   Heart?

22   A    In December of 2012.

23   Q    Did you see Dr. Kandala that month?

24   A    Yes, I did.

25   Q    Where was that?

Pallekonda - Direct by Greening

1    A    It was at a Continental Nursing Home.

2    Q    Did you discuss your agreement with Dr. Kandala?

3    A    Yes.

4    Q    And what did Dr. Kandala say?

5            MR. POULOS:  Your Honor, may we have more specific

6    foundation as to this meeting in December?  When?

7            THE COURT:  What part of December?

8            THE WITNESS:  It was during the Christmas holidays.

9            THE COURT:  Okay.  You can proceed.

10           THE WITNESS:  It was a holiday party at Continental.

11   BY MS. GREENING:

12   Q    And what's Continental?

13   A    It's a nursing home.

14   Q    What did Dr. Kandala say?

15           MR. POULOS:  Who was present?

16           THE COURT:  Was there anybody in the conversation

17   other than you and Dr. Kandala?

18           THE WITNESS:  No.

19           THE COURT:  Okay.  You can proceed.

20           MS. GREENING:  Thank you, your Honor.

21   BY MS. GREENING:

22   Q    What did Dr. Kandala say?

23   A    He said that he had not gotten paid by Medicare or

24   Medicaid, that's why he had not paid me.

25   Q    Did you believe Dr. Kandala when he said he had not been

Pallekonda - Direct by Greening

1    reimbursed by Medicare for your -- the services that you had

2    provided to his patients?

3    A    I did not.

4    Q    Why not?

5    A    It's hard for me to believe that a physician would not get

6    paid for eight months after initially seeing a patient.

7    Q    Dr. Pallekonda, why did you decide to stop seeing

8    Dr. Kandala's patients?

9    A    One, I had not gotten paid by Sacred Heart Hospital; two, I

10   had not gotten paid by Dr. Kandala; and three, our family was

11   moving to Texas.

12   Q    Did you inform Dr. Kandala of your decision?

13   A    Yes, I did.

14   Q    How?

15   A    I sent him a text message.

16   Q    Was this before or after the Christmas party at

17   Continental?

18   A    It was after the Christmas party.

19   Q    By the time you stopped seeing Dr. Kandala's patients, had

20   Dr. Kandala ever paid you for that work?

21   A    He had not.

22   Q    I'm now showing you what's been marked Government

23   Exhibit 3911B.  What is this?

24   A    This is an email.

25   Q    Who's it to?

Pallekonda - Direct by Greening

1    A    It's to Anthony Puorro.

2    Q    And who's it from?

3    A    It's from me.

4    Q    What's the date on the email?

5    A    December 31st.

6    Q    Of what year?

7    A    2012.

8    Q    Is this a true and accurate copy of an email that you sent

9    to Mr. Puorro on December 31st, 2012?

10    A    Yes.

11         MS. GREENING:  The government moves to admit

12    Government Exhibit 3911B.

13         MR. POULOS:  No objection.

14         THE COURT:  It's admitted.

15    (Government Exhibit 3911B admitted in evidence.)

16    BY MS. GREENING:

17    Q    Please read the first paragraph, Dr. Pallekonda.

18    A    "Dear Tony, this email is in regards to the concerns with

19    the contract between Sacred Heart Hospital and myself.  As you

20    are aware, the contract expires on January 2nd, 2013.  We have

21    had multiple conversations regarding the contract, and I have

22    major concerns regarding the wages in the contract.  The

23    contract that we have is an initial one-year contract that is

24    good for one year.  The hospital can renew this agreement for

25    the same terms for another year period upon written notice of

Pallekonda - Direct by Greening

1   election to the physician at least 60 days prior to the

2   expiration of each one-year contract.  This was not done.  I

3   have met you on multiple occasions regarding the contract

4   renewal as well as issues to be resolved prior to the new

5   year."

6   Q   And turning to the second page of the exhibit, please read

7   this paragraph, the first full paragraph on the page.

8   A   I have not -- "I have yet to get paid for seeing patients

9   for Dr. Kandala since May -- since April of 2012.  My license

10  is at risk for seeing and managing patients in the Medicare

11  system.  He has not paid me because 'he has not collected.'  I

12  do not know how much more information he needs to collect.  He

13  knows that his patients were seen on a daily basis and managed

14  via phone when needed.  Dr. Kandala is billing for the primary

15  care need of the patients I see for him.

16          "He assured me on multiple times when we met about

17  these very issues at the hospital to supplement my income for

18  seeing the patients for Dr. Kandala.  This has not happened

19  either.  I enjoyed doing the primary care visits and the

20  hospital have given me an opportunity, but I have to get paid

21  for the work that has been done.

22          "I end up staying beyond my 7:00 to 7:00 shift to help

23  manage these patient.  I get phone calls all hours of the day

24  and night, even on my vacation days to manage these very sick

25  patients."

Pallekonda - Direct by Greening

1    Q    Dr. Pallekonda, on the third line there's a phrase in

2    quotes.  What's that phrase?

3    A    "He has not collected."

4    Q    Did you quote Dr. Kandala there?

5    A    Yes.

6    Q    Please read the last paragraph.

7    A    "I need to be paid for the work that has already been done

8    and any further negotiations need to be addressed via contract,

9    and all payments must be made prior to the signing of a new

10   contract and prior to working in 2013.

11           "The payment owed for the HMPs is about $30,000.  In

12   addition, for admitting and following up with Dr. Kandala's

13   patients since April of 2012 would entail from the hospital an

14   additional $25,000.  This does not include the year-end

15   physician bonus, which I was promised to be paid."

16   Q    Dr. Pallekonda, how did you come up with this $25,000

17   figure?

18   A    I don't remember.

19   Q    When did you leave Sacred Heart Hospital?

20   A    My last day was February the 2nd or 3rd of 2013.

21   Q    Did you decide to leave?

22   A    Yes.

23   Q    Why did you decide to leave?

24   A    My family had moved to Texas by that time.

25   Q    Did you inform anyone at Sacred Heart of your decision?

Pallekonda - Direct by Greening

1    A   Yes.

2    Q   How did you do that?

3    A   I sent a resignation letter to Dr. Pavlovick via Leslie.

4          THE COURT:  We need to stop here.  We're on page 243

5   of the transcript.  I'm worn out, so we're going to stop right

6   here.  I know you might be almost done, but there's still cross

7   anyway, so you're going to be back tomorrow, so you can step

8   down.  I don't have anything else set, so we can start 9:30

9   sharp, I think.  Yeah.  That's true.  I think I have something

10  at 9:15.

11         So where -- have you heard anything from Dr. Noorlag

12  yet?

13         MR. HAMMERMAN:  There is a message from his attorney.

14  I have not had a chance to review that message, but I just

15  asked the attorneys to contact me and update me, and I'll let

16  the Court know tomorrow morning.

17         THE COURT:  Let me know in the morning.  So where are

18  we schedule-wise?

19         MR. HAMMERMAN:  We're halfway through our schedule for

20  today.  At this point, I would anticipate us going through the

21  end of Monday of next week, maybe bleeding slightly into

22  Tuesday, but I think we can still be done by Monday.

23         THE COURT:  When you say "done," you mean done with

24  evidence or done with evidence and closing?

25         MR. HAMMERMAN:  Evidence.

Pallekonda - Direct by Greening

1          THE COURT:  Okay.  All right.  The one -- yeah.

2     Dr. Noorlag is the question mark there.

3          MR. HAMMERMAN:  Right.

4          THE COURT:  Because if he's -- if he's not available

5     until Tuesday, then we're not finishing until Tuesday.  If he's

6     not available until Wednesday, we're not finishing until

7     Wednesday.  And if it's beyond that, then we're going to have

8     to think about other options because here's -- here's the

9     difficulty; I just want to put this on the table:  I am leaving

10    the country on the 17th of June, and I'm going to be gone for a

11    week.  My -- my plan, you know, based on the estimate that I'd

12    been given, I know we have a couple short days, but not this

13    much short, was that I was going to have several days and

14    hopefully would be able to render a decision before leaving,

15    like, on the 16th.  I am really extremely reluctant to leave

16    the country, you know, fly 14 hours two ways and not have this

17    decided.  So I guess what I'm asking is when you talk to

18    Dr. Noorlag's lawyer -- okay.  And I can say this as a person

19    who had general anesthesia knee surgery:  He's going to be able

20    to testify.  He may not want to, but he's going to be able to

21    testify.  And if you get something like, well, it's going to be

22    Tuesday or Wednesday or I don't know, I do have other options

23    here.  I can direct him to come in, and I will do that, or

24    there are other options besides that, which involve what

25    happens if he doesn't come in.  So you're going to have to

Pallekonda - Direct by Greening

1    press is what I'm telling you.

2            MR. HAMMERMAN:  Yes, your Honor.

3            THE COURT:  Please feel free to lay as much of it off

4    on me as you want to because it would be true because I am

5    directing you to do it.

6            So anyway, so 9:30 tomorrow.

7            MR. POULOS:  Thanks, Judge.

8            MR. HAMMERMAN:  Your Honor, just so the Court is

9    aware --

10           THE COURT:  Yeah.

11           MR. HAMMERMAN:  -- one of our witnesses that we hoped

12   to call tomorrow afternoon, possibly on Monday morning,

13   depending on our schedule, is a witness that will require an

14   interpreter.

15           THE COURT:  What language?

16           MR. HAMMERMAN:  Cantonese.

17           MS. GREENING:  Cantonese.

18           THE COURT:  Do you have somebody lined up?

19           MR. HAMMERMAN:  I think we've got that done.

20           THE COURT:  Okay.

21           MR. HAMMERMAN:  The initial snafu is I didn't specify

22   the form of Chinese, and we ended up with Mandarin.

23           THE COURT:  Right.  That's usually what happens.

24           MR. HAMMERMAN:  That's my fault.

25           THE COURT:  Does the person know it might be tomorrow

Pallekonda - Direct by Greening

1  and it might be Monday and it might be both?

2          MR. HAMMERMAN:  Yes.

3          THE COURT:  The translator, I mean, not the witness.

4          MR. HAMMERMAN:  Yes.  So I think we're on top of it.

5  I just wanted to let the Court know because I don't think you

6  were expecting that.

7          THE COURT:  Whatever.  Is this Ms. Huang?

8          MR. HAMMERMAN:  Huang, yes.

9          THE COURT:  And what is the correct spelling?

10          MR. HAMMERMAN:  H-U-A-N-G.

11          THE COURT:  He was pretty close.

12          MR. HAMMERMAN:  He was.

13          THE COURT:  All right.  Great.  See you in the

14  morning.

15      (Adjourned at 4:37 p.m.)

16

17              C E R T I F I C A T E

18

19      I certify that the foregoing is a true and correct

20  transcript of the record of proceedings in the above-entitled

21  matter.

22

23  /s/ JENNIFER L. DUNN              October 18, 2015

24                                    DATE

25  JENNIFER L. DUNN, CSR, RMR, CRR
    Contract Court Reporter