IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )    Docket No. 13 CR 312
                                    )
                    Plaintiff,      )
                                    )
            vs.                     )
                                    )
RAJIV KANDALA and SHANIN MOSHIRI,   )    Chicago, Illinois
                                    )    June 5, 2015
                    Defendants.     )    9:30 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MATTHEW F. KENNELLY
VOLUME 5-A


APPEARANCES:


For the Plaintiff:       HON. ZACHARY T. FARDON
                         UNITED STATES ATTORNEY
                         BY:  MR. JOEL M. HAMMERMAN
                              MR. BRIAN S. WALLACH
                              MS. KELLY MATTEA GREENING
                         219 South Dearborn Street, Suite 500
                         Chicago, IL  60604
                         (312) 353-5300


For Defendant            COTSIRILOS, TIGHE, STREICKER,
Rajiv Kandala:           POULOS & CAMPBELL, LTD.
                         BY:  MR. THEODORE THOMAS POULOS
                              MR. MARTY BASU
                         33 North Dearborn Street, Suite 600
                         Chicago, IL  60602
                         (312) 263-0345


Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Suite 2102
                         Chicago, Illinois  60604

(312) 435-5639

APPEARANCES CONTINUED:

For Defendant          MR. CARL PETER CLAVELLI
Shanin Moshiri:        53 West Jackson Boulevard, Suite 733
                       Chicago, IL  60604
                       (312) 953-8165

                       MS. JUSTINA SHOBAT
                       53 West Jackson Boulevard, Suite 1603
                       Chicago, IL  60604
                       (312) 353-2118

1    (The following proceedings were had in open court:)

2         THE CLERK:  13 CR 312, USA v. Kandala and Moshiri.

3         THE COURT:  So can I get everybody's appearances for

4    the record, please?

5         MR. HAMMERMAN:  Good morning, your Honor.  Joel

6    Hammerman and Kelly Greening on behalf of the United States.

7         Your Honor, Mr. Wallach had a doctor's appointment

8    that he had to attend this morning --

9         THE COURT:  I thought you were going to say he got

10   injured.

11        MR. HAMMERMAN:  He was not injured.  It was a planned

12   meeting for a family member.  He will be here a little bit

13   late.

14        THE COURT:  Okay.

15        MR. HAMMERMAN:  He apologizes to the Court for that.

16        THE COURT:  There's no need.  All right.

17        MR. CLAVELLI:  Good morning, your Honor.  Carl

18   Clavelli and Justina Shobat for Dr. Moshiri.

19        THE COURT:  And Dr. Moshiri is present.

20        MR. BASU:  Good morning, your Honor.  Marty Basu and

21   Ted Poulos on behalf of Dr. Kandala.

22        THE COURT:  And Dr. Kandala is present as well.

23   Okay.

24        Anything before we start?  Oh, what's the status on

25   Dr. Noorlag?  Any status?

1    MR. HAMMERMAN:  I tried to relate the Court's
2  adamant --

3          THE COURT:  Did not work too well?

4          MR. HAMMERMAN:  I felt like I had made an impression,
5  but I received an email late last night that was not
6  encouraging.  I spoke to -- Dr. Noorlag's attorney is Jamie
7  Shapiro.  I spoke to Mr. Shapiro this morning, and I thought
8  it was best if he come to court and speak with the Court.  So
9  he told me he could try to be here at 11:30 this morning.

10          THE COURT:  Okay.  That's fine.

11          MR. HAMMERMAN:  And I gave him a list of questions
12  that I thought the Court might want the answers to as to
13  Mr. Noorlag's condition.  So I think he's going to try to
14  provide that by 11:30.

15          THE COURT:  Did you get any kind of a feel for what
16  they think his availability is?  Are we talking October or
17  something?

18          MR. HAMMERMAN:  Yeah, it was basically that.  The
19  email I received back was he would be ready to come back
20  downtown in six to eight weeks.

21          THE COURT:  Okay.

22          MR. HAMMERMAN:  Okay.  So you understand the
23  disconnect.

24          THE COURT:  Yeah, okay.  Well, if he comes in and
25  says that, it's going to be real easy.

1    MR. HAMMERMAN:  Your Honor, he -- and I think he can

2    explain it better.  Apparently, what Dr. Noorlag did is he

3    broke the top of his tibia and so that there's some -- and I

4    don't think there was surgery, but it sounds like it's

5    completely immobilized and that he might still be hospitalized

6    even still right now.

7    THE COURT:  The tibia is one of the ones down here.

8    MR. HAMMERMAN:  Yeah, it's basically the top of the

9    shin going into to the knee.

10    THE COURT:  So, I mean -- well, I will worry about it

11    when he comes in.  Let's pick up where we left off.

12    MR. POULOS:  Judge, the other thing, I just want to

13    alert the Court to this.  Doris Huang, H-u-a-n-g, is going to

14    be testifying today.  Judge, she is a recent development in

15    this case by way of discovery, and the government interviewed

16    her, I think, sometime last week for the first time or the

17    week before that.

18    The bottom line is this, Judge.  She has two cell

19    phones with all sorts of text messages with Dr. Kandala,

20    Dr. Pallekonda, Tony Puorro.  We received those from the

21    government on Saturday, two days before trial.  We have been

22    scrambling to deal with those, and --

23    THE COURT:  What form did you get them in?  Were they

24    printed out, or was it a download or --

25    MR. HAMMERMAN:  We received her cell phones, we had

1    them imaged, and we had that -- a report of that image in

2    defense counsel's hands literally within an hour of us

3    receiving it.  And then we provided them the next day an

4    updated report where we then tried to download -- we

5    downloaded those same text messages not in a report form but

6    in a spreadsheet so they could be searched.  That came the

7    next day.

8            MR. POULOS:  So, Judge, I am raising first with

9    respect to my cross-examination of Dr. Pallekonda, there are

10   some text messages between Ms. Huang and Dr. Pallekonda.  The

11   way it downloaded, Dr. Kandala may have received the same or

12   similar texts at the same time.  It's not clear to us.  We

13   were scrambling.  We extracted what are clearly communications

14   between Pallekonda and Ms. Huang, and we're going to present

15   that to the witness.

16           I don't think there is any dispute about the fact

17   that those communications took place and were accurately

18   recorded in our exhibit.  And I think that what we're -- I'm

19   just alerting the Court to that, we are still scrambling a

20   little bit for presentation when Doris Huang testifies.

21           THE COURT:  And she is expected to start today

22   sometime?

23           MR. HAMMERMAN:  Yes.  There is one --

24           THE COURT:  The whole Cantonese thing.

25           MR. HAMMERMAN:  Yes.  And we were going to try to

1  move her to next week, but scheduling a Cantonese court

2  reporter is --

3          THE COURT:  Interpreter.

4          MR. HAMMERMAN:  Yes, sorry.  Interpreter.

5          -- (continuing) is very difficult.  It would be

6  interesting if it was a court reporter, though.

7          With respect to the text messages that Mr. Poulos is

8  referring to, our only concern is that some were group

9  messages, and the way that the defense has put them in their

10  exhibits that they provided to us show us only the

11  communications between Dr. Pallekonda and Ms. Huang and not

12  those that also included Dr. Kandala.  So there is a party

13  missing, which would make it, we believe, a little less clear

14  to the witness.

15          THE COURT:  Okay.  So can you all explain to me why

16  we are talking about something other than the witness who's on

17  the stand right now?  I didn't think so.  Let's get him in

18  here, let's go, and we will talk about this later.

19          You're still on direct, right?

20          MS. GREENING:  Yes, your Honor, just about ten

21  minutes.

22          THE COURT:  Okay.

23          Dr. Pallekonda, do you understand you are still under

24  oath?

25          THE WITNESS:  Yes.

1           THE COURT:  Go ahead.

2           By the way, if you hear my phone ring, it's on

3   purpose.  I may get a call this morning.  If I get it, I'm

4   just going to have to stop in my tracks and go out and take

5   it.

6                              - - -

7       VIJAY PALLEKONDA, D.P.M., DIRECT EXAMINATION CONTINUED

8   BY MS. GREENING:

9   Q.  Dr. Pallekonda, when we broke yesterday, we were starting

10  to talk about your resignation from Sacred Heart Hospital.  Do

11  you remember that?

12  A.  Yes, ma'am.

13  Q.  Before we turn back to that, I'd like to show you what's

14  been marked as Government Exhibit 3914.  Do you recognize

15  this?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  It's an email from Anthony Puorro to me.

19  Q.  What's the date?

20  A.  July 31st, 2012.

21  Q.  Is this a true and accurate copy of an email that you

22  received from Tony Puorro in July of 2012?

23  A.  Yes, it is.

24          MS. GREENING:  The government moves to admit

25  Government Exhibit 3914.

1    MR. POULOS:  No objection.

2    THE COURT:  It's admitted.

3   (Above-mentioned exhibit was received in evidence.)

4   BY MS. GREENING:

5   Q.  Dr. Pallekonda, please read the email.

6   A.  Dr. Pallekonda, today, Dr. Kandala called upset about a

7   patient that was discharged to Woodbridge Nursing Home instead

8   of Ambassador.  Apparently, he indicated that there was a

9   delay in assessing the patient and the patient should have

10  gone back to Ambassador.  He also indicated that responses to

11  his text messages from you are not timely.

12           At Jackson Park, Dr. Kandala receives a daily update

13  on the status of his patients that are admitted there.

14  Perhaps if we can institute a daily update here at Sacred

15  Heart Hospital, it would improve his perception on

16  communication.  As we discussed, maintaining a strong,

17  positive relationship with Dr. Kandala is among the utmost

18  importance.  Your thoughts?  Thanks, Tony.

19  Q.  Dr. Pallekonda, do you recall this incident with the

20  patient that was discharged to Woodbridge Nursing Home instead

21  of Ambassador?

22  A.  Yes, I do.

23  Q.  What happened?

24  A.  The patient was supposed to go to Ambassador, but because

25  the Ambassador didn't have any room over there, we contacted

1  the social worker, and she arranged for the patient to go to

2  Woodbridge.

3  Q.  Mr. Puorro says that Dr. Kandala had said your text

4  message responses were not timely.  Did you communicate with

5  Dr. Kandala?

6  A.  I was talking to his nurse practitioner, Doris.

7  Q.  Did you also communicate with Dr. Kandala at times?

8  A.  Yes, I did.

9  Q.  How often?

10  A.  I'm not sure how often, but we texted back and forth.

11  Q.  And when Dr. Kandala texted you, did you make an effort to

12  respond in a timely manner?

13  A.  Yes, I did.

14  Q.  Mr. Puorro ends by saying that maintaining a strong,

15  positive relationship with Dr. Kandala is among the utmost

16  importance.  Do you recall a discussion with Mr. Puorro about

17  the importance of Dr. Kandala to Sacred Heart that he's

18  referring to here?

19  A.  Yes.

20  Q.  When did that take place?

21  A.  It took place on multiple occasions during the year

22  from 2012.

23  Q.  And what did Mr. Puorro express was the importance of

24  maintaining a strong, positive relationship with Dr. Kandala?

25  A.  Dr. Kandala was sending patients from his practice to the

1  hospital, and it was important that we take care of his

2  patients and we make sure that we communicate with him so that

3  he can continue to send patients to the hospital.

4  Q.  Dr. Pallekonda, I'm now going to turn back to your

5  resignation and show you what's been marked as Government

6  Exhibit 3905.  Do you recognize this document?

7  A.  Yes, I do.

8  Q.  What is it?

9  A.  It's a letter resignation from me to Dr. Pavlovic.

10  Q.  What is the date of this letter?

11  A.  January 4, 2013.

12  Q.  Is this a true and accurate copy of the letter that you

13  wrote in January of 2013?

14  A.  Yes.

15          MS. GREENING:  The government moves to admit

16  Government Exhibit 3905.

17          MR. POULOS:  No objection.

18          THE COURT:  It's admitted.

19    (Above-mentioned exhibit was received in evidence.)

20  BY MS. GREENING:

21  Q.  Please read the letter, Dr. Pallekonda.

22  A.  Dear Dr. Pavlovic, I am voluntarily submitting my

23  resignation to the medical staff office at Sacred Heart

24  Hospital effective February 4th, 2013.  I will be joining my

25  family in Texas.  I would like to thank you and the hospital

1  administration for giving me the opportunity to work at Sacred

2  Heart Hospital.  Sincerely yours, Vijay Pallekonda.

3  Q.  Who did you give -- who did you hand this letter to?

4  A.  I handed the letter to Ms. Leslie Thomas-Muldrow.

5  Q.  I'm now showing you what's been marked Government

6  Exhibit 3911-A.  Do you recognize this document?

7  A.  Yes, I do.

8  Q.  What is it?

9  A.  It's an email.

10  Q.  From who?

11  A.  From myself to Mr. Puorro.

12  Q.  What's the date of the email?

13  A.  January 7, 2013.

14  Q.  So three days after the date of your resignation letter?

15  A.  Yes.

16  Q.  Please read the first three paragraphs only of this email.

17  A.  Dear Tony, I will be returning to work on the 8th of

18  January.  I will keep my part of the bargain to keep working

19  by the terms of the old contract, for the ER only, per our

20  conversation on the 18th of December.

21       I fully expect you to keep your part of the bargain,

22  which is to make sure that the hospital and/or Dr. Kandala pay

23  me for the work that was done in the hospital by me as a

24  hospitalist from April 2012 through December of 2012.  I

25  expect the hospital, as was promised to me by you, will

1  compensate me the fair market value for the services that were

2  provided for Dr. Kandala's patients on the next paycheck.

3         Dr. Kandala, as you know, said he may not be able to

4  pay me.  You promised that you would compensate me if he did

5  not pay me.  He has not paid me.

6         Because of the issues raised above, I will no longer

7  provide coverage as a hospitalist for Dr. Kandala's patients.

8  I will no longer take calls from the nurses for his patients

9  either.  Dr. Kandala will be responsible for his own patients

10  from here on forth.  I will let Dr. Kandala know in the

11  morning.

12  Q.  Dr. Pallekonda, you say that Dr. Kandala said he may not

13  be able to pay me.  To what are you referring?  What

14  conversation are you referring to?

15         When did you have that conversation with Dr. Kandala

16  where he said he may not be able to pay you?

17  A.  That was probably around the Christmas party where I had

18  the conversation with him.

19  Q.  You also referenced in that email that you were going to

20  let Dr. Kandala know that you would no longer be seeing his

21  patients.  Did you let Dr. Kandala know that you would no

22  longer be seeing his parents?

23  A.  Yes, I did.

24  Q.  How did you do that?

25  A.  I sent him a text message.

1   Q.  When did you send that text message?

2   A.  The following morning.

3   Q.  Did you have any further communication from Sacred Heart

4   about you leaving the hospital?

5   A.  Yes, I did.

6   Q.  I'm now showing you what's been marked as Government

7   Exhibit 3906.  Do you recognize this document?

8   A.  Yes, I do.

9   Q.  What is it?

10  A.  It's a certified letter.

11  Q.  Who is it from?

12  A.  It's from the hospital and Anthony Puorro.

13  Q.  Is it signed?

14  A.  Yes.

15  Q.  And what's the name under the signature?

16  A.  Anthony J. Puorro.

17  Q.  And the date of the letter, Dr. Pallekonda?

18  A.  January 25th, 2013.

19  Q.  Is this a true and accurate copy of a letter that you

20  received from Sacred Heart Hospital?

21  A.  Yes, it is.

22          MS. GREENING:  The government moves to admit

23  Government Exhibit 3906.

24          MR. POULOS:  No objection.

25          THE COURT:  It's admitted.

1    (Above-mentioned exhibit was received in evidence.)

2   BY MS. GREENING:

3   Q.  Dr. Pallekonda, was this letter sent about three weeks

4   after you resigned?

5   A.  Yes.

6   Q.  Does it say that your contract will not be renewed?

7   A.  Yes.

8   Q.  Was your contract not renewed?

9   A.  It was not renewed.

10   Q.  What did you do after you left Sacred Heart?

11   A.  I moved to Texas.

12   Q.  Did you ever have any further communication with anyone

13   from Sacred Heart Hospital?

14   A.  Yes, I did.

15   Q.  When was that contact?

16   A.  That was in April, I believe, when I received a letter.

17   Q.  I'm going to show you what's been marked as Government

18   Exhibit 3907.  What is this?

19   A.  This is a letter.

20   Q.  Is this the letter you were referring to?

21   A.  Yes.

22   Q.  What's the date on the letter?

23   A.  May 14th, 2013.

24   Q.  Who is it from?

25   A.  It's from Leslie Thomas-Muldrow.

1   Q.  Who is it to?

2   A.  It is to me.

3   Q.  Is this a true and accurate copy of a letter that you

4   received in May of 2013?

5   A.  Yes.

6         MS. GREENING:  The government moves to admit

7   Government Exhibit 3907.

8         MR. POULOS:  No objection.

9         THE COURT:  It's admitted.

10    (Above-mentioned exhibit was received in evidence.)

11  BY MS. GREENING:

12  Q.  Dr. Pallekonda, please read the letter.

13  A.  Dr. Pallekonda, I hope this letter finds you in good

14  spirits.  I am forwarding these checks to you because I don't

15  trust administration to do so.  I opened the mail to see what

16  it was and got your forwarding address for HR, so I could no

17  (sic) contact you myself or your mother-in-law.  I hope you

18  and your family are healthy and happy.  I miss seeing you

19  around but know you made the right decision.  Best regards,

20  Leslie Thomas-Muldrow.

21  Q.  Was this letter sent -- how many months after your

22  resignation was this letter sent to you, Dr. Pallekonda?

23  A.  About four months.

24  Q.  And the letter mentions checks.  Did you receive checks

25  along with this letter?

1  A.  Yes, I did.

2  Q.  I'm now showing you what's been marked as Government

3  Exhibit 3908.  Do you recognize this document?

4  A.  Yes, I do.

5  Q.  What is it?

6  A.  These are checks that I received.

7  Q.  Are these copies of checks that you received?

8  A.  Yes.

9  Q.  Are these copies of the checks you received along with the

10  letter from Ms. Thomas-Muldrow in May of 2013?

11  A.  Yes.

12  Q.  Are these true and accurate copies of those checks?

13  A.  Yes.

14         MS. GREENING:  The government moves to admit

15  Government Exhibit 3908.

16         MR. POULOS:  No objection.

17         THE COURT:  It's admitted.

18    (Above-mentioned exhibit was received in evidence.)

19  BY MS. GREENING:

20  Q.  Dr. Pallekonda, from whose bank account were these checks

21  drawn?

22  A.  Dr. Rajiv Kandala.

23  Q.  How much are these checks for?

24  A.  One is for $1,000, and the other one is for $5,000.

25  Q.  Were these the first payments that you ever received from

1  anyone for the work performed on Dr. Kandala's patients at

2  Sacred Heart Hospital?

3  A.  Yes.

4  Q.  Are these the only payments you received from anyone for

5  the work performed on Dr. Kandala's inpatients at Sacred Heart

6  Hospital?

7  A.  Yes.

8  Q.  Did you receive any communication from Dr. Kandala along

9  with these checks?

10  A.  I did not.

11  Q.  During your tenure at Sacred Heart, did you round on any

12  other patients besides Dr. Kandala's?

13  A.  I did not.

14  Q.  Did you ever observe Dr. Kandala round on his own

15  inpatients at Sacred Heart?

16  A.  I did not.

17  Q.  What is your understanding of the term "palliative care"?

18  A.  That's when a patient is being cared for at the end of his

19  or her life for pain control and to make them comfortable

20  before they pass away.

21  Q.  During your tenure at Sacred Heart Hospital, did

22  Dr. Kandala ever teach you about palliative care?

23  A.  He did not.

24  Q.  Were you aware of him teaching any Sacred Heart employee

25  or patient on that topic?

1   A.  I was not.

2   Q.  Did Dr. Kandala ever teach you about the treatment of the

3   elderly, frail elderly, or disabled patients?

4   A.  He did not.

5   Q.  Did he ever teach you about case management of patients?

6   A.  He did not.

7   Q.  Were you aware of Dr. Kandala teaching any Sacred Heart

8   employee or patient about those topics?

9   A.  I was not.

10  Q.  During your time at Sacred Heart, did you ever hear about

11  the development of a palliative care education program at the

12  hospital?

13  A.  I did not.

14  Q.  Did you ever hear Sacred Heart was developing a hospice

15  care program?

16  A.  I did not.

17  Q.  Did Tony Puorro ever mention the development of a hospice

18  care program to you?

19  A.  He did not.

20  Q.  Are you familiar with a company called Passages?

21  A.  I am not.

22  Q.  So do you know if Dr. Kandala was associated with a

23  company by that name?

24  A.  I don't know.

25  Q.  Do you know if Sacred Heart was ever associated with a

1  company by that name?

2  A.  I do not know.

3  Q.  Did Dr. Kandala ever communicate with you about developing

4  a hospice care program at Sacred Heart Hospital?

5  A.  He did not tell me.

6  Q.  Do you recall ever hearing of a Passages training at

7  Sacred Heart?

8  A.  I do not.

9       MS. GREENING:  One moment, your Honor?

10      No further questions.

11      THE COURT:  Mr. Poulos.

12      MR. POULOS:  One moment, your Honor.

13      THE COURT:  Sure.

14                          - - -

15      VIJAY PALLEKONDA, D.P.M., CROSS-EXAMINATION

16  BY MR. POULOS:

17  Q.  Good morning, Dr. Pallekonda.

18  A.  Good morning.

19  Q.  Dr. Pallekonda, is it fair to say that by December of 2012

20  and January of 2013, your relationship with Sacred Heart

21  Hospital and Tony Puorro was disintegrating?

22  A.  Yes.

23  Q.  Okay.  So in December, no one invited you to hospice

24  palliative care training sessions involving Passages; no one

25  invited you to that, correct?

1   A.  No, sir.

2   Q.  And by -- you had resigned by January 4th, correct?

3   A.  Yes.

4   Q.  Okay.  And so you weren't invited to any training sessions

5   for anything in January or February of 2013, correct?

6   A.  No, sir.

7   Q.  Okay.  And by December of 2012, your relationship with

8   Dr. Kandala had deteriorated, correct?

9           Did I say December of 2012?  That's what I meant to

10  say.

11          THE COURT:  That's what you said.

12          THE WITNESS:  Could you define "deteriorated,"

13  please?

14  BY MR. POULOS:

15  Q.  Well, you were having problems with him, correct?

16  A.  Yes.

17  Q.  And when you quit working at the hospital, you didn't --

18  you had no further contact with Dr. Kandala, right?

19  A.  I did not.

20  Q.  You didn't -- Dr. Kandala didn't -- you didn't give

21  Dr. Kandala a forwarding address where you were in Texas with

22  your wife, correct?

23  A.  I did not.

24  Q.  And, in fact, you had no longer had the same phone number,

25  correct?

1  A. Yes.

2  Q. Yes, that's correct, right?

3  A. Yes, that's correct.

4  Q. Okay. Which is why when you go to Exhibit 3907,

5  Government Exhibit 3907, Leslie Thomas-Muldrow said she

6  couldn't contact you herself, correct?

7  A. I don't know what she meant by that.

8  Q. Well, you no longer had that same cell phone number,

9  correct?

10  A. That's true.

11  Q. Okay. Now, Dr. Pallekonda, it is true, is it not, that

12  before any of Dr. Kandala's patients started coming to Sacred

13  Heart Hospital, you entered into an agreement with him?

14  Correct?

15  A. Yes.

16  Q. And the agreement that you had directly with Dr. Kandala

17  was pretty simple, wasn't it?

18  A. Yes, it was.

19  Q. The agreement that you and he reached was that his

20  patients -- some of his patients would come to Sacred Heart

21  Hospital, correct?

22  A. Yes.

23  Q. And if his patients came to Sacred Heart Hospital, the

24  second component of the agreement was that you would treat

25  them, correct?

1  A.  Yes.

2  Q.  And by treating, we're talking about doing H&Ps, correct,

3  if you were there?

4  A.  Yes.

5  Q.  And an H&P, we've seen that term in some of the records,

6  that's a history and physical, right?

7  A.  Yes.

8  Q.  So the first time a patient comes to any hospital, right,

9  the hospital staff wants to do a history and physical,

10  correct?

11  A.  Yes.

12  Q.  And then if the patient is admitted, when a patient is in

13  a hospital, it is standard care that a physician do a round on

14  the patient at least once a day, correct?

15  A.  Yes, the physician or his designate.

16  Q.  And you were Dr. Kandala's designate for his patients,

17  correct?

18  A.  Yes, when I was there.

19  Q.  Right.

20       And when we talk about a doctor doing a round, that

21  is visiting the patient at some point during the day and

22  checking in with the nursing staff, correct?

23  A.  Yes.

24  Q.  Looking at the patient file notes for what's happened

25  between the time you -- the last round to this current round,

1  correct?

2  A.  Correct.

3  Q.  Talking to the patient, correct?

4  A.  Yes.

5  Q.  Making assessments as to whether any changes needed -- or

6  any particular treatment needed to be applied, correct?

7  A.  Yes.

8  Q.  Making decisions on whether the patient should remain in

9  the hospital for another day, correct?

10  A.  Yes.

11  Q.  And making decisions on whether the patient should be

12  discharged, correct?

13  A.  Yes.

14  Q.  Okay.  Those are all of the types of things that was part

15  of your agreement that you would perform on a daily basis for

16  Dr. Kandala's patients, correct?

17  A.  Yes.

18  Q.  And then the third component of this agreement was that

19  Sacred Heart wouldn't bill for your services, Dr. Kandala

20  would bill for the services, correct?

21  A.  Yes.

22  Q.  Because you knew that if Dr. Kandala physically,

23  personally came to the hospital and saw these patients, he

24  could bill for those, correct?

25  A.  Yes.

1  Q.  And instead of him doing it, you, sir, became his de facto
2  employee, correct?

3       I shouldn't have used "de facto employee" term.  Let
4  me withdraw that.

5       You became an authorized physician, a member of his
6  practice group, correct?

7  A.  Yes.

8  Q.  And that's common in the medical industry, is it not?
9  A.  Yes.

10  Q.  In fact, you previously worked for a private practice
11  group where they billed for your services in seeing practice
12  group's patients, correct?

13  A.  Yes.

14  Q.  Okay.  So the third component was Dr. Kandala was going to
15  submit bills to Medicare and Medicaid, private insurance,
16  whatever the case may be, for the services that you provided,
17  correct?

18  A.  Yes.

19  Q.  And then the fourth component was he would pay you some
20  portion of what he collected from the payor, whether it was
21  Medicare or Medicaid, correct?

22  A.  Yes.

23  Q.  And he did tell you that he would pay you after he had
24  collected from the paying entity, correct?

25  A.  Yes.

1  Q.  Okay.  Now, has it been your experience, sir, in the

2  medical profession that payments are disbursed to members of

3  practice groups at the end of the year?

4  A.  No, sir.

5  Q.  That's never been part of your experience?

6  A.  No.

7  Q.  Okay.  Now, you understood, did you not, from your

8  discussions and negotiations with Dr. Kandala that he was

9  interested in making money off of your services, correct?

10  A.  Yes.

11  Q.  And he told you that, did he not?

12  A.  Yes.

13  Q.  And you understood, did you not, that he would not have

14  sent patients to Sacred Heart absent the agreement, your

15  agreement with him, that you would see his patients on a daily

16  basis and he could bill for it, correct?

17          MS. GREENING:  Objection.  Foundation.

18          THE COURT:  Overruled.

19  BY MR. POULOS:

20  Q.  You understood that, correct?

21  A.  Yes.

22  Q.  And that, again, was part of the discussion you had with

23  Dr. Kandala, correct?

24  A.  Yes.

25  Q.  Now, this arrangement that you had, it had benefits for

1  patients, did it not?

2  A.  Yes.

3  Q.  The benefits that this arrangement between you and

4  Dr. Kandala had for patients is, one, you were there to

5  provide quality care to these patients, right?

6  A.  Yes.

7  Q.  You were an experienced hospitalist, correct?

8  A.  Yes.

9  Q.  You were an experienced ER doctor, correct?

10  A.  This was my first time working in a non-emergency room.

11  Q.  And you had provided care as an ER doctor on many

12  occasions, correct?

13  A.  Yes.

14  Q.  So let me ask you this, sir.  For every single patient of

15  Dr. Kandala that was admitted to Sacred Heart Hospital, did

16  they receive quality care?

17  A.  From me, yes.

18  Q.  Okay.  Let me back up a second on that.

19       Sacred Heart Hospital has generally -- you observed,

20  generally provided quality care, correct?

21  A.  Yes.

22  Q.  There were many, many highly-skilled, highly-qualified,

23  good doctors working at Sacred Heart, right?

24  A.  I'm not sure what their qualifications were, sir.

25  Q.  Did you interact with doctors at Sacred Heart Hospital?

1  A.  Yes, sir.

2  Q.  Generally, did you have the view that there were many good

3  doctors at Sacred Heart Hospital?

4  A.  Yes.

5  Q.  Excellent doctors?

6  A.  Yes.

7  Q.  You were one of them, correct?

8  A.  Yes.

9  Q.  In addition to the quality of care that they received, let

10  me use this phrase, "continuity of care," do you understand

11  that term in connection with treating patients?

12  A.  Yes, I do.

13  Q.  Explain to the Court what continuity of care is.

14  A.  This is when a patient comes to the hospital and you want

15  a physician to take care of the patient from the time they are

16  admitted to the time they are discharged.  Patients generally

17  like to see the same physician every single day, if possible.

18  Q.  And that's what you promised to provide Dr. Kandala,

19  correct?

20  A.  Yes.

21  Q.  In fact, in your early discussions with Dr. Kandala

22  leading up to the first of his patients arriving, you assured

23  him that you would provide good quality care and continuity of

24  care, correct?

25  A.  Yes.

1  Q.  That is -- as best as you could possibly do it, you would
2  personally be the guy to go see these patients on a daily
3  basis so they saw the same doctor, the same excellent doctor,
4  providing services every single day, correct?
5  A.  Yes, sir.
6  Q.  And you knew that was important to Dr. Kandala; he told
7  you so, right?
8  A.  Yes.
9  Q.  Now, in addition to the continuity of care flowing day to
10  day, many of these patients, Dr. Kandala's patients, you knew
11  they came from nursing homes, a lot of them did?
12  A.  Yes.
13  Q.  And it's true, is it not, from, say, late April through
14  most of December of 2012, you saw many of these patients
15  month -- on multiple occasions?
16  A.  Yes.
17  Q.  In other words, some of these patients would be admitted
18  for whatever their symptoms and issues were, you would treat
19  them, they would be discharged, and then whether it was two
20  weeks later or a couple months later, you saw many of them
21  readmitted, correct?
22  A.  Yes.
23  Q.  And with each of the readmissions that you saw, you
24  recognized that they were appropriate and necessary
25  readmissions, correct?

1  A.  Yes.

2  Q.  And you provided high-quality care to those patients,

3  correct?

4  A.  Yes.

5  Q.  I'm going to place...

6         MR. POULOS:  Your Honor, so many of these emails in

7  these chains repeat themselves in multiple, various exhibits

8  that have been marked as evidence.

9         THE COURT:  Okay.

10        MR. POULOS:  I have put on the screen --

11  BY MR. POULOS:

12  Q.  Dr. Pallekonda, I have put on the screen an email -- email

13  communications from February 20th of 2012 between you and Tony

14  Puorro about the status of things between Dr. Sawlani and

15  Dr. Kandala.  Do you remember this from yesterday?

16  A.  Yes, sir.

17        MR. POULOS:  Your Honor, I apologize.  I had this

18  marked as 3904-E, but I'm not sure --

19        THE COURT:  I think it's 3904-B.

20        MR. POULOS:  Thank you, your Honor.  It was an E as

21  well, but B is in evidence, so thank you.

22  BY MR. POULOS:

23  Q.  So starting at the bottom of what I have up on the screen,

24  on February 20th, Anthony Puorro wrote to you:

25  Dr. Pallekonda, please provide an update on activities with

1    each physician.  Thanks.

2          Correct?

3    A.  Yes, sir.

4    Q.  Let's just flip the page, and it carries over, and he

5    said, Tony, correct?

6    A.  Yes, sir.

7    Q.  And then later that same day, you responded, correct?

8    A.  Yes, sir.

9    Q.  And you said, I filled out the paperwork for Dr. Kandala

10   today and gave it to Leslie to mail out via FedEx today per

11   our previous conversations, correct?

12   A.  Yes, sir.

13   Q.  And, again, just to be clear, what was going on in late

14   February is you were working with Dr. Kandala, with some

15   administrative assistance from people at the hospital, to fill

16   out all the necessary paperwork to be submitted to both

17   Medicare and Medicaid, correct?

18   A.  Yes, sir.

19   Q.  And that was the paperwork that was necessary for you to

20   become a member of Dr. Kandala's practice group, correct?

21   A.  Yes, sir.

22   Q.  So that Dr. Kandala would be authorized legally to bill

23   Medicare or Medicaid for your services, correct?

24   A.  Yes, sir.

25   Q.  And now I'm pretty sure -- and now I am going to turn to

1  an email that is in Government Exhibit 3904-C, which I believe

2  was admitted into evidence yesterday.  And at the bottom of

3  this email, sir, do you see this is an email from you March 6,

4  now, to Tony Puorro, correct?

5  A.  Yes, sir.

6  Q.  And it begins at the bottom of the page of the exhibit

7  where you begin, Tony, comma, and you explain on March 6th,

8  I've finished the application package and sent it back to

9  Dr. Sawlani yesterday, and I expect him to receive it in the

10  next couple of days.

11        Then you go on to say, Dr. Kandala is waiting to hear

12  from Medicare.  He's already sent the application to Medicare

13  for their review, correct?

14  A.  Yes, sir.

15  Q.  Okay.  And now it's March 6th, correct?

16  A.  Yes.

17  Q.  And Doctor, you do recall that Dr. Kandala didn't have any

18  of his patients sent to Sacred Heart Hospital until you were

19  approved as a member of his practice group so that he could

20  bill both Medicare and Medicaid, correct?

21  A.  Yes, sir.

22  Q.  And you recall that that took a number of months for the

23  approval to happen?

24  A.  Yes, sir.

25  Q.  And it is also your recollection, is it not, that as soon

1  as that approval came in, as soon as that happened, you almost

2  immediately began seeing and treating Dr. Kandala's patients,

3  correct?

4  A. Yes, sir.

5  Q. Okay. Now, many of Dr. Kandala's patients, if not all, I

6  will tell you if it was, were admitted to Sacred Heart

7  Hospital through the emergency room, correct?

8  A. Yes.

9  Q. And that wasn't just Dr. Kandala's patients admitted in

10  that fashion. Patients for any number of doctors were

11  admitted in that fashion, correct?

12  A. Yes.

13  Q. Okay. And, sir, at least from my experience with my

14  father not too long ago, it's common, is it not, that if

15  someone is in a nursing home or at home and something is going

16  on and they reach their doctor, it is common for a doctor to

17  say, go to the hospital, just go to the emergency room, I'll

18  call and have you admitted through the emergency room? That's

19  something common in the industry, isn't it?

20  A. Yes, sir.

21  Q. Okay. So that certainly wasn't something unique to

22  Dr. Kandala's patients and Sacred Heart Hospital is what I'm

23  saying, right?

24  A. Could you repeat the question again, sir?

25  Q. Admitting patients through the ER was not something that

1  was unique to Dr. Kandala and Sacred Heart Hospital?

2  A.  No, sir.

3  Q.  It happens at all the hospitals, as far as you know?

4  A.  Yes, sir.

5  Q.  Okay.  And I just want to be clear on this, that you --

6  you personally did the H&Ps for many of Dr. Kandala's

7  patients, right?

8  A.  Yes, sir.

9  Q.  And every single patient that was admitted -- every single

10  patient that you saw at Sacred Heart Hospital, was a

11  Dr. Kandala patient that was admitted to Sacred Heart, you had

12  concluded warranted hospitalization, correct?

13  A.  Yes, sir.

14  Q.  Their conditions were such that you felt it appropriate

15  that they be admitted for whatever care was provided at Sacred

16  Heart Hospital, correct?

17  A.  Yes, sir.

18  Q.  And we're going to get into this in a little bit, but

19  Doris, do you remember a nurse named Doris?

20  A.  Yes, sir.

21  Q.  Doris Huang.  I think you referenced her a little bit in

22  direct examination.

23         You remember communicating with her, right?

24  A.  Yes.

25  Q.  Through text messages, correct?

1   A.  Yes.

2   Q.  At all hours of the day, correct?

3   A.  Yes.

4   Q.  And she would alert you that she was sending patients from

5   nursing homes to Sacred Heart Hospital, correct?

6   A.  Yes.

7   Q.  Do you have any recollection of a doctor by the last name

8   of Bailey, Dr. Bailey, also being a physician who worked with

9   Dr. Kandala with patients at nursing homes?

10  A.  Yes.

11  Q.  He is somebody who also sent patients to Sacred Heart

12  Hospital, right, that you communicated with in terms of him

13  notifying you that one of Dr. Kandala's patients was coming to

14  Sacred Heart?

15  A.  I don't remember if he sent patients directly or not.

16  Q.  Okay.  The patients that arrive at Sacred Heart Hospital,

17  am I correct, sir, that you have -- do you not recall a single

18  occasion of ever sending back a patient that was one of

19  Dr. Kandala's patients?

20  A.  I do not.

21  Q.  That's something that happened with Dr. Kuchipudi's

22  patients, correct?

23  A.  Yes.

24  Q.  And that caused something of a stir at Sacred Heart

25  Hospital and with Dr. Kuchipudi, correct?

1  A.  Yes.

2  Q.  But that situation did not apply to Dr. Kandala, correct?

3  A.  No.

4  Q.  No, it did not apply?

5  A.  No, it did not apply.

6  Q.  Thank you.

7       Now, under the terms of your employment contract with

8  Sacred Heart Hospital, you worked in the emergency room three

9  days a week, correct?

10  A.  Yes, sir.

11  Q.  And was it Monday, Tuesday, and Thursday?

12  A.  It would depend on a week-to-week basis.

13  Q.  Okay.  But, basically, there were three days out of a

14  seven-day week that you were working in the emergency room a

15  12-hour shift, correct?

16  A.  Yes, sir.

17  Q.  Okay.  And for working those 36 hours, those three-day,

18  12-hour shifts, you were compensated with a salary of $200,000

19  a year, correct?

20  A.  Yes, sir.

21  Q.  Okay.  And then the additional fourth day, there was an

22  additional fourth day where you worked as an anesthesiologist

23  in the OR, correct?

24  A.  Yes, sir.

25  Q.  And for that one additional day, you were paid $1100 each

1  day, correct, that you worked as an anesthesiologist?

2  A.  Yes, sir.

3  Q.  So I did some math.  I believe 1100 times 52 weeks is

4  $57,200.  Does that sound right to you?

5  A.  I will take your word for it.

6  Q.  And I will take Mr. Basu's word for it.

7        So, ballpark, what you were receiving annually from

8  Sacred Heart Hospital was roughly $257,000 a year, correct?

9  A.  Yes, sir.

10  Q.  For working four days a week?

11  A.  Yes.

12  Q.  Now, because of the agreement that you had with

13  Dr. Kandala, you were at the hospital six or seven days a

14  week, right?

15  A.  Yes.

16  Q.  And that's because if Dr. Kandala had patients of his in

17  Sacred Heart Hospital on one of those three days that you were

18  not working in the OR or the ER, you made sure you went down

19  to Sacred Heart Hospital to check on his patients, right?

20  A.  Yes.

21  Q.  Okay.  And so let's focus on the four days that you were

22  there first.

23        On the four days that you were there, if there's an

24  emergent situation in the emergency room, you're down there as

25  an ER doctor dealing with those issues, right?

1  A.  Yes, sir.

2  Q.  But there would be time every day for you to go upstairs

3  and check in on the three or four patients that Dr. Kandala

4  had in that hospital, correct?

5  A.  Yes.

6  Q.  Okay.  And am I correct, sir, that for all -- every day of

7  the week that you did rounds, when you're doing a round on a

8  patient, you generally would spend between 15 to 20 minutes,

9  is that a fair estimate, focused on each patient?

10  A.  Yes, sir.

11  Q.  Okay.  And sometimes it was more, right?

12  A.  Yes.

13  Q.  Okay.  But on average, 15 to 20 minutes, does that sound

14  right?

15  A.  Yes, sir.

16  Q.  Okay.  So if Dr. Kandala had three patients in the

17  hospital on that particular day, you would spend roughly 45 to

18  60 minutes with respect to the treatment of his patients?

19  A.  Yes, sir.

20  Q.  Okay.  And that was true whether it was one of the four

21  days you were there or one of the days that he came in?

22  A.  Yes.

23  Q.  So, in other words, of course, if it was a Thursday or

24  whatever day of the week it was, you weren't working in the OR

25  or the ER -- in other words, it was your day off -- you would

1  come in for 45 minutes to an hour, maybe an hour and a half,
2  every day that you were off and take care of his patients?
3  A.  Yes.
4  Q.  Okay.  Now, Dr. Pallekonda, weren't there times, I mean,
5  over that one-year period that you worked at Sacred Heart
6  Hospital that a patient is in the hospital but a doctor can't
7  make it over there, didn't somebody ask you just to fill in
8  and round on a patient?
9  A.  No, sir.
10  Q.  Never?
11  A.  No.
12  Q.  Okay.  You were never even asked to do that?
13  A.  No, sir.
14  Q.  Okay.  Was there a doctor at the hospital who was kind of
15  available to do that?
16  A.  I'm sorry.  I don't follow.
17  Q.  There were many -- there were many doctors who had
18  admitting privileges at Sacred Heart who admitted patients,
19  right?
20  A.  Yes.
21  Q.  And my question is, was there a doctor, like Dr. Kelsick,
22  for example, who worked at the hospital every day who might be
23  called on in a pinch to go see a patient if a doctor couldn't
24  come in and do a round?
25  A.  Yes.

1  Q.  Was it Dr. Kelsick?

2  A.  He helped me out, yes.

3  Q.  Did he help other doctors out, to your knowledge?

4  A.  I'm not sure, sir.

5  Q.  I believe we established that you knew a lot of these

6  patients were patients who were in nursing homes, correct?

7  A.  Yes.

8  Q.  And you knew that a number of these patients came from

9  nursing homes in the South Shore or South Side area of the

10  city?

11  A.  Yes.

12  Q.  Okay.  There are certainly hospitals that were closer --

13  any number of hospitals that were closer to a particular

14  nursing home, right?

15  A.  Yes.

16  Q.  Okay.  And the patients that came to -- Dr. Kandala's

17  patients that came to Sacred Heart that you provided care to

18  and admitted, did you ever feel any patient safety concern

19  that they came to Sacred Heart as opposed to some hospital

20  closer to the nursing home?

21  A.  Not with Dr. Kandala's patients.

22  Q.  Okay.  Could you explain to the Court why that is?

23  A.  If there was an emergency either from the time the nursing

24  home would call Sacred Heart or Doris would call Sacred Heart

25  and the time the paramedics went to go pick the patient up or

1  in the transport time from the nursing home to Sacred Heart

2  and an acute emergency occurred in the meantime, then they

3  would certainly get diverted to the closest facility to the

4  nursing home, or on the way to Sacred Heart Hospital, they

5  would get diverted to that facility.

6  Q.  Okay.  And you saw that occurring based on text messages

7  you were receiving from Doris, correct?

8  A.  Yes.

9  Q.  So what you explained before about the continuity of care

10  is, in fact, important, is it not?

11  A.  Yes.

12  Q.  And did the -- did the benefits of continuity of care play

13  any role in your -- you feeling comfortable that patients were

14  coming from maybe greater distances on the South Side to

15  Sacred Heart Hospital so they could see you?

16  A.  Could you rephrase that question, please?

17  Q.  I'll just withdraw it.  I'll move on.

18        Now, the concept of diversions, you used that term --

19  diverted or diversions, you know what we're talking about,

20  right?

21  A.  Yes.

22  Q.  Okay.  A diversion is when a call is made either in a

23  nursing home or by a doctor, any healthcare professional, send

24  this patient to Sacred Heart Hospital, and sometime between

25  that determination and call, the patient doesn't come to

1  Sacred Heart Hospital, the patient ends up being sent to a

2  different hospital, correct?

3  A.  Yes.

4  Q.  And that occurs because between that initial call, someone

5  made a determination that we have an emergency situation,

6  correct?

7  A.  Yes.

8  Q.  A 911-type issue, correct?

9  A.  Yes.

10  Q.  And skilled healthcare professionals are the ones who make

11  that determination, right?

12  A.  Yes.

13  Q.  That's something that's common, is it not?  That's not

14  unique to Sacred Heart Hospital, right?

15  A.  Could you say was or was not common, please?

16  Q.  Diversions occurring, that's happened at all the hospitals

17  that you've worked at, correct?

18          Actually, withdraw that.

19          A situation where a patient is going to be

20  transported to one hospital and he ends up being transported

21  to another hospital because an emergency develops, that is a

22  common occurrence in the industry, correct?

23  A.  I am not sure how common it is.  I don't know numbers or

24  anything like that.

25  Q.  You've only seen that with respect to the time you've

1  worked at Sacred Heart Hospital?

2  A.  No.

3  Q.  You've seen it elsewhere?

4  A.  Yes.

5  Q.  Okay.  I guess "common" isn't -- what I meant by "common,"

6  it's not unique to Sacred Heart Hospital; that is something

7  that happens with respect to all the hospitals that you've

8  been acquainted with?

9  A.  Yes.

10  Q.  Okay.  And the patients that made it to Sacred Heart that

11  you treated at Sacred Heart, they weren't -- generally, they

12  weren't coming there for an emergency situation, right?

13  A.  No, sir.

14  Q.  Okay.  They were coming there for pain management-type

15  issues and issues that just arise with old age, correct?

16          That's not a good question, is it?  Let me withdraw

17  it.

18          Just to be clear, so maybe it's the same question,

19  but I just want to make sure we are all clear on this, the

20  patients -- Dr. Kandala's patients that arrived at Sacred

21  Heart Hospital, you don't recall any situation where it was a

22  911 actual emergency issue with those patients?

23  A.  They were sick enough to be sent to the facility, but it

24  was not an acute emergency where they should have been

25  diverted to another facility.

1  Q.  Thank you, sir.

2          Now --

3          MR. POULOS:  May I have a moment, your Honor?

4          THE COURT:  Sure.

5    (Brief pause.)

6  BY MR. POULOS:

7  Q.  Dr. Pallekonda, do you recall that Doris, the nurse, that

8  she communicated to you through text messages?

9  A.  Yes.

10 Q.  Alerting you to a patient arriving or being sent to Sacred

11 Heart?

12 A.  Yes.

13 Q.  And do you recall that sometime in about August that Tony

14 Puorro was kind of added to a group text?  Do you remember

15 Tony Puorro being part of those -- at least some of the

16 communications with Doris and you?

17 A.  Yes, I do.

18         THE COURT:  You mean August 2012?

19         MR. POULOS:  Yes.

20 BY MR. POULOS:

21 Q.  And that includes -- and Dr. Kandala was on some of those

22 texts as well, correct?

23 A.  I don't remember Dr. Kandala, but I definitely remember

24 Tony Puorro.

25 Q.  Okay.  And there were occasions where Doris -- you recall

1　occasions where Doris would notify you and Tony Puorro XYZ

2　patient being sent from ABC Home for a particular -- with a

3　particular type of diagnosis or issue, correct?

4　A.　Yes.

5　Q.　And then you remember, do you not, Tony Puorro maybe

6　following up sometime thereafter saying, Doris, the patient

7　hasn't arrived, what's going on?　Do you recall that?

8　A.　Yes.

9　Q.　And I think you did that a couple times as well, correct?

10　A.　Yes.

11　Q.　And then Doris would respond, well, patient diverted to

12　whatever hospital.　Do you remember that?

13　A.　Yes.

14　Q.　Now, you recall, don't you, that Tony Puorro was concerned

15　about those diversions?

16　　　　　He didn't like it; is that fair to say?

17　A.　Yes.

18　Q.　Okay.　And so -- and that's how this concept of room 200

19　-- is it your recollection that that's how this concept of

20　room 200 evolved?

21　A.　Yes.

22　Q.　That wasn't your idea, was it?

23　A.　It was not.

24　Q.　It was Tony Puorro's idea, right?

25　A.　I'm not sure whose idea it was.

1    Q.  Well, I'm going to put on the screen Government

2    Exhibit 3913, which is an email from -- from Tony Puorro to

3    Dr. Kandala.  You're cc'd on it.  Do you see that?

4    A.  Yes.

5    Q.  And this is -- it wasn't until September 4th of 2012 that

6    you first heard about this, correct?

7    A.  First heard about what, sir?

8    Q.  I'm sorry.  It was on September 4th of 2012 that Puorro

9    sent an email to Dr. Kandala that told Dr. Kandala, I just

10   want to suggest an alternative for consideration relating to

11   patients diverted from Sacred Heart Hospital, correct?

12   A.  Yes.

13   Q.  Okay.  Perhaps if we inform the transport company that

14   this is a direct admission to room 200 at Sacred Heart

15   Hospital, the ambulance will transport the patient directly to

16   us, correct?

17   A.  Yes.

18   Q.  Our ER team understands that when patients arrive with

19   these instructions, that a full assessment of the patient will

20   be performed in the ER upon arrival.

21        Do you see that?

22   A.  Yes.

23   Q.  When he said "our ER team," that included you, correct?

24   A.  Yes.

25   Q.  This seems to work well with avoiding diversions in other

1  cases, correct?

2  A.  Yes.

3  Q.  To the best of your knowledge, this is the first time

4  Dr. Kandala is being told by anybody about direct admit to

5  room 200, correct, as far as you know?

6  A.  Yes.

7  Q.  This didn't work, did it?  There were still plenty of

8  diversions after this room 200 thing was being utilized,

9  right?

10  A.  I don't know how many diversions there were, sir.

11  Q.  Okay.  Well, but, again, diversions occurred primarily

12  because other healthcare professionals, before they get to

13  Sacred Heart Hospital, determine you have an emergent

14  situation and somebody needs immediate acute care and so they

15  get diverted to another hospital, correct?

16  A.  Yes.

17  Q.  The fact that somebody was told room -- you don't recall

18  that there were still diversions after September 4th?

19  A.  I do not, sir.

20  Q.  Okay.  But it was Tony Puorro, not Dr. Kandala, that was

21  concerned or upset with these diversions, correct?

22            MS. GREENING:  Objection.  Foundation.

23            THE COURT:  Overruled.  You can answer.

24            THE WITNESS:  Yes.

25  BY MR. POULOS:

1  Q.  Dr. Kandala (sic), I am placing on the screen a chart

2  summary-type document that we have marked as Defendants'

3  Exhibit Kandala 1.  And, sir, I will represent to you and to

4  the Court -- we will tie this up down the road, I believe,

5  with a stipulation -- but this is a summary of billing data

6  extracted from a Government Exhibit Disk 14.

7          And, sir, I will represent to you that this

8  identifies the patient -- the Dr. Kandala patients by admit

9  date and discharge date at Sacred Heart Hospital.  These are

10  the Dr. Kandala admitted patients that Sacred Heart Hospital

11  billed Medicare and Medicaid, okay?

12  A.  Okay.

13  Q.  Okay.  Do you understand that?

14          Okay.  Now, this is in chronological order by service

15  date.  And so, Dr. Kandala (sic), what I want to direct your

16  attention to is chronologically, the very first service date

17  for a Dr. Kandala patient is Wilder Schackelford with an admit

18  date of April 28th of 2012.  Do you see that?

19  A.  Yes, sir.

20  Q.  And does that comport with your recollection that it

21  wasn't until about -- that it was in late April that

22  Dr. Kandala's patients started arriving at Sacred Heart

23  Hospital?

24  A.  Yes.

25  Q.  Okay.  I want to specifically direct your attention to

1  patient last name Mencer with an admit date of April (sic)

2  5th; patient Hopkins, admit date, May 7th; and patient Vaughn,

3  admit date, May 7th.  Okay?

4         Mencer, Hopkins and Vaughn, I just want to highlight

5  those, May 7, okay?

6         Now, we talked about the fact that you had many text

7  messages with Doris Huang about these patients, correct?

8  A.  Yes.

9  Q.  Now, I'm now going to place over that chart -- I'm now

10  showing you Defendants' Exhibit Kandala 5-A.

11         THE COURT:  Excuse me one second.

12         MR. POULOS:  Sure.

13         THE COURT:  Go ahead.  I'm sorry.

14  BY MR. POULOS:

15  Q.  Sir, Defense Exhibit 5-A, Kandala 5-A, I will represent

16  contains various excerpts of text communications between you

17  and Doris that were covered and extracted from Doris Huang's

18  cell phone, okay?

19  A.  Okay.

20  Q.  Now, now, the first text message from Doris to you -- and

21  we will tie this up later, but I will make the representation

22  -- was on April 30th of 2012, okay?  And the message to you

23  was sending Julius Sewell at R at Park South to Sacred Heart

24  for CHF.  That's congestive heart failure, correct?

25  A.  Yes, sir.

1  Q.  And then it says, BNP 2244, correct?

2  A.  Yes.

3  Q.  What's BNP 2244?

4  A.  That's the marker for congestive heart failure that

5  physicians look at to help them diagnose congestive heart

6  failure.

7  Q.  Again, from my own experience with my father, congestive

8  heart failure is a condition that people live with -- could

9  live with for a long time, right?

10  A.  Yes.

11  Q.  And it often leads and involves other serious

12  complications, correct?

13  A.  Yes.

14  Q.  The reference to congestive heart failure, it isn't a

15  signal at all that there's some emergency situation, correct?

16  A.  It could be, but it depends.

17  Q.  In and of itself, it doesn't mean there is an emergency

18  situation, correct?

19  A.  No.

20  Q.  Okay.  By the way, same thing with -- Doris would send you

21  text messages that patients are coming to Sacred Heart because

22  of chest pain, correct?

23  A.  I don't recall a particular patient with a diagnosis of

24  chest pain.  I'm sorry.

25  Q.  Okay.  I will withdraw that.

1    So April 30th, there's the reference to Julius

2  Sewell.  And there it is on Defense Exhibit Kandala 1,

3  April 30th admit date, J. Sewell.

4    Do you see that?

5  A.  Yes, sir.

6  Q.  And then I previously directed your attention to May 5th,

7  7th, and 7th on Mencer, Hopkins and Vaughn, and what we have

8  in Defense Exhibit Kandala 5-A, do you see that on May 8th

9  from -- you sent a text to Doris that said, I did not get

10  notified that Mercer, Hopkins, and Vaughn were sent to Sacred

11  Heart for eval and admission.  Please let me know so that I

12  know they are here.

13    Do you see that?

14  A.  Yes.

15  Q.  Okay.  Now, you wrote Mercer, Hopkins, and Vaughn.  The

16  patients here are Mencer, Hopkins, and Vaughn.  You don't have

17  any doubt that that's just spelling issues there, do you?

18  A.  Yes.

19  Q.  Yes, you do not have any doubt?

20  A.  No, they are the same patients, I believe.

21  Q.  Okay.  And I think you told us on direct examination that

22  early on, there was some issue about coordinating

23  communications, right, and getting notified about patients

24  coming, correct?

25  A.  Yes.

1 Q. And so the issue really only lasted for about a week

2 because you raised this issue, and then you began getting the

3 standard, regular correspondence from Doris, correct?

4 A. Yes.

5 Q. Okay. And just to continue that thread on the first page

6 of Kandala 5-A, it said, Please let me know so that I know

7 they are here and they need to be seen. Otherwise, they will

8 not be seen for quite some time. Thanks. Correct?

9 A. Yes.

10 Q. And five minutes after you sent that text message -- well,

11 later that day, Doris sent you a text, and perhaps others,

12 saying, Sending Lawrence Pierce at South Park (sic) to Sacred

13 Heart for R, slash, O bowel obstruction, correct?

14 A. Yes.

15 Q. And then there is Lawrence Pierce on Defendants' Exhibit

16 Kandala 1 on 5/8. Do you see that?

17 A. Yes.

18 Q. Now skipping ahead to page 2 of Defendants' Exhibit

19 Kandala 5-A, now we're to May 12th, and Doris sent you a text

20 saying, Kenneth Thompson at Southpoint to Sacred Heart for

21 RO/bowel obstruction, correct?

22 A. Yes.

23 Q. And then you say okay. And then at some later point,

24 you're sending her a text saying, The results of the F -- I'm

25 sorry. The results of the VFSS and the subsequent EGV as well

1 as the x-ray results were faxed to Kenwood Nursing Home care

2 of Dr. Kandala one day prior for Mr. Leroy Williams.

3         Do you see that?

4 A. Yes.

5 Q. And then she responds, TY -- that was an abbreviation,

6 talk to you later, TY, talk to you?

7 A. Thank you.

8         THE COURT:  Thank you.  And I am older than you.  You

9 should know that.

10         MR. POULOS:  Marty should have pointed that out to

11 me.

12 BY MR. POULOS:

13 Q. All right.  So what I'm focusing on here is you're

14 communicating specific information to Doris about this

15 patient, correct?

16 A. Yes.

17 Q. And what you're doing, right?

18 A. Yes.

19 Q. And, Dr. Pallekonda, it is fair to say that during this

20 eight -- seven- to eight-month period that you were seeing

21 Dr. Kandala's patients, communicating with Doris, you three,

22 along with perhaps others, were kind of involved in

23 coordinating the care of these patients, right?

24 A. Yes.

25 Q. Okay.  Third page of Kandala 5-A are text messages from

1  May 16th.  On May 16th, she sent you a text message.  RA, you
2  understood, was readmit, right?
3  A.  Yes.
4  Q.  Readmit Lawrence MSH Pierce at South Park (sic) from
5  Sacred Heart.  She was notifying you that a patient has been
6  readmitted to the nursing home, right?
7  A.  Yes.
8  Q.  But then she reports, abdomen still very distended,
9  abdominal KUB, recommended CTR scan.  Then she goes on to say,
10  It's done, INR, the hospital, I do not have information from
11  hospital.  And then you respond with additional information,
12  correct?
13  A.  Yes.
14  Q.  You say specifically, KUB was done post colonoscopy.  I
15  will get the results and fax them to you.  What number should
16  I fax the results to?  He may need to be reevaluated by CT
17  scan again.  If the distension has reoccurred, he may need
18  surgery to correct a volvulus if it's recurred, correct?
19  A.  Yes.
20  Q.  And then she sends you a fax number.  And then she reports
21  to you, I'm sending back Lawrence Pierce to Sacred Heart for
22  abdominal distension, no eating, and other issues, correct?
23  A.  Yes.
24  Q.  Okay.  Again, another example of you working with Doris to
25  coordinate care, correct?

1  A.  Yes.

2  Q.  And I just want to be clear, based on --

3         MR. POULOS:  It's my information, Judge, from

4  Mr. Basu that the first text and the second text Dr. Kandala

5  may have been -- was, in fact, on those text messages as well.

6  BY MR. POULOS:

7  Q.  But, again, another example of you guys coordinating care

8  and staying in communication about the long-term care of these

9  patients, correct?

10  A.  Yes.

11  Q.  Page 4 of Kandala 5 reflects text messages involving you

12  and Doris Huang from May 28th of 2012 which begin with her

13  telling you -- I'm sorry -- yes, with her telling you she is

14  sending Kenneth Thompson at Sacred Heart for anemia.  Do you

15  see that?

16  A.  Yes.

17  Q.  And you tell her, Please have the nurse call, and you

18  provide a specific number, to give a report to our nurse.

19  Thanks.  And she responds, Okay, I just told the nurse.

20         Do you see that?

21  A.  Yes.

22  Q.  What you were doing there is you requested that Doris have

23  the nurse at the nursing home contact the hospital to provide

24  information to the hospital so you guys get as much

25  information as you can to deal with the situation, correct?

1  A.  Yes.

2  Q.  Again, a common occurrence, right?

3  A.  Yes.

4  Q.  You guys -- it wasn't just you, but it was your staff and

5  people at the hospital and Doris and Dr. Kandala and people at

6  nursing homes staying in communication about the needs of

7  these patients, correct?

8  A.  Yes.

9  Q.  We move on to June 20th and a series of text messages

10  involving you and Doris Huang.  On June 20th, you sent a

11  text -- you sent a text to Doris saying, Pamela Young did not

12  come to Sacred Heart Hospital.  I am not sure where she was

13  sent to.  Can you find out and let me know?  I am concerned

14  that she never made it here, correct?

15  A.  Yes.

16  Q.  She said okay.  And then later responds on the same date,

17  Pamela Young went to Roseland.  This is third times (sic) I

18  tried to send her to Sacred Heart.  Used ATI.  Could you

19  transfer to Sacred Heart?  You say, I'll find out what the

20  procedure is and will let you know.  In the OR at the moment.

21  Thanks for the update.  You're welcome.

22       Do you see that?

23  A.  Yes, sir.

24  Q.  Dr. Pallekonda, you know, it's -- you enjoyed -- you

25  enjoyed treating Dr. Kandala's patients, right?

1  A.  Yes.

2  Q.  I mean, enjoyed it from a professional standpoint is what

3  I'm saying, right?

4  A.  Yes.

5  Q.  You liked having that interaction, correct, and applying

6  your skills to the needs of these patients, right?

7  A.  Yes.

8  Q.  Okay.  When you were communicating with Doris about how is

9  it that we could get Pamela Young transferred over here from

10  Roseland, you weren't doing that thinking of the bottom line

11  of Sacred Heart Hospital, were you?

12  A.  No, sir.

13  Q.  Do you recall why you did that?

14  A.  I'm not sure -- Dr. Kandala was on staff at Roseland

15  Hospital, and I'm not sure if he had anybody taking care of

16  his patients at Roseland Hospital.  And if he didn't, then

17  they would not have any idea what was going on with Ms. Young

18  and I would have a better idea of what was going on with her.

19  Q.  Okay.  I'm now skipping to August 3rd on page -- I'm now

20  on page 9 -- 6 of 9 on Defendants' Kandala 5.  And we have a

21  series of text messages that begins August 3rd from -- the

22  entry here says, From Dr. Kandala, parentheses, but Doris.

23  And now it reflects it's to Dr. Kandala as well, right?

24          And Doris is reporting, Sent Sallia Chambers at South

25  Park (sic) to Sacred Heart early this a.m. for AMS, correct?

1  A.  Yes.

2  Q.  And then there is a response that comes, Is this

3  Dr. Kandala?  That came from phone number prefix ending 2120.

4  I will represent to you there is a stipulation on this.  That

5  is Anthony Puorro's telephone.  Do you see that?

6  A.  Yes, I do.

7  Q.  And then Dr. Kandala responds, Tony, there should be two

8  patients.  And then Puorro from -- and Puorro responds, Thank

9  you, Doris.  Please continue to text me in advance.  I really

10  appreciate all your help.  Tony.  Correct?

11  A.  Yes.

12  Q.  Again, this is consistent with what your recollection was

13  when I asked you a while ago that there came a point when

14  Anthony Puorro became involved in these text messages with you

15  and Doris and Dr. Kandala, correct?

16  A.  Yes.

17  Q.  Okay.

18        THE COURT:  If you are going to another document, we

19  are going to take a break here.  Break for 10 minutes.

20    (Short break.)

21    (The following proceedings were had in open court:)

22        THE COURT:  When Mr. Shapiro gets here, we will just

23  stop with whatever we're doing when I see him come in.

24        MR. HAMMERMAN:  Yes, your Honor.

25        THE COURT:  Okay.  Everybody is here, including both

1  defendants.

2        Mr. Poulos, you can go ahead.

3        MR. POULOS:  Thank you, Judge.

4  BY MR. POULOS:

5  Q.  Dr. Pallekonda, I want to go back to page -- what is

6  page 5 of Kandala 5, this dialog about Pamela Young and what

7  you said about your concern.  Do you recall that?

8  A.  Yes, sir.

9  Q.  That she didn't come to Sacred Heart, and you were making

10 an inquiry.  And you said, I'm concerned she never made it

11 here.

12       That was on December 20th, correct?

13 A.  June 20th.

14 Q.  June 20th of 2012, correct?

15 A.  Yes.

16 Q.  Okay.  And you had previously treated Pamela Young, had

17 you not?

18 A.  Yes.

19 Q.  So referring to Defendants' Exhibit Kandala 1, you see

20 that Pamela Young was a patient at Sacred Heart Hospital from

21 May 16th of 2012 to May 28th of 2012.  Do you see that?

22 A.  Yes, sir.

23 Q.  Okay.  Now, turning now to page 7 of Kandala 5-A, just a

24 series of texts from August 4th.  Do you remember just a

25 couple days earlier, Tony Puorro joined the discussion?  Do

1  you remember that?

2  A.  Yes.

3  Q.  And here he is, 2120, saying directly to Doris, Doris,

4  thank you for thinking of Sacred Heart Hospital.  I really

5  appreciate your help.  Tony.  Correct?

6  A.  Yes.

7  Q.  And Doris responds, you are welcome, three exclamation

8  points.

9       Do you see that?

10 A.  Yes.

11 Q.  Do you generally recall that once Tony Puorro got involved

12 in dialog with Doris, that he was constantly asking her to

13 please send more patients to Sacred Heart Hospital?  Do you

14 generally recall that?

15 A.  Yes.

16 Q.  We are now to September 27th of 2012, page 8 of 9 of

17 Kandala 5.  And do you see that on September 27th, you sent an

18 email to Doris saying, Could you please give me Dr. Kandala's

19 billing address?  I have face sheets to mail in.  And she

20 provided you the address of 7531 South Stony Island Avenue,

21 correct?

22 A.  Yes.

23 Q.  You know, that address, 75th and Stony Island, that's

24 Jackson Park Hospital, right?

25 A.  I did not know it was Jackson Park Hospital.

1  Q.  Okay.  And you respond, of course, Thank you.  You got

2  that, right?

3  A.  Yes.

4  Q.  Okay.  So I am going to come back to this in a second.

5          The last text message I'm going to show you, sir, is

6  what I think I can confidently represent to you are the last

7  text messages between you and Doris where there were some

8  series of texts that came in earlier.  And you said, Doris,

9  this is Dr. Pallekonda.  Am I supposed to be getting all these

10  texts?  She said, Sorry, do not worry.  You said, Okay,

11  thanks.

12          Do you see that?

13  A.  Yes.

14  Q.  That was on December 20th of 2012?

15  A.  Yes.

16  Q.  Do you recall, sir -- well, let me -- now, I'm going to

17  turn back to Defendants' Exhibit Kandala 1, which we said

18  before is a summary sheet of billing by Sacred Heart Hospital

19  on Dr. Kandala's patients in chronological order by service

20  date, okay?  And I'm going to turn to the very last page of

21  this.

22          Now, you recall these text messages, September 27th,

23  about getting billing face sheets to Dr. Kandala's office,

24  correct?

25  A.  Yes.

1  Q.  I want to go to this starting with September 27th.  As of

2  that date, sir, do you see that for the month of September

3  after that date one, two, three -- four patients of

4  Dr. Kandala's were admitted to Sacred Heart Hospital?  Do you

5  see that, through the rest of September?

6  A.  Yes.

7  Q.  And then for October, do you see that it's one -- Stevens

8  and DeLeon are on here twice, so that's one, two, three --

9  four patients in October.  That's it.  Do you see that?

10  A.  Yes.

11  Q.  In November, do you see Reddel is counted twice, but

12  that's one, two, three, four, five -- only six patients in

13  November.  Do you see that?

14       Correct?

15  A.  I see seven, sir.

16  Q.  Oh, I'm sorry.  I apologize if I miscounted.

17       Boyer is one, Reddel is two, Washington is three,

18  Carlso, Washington is five, Betances is six, Pates is seven,

19  correct?

20  A.  Yes.

21  Q.  So I stand corrected.  Thank you.  That's seven patients

22  in November, correct?

23  A.  Yes.

24  Q.  And do you see, sir, that in December of 2012, there was

25  only one patient?

1  A.  Yes.

2  Q.  Last name Smith, correct?

3  A.  Yes.

4  Q.  Admit date, December 13th, correct?

5  A.  Yes.

6  Q.  After December 20th of 2012, sir, according to these

7  billing records, there were no further Dr. Kandala patients

8  admitted to Sacred Heart Hospital except for this one patient

9  with an in date of February 22nd and an out date of

10  February 22nd, name Robert Kennedy.  Do you see that, sir?

11  A.  Yes.

12  Q.  You didn't treat Robert Kennedy, did you?

13  A.  I did not.

14  Q.  Now, sir, within a few months of Dr. Kandala's patients

15  arriving at Sacred Heart Hospital, you came to realize that

16  Dr. Kandala was very interested in getting billing information

17  from you and Sacred Heart Hospital so that he could bill for

18  your services, right?

19  A.  Yes.

20  Q.  Because the essence of his arrangement with you was you

21  were going to -- he was going to make money off your services,

22  right?

23  A.  Yes.

24  Q.  And this issue of him trying to get billing data so that

25  he could bill for your services as of about July became an

1    ongoing issue seemingly every month until the date that you

2    stopped treating Dr. Kandala's patients, correct?

3    A.   Yes.

4    Q.   I just want to quickly turn to Government Exhibit 3914.

5    This is the email from July 31st from Puorro to you saying

6    Dr. Kandala was upset about a woman discharged to a different

7    nursing home.  Do you see that?

8    A.   Yes.

9    Q.   You do know that Doris -- you recall, right, that Doris

10   and Dr. Kandala, based on your communications with them, were

11   very interested in trying to make sure that the patients that

12   went to Sacred Heart Hospital went back to the same nursing

13   home unless the patient made some other request, right?

14   A.   Yes.

15   Q.   That too was part of continuity of care, correct?

16   A.   Yes.

17   Q.   And Dr. Kandala -- Dr. Kandala was definitely interested

18   in making money off your services, but you recognized that he

19   was also sincerely interested in the well being of his

20   patients and getting information on their care, correct?

21   A.   Yes.

22   Q.   And so that's what Tony Puorro is telling you; Tony Puorro

23   learned, apparently, presumably from Dr. Kandala, that at

24   Jackson Park, Dr. Kandala receives a daily update on the

25   status of his patients that are admitted there, right?

1    A.  Yes.

2    Q.  There was nothing wrong with the admitting or primary care

3    attending physician for a patient wanting a daily update on

4    the status of his patients, right?

5    A.  No.

6    Q.  You would expect that of a good doctor, correct?

7    A.  Yes.

8    Q.  We talked about his request for billing information being

9    kind of a constant theme within a couple of months of him

10   working with you and you working with him.  And there were

11   times when you thought that you sent all the necessary data,

12   yet you're being told by people at Sacred Heart Hospital you

13   need to send additional data or resend data, correct?

14   A.  Yes.

15   Q.  Okay.  You too became frustrated with that, did you not?

16   A.  Yes.

17   Q.  Now, I don't know what your experience has been since you

18   left Sacred Heart, but up until the time that you left Sacred

19   Heart, am I correct, Dr. Pallekonda, that you had no

20   experience, none whatsoever, in billing for your services?

21   A.  I did not have any experience.

22   Q.  Based on you working at hospitals and other practice

23   groups, it was always somebody else billing for your services,

24   correct?

25   A.  Yes.

1  Q.  So you weren't familiar with the billing process, correct?

2  A.  I was not.

3  Q.  Do you recall communications with a woman named Karen --

4  something like Polewaczyk, Dr. Kandala's billing clerk?

5  A.  Yes.

6       MR. POULOS:  May I have a minute, your Honor?

7       THE COURT:  Yes.

8    (Brief pause.)

9  BY MR. POULOS:

10  Q.  Dr. Pallekonda, I'm going to put on the screen what we

11  have marked as Defense Exhibit Kandala 2, and it's similar to

12  Defense Exhibit Kandala 1 in that it contains billing data.

13  And so I will represent to you that this is information, a

14  summary chart, that is extracted from a government exhibit,

15  Disk 17.  And, sir, this contains -- I'll represent to you

16  that this contains all the billing data from Medicare Part B

17  for Dr. Kandala's practice group billing for your services at

18  Sacred Heart Hospital, okay?

19  A.  Okay.

20  Q.  And so when we start at the very beginning, again, we see

21  the reference to Julius Sewell.  Remember that was the first

22  patient?

23  A.  Yes.

24  Q.  And then we get down to this May period, May 5th, 6th, you

25  see there was Mencer a couple times, there's Hopkins, there's

1    Vaughn.  Do you see that?

2    A.  Yes.

3    Q.  And, sir, Medicare's billing data for the claims submitted

4    by Dr. Pallekonda's (sic) practice group for your services at

5    Sacred Heart Hospital, the last claim chronologically relates

6    to dates of service on October 22nd of 2012.  Do you see that,

7    sir?

8    A.  Yes.

9    Q.  Do you recall, sir, that it was in approximately mid

10   October -- do you recall sending a text message to Dr. Kandala

11   in mid October inquiring when you're going to get paid for

12   your services?

13   A.  I don't remember the exact date; but, yes, I remember

14   texting him.

15   Q.  Okay.  You told us about a conversation that occurred

16   around the holidays, so late December of 2012 at a nursing

17   home Christmas party, right?

18   A.  Yes, sir.

19   Q.  But the fact is, sir, that you began raising those issues

20   and concerns with Dr. Kandala in approximately October?  I

21   mean, it was at least a couple months prior that you began

22   raising those issues and concerns, correct?

23   A.  Yes.

24   Q.  You began telling him that you're not particularly

25   inclined to continue to see his patients, correct?

1  A.  Yes.

2  Q.  And did there come a time, sir, even before December 20th

3  that you stopped seeing his patients?

4  A.  I don't remember if I stopped seeing his patients in

5  October or late November, early December.

6  Q.  It could have been before December 20th, correct?

7  A.  I left for vacation around December 18th, yes.

8  Q.  And whether you continued to see them in November and

9  early December -- although there really weren't many patients

10  around that time.  Do you recall that?

11         Again, going back to Kandala 1, in fact, there was

12  only one patient in December.  Do you see that?

13  A.  Yes.

14  Q.  Okay.  But do you recall prior to, say, December 1st

15  of 2012 telling Tony Puorro and/or Dr. Kandala that you're

16  going to stop seeing Dr. Kandala's patients based on a failure

17  to be compensated?

18  A.  Yes.

19  Q.  Sir, I'm going to put on the screen now Defendants'

20  Exhibit Kandala 9916.  And we could tie this up later.  This

21  is not to you, sir, but it purports to be a letter from

22  Dr. Kandala to the president, slash, CEO, slash, COO, slash,

23  CNO of Sacred Heart Hospital dated 12/1/2012.  Do you see

24  that, sir?

25  A.  Yes.

1  Q.  And in this letter, Dr. Kandala wrote, Dear Sir/Madam,

2  please admit my patients to Dr. Vijay Pallekonda M.D.  When my

3  patients arrive to the emergency room, please call Dr. Vijay

4  ASAP.  All orders to be given by Dr. Vijay Pallekonda.  In the

5  event he is not reachable, please call Dr. Merlin Kelsick.

6       Do you see that?

7  A.  Yes.

8  Q.  Do you recall by any chance, sir, Tony Puorro or anybody

9  else at Sacred Heart Hospital either giving you that letter or

10 discussing it with you in early December of 2012?

11 A.  No, sir.

12 Q.  I'm sorry?

13 A.  No, sir, I did not see this letter.

14 Q.  Okay.  Now, sir, the last thing I want to discuss with you

15 is this -- are the discussions that you had leading up to your

16 agreement with Dr. Kandala, okay?

17 A.  Yes, sir.

18 Q.  Now, if I understand you correctly, you testified about a

19 meeting that your wife attended in the room across from Tony

20 Puorro's office at Sacred Heart Hospital.  Do you remember

21 that?  I think you said it was in December?

22 A.  Yes, sir.

23       THE COURT:  What year are we talking about?

24       MR. POULOS:  Of 2011.  Thank you, Judge.

25 BY MR. POULOS:

1 Q. On direct exam, I believe you said sometime in December

2 of 2011, there was a meeting that involved you and

3 Dr. Kandala, correct, your wife, Mike Castro, and Tony Puorro.

4 Do you recall that?

5 A. Yes.

6 Q. And this is the very first time you met Dr. Kandala,

7 correct?

8 A. Yes.

9 Q. You were -- this was you being introduced to Dr. Kandala,

10 correct?

11 A. Yes.

12 Q. And this is the only meeting between you -- that involved

13 both you and Dr. Kandala, Puorro, and Castro that your wife

14 attended, right?

15 A. Yes.

16 Q. Okay. Now, is it possible that that meeting occurred in

17 January, sir?

18 A. Maybe.

19 Q. Okay. Sir, you testified on direct examination that at

20 this first meeting where you met Dr. Kandala, the one meeting

21 that included your wife, that Tony Puorro made a comment in

22 front of all of you, including Dr. Kandala, that Sacred Heart

23 Hospital would somehow supplement your pay because Dr. Kandala

24 wasn't going to be paying you enough, correct?

25 A. Yes.

1  Q.  Now, sir, you had a number of meetings and discussions

2  with Tony Puorro and Mike Castro about the financial

3  arrangement, correct?

4  A.  Yes.

5  Q.  Okay.  And, sir, isn't it a fact, isn't it a fact, that at

6  this first meeting where Tony Puorro introduced to you

7  Dr. Kandala, that you guys just talked about the general

8  arrangement of, hey, he's going to start admitting patients, I

9  want you to work out a deal with him, and, you know, he's

10  going to bill for your services, are you willing and

11  interested to see and treat his patients that he admits?

12       In other words, that was all that was discussed, and

13  there was no specific discussion of how much Dr. Kandala was

14  going to pay you; isn't that the truth, sir?

15  A.  Could you rephrase the question, please?  There were a lot

16  of questions in there.

17  Q.  At that first meeting and introduction with Dr. Kandala,

18  you didn't discuss how much Dr. Kandala was going to pay you;

19  isn't that the truth?

20  A.  No, sir.  We discussed everything, including patient care,

21  as well as pay, because I did not want there to be any

22  misunderstanding between Dr. Kandala, myself, and the

23  hospital.

24  Q.  But there was plenty of time to have those discussions

25  with Dr. Kandala, wasn't there?  You hadn't even talked about

1  submitting your applications and all that stuff.  That was in
2  February, right?
3  A.  Yes.
4  Q.  Sir, at that meeting, it was discussed that you would
5  perform medical services as necessary for the patients sent by
6  Dr. Kandala, correct?
7  A.  Yes.
8  Q.  It was discussed that Dr. Kandala would do the billing; in
9  other words, he would bill for your services, correct?
10  A.  Yes.
11  Q.  And it was discussed that Dr. Kandala would pay you for
12  your services, correct?
13  A.  Yes.
14  Q.  But there was no discussion the very first time
15  Dr. Kandala met you and knew nothing more than having just met
16  you about how much he was willing to pay you, correct?
17  A.  No.
18  Q.  I'm going to ask you this, sir.  Think about the sequence
19  of events.  Isn't it a fact that it was a couple of weeks
20  after that meeting that included your wife that you first
21  spoke to Dr. Kandala about the specific reimbursement that he
22  would provide you for your services?
23  A.  I talked to him again about the reimbursement, yes.
24  Q.  Isn't it a fact that it was after you spoke with
25  Dr. Kandala, which was after that meeting, that you then spoke

1   to Tony Puorro separately, without Dr. Kandala present, about

2   your request that he compensate you further?  Isn't that the

3   fact, sir?

4   A.  No, sir.

5   Q.  All right.  We are now approximately two and a half

6   years --

7           THE COURT:  If you are changing topics, Mr. Shapiro

8   is here.  I want to try to deal with him for a second.

9           MR. POULOS:  I was just going to do some impeachment,

10  but that's probably going to take a while.

11          THE COURT:  Let's do that later.

12          Mr. Shapiro, come on in.  Thank you for coming over

13  here.

14          MR. SHAPIRO:  Not at all, your Honor.  Sorry to

15  interrupt.

16          THE COURT:  Can you give me sort of a rundown on what

17  Dr. Noorlag says?

18          MR. SHAPIRO:  I can, your Honor.  Apparently, he is

19  just going -- I don't know about home from the hospital today,

20  I think going to a rehab center, probably RIC.

21          He's in pretty bad shape.  He's in a lot of pain.

22  He's on Norco.  The bottom line is he thinks -- his doctor

23  apparently told him six to eight weeks, which is ridiculous.

24          THE COURT:  Six to eight weeks before what?

25          MR. SHAPIRO:  Before he could get actually get in

1  here.  That's what his doc said.

2          THE COURT:  Does that mean he's going to be

3  completely immobilized and not doing anything for six to eight

4  weeks?

5          MR. SHAPIRO:  Yes, except going to the bathroom.

6          THE COURT:  Seriously?

7          MR. SHAPIRO:  Yeah, his bathroom is apparently 15

8  paces away from his bed.  He thinks --

9          THE COURT:  So what you're saying is that the doctor

10  is saying he's going to be homebound for six to eight weeks

11  and not be able to move out of his house?

12          MR. SHAPIRO:  I've been waiting for some

13  documentation from his doctor, your Honor.  My client has not

14  been able to get it to me yet.

15          THE COURT:  People who are on hip replacements are

16  moving around within three days.

17          MR. SHAPIRO:  I'm sorry, your Honor?

18          THE COURT:  People who have hip replacements are

19  moving around within three days.

20          MR. SHAPIRO:  I'm not sure if a hip replacement is

21  the same as not a knee replacement but a fractured tibial

22  plateau.  I'm not a doctor.

23          There's another complication to it.  He thinks three

24  to four weeks, my client thinks three to four weeks, which

25  would mean after your Honor has returned.  He's pretty well

1    immobilized.  He assures me that he's not trying to avoid
2    cross-examination, and I believe him.

3         THE COURT:  How long is he going to be on pain
4    medications for?  Do you know that?

5         MR. SHAPIRO:  I don't know how long.  I think it just
6    depends on when the pain starts to subside.

7         THE COURT:  So we are going to talk here.  So there
8    are options.  Waiting six to eight weeks is not an option.
9    It's just not an option.  I will have to declare a mistrial or
10   I will strike his testimony, okay?  Or there's a deposition at
11   his house which I go to.  If he wants us in his house, if it's
12   really three to four to six to eight weeks, then that's an
13   option.

14        This needs to get resolved fairly quickly, and I
15   can't think of any options other than those.

16        Now, I can't -- I don't know whether I can force
17   myself into Dr. Noorlag's house, but -- so this is what needs
18   to happen.  And I appreciate what you're telling me.  And,
19   honestly, I appreciate what his doctor is telling me too, but
20   as we all know, having done this for a while, the doctor is
21   going to say whatever the doctor thinks he needs to say to
22   make life easier for his patient, unless the doctor -- the
23   treating doctor is standing here like you are staring me in
24   the face.  I have been doing this long enough to know that.
25        So this needs to get discussed today, over the

1  weekend, it needs to get resolved.  We are going to resolve it

2  on Monday morning.  One way or another, it's going to get

3  resolved on Monday morning.

4          MR. SHAPIRO:  I have discussed the possibility,

5  actually, your Honor, of doing the testimony in his hospital

6  room.  I guess he's leaving the hospital today, but I'll talk

7  to --

8          THE COURT:  Yeah.  I mean, we could do it -- you

9  know, another option would be -- I don't know if it's feasible

10  to do.  I mean, there's confrontation issues with what I am

11  about to say, but one option, theoretically, would be to, you

12  know, we could do some sort of a FaceTime thing, Skype, or

13  whatever.  It's a little bit difficult because we have, you

14  know, a secure network here, but it's doable.  It would take

15  some thinking here, working with the technical people.

16          MR. HAMMERMAN:  I have done that once before, your

17  Honor, in a trial where there was no flights.  And the way

18  that was done, as your Honor is pointing out, is it was a

19  secure network.  We have to figure out how to get a video

20  camera in Dr. Noorlag's room or wherever he is at.

21          THE COURT:  Well, or one of these.

22          MR. SHAPIRO:  FaceTime.

23          THE COURT:  Okay.  Well --

24          MR. SHAPIRO:  Sorry I don't have better news to

25  report.

1          THE COURT:  Well, it is what it is.  So -- anyway, so

2   just be in communication with Mr. Hammerman and with defense

3   counsel and so on.

4          MR. SHAPIRO:  He personally thinks three to four

5   weeks.  He is a doctor.

6          THE COURT:  Here's the deal.  I cannot wait three to

7   four weeks, period.  That is the end of that discussion.  I

8   will not wait three to four weeks.  If I have to wait three to

9   four weeks, then -- and a deposition or testimony from his

10  house isn't an option, we have two options left, okay, which

11  is strike the testimony, declare a mistrial.  Those are the

12  two options.

13         I will not wait three to four weeks.  Here's why.  I

14  could die within the next three to four weeks, all right?  I

15  mean, I'm flying overseas, you know, and it's just not -- it's

16  just not, from my standpoint, acceptable, you know, to hear

17  two dozen or three dozen witnesses in a trial and we're done

18  except for one witness and I have to wait God knows how long

19  to see that.

20         MR. SHAPIRO:  I completely understand, your Honor.

21         THE COURT:  Have a good day.

22         MR. SHAPIRO:  I will let my client know.

23         THE COURT:  Okay.  I -- obviously, Dr. Noorlag, he's

24  not on trial here, and I am not suggesting that, you know, he

25  has to sort of, you know, rearrange everything to suit this,

1 but --

2 MR. SHAPIRO: Would your Honor be willing to wait
3 until after you come back?

4 THE COURT: I got to tell you. I said this to the
5 lawyers the other day. I mean, just think about this.
6 Pretend I am a jury, because I kind of am, okay? You hear two
7 weeks of testimony, hear a week and a half of testimony, and
8 then you sit and wait for three weeks, and then you hear one
9 witness, and then closing arguments. It's just not a good way
10 of doing things. It's probably not fair to anybody on either
11 side of the case, not including Dr. Noorlag.

12 MR. SHAPIRO: Let me ask him about the video option.
13 I will ask him about that.

14 THE COURT: That's going to, obviously, have to
15 involve some consultation with the lawyers in the case too.

16 Anyway, thanks a lot. Thanks for coming in. I
17 appreciate it.

18 MR. SHAPIRO: Not at all.

19 MR. HAMMERMAN: Can we resume? I am going to step
20 outside and ask Mr. Shapiro --

21 THE COURT: Yeah, that's fine. If you need to go
22 outside too, we will just pause. You guys need to have a
23 little discussion.

24 (Short break.)

25 (The following proceedings were had in open court:)

1    THE COURT:  We are ready to resume.  All the lawyers
2   are present, as are both defendants.
3   BY MR. POULOS:
4   Q.  Dr. Pallekonda, we were talking about your recollection of
5   this meeting involving you, and your wife, Dr. Kandala, Tony
6   Puorro, and Mike Castro, right?
7   A.  Yes.
8   Q.  Okay.  Now, sir, you spoke with agents of the government
9   and prosecutors on multiple occasions, right?
10  A.  Yes.
11  Q.  Do you recall that the first time you were asked about
12  events at Sacred Heart was in -- in June of 2013?
13  A.  Yes.
14  Q.  Does that sound right?
15          And do you recall that on July 5th, you traveled from
16  Corpus Christi, Texas, and you met with Mr. Hammerman and
17  other agents and that was your first meeting with them and you
18  had your attorney with you as well?  Do you recall that?
19  A.  Yes.
20  Q.  And then you were interviewed again telephonically on
21  August 16 of 2013, correct?
22  A.  Yes.
23  Q.  And then you were interviewed telephonically this time for
24  the first time by Assistant U.S. Attorney Kelly Greening over
25  the telephone on January 23rd of 2013.  Do you recall that?

1    I'm sorry.  That might have been the '15 --
2  January 23rd, 2015, about a month before you testified at the
3  trial?
4  A.  Yes.
5  Q.  Okay.  And then you were -- you met again with
6  Ms. Greening on January 31st of 2015.  Do you recall that?
7  A.  Yes.
8  Q.  And then again the night before you testified in the jury
9  trial involving Mr. Novak on February 25th of 2015, correct?
10  A.  Yes.
11  Q.  And then last week, on Memorial Day, in anticipation of
12  this trial, you were interviewed again telephonically with
13  your lawyer on the phone by assistant U.S. attorneys and some
14  agents.  Do you recall that?
15  A.  Yes.
16  Q.  And then, sir, on Wednesday night, you were interviewed
17  again, correct?
18  A.  Yes.
19  Q.  And, sir, if I represented to you that in all the -- you
20  understood agents were taking notes of these meetings and
21  interviews, correct?
22  A.  Yes.
23  Q.  Sir, if I represented to you that in all the reports of
24  your interviews and meetings with the government, that it was,
25  sir, two nights ago, the night before you testified in this

1 case, was the very first time you ever said to the government

2 that at that meeting, there was any discussion about Sacred

3 Heart supplementing your pay for treating Dr. Kandala's

4 patients? Do you -- that's what the reports reflect. Would

5 you agree with that, that that was the first time you said

6 that, sir?

7 A. I'm not sure what they wrote down, but I've been saying

8 that since the very beginning.

9 Q. Okay. Let's talk about the very beginning.

10 MR. POULOS: May I approach, your Honor?

11 THE COURT: Sure.

12 BY MR. POULOS:

13 Q. Doctor, I'm handing you a binder that contains various

14 reports. I have turned it to tab 6. Let me get mine.

15 Sir, this is a report of your interview prepared by

16 Agent Ben Folger, okay, of an interview that occurred at the

17 U.S. Attorney's Office. Do you see that down there?

18 A. Yes.

19 Q. And the meeting involved you, your attorney, AUSA

20 Greening, and, of course, Agent Ben Folger, correct?

21 A. Yes.

22 Q. Sir, those first three bullet points, you have them in

23 front of you.

24 MR. POULOS: Judge, is it appropriate in a bench

25 trial for me to put this in front of the screen as well, so

1 the Court knows what he's reading?

2        THE COURT:  Is there an objection?

3        MS. GREENING:  Your Honor, there's no objection to

4 the report being on the screen, but I'm not sure if you're

5 refreshing recollection.

6        MR. POULOS:  A little bit of both.

7 BY MR. POULOS:

8 Q.  First, I would just ask you to review that to yourself,

9 sir.  Review those first three bullet points.

10        Have you finished reading those, sir?

11 A.  Yes.

12 Q.  Okay.  Sir, this is a report.  According to this report,

13 at this meeting in January of -- nearly six months ago, you

14 discussed with AUSA Greening and agents with your lawyer

15 present at this meeting involving Puorro, Dr. Kandala, Castro,

16 and your wife, correct?

17 A.  Yes.

18 Q.  Now, according to the report, at that time, you said that

19 that meeting occurred in March of 2012, right?

20 A.  Yes.

21 Q.  And it's now your recollection that it was December, but

22 it could have been in January, correct?

23 A.  It was probably in December, yes.

24 Q.  Okay.  And I'm not going to quibble about the date, sir,

25 but, again, you've told us a number of times now there was

1  only one meeting involving Puorro, Kandala, Castro, yourself

2  that your wife attended, right?

3  A.  Yes.

4  Q.  So this is the meeting that we're talking about, correct,

5  that you've described as reflected in this report, correct?

6  A.  Yes.

7  Q.  Okay.  Now, sir, during that meeting, when you describe

8  what occurred at that meeting, isn't it true that the only

9  thing you said happened there was that Puorro suggested

10  Pallekonda begin to see Kandala's patients that were at Sacred

11  Heart Hospital as a hospitalist?  During this meeting, it was

12  discussed that Pallekonda would perform medical services as

13  necessary for those patients sent by Kandala, Kandala would do

14  the billing, and Kandala would pay Pallekonda for those

15  services after insurance had reimbursed Kandala?  Correct?

16  A.  Yes.

17  Q.  In other words, according to the report of the agents,

18  sir, you didn't say anything about discussion of how much

19  Pallekonda (sic) or the hospital would pay you for providing

20  those services at that meeting, correct?

21  A.  I stated I'm not sure Mr. Folger or anybody else wrote the

22  information down, sir.

23  Q.  And, in fact, sir, you then talked about exactly -- the

24  issue of getting paid by Dr. Kandala, and what you said then,

25  sir, is that it was after the above meeting, after that

1  meeting.  Pallekonda spoke with Kandala on the phone about

2  reimbursement.  Pallekonda stated that Kandala told him he'd

3  only be able to pay Pallekonda the maximum of half of whatever

4  Medicare and Medicaid reimbursed him.  Correct?

5  A.  That's what the statement says, yes.

6  Q.  Yeah.  So when you were -- the first time you discussed

7  this specific meeting, sir, in January of this year, you said

8  that it was after the meeting involving your wife that you and

9  Kandala spoke about how much he would pay you, right?

10 A.  That was the second time we had spoken about it.

11 Q.  Okay.  And then it was after you spoke to Kandala,

12 according to this report, that it was after you had that

13 conversation, which was after the meeting, sir, you said in

14 January that it was after all that that you had another

15 meeting with Tony Puorro and you told Puorro about the call

16 you had with Kandala and that his compensation for services

17 was going to perform for you (sic), right?

18 A.  This is another conversation with Mr. Puorro about the

19 reimbursement as well.

20 Q.  Okay.  So it's your recollection that you said at that

21 time, sir, that it was at this meeting that you discussed

22 compensation issues and Agent Folger got it wrong?  Is that

23 your testimony?

24 A.  I'm not sure what he wrote down, sir.  This is the first

25 time I'm seeing this information.

1 | Q. Sir, would you turn to tab 3 of your binder?

2 | Sir, at tab 3 of your binder I will represent to you

3 | is a report prepared by Special Agent -- FBI Special Agent

4 | Christy Wells of your interview by Agent Wells and Assistant

5 | U.S. Attorney Joel Hammerman going all the way back to July

6 | 5th of 2013, okay?

7 | A. Yes.

8 | Q. Remember, you told us you recall coming up there the day

9 | after the 4th of July and meeting Mr. Hammerman for the first

10 | time, right?

11 | A. Yes.

12 | Q. And this is the first time that you provided details to

13 | the government about Sacred Heart Hospital, correct?

14 | A. They interviewed me during the summer of 2013.

15 | Q. Okay. And this is the summer of 2013.

16 | A. I'm sorry.

17 | Q. Sir, the events were much fresher in your mind in July

18 | of 2013 than they are now, right?

19 | A. Some things are fresher, but if I sit down and think about

20 | things, then I can recollect things.

21 | Q. Well, let me ask you this. When you were interviewed back

22 | in January of 2013 by Ms. Greening, you did your best to tell

23 | the absolute complete truth, right?

24 | A. Yes.

25 | Q. And, of course, you did that on July 5th of 2013 as well,

1 | correct?

2 | A. Yes.

3 | Q. Now, sir, on page 1 of the report of your July 5th, 2013,

4 | interview, would you take a look at paragraph -- the fifth

5 | paragraph that says, Prior to Pallekonda beginning employment

6 | at Sacred Heart Hospital. Do you see that, sir?

7 | A. Yes.

8 | Q. And I will put that on the screen too for the Court. The

9 | one in your book isn't highlighted, but that's okay. Please

10 | read the one in your book, sir, the paragraph that begins,

11 | Prior to Pallekonda beginning employment.

12 | MS. GREENING: Objection, your Honor. This is

13 | improper impeachment. Dr. Pallekonda has answered the

14 | question, and he didn't say that he doesn't remember, and this

15 | is not refreshing recollection. Mr. Poulos is just having him

16 | read his reports into the record. And by "his reports," I'm

17 | sorry, I mean the agent's reports.

18 | MR. POULOS: I am now impeaching by omission, Judge.

19 | THE COURT: Hang on a second.

20 | Okay. You think this is not proper impeachment by

21 | omission?

22 | The silence is telling me. The objection is

23 | overruled.

24 | BY MR. POULOS:

25 | Q. Dr. Pallekonda, have you read that paragraph?

1    Please read that paragraph.

2  A.  Okay.  Prior to Pallekonda beginning employment --

3  Q.  No, no, I'm sorry.  Just read it to yourself.

4    THE COURT:  Just read it to yourself is what he

5  meant.

6    THE WITNESS:  I'm sorry.  Okay.

7  BY MR. POULOS:

8  Q.  Do you see that?

9  A.  Yes.

10  Q.  So, sir, in July -- on July 5th of 2013, you were trying

11  to provide complete, truthful information to the prosecutors

12  and the agents, correct?

13  A.  Yes.

14  Q.  And the first time you describe for the prosecutors in

15  this case what Puorro had told you about whether Sacred Heart

16  was going to pay you anything for treating Dr. Kandala's

17  patients, isn't it a fact, sir, that you told the government

18  that Puorro told you that if Kandala doesn't pay you, Sacred

19  Heart will and that Pallekonda would receive a bonus at the

20  end of the year?  Isn't that what you said to the agents on

21  July 5th of 2013?

22  A.  That's not what I said, sir.

23  Q.  Okay.  And when you said this here, you didn't tell them

24  anything about Puorro supposedly making a comment in the

25  presence of Dr. Kandala that Sacred Heart was going to pay you

1  any amount of money for seeing his patients, right?

2  A. I'm sorry. Could you repeat the question again?

3  Q. When you were describing Puorro talking to you about

4  compensation to you, okay --

5  A. Yes.

6  Q. -- that's reflected in this report, you didn't say

7  anything at that time about Puorro saying something in the

8  presence of Dr. Kandala that Sacred Heart would also

9  supplement your pay, correct?

10  A. Like I said, this is the first time seeing the report,

11  sir, but I told the agents everything that I told you today,

12  which is that Dr. Kandala, myself, and Tony Puorro discussed

13  seeing patients as well as being compensated initially when I

14  first met him and then subsequent phone calls with Dr. Kandala

15  and in meetings with Mr. Puorro.

16  Q. Okay. And that, sir, is contrary to what the reports

17  reflect you having said on July 5th of 2013 and in January of

18  this year, correct?

19  A. I didn't write this report, sir. This is the first time,

20  like I said, seeing these reports.

21  Q. Okay. Last item. We go to page 2 of the same report from

22  July 5th. I'm going to ask you to read the paragraph at the

23  top of the screen to yourself, Pallekonda became a

24  hospitalist.

25          Let me know when you're done.

1    A.  Yes.

2    Q.  Okay.  So the paragraph we reviewed on the first page

3    reflected information you provided in July of 2013 about what

4    Puorro told you about compensation for seeing Kandala's

5    patients, and this paragraph reflects information that you

6    provided to the government about your conversations directly

7    with Dr. Kandala about what he would pay you, correct?

8    A.  Yes.

9    Q.  And at that time, sir, when you were talking about

10   conversations and communications involving Dr. Kandala, you

11   didn't say one word about this supposed -- about this supposed

12   statement by Tony Puorro at that meeting that Puorro said in

13   front of Dr. Kandala that the hospital would reimburse you and

14   pay you anything, right?  You didn't say it, correct?

15   A.  Once again, I don't know what the person who wrote the

16   report wrote down, sir.

17   Q.  Okay.  Now, let's review the contemporaneous documentation

18   of your statements at the time, sir.

19           I'm going to hand you or show you -- I'm going to

20   hand you what I am going to -- what I've marked -- well, I'm

21   going to show you what I've marked as Defendants' Exhibit

22   Kandala 3904-E, okay?

23           And, sir, some of these emails -- some of this chain

24   includes some other emails that you've seen in other exhibits,

25   but I'm going to use this one, okay?

1    And, again, this starts with you having -- this
2  starts -- you forwarded a bunch of emails to your lawyer,
3  Steve Rosenberg, correct?
4  A. Yes.
5  Q. And the bottom chain begins with you in communications
6  from November 17th of 2011, correct?
7  A. Yes.
8  Q. And this is Tony Puorro attaching and sending you a draft
9  contract for your review, correct?
10  A. Yes.
11  Q. Okay. And again, some of these were reviewed with you
12  yesterday and other chains.
13    And then one of the next emails is November 28th on
14  page -- Bates stamp number VP-0065, where it starts, Your
15  response. This is an email from you Monday, November 28th, to
16  Tony Puorro about that agreement, right?
17  A. Yes.
18  Q. And you say, I did not get a chance to look at the
19  agreement and fringe benefits package --
20    THE COURT: You said "did not." The letter says "I
21  did."
22    MR. POULOS: I apologize, your Honor. So I'm going
23  to start again for the record. Thank you, Judge.
24  BY MR. POULOS:
25  Q. You said, Hi, Tony. I did get a chance to look at the

1 agreement and fringe benefits package. I have a few

2 questions. I'll have to email you back later, correct?

3 A. Yes.

4 Q. Okay. And you did later email him back, correct?

5 A. Yes.

6 Q. So VP -- the Bates number on this exhibit, VP-0064, of

7 Kandala 3904-E, you sent him a rather lengthy email on

8 November 28th, 2011, from you to Tony Puorro, again, subject,

9 contract, right?

10 A. Yes.

11 Q. And you say, Hello, Tony. And then the third sentence

12 says, A few things in the agreement I would like to address.

13        Do you see that?

14 A. Yes.

15 Q. And then you went on to talk about various financial

16 matters relating to your work at Sacred Heart Hospital,

17 correct?

18 A. Yes.

19 Q. Issues relating to your compensation, correct?

20 A. Yes.

21 Q. Sir, item 6 in this email from November 28th of 2011,

22 would you read that paragraph 6 for the record, please?

23 A. If any other physicians want me to work with them in doing

24 H&Ps for their patients and following their patients in the

25 hospital, it is to be a completely separate contract. It

1 would be between the individual physician and myself. I would

2 get help from physician assistants and nurse practitioners in

3 taking care of these patients.

4 Q. Sir, on November 28th, when you wrote that item, when you

5 say, If any other physicians want to work with me in doing --

6 want me to work with them in doing their H&Ps for their

7 patients and following their patients in the hospital, that

8 clause, right, that describes, sir, exactly the relationship

9 that you entered into with Dr. Kandala, correct?

10 A. Yes.

11 Q. And you went on to write there, sir, what you told Tony

12 Puorro November 28th: That is to be a completely separate

13 contract, right?

14 A. Yes.

15 Q. And you said, It would be between the individual physician

16 and myself, correct?

17 A. Yes.

18 Q. In other words, what you were proposing there was this is

19 something that's going to be -- it's going to be something

20 totally between me and Dr. Kandala, the hospital is not going

21 to be involved. That's what you meant with that, right?

22 A. If the wages are going to be adequate, then that will be a

23 completely separate agreement, yes.

24 Q. Yeah. But you didn't say anything about adequate wages.

25 You told Tony Puorro what you wrote, sir, in realtime on

1  November 28th is any deal between you and another doctor for

2  you treating their patient, completely separate contract, it

3  would be between you and the individual physician, correct?

4  A.  Yes.

5  Q.  And then we get to -- Tony Puorro responded.  This is

6  on -- his response was on November 29th of 2011, as reflected

7  on Kandala 3904-E.  And he began a response:  Dr. Pallekonda

8  -- this is on page 1 of the exhibit -- thank you for providing

9  your comments on the draft agreement and fringe benefits

10  package.

11          Do you see that?

12  A.  Yes.

13  Q.  And you recall that he responded bullet point, numbered

14  paragraph by numbered paragraph, to the issues you raised,

15  correct?

16  A.  Yes.

17  Q.  And on number 6, the one about you having a completely

18  separate agreement with the physician, he wrote, Item 6,

19  regarding H&Ps is up to you and any other physician, correct?

20  A.  Yes.

21  Q.  Okay.  Finally, sir, we get to Government Exhibit 3904-A,

22  which is in evidence.  And that, sir, had included this email

23  that -- a portion of which was reviewed yesterday.

24          January 26th of 2012, an email from you to Tony

25  Puorro and Mike Castro, correct?

1  A.  Yes.

2  Q.  This is an email -- Dr. Kandala is not on this email, of

3  course, correct?

4  A.  No, he is not.

5  Q.  Okay.  Let's take this one step at a time.

6  So on January -- Thursday, January 26th, you said, As

7  I told you last week, Dr. Kandala is adding me to his

8  corporation, and he is sending me the paperwork, correct?

9  A.  Yes.

10  Q.  And then you tell Tony, you had suggested I accept the

11  offers that these two physicians had made, correct?

12  A.  Yes.

13  Q.  I have accepted Dr. Kandala's offer which you recommended

14  because you stated we could revisit the compensation package

15  down the road, right?

16  A.  Yes.

17  Q.  Okay.  Now, what we know from this, sir, is that as of

18  January 26th, you had accepted Dr. Kandala's offer, right?

19  A.  Yes.

20  Q.  And his offer was he's going to pay you about half of what

21  he would get from Medicare and Medicaid, right?

22  A.  Yes.

23  Q.  And you accepted that?

24  A.  Yes.

25  Q.  Okay.  By the way, sir, I believe you testified that you

1 | had a written contract with Dr. Kandala?

2 | A. Yes, sir.

3 | Q. Where is that?

4 | A. I can't seem to find a copy of my contract. In the move

5 | from Chicago to Corpus Christi, it's been misplaced.

6 | Q. You have all these emails, sir. Now, this was

7 | communication that occurred in 2012. The Internet was alive

8 | and well, and emails were a common means of communication way

9 | back in January 2012, correct?

10 | A. Yes, sir.

11 | Q. Do you have a single email that attaches or references or

12 | shows any communication between you and Dr. Kandala and any

13 | lawyers or anybody at the hospital or anybody in the world,

14 | sir, about a written contract with Dr. Kandala?

15 | A. I don't have a copy of it.

16 | Q. So by this point, sir, you have accepted an offer. The

17 | meeting, the first time you met Dr. Kandala and had a meeting

18 | with his wife -- and had a meeting that included your wife,

19 | excuse me, that clearly had occurred by this point,

20 | January 26th, right?

21 | A. Yes.

22 | Q. Okay. And what you write at this point, sir, you don't

23 | say, hey, Tony Puorro, you promised -- you know, you told

24 | Dr. Kandala that we're going to -- you're going to give me

25 | some additional money. You didn't say that here, did you?

1  A.  No.

2  Q.  You say -- in fact, you say that when you talked to -- let

3  me break this down.

4      At some point, you got back to Tony Puorro, right,

5  and he recommended to you that you accept whatever offer you

6  had worked out with Dr. Kandala, right?

7  A.  Yes.

8  Q.  That didn't occur at the meeting, right?

9  A.  Which meeting are you talking about, sir?

10  Q.  The meeting with your wife.

11      He didn't tell you at that meeting in front of your

12  wife with Castro -- the deal wasn't struck there, of course,

13  was it?  He didn't say, take this offer right now, the very

14  first time you met Dr. Kandala, right?

15  A.  He did not say that.

16  Q.  Okay.  So when you say, I have accepted Dr. Kandala's

17  offer, which you recommended, okay, right, that would have

18  been during a conversation where he recommended to you at some

19  point between this meeting including your wife -- I keep

20  saying -- referencing your wife just to make clear --

21  A.  Yes.

22  Q.  -- that there was only one such meeting, so it's a point

23  of reference.

24      That meeting with your wife, that included your wife,

25  and you accepting Kandala's offer, this reflects that you had

1 at least another conversation with Tony Puorro at which he
2 recommended you accept it, correct?
3 A.  Yes.
4 Q.  Okay.  And at that point, he said, we could revisit a
5 compensation package, right?  At this point, he's telling you,
6 we'll talk about your compensation later.  That's what he told
7 you, right, we will revisit that later?  Right?
8 A.  Yes, we can revisit the compensation package later, yes.
9 Q.  But you say, I don't want to wait, correct?
10 A.  Yes.
11 Q.  And then you start talking about -- you say that the
12 compensation the physicians were offering is definitely not
13 enough for the work that's going to be required, right?
14 A.  Yes.
15 Q.  Okay.  Sir, did you even know what the compensation rate
16 was at the time you accepted Dr. Kandala's offer, how much
17 Medicare and Medicaid paid for a daily visit?
18 A.  I did not.
19 Q.  Okay.  You talk about fair market and what was fair
20 market.  You don't even know what the fair market was in terms
21 of what Medicare and Medicaid pays a doctor for the services
22 you provide to these patients in the hospital, right?
23 A.  I know the rate for hospital services.
24 Q.  Sir, a hospitalist is a full-time employee of the hospital
25 and spends his full day treating patients at the hospital,

1  right?  That's what a hospitalist does, correct?

2  A.  Yes.

3  Q.  Okay.  Now, here you were standing in for a private

4  physician who goes to the hospital, spends time doing the

5  rounds, 15 or 20 minutes, bills his time to Medicare and

6  Medicaid, and then collects from Medicare and Medicaid, right?

7  A.  Yes.

8  Q.  Did you know, sir, that Medicare and Medicaid pays a

9  fraction, a fraction, of the amount billed that a private

10  insurance company would pay?

11  A.  No, sir.

12  Q.  Because you have no experience with billing, right?

13  A.  I do not.

14  Q.  And so what you propose here, now -- you suggest in this

15  meeting, sir, this is the first documentation of any

16  correspondence where you and Tony Puorro are discussing any --

17  you getting paid anything for seeing Dr. Kandala's patients,

18  by the hospital, that is, correct?

19  A.  No.

20  Q.  And here, sir, you propose that they send you -- that the

21  hospital pay you $200 a day, right, for every -- even if there

22  are zero patients in the hospital, right?

23  A.  It says zero to five, yes.

24  Q.  Yeah.  Starting with zero, right?

25  A.  Yes.

1   Q.  $1400 a week even if there were zero patients in there,

2   correct?

3   A.  That's what it seems like.

4   Q.  Okay.  For one patient, sir, on one day when you spend 15

5   minutes, you were saying, you supplement my pay to the tune

6   of $200 for the 15 minutes or 20 minutes that I spent on this

7   one patient a day, correct?

8   A.  That's what it seems like.

9   Q.  That's what it's saying here, right?

10  A.  That's what it seems like.

11  Q.  And you're making a suggestion here, right?

12  A.  Yes.

13  Q.  By the way, you don't say one word in realtime -- when

14  you're negotiating with Tony Puorro, you don't say one word in

15  any of these emails of, hey, remember the meeting with

16  Dr. Kandala when you promised us, you said to us, that the

17  hospital would supplement my pay.  There is not a single word

18  in any of these emails about you asserting that claim that

19  that statement was made at that meeting?  And I should

20  probably rephrase that question.

21          Right, sir?  In this email and any of the emails that

22  the government has ever showed you, okay, that you gave them,

23  that you sent to your lawyer, in no email do you ever say that

24  Tony Puorro told you at a meeting in front of your wife, in

25  front of Dr. Kandala, that the hospital would supplement your

1 pay for seeing Dr. Kandala's patients, right?  It is not in

2 this email, right?

3 A.  It is not in this email.

4 Q.  And it's not in any email, is it?

5 A.  It is not in any email.

6 Q.  And it is not in any of the prior reports of your

7 interview except for the night before you testified against

8 Dr. Kandala, correct?

9      MS. GREENING:  Objection.  Foundation.  The witness

10 doesn't know what's in all --

11      THE COURT:  Sustained, sustained as to the question

12 about the prior reports.

13      MR. POULOS:  May I have one moment, please?

14   (Brief pause.)

15      MR. POULOS:  Your Honor, I move to admit Kandala

16 Exhibit 3904-E, which I failed to do.

17      THE COURT:  Any objection?

18      MS. GREENING:  No objection, your Honor.

19      THE COURT:  It's admitted.

20   (Above-mentioned exhibit was received in evidence.)

21 BY MR. POULOS:

22 Q.  Sir, in fact, in none of the emails that you've reviewed

23 do you even ever tell Tony Puorro what your deal is with

24 Dr. Kandala, right?

25 A.  I believe somewhere in there it says he would pay roughly

1 half or something like that. I can't remember a hundred

2 percent for sure.

3 Q. Well, let's focus on January, okay, in this email that's

4 on the screen from January of 26 (sic). You just say the

5 compensation they're offering isn't enough, right?

6 A. Yes.

7 Q. Okay. And then go on to make your proposal that they pay

8 you $200 a day even if there aren't any patients from these

9 doctors in the hospital, correct? You go on to make that

10 proposal, right?

11 A. Yes.

12 Q. You were leveraging this situation in trying to extract

13 more money from the hospital and Tony Puorro, weren't you?

14 A. No.

15 Q. And then in January 2013, after you submitted your

16 resignation letter, you hadn't been paid by Dr. Kandala,

17 right?

18 A. No.

19 Q. And you began making claims to Tony Puorro that, hey, you

20 promised me this and that, correct?

21 A. Yes.

22 Q. And there isn't a single email -- he doesn't even respond

23 to your request for this. This is not a single email where he

24 told you, yes, I will supplement your pay, is there?

25 A. No.

1  Q.  Okay.  But after you submit your resignation and in

2  January, you start making all these representations about you

3  promised me this, you promised me that, correct?

4          Correct?

5          MS. GREENING:  Objection.  Form of the question.

6          THE COURT:  Overruled.  You can answer.

7          THE WITNESS:  Could you repeat the question, please?

8  BY MR. POULOS:

9  Q.  After you submit your resignation is when you start

10  writing emails to Tony Puorro claiming you promised me this

11  and you promised me that for seeing Dr. Kandala's patients,

12  right?

13  A.  I did it previously as well.

14  Q.  Okay.  And as part of that discussion, sir, in Government

15  Exhibit -- as part of Defense Exhibit Kandala 3904-E, is this

16  email chain, Bates number VP-70 in the bottom right-hand

17  corner -- do you see that, sir?

18  A.  Yes.

19  Q.  And here, sir, even in January 16 when you are making

20  representations about what the discussion was, you say, right,

21  you write him, you promised me -- on January 16 of 2013, you

22  promised me in no uncertain terms that the hospital would pay

23  me if Dr. Kandala did not.  That's what you wrote, correct?

24  A.  Yes.

25          THE COURT:  This is in what exhibit, Mr. Poulos?

1  |  MR. POULOS:  Kandala 3904-E, Judge.

2  |  BY MR. POULOS:

3  |  Q.  And do you remember how we reviewed those emails that

4  |  said -- where you're the guy who proposed it back in November

5  |  of 2011, you said, hey, any deal I cut with the doctor, that's

6  |  just between me and the doctor, private?  Do you remember that

7  |  email?

8  |  A.  Yes.

9  |  Q.  And here you are in January 2013 when you're having your

10 |  dispute, Puorro responds to you and says, hey, as you know,

11 |  I'm not privy to your discussions with Kandala regarding the

12 |  compensation arrangements he made with you for his patients,

13 |  right?  That's what he wrote, I'm not privy to your discussion

14 |  regarding the compensation arrangements he made with you for

15 |  his patients, correct?

16 |  A.  Yes.

17 |  Q.  And then you responded, did you not?

18 |  A.  Yes.

19 |  Q.  Now, you respond, Tony, I understand that you are not

20 |  privy in my conversations with Dr. Kandala.  You had the

21 |  general idea, though, correct?

22 |  A.  Yes, that's what I wrote.

23 |  Q.  Okay.  Now, you wrote, I understand you are not privy to

24 |  my conversations with Dr. Kandala, right?

25 |  A.  Yes.

1   Q.  And, sir, what you didn't write to him is you didn't say,

2   what the heck are you talking about?  Remember the meeting

3   where with my wife present where you told Dr. Kandala and we

4   all discussed the exact compensation terms and that you would

5   supplement my pay?  You didn't say that at that time, correct?

6   A.  I did not say that.

7   Q.  In fact, you said, you don't know anything about the

8   compensation arrangements I had specifically with Kandala,

9   right?

10  A.  I did not say that either.

11  Q.  And then the night before you come into this courtroom and

12  testify against Dr. Kandala, you tell these guys about this

13  so-called statement in the presence of Dr. Kandala, right?

14  A.  I made the statement always, sir.

15  Q.  Sir, before you came here, the night before you testified,

16  were you aware that there were pleadings filed in this court

17  where Dr. Kandala's lawyers asserted that there was absolutely

18  no evidence that Dr. Kandala was aware that Puorro had made

19  any statement or promise to you about compensating you for

20  seeing his patients?  Were you aware of that filing by

21  Dr. Kandala's lawyer about two weeks before you made that

22  statement?

23  A.  No, sir, I was not.

24  Q.  Dr. Kandala didn't pay you for your services, did he?

25  A.  He did not.

1  Q.  And today is payback, isn't it?

2  A.  No, sir.

3          MR. POULOS:  Nothing further.

4          THE COURT:  Mr. Clavelli, do you have any questions?

5          MR. CLAVELLI:  No.

6          THE COURT:  Redirect.

7          Do you have a feel for how long the redirect is?

8          MS. GREENING:  Probably 20 minutes, Judge.

9          THE COURT:  Okay.  Then we are going to do it after

10  lunch.

11          Dr. Pallekonda, you cannot discuss your testimony

12  with anyone.  Do you understand that?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  We will resume at 1:30.

15    (The trial was adjourned at 12:30 p.m. until 1:30 p.m. of

16  this same day and date.)

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 13 CR 312 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RAJIV KANDALA and SHANIN MOSHIRI, | ) | Chicago, Illinois |
| | ) | June 5, 2015 |
| Defendants. | ) | 1:30 o'clock p.m. |

TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MATTHEW F. KENNELLY
VOLUME 5-B

APPEARANCES:

For the Plaintiff:       HON. ZACHARY T. FARDON
                         UNITED STATES ATTORNEY
                         BY:  MR. JOEL M. HAMMERMAN
                              MR. BRIAN S. WALLACH
                              MS. KELLY MATTEA GREENING
                         219 South Dearborn Street, Suite 500
                         Chicago, IL  60604
                         (312) 353-5300


For Defendant            COTSIRILOS, TIGHE, STREICKER,
Rajiv Kandala:           POULOS & CAMPBELL, LTD.
                         BY:  MR. THEODORE THOMAS POULOS
                              MR. MARTY BASU
                         33 North Dearborn Street, Suite 600
                         Chicago, IL  60602
                         (312) 263-0345


Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Suite 2102
                         Chicago, Illinois  60604
                         (312) 435-5639

APPEARANCES CONTINUED:

```
For Defendant            MR. CARL PETER CLAVELLI
Shanin Moshiri:          53 West Jackson Boulevard, Suite 733
                         Chicago, IL  60604
                         (312) 953-8165


                         MS. JUSTINA SHOBAT
                         53 West Jackson Boulevard, Suite 1603
                         Chicago, IL  60604
                         (312) 353-2118
```

1    (The following proceedings were had in open court:)

2         THE COURT:  Good afternoon.  Everybody is present,

3    including both defendants.

4         Do you understand you are still under oath,

5    Mr. Pallekonda?

6         THE WITNESS:  Yes, sir, I do.

7         THE COURT:  Okay.  Ms. Greening, you can start your

8    redirect.

9         MS. GREENING:  Thank you.

10                        - - -

11       VIJAY PALLEKONDA, D.P.M., REDIRECT EXAMINATION

12   BY MS. GREENING:

13   Q.  Dr. Pallekonda, Mr. Poulos asked you a few questions about

14   continuity of care.  Do you remember those questions?

15   A.  Yes.

16   Q.  Did you work in any nursing homes where Dr. Kandala had

17   patients?

18   A.  I did not.

19   Q.  Did you know patients of Dr. Kandala's before they got to

20   Sacred Heart Hospital?

21   A.  I did not.

22   Q.  Did Doris Huang treat those patients at Sacred Heart

23   Hospital?

24   A.  She did not.

25   Q.  Did Dr. Kandala treat his patients, to your knowledge, at

1    Sacred Heart Hospital?

2    A.  He did not.

3    Q.  Did you treat any of Dr. Kandala's patients in the nursing

4    homes after they left Sacred Heart?

5    A.  I did not.

6    Q.  What continuity of care, Dr. Pallekonda, did you provide

7    those patients before or after their time at Sacred Heart

8    Hospital?

9    A.  I did not provide continuity of care after they left

10   Sacred Heart or before they got to Sacred Heart.

11   Q.  You also testified, I believe, that you would expect a

12   good doctor to want daily updates on their patients.  Do you

13   remember that?

14   A.  Yes.

15   Q.  Would you expect a good doctor to ensure coverage for his

16   patients?

17   A.  Yes.

18   Q.  Would you expect a good doctor to contact the primary care

19   physician to check on his patient's status?

20   A.  Yes.

21   Q.  Did Dr. Kandala check in with you daily?

22   A.  He did not.

23   Q.  Did you give Dr. Kandala updates on his patients anytime

24   that he asked you for them?

25   A.  Yes, I did.

1   Q.  With respect to Dr. Kandala's patients' arrival at Sacred

2   Heart, who did you communicate with regularly regarding those

3   patients?

4   A.  Ms. Doris Huang.

5   Q.  And with respect to the patient's condition before and

6   upon their arrival at Sacred Heart, who did you communicate

7   regularly with?

8   A.  Ms. Doris Huang.

9   Q.  You were also asked some questions about diversions.  Do

10  you remember those questions?

11  A.  Yes.

12  Q.  Did diversions of Dr. Kandala's patients happen regularly?

13  A.  No.

14  Q.  But they did happen?

15  A.  Yes.

16  Q.  Do diversions happen when patients need to go to the

17  closest emergency room?

18  A.  Yes.

19  Q.  And is that because there's an emergent situation?

20  A.  There is an emergent situation, yes.

21  Q.  Where should patients go in terms of a closer hospital or

22  a far away hospital when there's an emergency?

23  A.  The closest facility.

24  Q.  Mr. Poulos asked you some questions about the patients

25  that actually arrived at Sacred Heart Hospital and were not

1  diverted.  Do you remember those questions?

2  A.  Yes.

3  Q.  And I believe you testified that these patients needed

4  hospitalization but they were not emergencies or 911 calls; is

5  that right?

6  A.  Yes.

7  Q.  Do you know if the patients who were diverted of

8  Dr. Kandala and did not make it to Sacred Heart were

9  emergencies?

10  A.  I do not know.

11  Q.  What was your understanding of why patients would be

12  diverted?

13  A.  Some sort of emergency arose from the time that the person

14  at the nursing home called our facility or Ms. Huang called

15  our facility and the time they got to our facility.

16  Q.  Dr. Pallekonda, I'm going to ask you about a few specific

17  conditions.  Is chest pain a potentially serious condition?

18  A.  Yes.

19  Q.  Were patients sent to Sacred Heart with these conditions,

20  with that condition?

21  A.  I don't remember the specific patients.

22  Q.  Is altered mental status a potentially serious condition?

23  A.  Yes.

24  Q.  Do you recall if patients of Dr. Kandala's were sent to

25  Sacred Heart with altered mental status?

1  A.  Yes.

2  Q.  Do you recall if any of those patients were diverted?

3  A.  I don't recall.

4  Q.  Is coughing up blood a potentially serious condition?

5  A.  Yes.

6  Q.  Do you recall if patients of Dr. Kandala's were sent to

7  Sacred Heart with that condition?

8  A.  No, I don't.

9  Q.  Do you recall if patients of Dr. Kandala's were sent -- or

10  were diverted along the way to Sacred Heart because of that

11  condition?

12  A.  I do not recall.

13  Q.  Seizures; is a seizure a potentially serious condition?

14  A.  Yes.

15  Q.  Do you recall if patients of Dr. Kandala's were sent to

16  Sacred Heart with seizures?

17  A.  I don't remember anybody actively seizing when I saw them.

18  Q.  Do you recall a report of seizure, someone being sent to

19  Sacred Heart because they had had a seizure?

20  A.  I don't recall.

21  Q.  Finally, possible stroke, is that a potential serious

22  condition?

23  A.  Yes.

24  Q.  Do you recall any patients of Dr. Kandala's being sent to

25  Sacred Heart with a possible stroke?

1    A.  No, I'm sorry, I do not.

2    Q.  Dr. Pallekonda, the code 200-A, what was the purpose of

3    that code?

4    A.  That was so patients would not get diverted to other

5    facilities.

6            MS. GREENING:  One moment, your Honor.  I apologize.

7        (Brief pause.)

8    BY MS. GREENING:

9    Q.  Did the code 200-A preclude sick patients from going to

10   the closest emergency room?

11   A.  Yes.

12   Q.  Mr. Poulos showed you Government Exhibit 3913.  Do you

13   remember that?

14   A.  Yes.

15   Q.  Is Dr. Kandala on this email?

16   A.  Yes.

17   Q.  To your knowledge, did Dr. Kandala ever object to the use

18   of the procedure sending a patient direct admit to room 200-A?

19   A.  He did not.

20   Q.  And did patients of his arrive at Sacred Heart with that

21   instruction?

22   A.  Yes.

23   Q.  To your knowledge, was Dr. Kandala advised when his

24   patients were diverted along the way to Sacred Heart?

25   A.  Yes.

1  Q.  You were also shown Defense Exhibit Kandala 1.  Do you
2  recall this exhibit?
3  A.  Yes.
4  Q.  You don't -- do you know for what patients Dr. Kandala
5  billed?
6  A.  I do not know which patients he billed for.
7  Q.  Do you know which services he was reimbursed for?
8  A.  I do not.
9  Q.  Dr. Pallekonda, did you see patients of Dr. Kandala's, to
10  your recollection, in October of 2012?
11  A.  Yes, I did.
12  Q.  Do you recall seeing Dr. Kandala in the hospital treating
13  his patients between October 2012 and December of 2012?
14  A.  No.
15  Q.  The $6,000 in two checks that you received from
16  Dr. Kandala via Leslie Muldrow Thomas, do you recall those two
17  checks?
18  A.  Yes.
19  Q.  Were they even close to complete payment for the work that
20  you performed on Dr. Kandala's patients?
21  A.  No.
22  Q.  Was that the market rate, $6,000, for that much work on
23  Dr. Kandala's patients?
24  A.  No.
25      MR. POULOS:  Objection, Judge, as to market rate in

1    terms of reimbursement for Medicare and Medicaid.

2            THE COURT:  Overruled.

3    BY MS. GREENING:

4    Q.  Dr. Pallekonda, how much did you charge daily for your

5    work as an anesthesiologist at Sacred Heart Hospital?

6    A.  $1100 a day.

7    Q.  You were also shown some text messages on Defense Exhibit

8    Kandala 5-A.  Do you remember that?

9    A.  Yes.

10   Q.  I'd like to turn to page 3 of that exhibit.  Do these

11   appear to be text messages between you and Doris Huang?

12   A.  Yes.

13   Q.  Regarding a patient named Lawrence Pierce?

14   A.  Yes.

15   Q.  I'm going to show you now what's been marked for

16   identification as Government Exhibit 7400-X.  And starting at

17   the bottom here -- I'm going to see if I can do a side by

18   side, Dr. Pallekonda, but --

19           THE COURT:  You'd probably want to zoom out a little

20   bit, although it's going to make it a little small.

21   BY MS. GREENING:

22   Q.  Starting with this bottom text message, 897, do you see

23   this entry here, 897?

24   A.  It's blurry on my end.

25           THE COURT:  When you put the other thing on there, it

1 | changes the focus on it.  Just hit autofocus.  It should do it

2 | automatically.

3 | It's a little bit better.  There you go.  There it

4 | is.  Can you see it now?

5 | THE WITNESS:  Yes, sir.

6 | BY MS. GREENING:

7 | Q.  So under 897, Dr. Pallekonda, is this a text message from

8 | you?

9 | A.  Yes.

10 | Q.  And does it match the text message here from you to Doris

11 | Huang?

12 | MR. POULOS:  Your Honor, I think Ms. Greening has it

13 | backwards.  It's from Doris to.

14 | MS. GREENING:  I apologize.

15 | THE COURT:  You're right.  To Dr. Pallekonda.

16 | BY MS. GREENING:

17 | Q.  To you from Doris Huang?

18 | A.  Yes.

19 | Q.  Do you see this entry here, entry 898?

20 | A.  Yes.

21 | Q.  Is that a message -- who is that a message to?

22 | A.  To Dr. Kandala.

23 | Q.  And is it the same date as the message to you?

24 | A.  Yes.

25 | Q.  Is it the same time?

1  A.  Yes.

2  Q.  Is it the identical message?

3  A.  Yes.

4  Q.  Then moving to entry 892, that's a text message to you?

5  A.  Yes.

6  Q.  From Doris Huang?

7  A.  Yes.

8  Q.  And does it match this text message here on Defense

9  Exhibit 5-A?

10  A.  Yes.

11  Q.  If you look at entry 893, who is that a message to?

12  A.  To Dr. Kandala.

13  Q.  And is it the exact same date as the message to you?

14  A.  Yes.

15  Q.  Is it the same time?

16  A.  Yes.

17  Q.  Is it the identical message?

18  A.  Yes.

19  Q.  We're just going to look at one more, Dr. Pallekonda.

20  Here is page 5 of the defense exhibit.  Is this text messages

21  between you and Doris Huang about a patient named Pamela

22  Young?

23  A.  Yes.

24  Q.  So at the bottom entry here, entry 372, do you see that?

25  A.  Yes.

1    Q.  Does this appear to be a text message from you?

2    A.  Yes.

3    Q.  And what's the date?

4    A.  6/20/2012.

5    Q.  Is that the same text message that appears in the defense

6    exhibit at the very top here?

7    A.  Yes.

8    Q.  Turning to entry 373, Dr. Pallekonda, who is this text

9    message from?

10   A.  Dr. Kandala.

11   Q.  What's the date?

12   A.  6/20/2012.

13   Q.  And is that the exact same text message as the one from

14   you in entry 372?

15   A.  Yes, it is.

16           THE COURT:  Hang on a second.  Can you put 372 and

17   373 up there at the same time?  Just slide 373 down since it's

18   a higher number, and put 372 over it.  I just want to look at

19   them together.  There you go.  Thanks.

20           Okay.

21   BY MS. GREENING:

22   Q.  Dr. Pallekonda, do you recall if you ever --

23           THE COURT:  Don't put those too far away because I am

24   going to want to ask a question about them.  So don't bury

25   them back in the cart or anything like that.

1          MS. GREENING:  Sure.

2    BY MS. GREENING:

3    Q.  Do you recall having group text messages with Doris Huang

4    and Dr. Kandala?

5    A.  Yes.

6    Q.  About patients being sent to Sacred Heart Hospital?

7    A.  Yes.

8    Q.  You were also shown what I believe has now been admitted

9    as Defense Exhibit 3904-E.  Do you remember this email?

10   A.  Yes.

11   Q.  So starting with this email at the top of the page from

12   Mr. Puorro, it says, As you know, I am not privy to your

13   discussions with Dr. Kandala regarding the compensation

14   arrangements he made for you -- or made with you for his

15   patients.

16          Is that right?

17   A.  Yes.

18   Q.  Was Mr. Puorro privy to some of the conversations you had

19   with Dr. Kandala?

20   A.  Yes, he was.

21   Q.  Which conversations?

22   A.  The conversation about compensation and conversation

23   regarding patient care.

24   Q.  And turning to your response email, do you recall this

25   email, January 17th, 2013?

1  A.  Yes.

2  Q.  Please start by reading this highlighted sentence, and

3  then I'll flip it to the next page.

4  A.  I undertook the additional responsibility and risk because

5  you had told me that the hospital would compensate me as

6  Dr. Kandala was not going to pay me fair wages for the work

7  that is being done.

8        You said that it was very important that we get Dr.

9  Kandala on board, especially as it related to the admissions

10  that he was sending from his nursing homes.  I worked very

11  hard getting the program off the ground.  I stayed late many a

12  night without getting adequately compensated.  I answered my

13  phone all hours of the day and night.  I rounded on the

14  patients and I wrote notes on all the patients on a regular

15  basis.

16        In our last conversation on the 18th of December, you

17  told me that you would try to get Dr. Kandala to pay me and,

18  if he did not, the hospital would pay me.  I have done the

19  work, and I should be fairly compensated by the hospital

20  because of our verbal agreement.

21  Q.  And just these other three highlighted paragraphs in the

22  middle of the page, Dr. Pallekonda.

23  A.  Dr. Kandala keeps telling me that he has not collected on

24  any of the patients that were sent to this facility and he

25  cannot pay me because he has not collected.  It's difficult

1  for me to believe that he has not billed nor collected since
2  April, but that's what he says.

3        If you can get him to pay me, that would be
4  wonderful, but I doubt that's going to happen.

5        On many occasions, I agreed to things because of the
6  firm belief that you would keep the verbal agreements that we
7  made.  Did I make a mistake in that?  Should I have gotten
8  everything in writing?

9  Q.  Dr. Pallekonda, I'm also going to move you a little bit
10  earlier in time to this November 29th, 2011, email that
11  Mr. Poulos showed you from Anthony Puorro.  And under
12  number 6, he had written, Item 6 regarding H&Ps is up to you
13  and any other physician.

14        This is before you had entered into the contract with
15  Dr. Kandala; is that right?

16  A.  Yes.

17  Q.  And Mr. Poulos had asked you whether -- or had maybe said
18  that the hospital was not involved in your contract
19  negotiations with Dr. Kandala.  Was Mr. Puorro involved?

20  A.  He knew the contents of the contract, yes.

21  Q.  Did he facilitate meetings between you and Dr. Kandala?

22  A.  Yes.

23  Q.  Did he facilitate the contract terms between you and
24  Dr. Kandala?

25        MR. POULOS:  Objection.  Leading, Judge.

1    THE COURT:  Overruled.

2    THE WITNESS:  Yes.

3   BY MS. GREENING:

4   Q.  Dr. Pallekonda, I'm going to show you now two emails from

5   Anthony Puorro, this first email that Mr. Poulos showed you,

6   January 16th, 2013; is that right?

7   A.  Yes.

8   Q.  And that's the one that says, As you know, I am not privy

9   to your discussions with Dr. Kandala regarding the

10   compensation arrangements he made with you for his patients?

11   A.  Yes.

12   Q.  And what's the date of this email from Anthony Puorro?

13   A.  January 17th, 2013.

14   Q.  And please read the first sentence of that email.

15   A.  Any conversations, and there have been many, that we have

16   had in the past on compensation were always subject to an

17   in-depth review by our attorneys to make certain that Sacred

18   Heart Hospital was meeting all legal requirements.

19   Q.  Dr. Pallekonda, you were asked some questions about your

20   familiarity with billing.  Do you remember those questions?

21   A.  Yes.

22   Q.  And you had said, I believe, that you had not submitted

23   your own billing in the past for your services; is that right?

24   A.  No, I have not submitted any billing.

25   Q.  Have you had the experience, though, of providing billing

1  information to your employer or whoever was going to bill for

2  you?

3  A.  Yes.

4  Q.  So were you familiar with the information that you should

5  give someone who was going to bill for your services?

6  A.  Yes.

7          MS. GREENING:  May I have a moment, your Honor?

8          THE COURT:  Yes.

9          MS. GREENING:  Nothing further.

10          THE COURT:  Mr. Poulos, anything else?

11          MR. POULOS:  Very briefly.

12                      - - -

13          VIJAY PALLEKONDA, D.P.M., RECROSS-EXAMINATION

14  BY MR. POULOS:

15  Q.  Dr. Pallekonda, just -- Ms. Greening asked you a series of

16  questions about potentially serious conditions, right?

17  A.  Yes.

18  Q.  And these patients that you were treating at the hospital

19  from the nursing homes, they were by and large quite elderly,

20  correct?

21  A.  Yes.

22  Q.  And chronically ill, correct?

23  A.  Yes.

24  Q.  So many of the reasons they came to the hospital -- let me

25  withdraw that.

1    That type of patient, everything is potentially
2  serious, correct?
3  A.  Yes.
4  Q.  A bowel obstruction is potentially serious in certain
5  circumstances, correct?
6  A.  Yes.
7  Q.  Chest pains is potentially serious in certain situations,
8  right?
9  A.  Yes.
10  Q.  If a patient -- and I believe you told us.  If a text from
11  Doris to you or Tony Puorro or anybody else saying, I'm
12  sending a patient to Sacred Heart with chest pains, okay,
13  accept that as a fact, do I understand correctly from your
14  testimony that none of the patients that arrived to Sacred
15  Heart that you treated for Dr. Kandala were emergency acute
16  care chest pain patients, to the best of your recollection?
17  A.  To the best of my recollection, there were no acute
18  instance that occurred with Dr. Kandala's patients.
19  Q.  Okay.  So a client -- a patient with chest pains being
20  sent to Sacred Heart Hospital, if they end up getting
21  diverted, that's because an acute situation arose, correct?
22  A.  Yes.
23  Q.  If they arrived at Sacred Heart, that's because an acute
24  situation of somebody with chest pains did not arise, to the
25  best of your recollection?

1  A.  Yes.

2  Q.  And I just want to make one thing clear, if I may.

3      Exhibit 3904-E, which is a defense exhibit,

4  Ms. Greening showed you this, I just want to be clear.  This

5  is an email that you wrote on January 17th of 2013, correct?

6  A.  Yes.

7  Q.  Okay.  And when you write here, In our last conversation

8  of the 18th of December, that's the 18th of December of 2012,

9  correct?

10  A.  Yes.

11  Q.  A month earlier?

12  A.  Yes.

13  Q.  That's not a representation of any conversation that

14  occurred in December of 2011, correct?  You're referring to

15  December of 2012?

16  A.  In this particular email, yes.

17  Q.  Okay.

18         MR. POULOS:  Thank you.  Nothing further.

19         THE COURT:  Anything else?

20         MS. GREENING:  No, your Honor.

21         THE COURT:  Mr. Clavelli, did you have anything?

22         MR. CLAVELLI:  None, Judge.

23         THE COURT:  Those two -- on the -- for 7400-X, what

24  were the two numbers you were showing, was it like 773 and 772

25  or something like that?

1  |  MS. GREENING:  The phone numbers, your Honor?

2  |  THE COURT:  No, the two line items.

3  |  MS. GREENING:  The first was 891 through 898.

4  |  THE COURT:  No, the one where I asked the question or

5  | the one where I had you put it back up on the screen.  No, it

6  | wasn't that one.  It was a much higher up number.  The one was

7  | at the bottom of the page and one was at the top of the next

8  | page.  I would like to look at them for a second physically.

9  |  No, physically.  Hand me those two pages.

10  |  MS. GREENING:  Sorry.

11  |  THE COURT:  Give me the whole thing.

12  |  Okay.  Could I ask you if you could just put those

13  | two up on the screen.  I want to ask Dr. Pallekonda a question

14  | or two about these.

15  |  So I know the exhibit is not in evidence, but that

16  | doesn't matter for now.

17  |  This is this chart, it's Exhibit 7400-X that has text

18  | on it.  So if you look at number 373 there, it says it's from

19  | Dr. Kandala and the time, and I think those are all like

20  | Greenwich Mean Time or something like that.  It doesn't really

21  | matter.  It says 2:51:09, and it's from Dr. Kandala.  And it

22  | says, Pamela Young did not come to Sacred Heart Hospital.  I'm

23  | not sure where she was sent to.  Can you find out and let me

24  | know?  I'm concerned that she never made it.

25  |  So then you look at 372.  That's a text from you

1  which is about 18 seconds later, 2:51:27.  It basically looks

2  like you just -- it like you forwarded the text to somebody,

3  maybe?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  I suppose you don't have any recollection

6  of that specific incident, but can you tell from looking at

7  that what it was that likely was going on there?

8            THE WITNESS:  Well, there was a patient who was

9  supposed to come to Sacred Heart Hospital, but because she

10  didn't, I just wanted to -- I think Dr. Kandala wanted me to

11  find out exactly where she was at.

12           THE COURT:  So who would you have forwarded this text

13  to to find out?  Were you forwarding it then to Doris?

14           THE WITNESS:  Yes, to Doris.  Yes, sir.

15           THE COURT:  All right.  Thanks.

16           Does anybody want to ask questions based on the

17  questions that I asked?

18           MR. POULOS:  I need to examine that.

19           THE COURT:  Yes.

20                               - - -

21    VIJAY PALLEKONDA, D.P.M., RECROSS-EXAMINATION CONTINUED

22  BY MR. POULOS:

23  Q.  So using this same document, if we then scroll up -- so

24  according to this document, those transmissions occurred at --

25           THE COURT:  You're talking about the ones I just

1  asked about?

2          MR. POULOS:  Yeah.

3  BY MR. POULOS:

4  Q.  The one the Court just asked about were at 2:51:09 and

5  2:51:27, correct?

6          THE COURT:  Is that right?

7          THE WITNESS:  Yes, sir.

8  BY MR. POULOS:

9  Q.  Okay.  And Dr. Kandala...

10  A.  I'm sorry, sir.

11  Q.  You have been text messaging for a while, correct?

12  A.  Yes.

13  Q.  Okay.  Have you ever had a situation where one text

14  message arrives to somebody before it arrives to somebody else

15  and it's out of sequence?

16  A.  Yes.

17  Q.  Do you know whether or not it was Dr. Kandala or whether

18  it was you who raised the concern about Pamela Young not

19  having come to Sacred Heart Hospital?

20  A.  I'm not sure who raised the issue.

21  Q.  And Dr. Kandala wouldn't have been at Sacred Heart

22  Hospital, correct?

23  A.  No.

24          MR. POULOS:  One moment.  I apologize, your Honor.

25  BY MR. POULOS:

1    Q.  Ours has been converted to Central Time.

2           On June 20th at 9:51 a.m.  Do you see that,

3    Dr. Pallekonda?

4    A.  Yes, sir.

5    Q.  If that was one of the four days that you were working,

6    would you have been at the hospital, correct?

7    A.  Yes.

8    Q.  And then when we scroll up to complete it, there are two

9    entries where you're receiving a text from -- presumably from

10   Doris, right, explaining Pamela Young went to Roseland?

11   A.  Yes.

12   Q.  And those two texts arrived at the same time to you and

13   Dr. Kandala, right?

14   A.  Yes.

15   Q.  And then you wrote, I'll find out what the procedure is

16   and will let you know, correct?

17   A.  Yes.

18   Q.  Okay.

19           MR. POULOS:  Nothing further, Judge.

20           THE COURT:  Anything else, Ms. Greening?

21           MS. GREENING:  No, your Honor.

22           THE COURT:  You are excused.  Thank you.

23           THE WITNESS:  Thank you, sir.

24      (Witness excused.)

25           THE COURT:  Please call the next witness.

1      MS. GREENING:  The government calls Tiffany Posey.

2    (Witness sworn.)

3                        - - -

4           TIFFANY POSEY, R.N., DIRECT EXAMINATION

5    BY MS. GREENING:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  Please state and spell your name for the record.

9    A.  Tiffany Posey, T-i-f-f-a-n-y, P-o-s-e-y.

10   Q.  Are you currently employed?

11   A.  Yes.

12   Q.  Where do you work?

13   A.  Weiss Memorial Hospital and Advocate Trinity Hospital.

14   Q.  What is your position at each of those facilities?

15   A.  ER staff nurse.

16   Q.  What do your responsibilities include as an ER staff nurse

17   at each of those facilities?

18   A.  They include triage, assessment of the patient,

19   evaluation, and treatment.

20   Q.  Are you a registered nurse?

21   A.  Yes.

22   Q.  For how long have you been a registered nurse?

23   A.  About five years.

24   Q.  Did you attend a nursing --

25           THE COURT:  I have you too close to the microphone

1   because we're hearing you breathe.  Sorry about that.

2   BY MS. GREENING:

3   Q.  Did you attend a nursing educational program?

4   A.  Yes.

5   Q.  Where?

6   A.  I went to University of Alabama at Birmingham.

7   Q.  When did you graduate?

8   A.  2009.

9   Q.  Where did you work after you graduated?

10  A.  Marshall Medical Center North.

11  Q.  What did you do there?

12  A.  I was an ER staff nurse.

13  Q.  Was that a hospital?

14  A.  Yes.

15  Q.  Are you currently involved in any educational programs?

16  A.  Yes, I'm attending North Park University for a master's in

17  nurse practitioner.

18  Q.  Ms. Posey, did you ever work at Sacred Heart Hospital?

19  A.  Yes.

20  Q.  When did you work at Sacred Heart?

21  A.  I started in May 2011.

22  Q.  When did you leave Sacred Heart?

23  A.  July 2013.

24  Q.  What was your position there?

25  A.  I was the ER staff nurse.

1    Q.  How many departments at Sacred Heart had nurses working

2    for them?

3    A.  How many departments in the hospital?

4    Q.  Um-hmm.  Yes.

5    A.  There was -- they had the ED, the ICU, telemetry, and med

6    surg unit.

7    Q.  And, I'm sorry, what was the last one?

8    A.  Med surg.

9    Q.  What were your responsibilities as an emergency room

10   nurse?

11   A.  Triaging patients, assessment, treatment.

12   Q.  Who was your direct supervisor?

13   A.  Tania Smith.

14   Q.  How many days per week did you work in the emergency room?

15   A.  Three days.

16   Q.  Were those primarily weekdays, weekends, or a mixture of

17   both?

18   A.  Usually weekdays.

19   Q.  What were your hours?

20   A.  7:00 a.m. to 7:00 p.m.

21   Q.  Is that the day shift?

22   A.  Yes.

23   Q.  And how many nurses worked in the Sacred Heart ER at a

24   time?

25   A.  One.

1   Q.  How many physicians worked in the ER at a time?

2   A.  One.

3   Q.  Which physicians did you work the most commonly with in

4   the Sacred Heart emergency room?

5   A.  Usually Dr. Trinos or Dr. Grasso.

6   Q.  Did you also work with a Dr. Pallekonda?

7   A.  Yes.

8   Q.  Are you familiar with Dr. Rajiv Kandala?

9   A.  Yes.

10  Q.  Did you see patients of Dr. Kandala's in the Sacred Heart

11  ER?

12  A.  Yes, I did.

13  Q.  When do you recall first seeing patients of Dr. Kandala's

14  in the emergency room?

15  A.  I'd say the last year that I worked there, maybe in 2013.

16  Q.  Are you aware of where Dr. Kandala's patients came from?

17  A.  They came from nursing homes.

18  Q.  Based on your experience in the Sacred Heart ER in 2012

19  and 2013, how often did Dr. Kandala send patients to the

20  emergency room during your shifts?

21  A.  Pretty often.  I would say like every shift, I would

22  usually get one of his patients.

23  Q.  Are you aware of how Dr. Kandala's patients were

24  transported to Sacred Heart?

25  A.  By private ambulance.

1  Q. Are you aware of what kind of insurance Dr. Kandala's

2  patients had?

3  A. No.

4  Q. Ms. Posey, are you familiar with the term "direct

5  admission"?

6  A. Yes.

7  Q. What is a direct admission?

8  A. The patient bypasses the emergency department, they're

9  admitted directly to a unit, either usually telemetry or med

10 surg.

11 Q. Under what circumstances would a patient be directly

12 admitted?

13 A. If the patient is considered stable and they have been

14 seen by their doctor recently, usually within the last 24

15 hours.

16 Q. In your experience as an emergency room nurse in several

17 hospitals, are direct admissions a common practice?

18 A. Yes.

19 Q. Turning back to Sacred Heart, are you familiar with the

20 terms "direct admit to room 200" or "200-A"?

21 A. Yes.

22 Q. How did you become familiar with those terms?

23 A. When a patient would be brought in, the paramedics that

24 brought the patient would say, this patient is supposed to be

25 admitted directly to room 200-A.

1 Q. Which physician's patients were sent with those

2 instructions to be admitted to room 200-A, to your

3 recollection?

4 A. Dr. Kuchipudi and Dr. Kandala's patients.

5 Q. Was there a room 200 or 200-A at Sacred Heart Hospital?

6 A. There was a room, but it wasn't a patient's room. It was

7 an office or storage room, I think.

8 Q. Are you aware of any patient who was actually admitted to

9 that room?

10 A. No.

11 Q. When do you recall Dr. Kandala's patients arriving -- or

12 beginning to arrive with the instructions direct admit to room

13 200-A?

14 A. As soon as his patients started arriving, most had that

15 instruction.

16 Q. Did you ever receive advance notice that a patient of

17 Dr. Kandala's was coming to Sacred Heart?

18 A. Sometimes.

19 Q. By what means would you receive that notice?

20 A. Sometimes my manager Tania would let me know, sometimes

21 we'd get a call from the nurse at a nursing home.

22 Q. So when you got a call from a nursing home, what phone

23 would that call come to?

24 A. To the emergency department.

25 Q. And where was that phone located?

1  A.  It was in the ED next to the nurses' station.

2  Q.  Did you answer that phone?

3  A.  Yes, usually.

4  Q.  What kind of information would the nursing home nurse

5  provide to you?

6  A.  The reason that the patient was being sent, their vital

7  signs, their medical history.

8  Q.  You also testified that at times, Tania Smith would inform

9  you that a patient was on the way.  Did she have a phone

10  separate from the ER phone that you knew about?

11  A.  Yes, she had a phone in her office.

12  Q.  What was Tania Smith's role during your daytime shifts?

13  A.  She was the director of the ED and ICU.

14  Q.  Was there a process in place of what to do when a patient

15  arrived at the hospital as a direct admit to room 200-A?

16  A.  I was told they needed to be seen through the emergency

17  department.

18  Q.  Who told you that?

19  A.  Tania Smith did.

20  Q.  Did you follow that instruction?

21  A.  Yes.

22  Q.  What would you do when a patient first arrived?

23  A.  I would assess the patient, get their vital signs, talk to

24  the paramedics about their medical history and so forth.

25  Q.  Do you recall ever speaking with Dr. Kandala about any of

1  his patients?

2  A.  Not that I remember, no.

3  Q.  Do you recall Dr. Kandala ever calling the ER to get an

4  update on his patients?

5  A.  Not that I can remember.

6  Q.  Do you recall whether Dr. Kandala's patients who came in

7  as direct admits to room 200-A were often admitted?

8  A.  I know some were, yes.

9  Q.  Ms. Posey, what is your understanding of palliative care?

10  A.  Palliative care is when a patient may be considered -- or

11  they may have, like, a terminal illness, and so this care is

12  geared toward making them more comfortable, and it's a less

13  aggressive treatment.

14  Q.  During your time at Sacred Heart, did you ever hear about

15  the development of a palliative care education program?

16  A.  No.

17  Q.  How about a hospice program?

18  A.  No.

19  Q.  Did you ever take part in a hospice training at Sacred

20  Heart?

21  A.  No.

22  Q.  Did you ever hear of such a training?

23  A.  No.

24  Q.  Are you familiar with Passages Hospice?

25  A.  No.

 1  Q.  Did Dr. Kandala ever teach you about palliative care?

 2  A.  No.

 3  Q.  Did he ever teach you about the treatment of the elderly,

 4  frail elderly, and disabled patients?

 5  A.  No.

 6  Q.  Did he ever teach you about case management of patients?

 7  A.  No.

 8  Q.  Were you ever aware of Dr. Kandala teaching any Sacred

 9  Heart employee or patient on those topics?

10  A.  No, not that I am aware of.

11  Q.  Did you ever see Dr. Kandala at Sacred Heart?

12  A.  No.

13  Q.  Have you ever met Dr. Kandala?

14  A.  No.

15          MS. GREENING:  One moment, your Honor?

16          THE COURT:  Okay.

17          MR. GREENING:  Nothing further.

18          THE COURT:  Mr. Poulos.

19                        - - -

20          TIFFANY POSEY, R.N., CROSS-EXAMINATION

21  BY MR. POULOS:

22  Q.  Good afternoon, ma'am.

23  A.  Good afternoon.

24  Q.  Ms. Posey; do I have that right?

25  A.  Yes.

1  Q.  Ms. Posey, it's fair to say that you're fuzzy on the

2  dates, aren't you?

3  A.  The dates of what?

4  Q.  Well, she asked you a question of, you know, when were

5  Dr. Kandala's patients admitted.  You don't recall exactly

6  when they started and exactly when they ended, right?

7  A.  Not exactly, no.

8  Q.  So when you said 2013, they, in fact, could have stopped

9  in December of 2012, right?

10  A.  Yes.

11  Q.  Okay.  And I'm showing you an email from Tony Puorro to

12  Dr. Pallekonda and Dr. Kandala.

13        You know Vijay Pallekonda, of course, right?

14  A.  Yes.

15  Q.  And this email talks about direct admission to room 200.

16  And do you see where Mr. Puorro wrote, Our ER team understands

17  that when patients arrive with these instructions, that a full

18  assessment of the patient will be performed in the ER upon

19  arrival?

20        Do you see that?

21  A.  Um-hmm.

22  Q.  And I think, if I understand your testimony when

23  Ms. Greening was asking you questions, you, in fact, did do

24  that, correct?

25  A.  Yes.

1  Q.  And, finally, with respect to Dr. Pallekonda, you

2  understood, didn't you, that Dr. Pallekonda was the treating

3  physician for Dr. Kandala's patients?

4  A.  Yes.

5        MR. POULOS:  Okay.  Nothing further.  Thank you,

6  Judge.

7        THE COURT:  Mr. Clavelli, do you have anything?

8        MR. CLAVELLI:  No, your Honor.

9        THE COURT:  Any redirect?

10        MS. GREENING:  No, your Honor.

11        THE COURT:  You're excused.

12    (Witness excused.)

13        THE COURT:  Call your next witness.

14        THE INTERPRETER:  For the record, Henry Cheung,

15  C-h-e-u-n-g.

16    (Interpreter sworn.)

17    (Witness sworn.)

18        THE COURT:  Okay.

19        MR. HAMMERMAN:  Your Honor, before we begin, this

20  will become incredibly clear from the beginning of Ms. Huang's

21  testimony that Ms. Huang has also been provided a letter of

22  immunity by the U.S. Attorney's Office.  I just wanted the

23  Court to be aware.

24        THE COURT:  All right.

25                                    - - -

1    DORIS SHUWEN HUANG, DIRECT EXAMINATION

2    BY MS. GREENING:

3    Q.  Ma'am, can you please state your name.

4    A.  Doris Shuwen Huang.

5    Q.  And can you spell your last name for the court reporter,

6    please.

7    A.  H-u-a-n-g.

8    Q.  Ms. Huang, do you speak English?

9    A.  Yes.

10   Q.  Is it your native language?

11   A.  No.

12   Q.  Have we met and talked about your testimony today without

13   the benefit of an interpreter?

14   A.  Yes.

15   Q.  Have you nevertheless asked that we obtain an interpreter

16   for your testimony today?

17   A.  Yes.

18   Q.  Is that because you feel more comfortable with an

19   interpreter assisting you with your testimony here?

20   A.  Yes.

21   Q.  Were you subpoenaed to testify here today?

22   A.  Yes.

23   Q.  Before you agreed to testify, did you, through your

24   counsel, ask that the U.S. Attorney's Office provide you with

25   a letter of immunity?

1   A.  Yes.

2   Q.  And are you, in fact, testifying today pursuant to that

3   letter of immunity?

4   A.  Yes.

5   Q.  And is this -- I'm going to show you what I've marked as

6   Government Exhibit 7415, the letter that provided you that

7   immunity.

8   A.  Yes.

9   Q.  And is that your signature?

10  A.  Yes.

11  Q.  What is your understanding of the protection of immunity

12  that agreement provides you?

13  A.  If I am coming to testify with assisting of -- assisting

14  the U.S. government, I will not be prosecuted.

15  Q.  Do you understand you have to tell the truth in your

16  testimony here today?

17  A.  Yes.

18  Q.  And is that as part of the agreement of your letter of

19  immunity?

20  A.  Yes.

21  Q.  Ms. Huang, how are you employed?

22  A.  How many years have I employed?

23  Q.  No.  How are you employed?  I apologize.

24  A.  I'm self-employed.

25  Q.  What is your profession?

1  A.  Nurse practitioner.

2  Q.  Where were you born?

3         THE INTERPRETER:  I'm sorry?

4  BY MR. HAMMERMAN:

5  Q.  Where were you born?

6  A.  China.

7  Q.  Did you go to school in China?

8  A.  Yes.

9  Q.  What did you study?

10  A.  Nursing.

11  Q.  Did you have a profession in China?

12  A.  Yes.

13  Q.  What was your profession in China?

14  A.  Nurse.

15  Q.  When did you come to the United States?

16  A.  1993.

17  Q.  Are you a United States citizen?

18  A.  Yes.

19  Q.  And when did you become a United States citizen?

20  A.  2009.

21  Q.  Did you go to school in the United States?

22  A.  Yes.

23  Q.  For what?

24  A.  Nurse practitioner assistant.

25  Q.  Did you also study English?

1  A.  Yes.

2  Q.  When did you become a nurse practitioner in the United

3  States?

4  A.  2000.

5  Q.  Now, you said that you're self-employed?

6  A.  Yes.

7  Q.  Where do you work?

8  A.  I visit different nursing homes.

9  Q.  And what do you do in the nursing homes?

10  A.  I visit the different nursing home to talk to patient, to

11  see patient, check on their status, do different exams, review

12  their file, check on their lab work result, if they need a

13  prescription refill.

14  Q.  And how long have you done this type of work?

15  A.  I started employed -- self-employed in 2005.

16  Q.  Whose patients do you see in the nursing homes?

17  A.  Different patient.  I partner with different doctors.

18  Q.  Do you work with more than one doctor?

19  A.  Yes.

20  Q.  Have you worked with more than one doctor since 2005?

21  A.  Yes.

22  Q.  Do you have any agreements with those doctors?

23  A.  Yes.

24  Q.  What type of agreements?

25  A.  We have a cooperation agreement among -- between myself

1    and the physicians.

2    Q.  Are those agreements required by your profession?

3    A.  Yes.

4    Q.  Why?

5    A.  It's by the law.

6    Q.  For the work that you do in nursing homes, who bills for

7    the care that you provide patients?

8    A.  I issue the -- I bill the patient insurance.

9    Q.  Do you not only bill the patients' insurance but collect

10   from those insureds for the care that you provide?

11   A.  Yes.

12   Q.  Do you use a billing company, or do you do your own

13   billing?

14   A.  I do my own billing.

15   Q.  Do you know a doctor named Rajiv Kandala?

16   A.  Yes.

17   Q.  How do you know him?

18          THE INTERPRETER:  Your Honor, the interpreter needs

19   clarification.

20          THE COURT:  That's fine.

21          THE WITNESS:  So I met Dr. Kandala at Renaissance at

22   Midway Nursing Home, and I asked for him if I can see one of

23   his patient.

24   BY MR. HAMMERMAN:

25   Q.  Is the nursing home the Renaissance at Midway?

1    A.  Yes.

2    Q.  Have you seen Dr. Kandala's patients over a period of

3    time?

4    A.  Yes.

5    Q.  At what types of facilities have you seen his patients?

6    A.  Nursing home, different nursing homes.

7    Q.  Do you still his patients today?

8    A.  Yes.

9    Q.  How long have you treated Dr. Kandala's patients?

10   A.  Since 2008.

11   Q.  You said that you first came to know Dr. Kandala through

12   the Renaissance at Midway Nursing Home; is that correct?

13   A.  Yes.

14   Q.  How did you come to meet him at that nursing home?

15   A.  I call him.

16   Q.  Why did you call him?

17   A.  It was requested by the administrator and the DON.  They

18   wanted me to see all the patient at the nursing home.

19   Q.  Were you already seeing patients at that nursing home?

20   A.  Yes.

21   Q.  And by "DON," do you mean the director of nursing?

22   A.  Yes.

23   Q.  And did you, pursuant to that request from the director of

24   nursing, contact Dr. Kandala and request to see his patients?

25   A.  Yes.

1  Q.  And have you worked with Dr. Kandala -- first of all, did

2  he agree?

3  A.  Yes.

4  Q.  And have you worked with him since that time?

5  A.  Yes.

6  Q.  What is the nature of your working relationship?

7  A.  I visit his patients.

8  Q.  Okay.  Do you have some -- for the patients that you see

9  for Dr. Kandala, does someone act as your supervising

10  physician?

11  A.  You mean supervising my work, side by side --

12  Q.  Yes.

13  A.  Not at the same time.

14  Q.  Does someone serve as a supervising physician for the work

15  you do for Dr. Kandala?

16  A.  No.

17  Q.  Do you treat Dr. Kandala's patients in all of the nursing

18  homes in which he has patients?

19  A.  No.

20  Q.  Who decides which nursing homes you are assigned to treat

21  Dr. Kandala's patients?

22  A.  Dr. Kandala.

23  Q.  I want to show you, Ms. Huang, what the government has

24  marked as Government's Exhibit 7403, 7404, and 7405.  I'm

25  going to put them on the screen and ask if you recognize these

1  agreements.  This is 7403, 7404, and 7405.

2        I will start by asking do you recognize that form of

3  agreement?

4  A.  Yes, I do.

5  Q.  What are Government's Exhibits 7403 through 7405?

6  A.  This is the cooperation agreement between myself and the

7  physicians.

8  Q.  And I'd like to show you the last page of each one of

9  these agreements -- the second to the last page.  That's 7403.

10  Do you see that?

11  A.  Yes, I do.

12  Q.  Do you recognize your signature?

13  A.  Yes, I do.

14  Q.  And I'm pointing to the signature on the top line to the

15  right.  Whose signature is that?

16  A.  That's my signature.

17  Q.  And to the left, whose signature is to the left?

18  A.  Dr. Kandala.

19  Q.  Showing you what -- and what's the date, I'm sorry, on

20  Government Exhibit 7403?

21  A.  December 24, 2012.

22  Q.  I want to show you then the last page of that exhibit.  Do

23  you see this page?

24  A.  Yes, I do.

25  Q.  It has a title of Notice of Delegated Prescriptive

1  Authority for Controlled Substances, Advanced Practice Nurse.
2  Do you see that?
3  A.  Yes.
4  Q.  Did you have prescription authority to write medication
5  prescriptions under Dr. Kandala's name pursuant to this
6  agreement?
7  A.  Yes.
8  Q.  And does that include Schedule 3, 4, and 5 drugs?
9  A.  Yes.
10  Q.  And, once again, is that your signature?
11       Do you recognize the signature here on the agreement?
12  A.  Dr. Kandala.
13  Q.  I'm going to ask you the same about Government
14  Exhibit 7404.  Do you recognize the signatures on the last
15  page of Government Exhibit 7404?
16  A.  Yes, I do.
17  Q.  Whose signatures are those?
18  A.  My signature on the right and Dr. Kandala's on the left.
19  Q.  And what is this agreement dated?
20  A.  December 2nd, 2011.
21  Q.  Finally, I will show you 7405.
22       Before I do that, I apologize, does this agreement
23  also contain a prescriptive authority agreement?
24  A.  Yes.
25  Q.  And this is the last page of Government Exhibit 7405.  Do

1   you, once again, recognize the signatures?

2   A.  Yes, I do.

3   Q.  And whose signatures?

4   A.  My signature and Dr. Kandala's signature on the left.

5   Q.  What's the date on this agreement?

6   A.  April 6, 2011.

7   Q.  And does it also contain a prescriptive authority

8   agreement?

9   A.  Yes.

10          MR. HAMMERMAN:  The government would seek to admit

11  what's been marked as Government Exhibit 7403 through 7405.

12          MR. POULOS:  No objection.

13          THE COURT:  They are all admitted.

14     (Above-mentioned exhibits were received in evidence.)

15  BY MR. HAMMERMAN:

16  Q.  Ms. Huang, these three documents appear to be form

17  documents.  Do you know where these documents came from?

18  A.  I download the form from the Internet.

19  Q.  Did you present Dr. Kandala with these agreements for his

20  signature?

21  A.  Yes.

22  Q.  Who filled in the information that you would find, for

23  example, on Government Exhibit 7404 where it lists names,

24  license numbers, the practice sites?  Who filled in this

25  information?

1  A.  I filled them out.

2  Q.  And did you fill out -- did you obtain an agreement -- a

3  signed agreement like this for Dr. Kandala every year that you

4  worked with him?

5  A.  Yes.

6  Q.  And do you have similar agreements with other physicians

7  with whom you work?

8  A.  Yes.

9  Q.  Using Government Exhibit 7404 as an example, you will see

10  there's a list of practice areas for concentration.  Do you

11  see that?

12  A.  Yes, I do.

13  Q.  And then there's a list of facilities.  Do you also see

14  the list of facilities?

15  A.  Yes.

16  Q.  Why are those facilities listed on this agreement?

17  A.  Actually, this is the list -- this is the list of

18  facilities that Dr. Kandala asked me to go to visit his

19  patients.

20  Q.  Do you have these type of agreements with other doctors?

21  A.  Yes.

22  Q.  Going back to the list of facilities, did you see

23  Dr. Kandala's patients in this list of nursing homes?

24  A.  Yes.

25  Q.  I want to put aside the advanced practice nursing written

1  collaborative agreement, Government Exhibit 7404, for a moment

2  and show you a different agreement.

3        This one is entitled Nurse Practitioner and Physician

4  Agreement, Parties Defined.

5  A.  Yes.

6  Q.  Do you recognize this document?

7  A.  Yes, I do.

8  Q.  It's Government Exhibit 7402.  I'm going to the turn last

9  page.  Do you recognize the signatures?

10  A.  Yes, I do.

11  Q.  And what is the date?

12  A.  January 3rd, 2011.

13  Q.  Is that your signature?

14  A.  Yes.

15  Q.  And who is the other signature?

16  A.  Dr. Kandala.

17  Q.  When did you first see this document?

18  A.  After the day.

19  Q.  I'm sorry?

20        THE INTERPRETER:  The interpreter needs

21  clarification.

22        THE COURT:  That's fine.

23        THE WITNESS:  I seen this document after the day, the

24  signed day, so I seen it after the January 3rd, '11.

25  BY MR. HAMMERMAN:

1  Q.  So the first time you saw it was after January 3rd of

2  2011?

3  A.  Yes.

4  Q.  But was it dated -- how long after January 3rd, 2011, did

5  you see this agreement?

6  A.  I don't remember the exact date.

7  Q.  Shortly after January 3rd, 2011, or a long time after that

8  date?

9  A.  A long period of time.

10 Q.  Why is it dated January 3rd, 2011?

11 A.  He told me to write that date.

12 Q.  Who is "he"?

13 A.  Dr. Kandala.

14       MR. HAMMERMAN:  The government would seek to admit

15 what's been marked as Government Exhibit 7402.

16       MR. POULOS:  Your Honor, I object to this testimony.

17 This stacks of 404(b) evidence has nothing to do with the

18 issues in this case.  I wasn't given advanced notice --

19       THE COURT:  What does it have to do with the issues

20 in the case?  What's the relevance?

21       MR. HAMMERMAN:  Your Honor, you will see that there

22 is a compensation section pursuant to which Ms. Huang paid

23 Dr. Kandala for him to be her supervising physician as stated

24 in the document.  And while --

25       MR. POULOS:  I object.

1    MR. HAMMERMAN:  While there are elements of it that I

2   would agree with Mr. Poulos have -- would be suggestive of

3   Rule 404(b) evidence, Mr. Poulos and I discussed this document

4   at length prior to Ms. Huang's testimony today, and the reason

5   that it is being presented to the Court -- and I thought we

6   had an agreement on this, and that's why you have not heard of

7   this matter previously -- is under the compensation section,

8   sections B and C go to state of mind and particularly

9   willfulness of the defendant, which, of course, is an element

10   of the crime.

11         As you can see, there are statements here --

12         THE COURT:  Wait a second.  I haven't even looked at

13   it yet.

14         There's a bunch of Bs and Cs on it.  Which B and C?

15         MR. HAMMERMAN:  Under "compensation," your Honor.

16         THE COURT:  So that's the argument for its relevance?

17         MR. HAMMERMAN:  Yes, your Honor.

18         THE COURT:  Mr. Poulos?

19         MR. POULOS:  May I confer with counsel for a second?

20         THE COURT:  Sure.

21         MR. POULOS:  Your Honor, I withdraw my objection.

22         THE COURT:  Okay.  It's admitted.

23    (Above-mentioned exhibit was received in evidence.)

24         THE COURT:  That's 7402 -- yeah, that's it.

25         MR. HAMMERMAN:  It is, your Honor.

1 | BY MR. HAMMERMAN:

2 | Q. Now, Ms. Huang, you said that you signed this agreement in

3 | January -- I'm sorry -- after January of 2011; is that right?

4 | A. Yes.

5 | Q. Approximately how long after that time?

6 | MR. POULOS: Objection, Judge. Asked and answered.

7 | She didn't say it was long after.

8 | MR. HAMMERMAN: She did say it was long, and I'm

9 | trying to define long.

10 | THE COURT: Okay. It's fine. Overruled.

11 | You can answer the question.

12 | THE WITNESS: Long, a long period of time after that.

13 | BY MR. HAMMERMAN:

14 | Q. Was it still in 2011?

15 | A. I don't think so.

16 | Q. Was it in 2012?

17 | A. Maybe.

18 | Q. There is a provision in this agreement that says

19 | "compensation." Do you see that?

20 | A. Yeah, there's the consulting fee that I agreed to pay him.

21 | Q. I'm sorry. Can you repeat the interpreter's statement

22 | again?

23 | THE COURT: There's the consulting fee that I agreed

24 | to pay him.

25 | MR. HAMMERMAN: Thank you, your Honor.

1 BY MR. HAMMERMAN:

2 Q. And it says in section E, Nurse practitioner will pay $500

3 per month for consultation.

4          Do you see that?

5 A. Yes.

6 Q. And did you pay Dr. Kandala to see his patients?

7          MR. POULOS: I object to that form of the question.

8 If he wants to ask if --

9          THE COURT: The objection is sustained as to leading.

10         MR. HAMMERMAN: I apologize, your Honor.

11 BY MR. HAMMERMAN:

12 Q. Did you pay Dr. Kandala pursuant to this agreement?

13 A. Yes.

14 Q. When did you begin paying Dr. Kandala at all?

15 A. I don't remember.

16 Q. Did you pay Dr. Kandala before you signed this agreement?

17 A. Yes.

18 Q. Did you pay Dr. Kandala after signing this agreement?

19 A. Yes.

20 Q. I want to go over some provisions of this agreement with

21 you, Ms. Huang.

22          This agreement indicates that the physician will act

23 as a supervising physician. Have you seen that before?

24          And I point you specifically to recitals,

25 paragraph A.

1   A.  Yes, I do.

2   Q.  Had Dr. Kandala acted as your supervising physician prior

3   to you signing this agreement?

4   A.  Same.

5   Q.  Had he acted as your supervising physician prior to

6   signing this agreement?

7   A.  Yes.

8   Q.  And then there is a provision here that says, Nurse

9   practitioner will pay $500 per month for consultation.

10          Do you see that?

11  A.  Yes.

12  Q.  Does this agreement also state that, Compensation to

13  physician will not be contingent on receiving physician

14  referrals, additional duties, payment patient, or insurance

15  reimbursement?

16  A.  Yes, I do see the sentence.

17  Q.  Okay.  And that was compensation section B, right?

18  A.  Yes.

19  Q.  And does compensation section C say, Physician will not be

20  obligated or expected to recruit or refer patients to the

21  nurse practitioner?

22  A.  Yes, I do.

23  Q.  Did you choose the language in this agreement?

24  A.  No.

25  Q.  Who did?

1    A.  Dr. Kandala.

2          MR. POULOS:  Objection, Judge.

3          THE COURT:  I'm sorry?

4          MR. POULOS:  Lack of foundation, Judge, choosing the

5    language.

6          THE COURT:  Yeah, the objection is sustained.  The

7    answer is stricken.

8    BY MR. HAMMERMAN:

9    Q.  Did you negotiate this agreement with Dr. Kandala?

10   A.  Yes, we had discussed this before.

11   Q.  Did you choose any of the language in the compensation

12   section under paragraphs B or C?

13   A.  No.

14   Q.  When you first saw a copy of this agreement, did it have

15   that language in it in paragraphs E and C?

16   A.  Yes.

17   Q.  The patients that you treat for Dr. Kandala -- for which

18   Dr. Kandala acts as a supervising physician, whose patients

19   are those?

20   A.  Dr. Kandala.

21   Q.  You said you also treat other doctors' patients?

22   A.  Yes.

23   Q.  Does Dr. Kandala supervise your work for other doctors'

24   patients?

25   A.  No.

1   Q.  For the patients -- I'm sorry.

2           The patients that you see for Dr. Kandala, is he the

3   attending physician?

4   A.  Yes.

5   Q.  I want to focus you now, Ms. Huang, on 2012.  In that

6   year, what work did you do for the patients for which

7   Dr. Kandala was the attending physician?

8   A.  I visit his patients at a nursing home, I check on the

9   patient's medical status, I read the file, the medical record.

10  If the patient needed a prescription refill, I was allowed to

11  write a prescription.  And also if patient needed order like

12  lab work and blood work, I also was allowed to perform that

13  duty.

14  Q.  On average, how often did you see Dr. Kandala's patients

15  in 2012?

16  A.  Back then, once a month.

17  Q.  You would see -- you would see each patient once a month

18  on average?

19  A.  Yes.

20  Q.  Do you know what it means to be on call?

21  A.  Yes.

22  Q.  What does it mean to be on call?

23  A.  "On call" means if the on-duty nurse at the nursing home

24  had any question or concern, they will call me immediately.

25  Q.  For the Dr. Kandala patients that you treated in 2012, do

1  you know who was on call for those patients?

2  A.  Can you say that one more time?

3  Q.  Sure.  For the Dr. Kandala patients that you treated

4  in 2012, do you know who was on call for those patients during

5  that year?

6  A.  I was.

7  Q.  Did Dr. Kandala tell you the nursing homes at which he

8  wanted you to see his patients in 2012?

9          THE INTERPRETER:  I'm sorry.

10         MR. HAMMERMAN:  Sure.

11  BY MR. HAMMERMAN:

12  Q.  Did Dr. Kandala tell you the nursing homes at which he

13  wanted you to see his patients in 2012?

14  A.  Yes.

15  Q.  When you went to those nursing homes, how would you

16  identify Dr. Kandala's patients?

17  A.  The nursing home, there is a list of the patient's name

18  and who is the doctor associated with them.

19  Q.  Would you treat all of the patients for whom Dr. Kandala

20  was identified on those lists as the attending physician when

21  you went to those nursing homes?

22  A.  Yes, but I won't -- I won't see his patients at all once.

23  I don't see all the patient at one time.

24  Q.  Understood.

25          If the patients that you did treat did not have any

1  problems, would you contact Dr. Kandala about your care for

2  those patients?

3  A.  No.

4  Q.  Under what circumstances would you contact Dr. Kandala

5  in 2012?

6  A.  For instance, if I noticed a patient needed different

7  treatment or the patient's medical condition got worse, then I

8  would contact Dr. Kandala for advice.

9  Q.  If a Kandala patient needed to go to the hospital prior

10 to 2012, to which hospital or hospitals did you direct those

11 patients?

12 A.  Jackson Park Hospital.

13 Q.  Why did you send patients to Jackson Park Hospital?

14 A.  Dr. Kandala told me to.

15 Q.  Did patients ever go to other hospitals?

16 A.  Yes.

17 Q.  Prior to 2012, under what circumstances would you send a

18 patient to a different hospital?

19 A.  It depends on if a patient's family requests to go to

20 different hospital, then we would honor that request.

21 Q.  Absent a request to go to a different hospital, did all of

22 Dr. Kandala's patients generally go to Jackson Park Hospital

23 in the period preceding 2012?

24      MR. POULOS:  Your Honor, I object to the form of the

25 question to say "all."

1    THE COURT:  You look at it as there's a little
2    inconsistency there.
3         Why don't you rephrase it.
4         MR. HAMMERMAN:  Sure.  Let me try asking my question
5    this way.
6    BY MR. HAMMERMAN;
7    Q.  Ms. Huang, what was the default hospital for Dr. Kandala
8    prior to April of 2012?
9    A.  He has different hospital.  First one is South Shore
10   Hospital; second, Jackson Park; and then Trinity.
11   Q.  Did Dr. Kandala have privileges at all those hospitals?
12   A.  Yes.
13   Q.  Where did you send patients prior to April of 2012 if a
14   patient needed to go to a hospital and the family did not
15   request a specific hospital?
16   A.  Usually, Jackson Park Hospital.
17   Q.  At some point, did you begin sending patients to a
18   different hospital?
19   A.  Yes.
20   Q.  Where?
21   A.  Sacred Heart Hospital.
22   Q.  Why?
23   A.  Dr. Kandala told me to.
24   Q.  Have you been to Sacred Heart Hospital?
25   A.  Yes.

1  Q. When did you first go to Sacred Heart Hospital?

2  A. May 30, May 31st.

3  Q. Of what year?

4  A. I don't remember the date.

5        2012.

6  Q. Why did you go to Sacred Heart Hospital at that time?

7  A. Dr. Kandala told me to.

8  Q. In one of your -- first of all, have you come to the U.S.

9  Attorney's Office for a number of meetings in anticipation of

10 your testimony today?

11 A. Yes.

12 Q. Did you provide the government with two cellular

13 telephones that you used during the calendar year of 2012?

14 A. Yes.

15        THE COURT: Before we get into cell phones, we are

16 going to take a break right here. It might be a couple more

17 than 10 minutes.

18        MR. HAMMERMAN: I'm sorry?

19        THE COURT: It might be a little bit more than 10

20 minutes.

21   (Short break.)

22   (The following proceedings were had in open court:)

23        THE COURT: Okay. Everybody is back, including the

24 defendants.

25        Mr. Hammerman, you can go ahead.

1   BY MR. HAMMERMAN:

2   Q.  Ms. Huang, right before the break, I was asking you if in

3   one of your recent interviews with the government, you

4   provided us with two cellular telephones that you used during

5   calendar year of 2012.

6   A.  Yes.

7   Q.  And did you give the government those phones so we could

8   copy the text messages contained on those phones?

9   A.  Yes.

10  Q.  And have you reviewed some of the text message

11  communications presented to you by the government in

12  preparation of your testimony here today?

13  A.  Yes.

14  Q.  I want to show you what's been marked as Government

15  Exhibit 4270.  Do you recognize this text message string in

16  particular?

17  A.  Yes, I do.

18  Q.  Prior to the break, I asked you the first time you went to

19  Sacred Heart Hospital, and you said on May 30th or May 31st.

20  Do you remember that?

21  A.  Yes.

22  Q.  Was there a text message communication that you reviewed

23  in anticipation of your testimony where it recorded you going

24  to Sacred Heart for the first time?

25  A.  Yes.

1  Q.  Is this that text message?

2  A.  Yes.

3  Q.  I am going to -- is this a true and accurate copy of the

4  text messages that were downloaded from your cellular

5  telephone?

6  A.  Yes.

7        MR. HAMMERMAN:  The government would seek to admit

8  what's been marked as Government Exhibit 4270.

9        MR. POULOS:  No objection.

10        THE COURT:  4270 is admitted.

11    (Above-mentioned exhibit was received in evidence.)

12  BY MR. HAMMERMAN:

13  Q.  This group of text messages starts on the bottom and goes

14  up.  First of all, from whom did you get this first text

15  message on May 30th of 2012?

16  A.  Dr. Kandala.

17  Q.  Did he ask you to meet somewhere?

18  A.  Yes.

19  Q.  Where?

20  A.  Sacred Heart Hospital.

21  Q.  And is that what's reflected on the second row from the

22  bottom on page 2, Can we meet in Sacred Heart for lunch

23  at 12:00 today?

24  A.  Yes.

25  Q.  Had you ever been to Sacred Heart Hospital before

1    receiving this invitation for lunch?

2    A.  No.

3    Q.  Is it fair to say, Ms. Huang, that following were a series

4    of text messages where you get instructions from Dr. Kandala

5    on where to meet you at Sacred Heart?

6    A.  Yes.

7    Q.  And at some point, does he give you the instruction in a

8    text message that says, Ask for Dr. Pallekonda?

9    A.  Yes.

10   Q.  Had you met Dr. Pallekonda before?

11   A.  No.

12   Q.  Had you spoken with Dr. Pallekonda before?

13   A.  No.

14   Q.  Did you know who Dr. Pallekonda was?

15   A.  No.

16   Q.  Does this instruction also say, Ask the security guard to

17   page Mike Castro when you get there?

18   A.  Yes.

19   Q.  Did you, in fact, attend a meeting at Sacred Heart on that

20   day?

21   A.  Yes.

22   Q.  How many people were at that meeting?

23   A.  It was about 10 to 12 people.  I don't remember the exact

24   number.

25   Q.  And where did the meeting take place in Sacred Heart?

1  A.  Inside the boardroom.

2  Q.  Of the 10 to 12 people at the meeting, excluding yourself,

3  who else do you recall being at that meeting?

4  A.  Dr. Kandala, Tony.

5  Q.  Do you remember any of the other participants?

6  A.  A lot of people there, I didn't know.

7  Q.  The text messages that we just reviewed referenced Mike

8  Castro and Dr. Pallekonda.  Do you know who they are?

9  A.  No.

10  Q.  So do you know if they were present?

11  A.  I don't know.

12  Q.  What was discussed at that meeting, to the best of your

13  recollection?

14  A.  Dr. Kandala said that he was going to work there.

15  Q.  Was anything else discussed?

16  A.  Also, they were talking about wanting more patients.

17  Q.  Who wanting more patients?

18  A.  The hospital wants more patients.

19  Q.  Do you recall the subject of palliative care being

20  discussed at that meeting?

21  A.  I don't remember.  I don't remember.

22  Q.  Do you recall the subject of hospice care being discussed

23  at that meeting?

24  A.  I don't remember.

25  Q.  Do you recall any conversation about Dr. Kandala providing

1  education to Sacred Heart's staff at that meeting?

2  A.  I don't remember.

3  Q.  Do you recall any conversation about Dr. Kandala providing

4  education to Sacred Heart's patients at that meeting?

5  A.  I don't remember.

6  Q.  Do you have any -- do you recall any conversation about

7  Dr. Kandala developing a program at Sacred Heart during that

8  meeting?

9  A.  No, I don't remember.

10  Q.  Is it fair to say that you have no recollection of any of

11  those subjects being raised at that meeting?

12  A.  Yes.

13  Q.  Following that meeting, where did you send patients when

14  they needed to go to the hospital?

15  A.  Sacred Heart Hospital.

16  Q.  Why?

17  A.  Dr. Kandala told me to.

18  Q.  How did he tell you?

19         That's a bad question.  Can I withdraw it and try it

20  again?

21         Did he tell you that in person, by telephone, by text

22  message, or more than one of those three?

23  A.  He told me that in person and also through text message.

24  Q.  I want to ask you about when he told you that in person.

25  When did he tell you that in person?

1  A.  After the meeting.

2  Q.  And where did you have this conversation?

3  A.  Inside Sacred Heart Hospital.

4  Q.  Was anyone else present for this conversation?

5  A.  No.

6  Q.  What did Dr. Kandala say during this conversation?

7  A.  He said that, you know, starting from today, have me send

8  all the patients to this hospital.

9  Q.  And when you say "this hospital," what hospital?

10  A.  Sacred Heart Hospital.

11  Q.  I want to show you what's been marked as Government

12  Exhibit 4262.  It's, once again, a text message.  Can you see

13  that, Ms. Huang?

14  A.  Yes, I do.

15  Q.  What's the date on that text message?

16  A.  May 31st.

17  Q.  And is this a text message that you received from

18  Dr. Kandala?

19  A.  Yes.

20  Q.  And does it read, Send any admissions to Sacred Heart?

21  A.  Yes.

22        MR. HAMMERMAN:  The government would seek to admit

23  what's been marked as Government Exhibit 4262.

24        MR. POULOS:  No objection.

25        THE COURT:  It's admitted.

1    (Above-mentioned exhibit was received in evidence.)

2   BY MR. HAMMERMAN:

3   Q.  What did you understand this text message to mean,

4   Ms. Huang?

5   A.  So when I received this message, my first understanding

6   was if a patient needed to be sent to hospital from a nursing

7   home, the first place to send to is Sacred Heart Hospital.

8   Q.  Was this text message consistent with the conversation you

9   had had with Dr. Kandala the previous day at Sacred Heart?

10          MR. POULOS:  Objection, Judge.

11          THE COURT:  Sustained.  Sustained.  It's a matter for

12  argument.

13  BY MR. HAMMERMAN:

14  Q.  Ms. Huang, who would decide when a patient needs to go to

15  the hospital?

16  A.  If I was the on-call nurse on that date, I would be the

17  one that makes the decision.

18  Q.  Would you -- how would you decide or how would you know

19  when a patient needs to go to the hospital?

20  A.  First, I would ask questions to the nurse, what condition

21  the patient has.

22  Q.  And what happened if you thought a patient needed to go to

23  the hospital?  What would you do?

24  A.  Then if I decide the patient needs to be transferred to

25  the hospital, then I would let the nurse know over phone and

1  then I also let Dr. Kandala know that a patient will be going

2  over there.

3  Q.  How would you let Dr. Kandala know that you were sending

4  his patient to the hospital?

5  A.  Through text.

6  Q.  I want to show you what's been marked as Government

7  Exhibit 4263.

8          MR. HAMMERMAN:  Hold on one second, your Honor.

9  BY MR. HAMMERMAN:

10  Q.  Were there also times where you would check with

11  Dr. Kandala before sending a patient to see if he thought a

12  patient needed to go to the hospital?

13  A.  Yes.  There were times -- there was a time that if I

14  wasn't sure that I needed to send the patient to the hospital,

15  I will make a phone call to Dr. Kandala for his advice and to

16  see if the patient needed to go.

17  Q.  Did you also text him for advice?

18  A.  Yes.

19  Q.  All right.  I'm going to show you what's been marked as

20  Government Exhibit 4263.  Do you see that?

21  A.  Yes, I do.

22  Q.  This is a text message that came from your phone.  It says

23  it's to Dr. Kandala.  Do you see that?

24  A.  Yes.

25  Q.  And do you see the number here that ends in 4527?

1  A.  Yes.

2  Q.  And is that -- whose phone number is that?

3  A.  Dr. Kandala.

4  Q.  And then there seems to be a phone number back from 3116.

5  Do you see that?

6  A.  Yes.

7  Q.  Do you know whose number that was?

8  A.  Dr. Kandala, but I'm not a hundred percent sure.

9         MR. HAMMERMAN:  Can I have a moment, your Honor?

10        THE COURT:  Yes.

11  BY MR. HAMMERMAN:

12  Q.  Now I want to show you what's been marked as Government

13  Exhibit 4264.  Do you see that?

14  A.  Yes.

15  Q.  And this is a text message that says, Sending Mary Carey

16  at Waterfront to SHH for hypoxia.

17        Do you see that?

18  A.  Yes.

19  Q.  And the response is, Thanks, good.

20  A.  Yes.

21  Q.  And what are the dates of these text messages?

22  A.  August 28, 2012.

23  Q.  And who are these text messages -- who did you send

24  Sending Mary Carey to Waterfront to Sacred Heart Hospital for

25  hypoxia to?

1  A.  Dr. Kandala.

2  Q.  And who wrote back, Thanks, good?

3  A.  Dr. Kandala.

4  Q.  And in the previous government exhibit, 4263, when you

5  said that you were sending Henry Smith at Waterfront to Sacred

6  Heart for a G-tube placement and possible aspiration

7  pneumonia, who did you send that to?

8  A.  Dr. Kandala.

9       MR. HAMMERMAN:  The government would seek to admit

10  Government's Exhibit 4263 and 4264.

11       MR. POULOS:  Your Honor, I have no objection as to

12  the bottom portion of 4263, but the top portion with this

13  number, that's not part of the stipulation.

14       THE COURT:  Can you put 4263 back up there so I know

15  what Mr. Poulos is talking about, basically?

16       MR. HAMMERMAN:  It ends in 3116.

17       MR. POULOS:  Your Honor, we have a stipulation, and

18  there is no dispute that the 4527 prefix is Dr. Kandala's

19  phone.  It's something of a head-scratcher for us as to -- we

20  don't know what 3116 is.

21       THE COURT:  Is there going to be some foundation for

22  who that's from?

23       MR. HAMMERMAN:  I'm not sure as of yet, your Honor.

24       THE COURT:  Okay.  So I am just admitting the bottom

25  part of it now, not the top part, and we'll worry about the

1  rest of it later.

2      So that's 4263, right?  And 4264 is admitted in its

3  entirety.

4    (Above-mentioned exhibits were received in evidence.)

5  BY MR. HAMMERMAN:

6  Q.  I want to show you Government Exhibit 4265.  Is this

7  another series of text messages you had with Dr. Kandala?

8  A.  Yes.

9  Q.  And is this a text message in which you wrote to

10 Dr. Kandala in November -- particularly, November 29th, 2012

11 -- that you write about a patient's condition and the date the

12 patient needed an antibiotic?  Is that right?

13 A.  Yes.

14 Q.  And that the patient had not received it; is that correct?

15 A.  Yes.

16 Q.  And did you receive a response to that information from

17 Dr. Kandala?

18 A.  Yes.

19 Q.  What did he tell you to do in November 29th of 2012?

20 A.  The message said -- told me to send the patient to Sacred

21 Heart Hospital.

22 Q.  I want to show you another example of a text that came

23 from your phone.  This is Government Exhibit 4266.  Do you see

24 that?

25 A.  Yes.

1  Q.  What's the date?

2  A.  December 5th, 2012.

3  Q.  And did you send a text message to Dr. Kandala that said

4  that, A patient at PSE has a chronic infected wound on the

5  left leg since he has metal in tibia.  He needs to see

6  orthopedic surgeon.  Whom do you refer?

7          Do you see that?

8  A.  Yes.

9  Q.  What is "PSE," when you say the "patient at PSE"?

10  A.  That's the name of the nursing home.

11  Q.  What's the name of the nursing home?

12  A.  Park Shore --

13          THE COURT:  I think she said Park Shore Estates.

14          THE WITNESS:  Park Shore Estates.

15  BY MR. HAMMERMAN:

16  Q.  There's a response to your question, Whom do you refer,

17  and it's, Sacred Heart Hospital Ortho.

18          Do you see that?

19  A.  Yes.

20  Q.  Who decided where this patient should have his surgery?

21  A.  The doctor.

22  Q.  Which doctor?

23  A.  It should be the surgeon making the decision.

24  Q.  Fair enough.

25          Who directed the patient to Sacred Heart Hospital?

1    MR. POULOS: Objection, Judge. That's misleading.
2  It's directing to a particular doctor.
3    THE COURT: You know, honestly, I see the email. I
4  really -- you know, after five days, I'm not sure why we have
5  to be reading and interpreting all of these documents. I
6  really am not.
7    So I am going to sustain the objection under 403.
8    MR. HAMMERMAN: Well, the government would seek to
9  admit then Government Exhibit 4266.
10    THE COURT: You didn't offer 4265 also, did you?
11    MR. HAMMERMAN: I will tender that too, your Honor.
12    MR. POULOS: No objection.
13    THE COURT: Those are both admitted.
14    (Above-mentioned exhibits were received in evidence.)
15  BY MR. HAMMERMAN:
16  Q. Following May of 2012, what became the primary hospital to
17  which you sent Dr. Kandala's patients when they required
18  hospitalization?
19    THE INTERPRETER: What day is that again?
20  BY MR. HAMMERMAN:
21  Q. Starting on June 1st, 2012.
22    Let me repeat the question, Ms. Huang.
23    Beginning on June 1st, 2012, what became the primary
24  hospital to which you sent Dr. Kandala's patients when they
25  required hospitalization?

1  A.  Sacred Heart Hospital.

2  Q.  Did Dr. Kandala have privileges at Jackson Park?

3         MR. POULOS:  Judge, objection.  This has been asked

4  and answered --

5         THE COURT:  Sustained.

6  BY MR. HAMMERMAN:

7  Q.  Did Jackson Park have an ER?

8  A.  Yes.

9  Q.  In addition to contacting Dr. Kandala about patients that

10  needed hospitalization, did you also contact people at Sacred

11  Heart?

12  A.  Yes.

13  Q.  Who?

14  A.  Dr. Kandala provided me another doctor's name.

15  Q.  What was the doctor's name?

16  A.  I cannot say it.

17  Q.  Are you familiar with the name Dr. Pallekonda?

18  A.  Yes.

19  Q.  Is that the doctor you're referring to?

20  A.  Yes.

21  Q.  How would you contact Dr. Pallekonda?

22  A.  Dr. Kandala provided me Dr. Pallekonda's cell phone

23  number, and I use text message to communicate with him.

24  Q.  Did you text message Dr. Pallekonda every time you would

25  send a patient to Sacred Heart?

1  A.  Yes.

2  Q.  Did you do that all the time, or did there come a time

3  where you began to do it all the time?

4  A.  Not all the time.  Sometimes, I forgot.

5  Q.  Would you also contact Dr. Kandala in addition to

6  contacting Dr. Pallekonda?

7  A.  Yes.

8  Q.  Would you contact them together or separately?

9  A.  In the beginning, I wasn't familiar with the messenger, so

10  I did it separately; I would text message to one doctor and

11  then second letter to a different doctor.

12  Q.  And later, did you text them together?

13  A.  Yes, after I learned that is a function on the phone that

14  I can send one message to different receivers.

15  Q.  Do you know what the relationship between Dr. Kandala and

16  Dr. Pallekonda was?

17  A.  From what I understand, Dr. Kandala told me that

18  Dr. Pallekonda is a doctor at the hospital.

19  Q.  And "at the hospital," do you mean Sacred Heart?

20  A.  Yes.

21  Q.  I'm showing you what's been marked as Government

22  Exhibit 7412.  Do you see that?

23  A.  Yes, I do.

24  Q.  Is this a document that shows text messages that were sent

25  by you to both Dr. Kandala and Dr. Pallekonda at or about the

1  same times?

2  A.  Yes.

3  Q.  And just to go through this quickly, are text messages

4  here on line 605 and 606 the same text message about the same

5  patient, one sent to Kandala, one sent to Pallekonda?

6  A.  Yes.

7  Q.  And looking at lines 607 and 608, is that the same thing,

8  text messages sent at the same time to both Dr. Kandala and

9  Dr. Pallekonda about a different patient?

10  A.  Yes.

11  Q.  And are both of these patients that are being referenced

12  in these two series of text messages, were they patients that

13  you were sending to Sacred Heart Hospital?

14  A.  Yes.

15  Q.  And before we move on to the next text message, I want to

16  ask you about those two patients.

17          The first message references a patient that's being

18  sent for a left leg edema, pain R/O DVT.  What does that mean?

19  It's "left leg" with the G missing.

20  A.  (Inaudible.)

21          THE COURT:  Yeah.  That was in English.

22          MR. HAMMERMAN:  Yep.

23  BY MR. HAMMERMAN:

24  Q.  And when you say -- and I apologize --

25          THE COURT:  I don't think anybody heard it because

1  she wasn't speaking into the microphone.

2         Left lower extremity edema and had pain, so you were

3  ruling out whether the patient had a DVT.  That's basically

4  what you were saying, right?

5         THE WITNESS:  Yes.

6  BY MR. HAMMERMAN:

7  Q.  And "DVT," is that a blood clot?

8  A.  (In English) Yes.

9  Q.  Is that a potentially serious condition?

10 A.  It's not like urgent, urgent.  It only happens on his leg.

11 It's not considered as an urgent matter.

12 Q.  Ms. Huang, if that blood clot gets loose from this

13 patient's leg, that could be very serious, right?

14         MR. POULOS:  Objection, your Honor.  It's already

15 admitted.

16         THE COURT:  Overruled.

17         THE WITNESS:  (In English) If the DVT got to the

18 lung, there is emergency, but if it's only staying in the leg,

19 it's not -- we can treat it in the nursing home sometimes.

20 BY MR. HAMMERMAN:

21 Q.  But this patient you sent to the hospital, right?

22         MR. POULOS:  Your Honor --

23         THE COURT:  The record should reflect that was in

24 English too.

25         What, Mr. Poulos?

1    MR. POULOS:  I didn't hear the answer, your Honor.

2    THE COURT:  If it got to the lung, there's an

3  emergency, but if it's staying in the leg, we can treat it in

4  the nursing home sometimes.

5    If you're going to answer in English, we are going to

6  have to move the microphone over.

7    THE WITNESS:  I prefer to stay in Chinese.

8    MR. POULOS:  Excuse me.  What number is this?

9    MR. HAMMERMAN:  7412.

10  BY MR. HAMMERMAN:

11  Q.  The other patient, it mentions the patient having -- is it

12  tachycardia?  T-a-c-h-y-d-a-r-i-a.  Is that an accelerated

13  heart rate?

14  A.  Yes.

15  Q.  That's potentially serious too, isn't it, Ms. Huang?

16  A.  Yes.

17  Q.  Can an accelerated heart rate lead to things like risk of

18  stroke or sudden cardiac arrest?

19  A.  Possible.

20  Q.  The first patient who had the edema, that was a patient

21  who lived at Park South.  Where is that?

22    Where is that in the city of Chicago?

23  A.  South Side.

24  Q.  Where is Waterfront?  It's also here for the second

25  patient residing.

1 A. South Side, Southeast.

2 Q. Did Dr. Kandala ever stop you and tell you to send those

3 patients to a different hospital, not Sacred Heart where you

4 were directing them?

5 A. Yes.

6 Q. Those two patients, where did they go?

7 A. I don't know. I'm not talking about those two patients.

8 Q. Those two patients went to Sacred Heart, right?

9 A. Yes.

10 Q. Government Exhibit 7413, Ms. Huang, do you recognize this

11 document?

12 A. Yes.

13 Q. Are these emails that you sent to Dr. Pallekonda and

14 Dr. Kandala, once again, at the same time?

15 A. Yes.

16 Q. This patient also was at Park South; is that right?

17 A. Yes.

18 Q. And you sent this patient for hypoglycemia that was

19 uncontrolled and -- I'm sorry -- uncontrolled hyperglycemia

20 and emesis. Do you see that?

21 A. Yes.

22 Q. Is "emesis" kind of a medical technical word for vomiting?

23 A. Yes.

24 Q. All right. Just so it's clear, this one says that it's

25 unsent, correct?

1  A.  Yes.

2  Q.  But you tried to send it to both, right?

3  A.  Yes.

4  Q.  Again, was it your policy to try to alert Dr. Kandala to

5  all the patients you were sending to Sacred Heart?

6         MR. POULOS:  Objection, Judge.  It's cumulative at

7  this point.

8         THE COURT:  Well, we're certainly getting pretty darn

9  close to that.

10         MR. HAMMERMAN:  I'll move on, your Honor.

11  BY MR. HAMMERMAN:

12  Q.  Other than Dr. Pallekonda, did you text anyone else at

13  Sacred Heart to let them know that you were sending patients?

14  A.  Yes.

15  Q.  Who?

16  A.  Dr. Kandala.

17  Q.  Did you text anyone else at Sacred Heart that you were

18  sending patients to Sacred Heart?

19  A.  Tony.

20  Q.  Who is Tony?

21  A.  I believe he was a CEO at Sacred Heart Hospital.

22  Q.  How did you contact him?

23  A.  Through text message.

24  Q.  Why did you contact him?

25  A.  Dr. Kandala told me to.

1   Q.  Did you send a lot of text messages to Tony Puorro?

2          THE INTERPRETER:  I'm sorry.  What's the last name?

3          MR. HAMMERMAN:  Puorro, P-u-o-r-r-o.

4          THE WITNESS:  Yes.

5   BY MR. HAMMERMAN:

6   Q.  Did he also text you a lot?

7   A.  Yes.

8   Q.  I'm going to show you what's been marked as Government

9   Exhibit 4290 and just ask if this is an example of a text

10  message that you sent to Mr. Puorro regarding a patient being

11  sent to Sacred Heart Hospital?

12  A.  Yes.

13  Q.  And just a quick question about this text.  The patient --

14  where is Concord?  Where is that located?

15  A.  South Side.

16  Q.  And what does "R/O CVA" mean?

17  A.  Rule out stroke.

18  Q.  Does that mean you're trying to rule out a stroke?

19  A.  Yes.

20  Q.  Why did you text this Tony Puorro at Sacred Heart Hospital

21  when you were sending patients?

22  A.  Dr. Kandala told me to.

23  Q.  Did you ever have a conversation with Dr. Kandala in which

24  you told him that you and Tony Puorro texted about specific

25  patients?

1    A.  Yes.

2    Q.  Did you ever text Dr. Kandala and Tony Puorro together?

3    A.  Yes.

4    Q.  Was there ever a problem getting the patients you tried to

5    send to Sacred Heart to the hospital?

6    A.  Yes.

7    Q.  What was the problem?

8    A.  Two things happened.  Some patient did not arrive at

9    Sacred Heart Hospital, and also we received complaint from

10   patients' family members.

11   Q.  I'm going to talk about the first part of that answer, the

12   ones that didn't arrive.

13          Were some of the patients that you tried to send to

14   Sacred Heart being diverted to other hospitals?

15   A.  Yes.

16   Q.  I'm going to show you what's been marked as Government

17   Exhibit 4291.  Are these text messages that you had with Tony

18   Puorro indicating that you were trying to send patients to

19   Sacred Heart Hospital -- a patient to Sacred Heart Hospital

20   who was then diverted to the University of Chicago Hospital?

21   A.  Yes.

22   Q.  And was that a patient who had chest pain?

23   A.  Yes.

24   Q.  In August of 2012?

25   A.  Yes.

1    Q.  I'm going to show you another, Government Exhibit 4277.

2            MR. HAMMERMAN:  Your Honor, I would seek to admit

3    what was marked as Government Exhibit 4291.

4            MR. POULOS:  No objection.

5            THE COURT:  4291 is admitted.

6      (Above-mentioned exhibit was received in evidence.)

7    BY MR. HAMMERMAN:

8    Q.  I'm going to show you 4277.  Is this another example of

9    you trying to send a patient with chest pain to Sacred Heart

10   Hospital who was diverted to a different hospital?

11   A.  Yes.

12   Q.  And is that in November of 2012?

13   A.  Yes.

14   Q.  And this was another patient who had chest pain?

15   A.  Yes.

16   Q.  Who was diverted to Jackson Park; is that right?

17   A.  Yes.

18           MR. HAMMERMAN:  The government would seek to admit

19   what's marked -- that was just shown to the witness as

20   Government Exhibit 4277.

21           MR. POULOS:  No objection.

22           THE COURT:  It's admitted.

23     (Above-mentioned exhibit was received in evidence.)

24   BY MR. HAMMERMAN:

25   Q.  I want to show you what's been marked as Government

1  Exhibit 4294.  It's a series of text messages from you to Tony

2  Puorro.

3       Does it show that you were trying to send a patient

4  by the name of Willie from Waterford (sic) to Sacred Heart?

5  A.  Yes.

6  Q.  Another patient named Charlie to Sacred Heart for renal

7  failure?

8  A.  Yes.

9  Q.  Sending a patient named Victor from Park South to Sacred

10 Heart for coughing up blood?

11 A.  Yes.

12 Q.  And was that patient also on Coumadin, which is -- is that

13 a blood thinner?

14 A.  Yes.

15 Q.  And Willie, the patient who had shortness of breath, is

16 that what "SOB" means?

17 A.  Yes.

18 Q.  That patient didn't get there, right, Ms. Huang?

19 A.  Yes.

20 Q.  He was diverted?

21 A.  Yes.

22 Q.  And that was to South Shore.  Is that South Shore

23 Hospital?

24 A.  Yes.

25       MR. HAMMERMAN:  The government would to seek to admit

1  Government Exhibit 4294.

2          MR. POULOS:  No objection.

3          THE COURT:  It's admitted.

4    (Above-mentioned exhibit was received in evidence.)

5          MR. HAMMERMAN:  Your Honor, just --

6  BY MR. HAMMERMAN:

7  Q.  I'll show you one more of these text messages, Ms. Huang,

8  on this topic.  This is Government Exhibit 7419.

9          MR. HAMMERMAN:  I think this is one that the Court

10  may have seen in the cross of the last witness or the witness

11  before --

12          THE COURT:  Okay.

13          MR. HAMMERMAN:  -- but just in case.

14  BY MR. HAMMERMAN:

15  Q.  Are these messages that you sent to Dr. Kandala in June

16  regarding a patient, first name Pamela?

17  A.  Yes.

18  Q.  And you write here that she went to Roseland.  This is the

19  third time you tried to send her to Sacred Heart using ATI.

20  Could you transfer her to Sacred Heart.  Do you see that?

21  A.  Yes.

22  Q.  And what was ATI?

23  A.  Ambulance, ambulance company.

24  Q.  That was an ambulance company that you sent the patient

25  with?

1  A.  Yes, this is the company that Dr. Kandala asked me to use.

2  Q.  Did Dr. Kandala ask you to use a specific ambulance

3  company?

4  A.  Not all the time.

5  Q.  Did he tell you to use ATI on certain occasions?

6  A.  Yes.

7  Q.  To bring patients to Sacred Heart?

8         MR. POULOS:  Objection, your Honor.  It's leading.

9         THE COURT:  Sustained.

10  BY MR. HAMMERMAN:

11  Q.  Where did he tell you to use ATI for?

12  A.  Send patient to hospital.

13  Q.  Which hospital?

14  A.  Sacred Heart Hospital.

15  Q.  And just so it's clear, we read that top line of

16  Government Exhibit 7419.  Was that after Dr. Kandala had asked

17  you to figure out where Pamela had gone because she wasn't at

18  Sacred Heart --

19         MR. POULOS:  Your Honor, I object to this document at

20  this point and that question.  Under the rule of completeness,

21  it's misleading in light of what we observed with the prior

22  witness.

23         THE COURT:  I didn't hear the last part of what you

24  said.

25         MR. POULOS:  In light of what we observed with the

1  prior witness, that that text message was also relating to
2  Dr. Pallekonda, the exact same language.
3        And so this question, I object to this document under
4  the rule of completeness.
5        THE COURT:  Well, I think the objection is that I
6  tell him to put in the other part too.
7        MR. HAMMERMAN:  And, your Honor, we will work with
8  opposing counsel to amend Government Exhibit 7419 to include
9  whatever additional lines he's referring to and seek to admit
10 it then --
11       THE COURT:  Hang on.  Your colleague may have it
12 here.
13       MR. HAMMERMAN:  I can't adjust it now on the fly.
14       THE COURT:  I understand, but --
15       MR. HAMMERMAN:  Do you want to show it?
16       THE COURT:  -- I would like to see it at the same
17 time.
18       Okay.  Oh, this is that 372 and 373 thing?
19       MR. HAMMERMAN:  Yes.
20       THE COURT:  Okay.  Fine.  You can go ahead.  I have
21 enough of a recollection of it already being shown.  I
22 remember what it says.
23       MR. HAMMERMAN:  The government would seek to admit
24 Government Exhibit 7419.
25       THE COURT:  The last one was 7419?

1        MR. HAMMERMAN:  Yes.

2        THE COURT:  It's admitted.

3     (Above-mentioned exhibit was received in evidence.)

4        THE COURT:  But what you'll need to do is add the

5   other parts to it at some point before you admit it.

6        MR. HAMMERMAN:  We will work with defense counsel to

7   do that, your Honor.

8        And, your Honor, the government is going to seek to

9   admit -- and we'll try to speed things along by not querying

10  the witness about it -- Government Exhibit 4273, which is

11  another series of text messages about a diverted patient.

12       THE COURT:  This is an act of mercy for me,

13  basically?

14       MR. POULOS:  Yes.

15       MR. HAMMERMAN:  It will be the last, your Honor.

16       THE COURT:  Okay.  Thank you.

17    (Above-mentioned exhibit was received in evidence.)

18       THE COURT:  "It will be the last"?  That's ominous.

19  BY MR. HAMMERMAN:

20  Q.  Ms. Huang, were patient diversions a problem with respect

21  to Sacred Heart?

22       MR. POULOS:  Objection.  Asked and answered.

23       MR. HAMMERMAN:  I don't believe I asked that, your

24  Honor.

25       THE COURT:  Well, I think it's kind of a vague

1  question that way. I mean, there have been questions asked

2  about diversions, so I think you need to sort of hone that

3  question a bit.

4  BY MR. HAMMERMAN:

5  Q. Ms. Huang, did you become aware of a code that was used to

6  try to avoid diversions?

7  A. Yes.

8  Q. What was the code?

9  A. Room 200.

10  Q. Did you ever -- who told you that code?

11  A. Dr. Kandala.

12  Q. Did you ever discuss that code with Tony Puorro in

13  addition to Dr. Kandala?

14  A. Yes.

15  Q. When you say "room 200," were you directed to tell

16  ambulance companies to admit patients to room 200 as direct

17  admits?

18  A. Direct admit, admission. Direct.

19  Q. Did you try to -- I'm sorry. Let me try that again.

20  Did you tell ambulance companies to directly admit

21  patients to room 200 at Sacred Heart?

22  A. Yes.

23  Q. I want to show you an exhibit that we've marked as

24  Government Exhibit 7411. And is this a series of text

25  messages that you had with Tony Puorro and Dr. Kandala? Do

1  you see that?

2  A.  Yes.

3  Q.  And does it show going up that you write to Dr. Kandala

4  that you're directly admitting Aaron Bellamy -- I will just

5  say Aaron to Sacred Heart Hospital for AMS?  Is that altered

6  mental status?

7  A.  Yes.

8  Q.  And did you instruct that that patient be directly

9  admitted?

10 A.  Yes.

11 Q.  Did Dr. Kandala write back, Yes, direct admit?

12 A.  Yes.

13 Q.  Did you then write that you directly -- directed admitted

14 (sic) Brian -- or it says here "Brain," but Brian at Park

15 Shore to Sacred Heart Hospital for high fever?

16 A.  Yes.

17 Q.  And does Dr. Kandala write yes?

18 A.  Yes.

19 Q.  Did you then get a question from Tony Puorro by text that

20 reads, Doris, did we mention to the ambulance, quote, direct

21 admission to room 200, end quote, the last time it worked?

22 Thanks, Tony?

23 A.  Yes.

24 Q.  And did you -- did Dr. -- did you then write to

25 Dr. Kandala, Brian McGee diverted to UC?

1    A.  Yes.

2    Q.  And did Mr. Puorro write back, Did we try to send as a

3    direct admit to Sacred Heart Hospital for room 200?

4    A.  Yes.

5    Q.  And did you write, We tried, yes, but due to the patient's

6    condition of tachycardia, that didn't happen?

7    A.  Yes.

8         MR. HAMMERMAN:  The government would seek to admit

9    Government Exhibit 7411.

10         MR. POULOS:  No objection.

11         THE COURT:  It's admitted.

12    (Above-mentioned exhibit was received in evidence.)

13         MR. HAMMERMAN:  And, your Honor, once again, just for

14    purposes of relieving the Court, the government would seek to

15    admit Government Exhibit 4293, another series of text messages

16    regarding the attempt to use room 200 in diversion.

17         THE COURT:  What's the number again?  429- --

18         MR. HAMMERMAN:  4293.  And I'll just leave it up

19    there for a second if the Court wants to take a look.

20         THE COURT:  Is there any objection to this one,

21    Mr. Poulos?

22         MR. POULOS:  This is 4293?

23         THE COURT:  Correct.

24         MR. HAMMERMAN:  Yes.

25         MR. POULOS:  For the record, this is only Tony Puorro

1  and Ms. Huang?

2          MR. HAMMERMAN:  Yes.

3          MR. POULOS:  No objection.

4          THE COURT:  Wait a second.  What Mr. Poulos just

5  said, just based on what I am reading here, there is something

6  that doesn't make sense to me then, because the "to" column,

7  that's the fourth column from the left, says, From

8  Dr. Kandala.

9          MR. HAMMERMAN:  It's text messages to Tony Puorro

10  from his phone from Ms. Huang.

11          MR. POULOS:  Your Honor --

12          THE COURT:  Does everybody agree that's right?

13          MR. POULOS:  Just so we're clear, and I think we're

14  in agreement, these text messages -- and we probably should be

15  clear that the 4293 series text messages are text messages, as

16  I understand it, that were recovered from Tony Puorro's phone,

17  not her phone.

18          THE COURT:  Oh, is that right?

19          MR. HAMMERMAN:  Yes.

20          THE COURT:  Oh, okay.

21          MR. HAMMERMAN:  We're using both.

22          THE COURT:  Okay.  You threw me off there.

23          MR. HAMMERMAN:  I apologize, your Honor.

24          THE COURT:  These are texts -- what you have up on

25  the screen right now, which is Exhibit 4293, are texts -- it's

1    a chart of texts from Mr. Puorro's.

2            MR. HAMMERMAN:  Phone that were sent to him by

3    Ms. Huang --

4            THE COURT:  Got it.

5    BY MR. HAMMERMAN:

6    Q.  Let me just ask you, Ms. Huang --

7            MR. POULOS:  If I could just interrupt on this issue

8    just so we're all clear.

9            THE COURT:  Yeah.

10           MR. POULOS:  I think we're all in agreement that --

11   so, for example, in the top bracket, the top line there, from

12   a particular number, parentheses, from Dr. Kandala,

13   parentheses, Doris, that reflects the way Tony Puorro had

14   Doris' number stored --

15           THE COURT:  Is that right?

16           MR. HAMMERMAN:  He beat me to the question; but, yes.

17           THE COURT:  Okay.  I will just take that as a

18   stipulation then.

19           MR. HAMMERMAN:  It is, your Honor.

20   BY MR. HAMMERMAN:

21   Q.  Ms. Huang, your phone number ends with the number 7013,

22   correct?

23   A.  Yes.

24   Q.  Do you know what a direct admit is, Ms. Huang?

25   A.  Yes.

1    Q.  What's a direct admit?

2    A.  Patient direct admit to the hospital.

3    Q.  Does that mean that they would go to a room on a floor?

4    A.  Yes.

5    Q.  The patients that you sent as direct admits to Sacred

6    Heart, did those patients require emergency room evaluation

7    and care?

8    A.  Yes.

9    Q.  Did Tony Puorro ever text you concerning your ability to

10   refer patients to Sacred Heart?

11   A.  I don't understand the question.

12   Q.  Did Tony Puorro ever tell you that he wanted you to send

13   more patients?

14   A.  Yes.

15   Q.  Did he say why?

16   A.  He wanted more patients.

17   Q.  Did he ever text you about the hospital's census?

18   A.  Yes.

19   Q.  I'm going to show you what's been marked as Government

20   Exhibits 7410, 7409, 7407.

21           7410, is that a text message in which Mr. Puorro told

22   you that he wanted you to keep Sacred Heart in mind for

23   additional admissions?   We are six less than last month as we

24   close September.  As always, your assistance is greatly

25   appreciated.  Tony.

1    A.  Yes.

2             MR. HAMMERMAN:  The government would seek to admit

3    Government Exhibit 7410.

4             MR. POULOS:  No objection.

5             THE COURT:  Admitted.

6      (Above-mentioned exhibit was received in evidence.)

7    BY MR. HAMMERMAN:

8    Q.  Let me show you what's been admitted as Government

9    Exhibit 7409.  Is that a text message that you received from

10   Tony Puorro where he says, Doris, please keep Sacred Heart in

11   mind for admissions.  We came up short for our target last

12   month.  Thanks again for your help.  Your assistance is

13   greatly appreciated.  Tony?

14   A.  Yes.

15   Q.  I'm going to show you what's been marked as Government

16   Exhibit 7407.  Is this another text message where Tony Puorro

17   wrote, Doris, please keep Sacred Heart in mind for admissions,

18   as our census is low.  Thanks, Tony?

19   A.  Yes.

20            MR. HAMMERMAN:  The government would seek to admit

21   Government Exhibit 7407 and 7409.

22            MR. POULOS:  No objection.

23            THE COURT:  It's admitted.

24     (Above-mentioned exhibits were received in evidence.)

25   BY MR. HAMMERMAN:

1 Q. Did you ever have a conversation -- or a meeting, I'm

2 sorry, with Tony Puorro and Dr. Kandala in which you discussed

3 Tony Puorro contacting you directly about sending patients?

4 A. Yes.

5 Q. Where did that meeting take place?

6 A. In a restaurant.

7 Q. What kind of restaurant?

8 A. I believe an Indian restaurant.

9 Q. Who was present for this meeting?

10 A. Dr. Kandala, Mr. Puorro, and two or three other people

11 attended the meeting that I didn't know.

12 Q. Did you talk about patients going to Sacred Heart at this

13 meeting?

14 A. Yes.

15 Q. Did you talk about the number of patients going to Sacred

16 Heart at this meeting?

17 　　　　MR. POULOS: Judge, I object to the leading.

18 　　　　THE COURT: Sustained.

19 BY MR. HAMMERMAN:

20 Q. What did Tony Puorro say in this meeting?

21 　　　　MR. POULOS: May we have foundation as to the date,

22 your Honor?

23 　　　　THE COURT: Yes, we don't have anything about when

24 this happened.

25 　　　　MR. HAMMERMAN: Sure.

1  BY MR. HAMMERMAN:

2  Q.  Do you remember when this meeting took place, Ms. Huang?

3  A.  I don't remember.

4  Q.  We have seen a number of text messages where Tony Puorro

5  is texting you about census and requesting patients.  Do you

6  know if it was before or after you started receiving those

7  text messages?

8  A.  After the dinner meeting.

9  Q.  Those text messages came after the meeting?

10  A.  I cannot remember.

11  Q.  Okay.  At this meeting at the Indian restaurant, what did

12  Tony Puorro say?

13  A.  He said that he wanted more patients.

14  Q.  Did Dr. Kandala say anything with respect to Mr. Puorro's

15  statement that he wanted more patients?

16  A.  He told Tony to contact me.

17  Q.  And after that, did Tony Puorro contact you directly

18  asking for patients?

19  A.  Yes.

20          MR. HAMMERMAN:  Your Honor, the government is going

21  to seek to admit Government Exhibit 4312.  It's, once again, a

22  series of text messages taken from Mr. Puorro's phone between

23  Ms. Huang and Tony Puorro.

24          THE COURT:  Any objection, Mr. Poulos?

25          MR. POULOS:  No.

1    THE COURT:  It's admitted.

2    (Above-mentioned exhibit was received in evidence.)

3    MR. HAMMERMAN:  I will leave it up there for just a

4    second, your Honor.

5    THE COURT:  Hang on.  So it's between Ms. Huang and

6    Mr. Puorro?

7    MR. HAMMERMAN:  Yes.  The "from" Dr. Kandala, Doris,

8    is Ms. Huang.  And these were taken from Mr. Puorro's cellular

9    telephone.

10    THE COURT:  Okay.  Thanks.  You can take it down.

11    MR. HAMMERMAN:  Thank you, your Honor.

12    BY MR. HAMMERMAN:

13    Q.  Ms. Huang, I'm showing you a document that the government

14    has marked as Government Exhibit Map 3.  I want to show you

15    the first page to start, which is a list of nursing homes and

16    nursing home addresses.  Do you see that?

17    A.  Yes.

18    Q.  Are the nursing homes that are listed on the left-hand

19    column, are those nursing homes at which you saw Dr. Kandala's

20    patients in 2012?

21    A.  Okay.  The second one, Midway Neurological and Rehab, I

22    never been there before.

23    Q.  Other than Midway Neurological and Rehab, did you treat

24    Dr. Kandala's patients at these nursing homes?

25    A.  Yes.

1  Q. And to the best of your understanding, are those addresses

2  for all of those nursing homes accurate, of course excluding

3  Midway Neurological and Rehab?

4  A. Correct.

5  Q. I will show you the second page of Government Map 3.  Have

6  you reviewed this map in anticipation of your testimony in my

7  office?

8  A. Yes.

9  Q. Does this map, once again, depict where all of these

10  various nursing homes are that were on that list at which you

11  saw patients for Dr. Kandala?

12  A. Yes.

13  Q. And is Jackson Park Hospital here in yellow, is that an

14  accurate depiction of where Jackson Park is?

15  A. Correct.

16  Q. And excluding All Faith Nursing and Rehab Center, is it

17  fair to say almost all of these nursing homes are closer to

18  Jackson Park than they are to Sacred Heart up here on

19  Chicago's West Side?

20  A. Yes.

21      MR. HAMMERMAN:  The government would seek to admit

22  Government Exhibit Map 3.

23      MR. POULOS:  No objection.

24      THE COURT:  It's admitted.

25    (Above-mentioned exhibit was received in evidence.)

1    THE COURT:  That's both the map and the chart, right?

2         MR. HAMMERMAN:  Yes, your Honor.

3    BY MR. HAMMERMAN:

4    Q.  In addition to Jackson Park, Ms. Huang, are there other

5    hospitals located on the South Side of Chicago that were

6    closer to these nursing homes than Sacred Heart?

7    A.  Yes.

8    Q.  For example, is Roseland closer to these nursing homes

9    than Sacred Heart?

10        MR. POULOS:  I'm going to object to any hospitals

11   that Dr. Kandala did not have privileges.

12        MR. HAMMERMAN:  Your Honor, I think that is an

13   objection that goes to weight, not as evidence.

14        THE COURT:  I mean, I can pretty much take judicial

15   notice that there are other hospitals that are closer to these

16   things than Sacred Heart.  And it's really not contested.

17        MR. HAMMERMAN:  Okay.

18        THE COURT:  So it's not -- there's other hospitals

19   down there, right?

20        MR. POULOS:  Yes.

21        THE COURT:  Okay.  There's more than one hospital on

22   the South Side of Chicago.  We've heard evidence about some of

23   them.  University of Chicago, for example.

24        MR. HAMMERMAN:  South Shore, University of Chicago.

25        THE COURT:  Right.

1   BY MR. HAMMERMAN:

2   Q.  Is it fair to say that some of the patients that you tried

3   to send to Sacred Heart had serious conditions, Ms. Huang?

4               MR. POULOS:  Objection.  Leading.

5               THE COURT:  Just one second.

6               Overruled.

7               THE WITNESS:  Yes.

8   BY MR. HAMMERMAN:

9   Q.  Did some of them have symptoms of strokes?

10  A.  Possible.

11  Q.  Some of them have symptoms of heart attacks?

12  A.  Possible.

13  Q.  When you sent patients to Sacred Heart with those

14  conditions, did you let Dr. Kandala know?

15  A.  Yes.

16  Q.  You said that -- when I asked you originally if there were

17  problems of patients getting to Sacred Heart, you said there

18  were two:  diversions and problems with patients' families.

19  Is that right?

20  A.  Yes.

21  Q.  What did you mean by problems with patients' families?

22  A.  Patient family member complaining about service, the

23  service that was provided at Sacred Heart Hospital.

24  Q.  I'm going to just show you what's been marked as

25  Government Exhibit 4267.  Is this a text message series that

1  you reviewed in anticipation of your testimony here today?

2  A.  Yes.

3  Q.  And in this text message series, was -- first of all, was

4  it with Dr. Kandala?

5  A.  Yes.

6  Q.  Did you note to him that the family had complained because

7  they wanted the patient to go to a different hospital?

8  A.  Yes.

9  Q.  And that they demanded that Dr. Kandala call and wouldn't

10  talk to you because they were upset?

11  A.  Yes.

12        MR. HAMMERMAN:  The government would seek to admit

13  Government Exhibit 4267.

14        MR. POULOS:  No objection.

15        THE COURT:  It's admitted.

16    (Above-mentioned exhibit was received in evidence.)

17  BY MR. HAMMERMAN:

18  Q.  I want to show you what we've marked as Government Exhibit

19  4316.  Is this a text message conversation you had with

20  Mr. Puorro again?

21  A.  Yes.

22  Q.  Did Mr. Puorro in November of 2012 -- in particular,

23  November 2nd -- text you, Doris, is there a problem that

24  requires attention?  We haven't had any admissions in a long

25  time.  Let me know.  Thanks, Tony?

1   A.  Yes.

2   Q.  Did you write back, Yes, I have a problem.  Most of the

3   patients who I sent to Sacred Heart Hospital, the patient or

4   the family refused to go back?

5   A.  Yes.

6        MR. HAMMERMAN:  The government would seek to admit

7   what's been marked as Government Exhibit 4316.

8        MR. POULOS:  No objection.

9        THE COURT:  Admitted.

10     (Above-mentioned exhibit was received in evidence.)

11  BY MR. HAMMERMAN:

12  Q.  Ms. Huang, did you have conversations with Dr. Kandala

13  about patients and their families complaining about going to

14  Sacred Heart Hospital?

15  A.  Yes.

16  Q.  Did you continue to send patients to Sacred Heart

17  Hospital?

18  A.  Yes.

19  Q.  Why?

20  A.  He did not tell me to stop sending patients to Sacred

21  Heart Hospital.

22  Q.  When you say "he," who are you talking about?

23  A.  Dr. Kandala.

24  Q.  Do you know who was treating the patients at Sacred Heart

25  Hospital?

1  A.  I don't know.

2  Q.  Did you ever discuss it with Dr. Kandala?

3  A.  No, I didn't ask him.

4  Q.  You did have some conversations, though, with

5  Dr. Pallekonda at Sacred Heart about those patients, right?

6  A.  Yes.

7  Q.  Do you know any of the details about the relationship --

8  or about when Dr. Pallekonda would or would not treat patients

9  at Sacred Heart?

10        THE INTERPRETER:  I'm sorry.  Say that again?

11  BY MR. HAMMERMAN:

12  Q.  Do you know any of the details about when Dr. Pallekonda

13  would or would not treat patients at Sacred Heart, what his

14  schedule was?

15  A.  No.

16  Q.  At some point, did you stop sending patients to Sacred

17  Heart?

18  A.  Yes.

19  Q.  Why?

20  A.  Dr. Kandala told me to not send patients to Sacred Heart

21  Hospital.

22  Q.  How did he inform you of -- how did he instruct you not to

23  send patients there anymore?

24  A.  He sent me a text message.

25  Q.  I'm showing you what's been marked as Government

1   Exhibit 4269.  Ms. Huang, is this that text message

2   conversation you're referring to?

3   A.  Yes.

4   Q.  What's the date?

5   A.  December 21st, 2012.

6   Q.  And in that text message communication, did he write, send

7   all patients to Jackson Park from now on.  No more Sacred

8   Heart for now?

9   A.  Yes.

10  Q.  And did you --

11          MR. POULOS:  Just for clarification for a point of

12  record that the date reflected on this exhibit is that UTC

13  date.

14          THE COURT:  Right, but it -- oh, a.m., so it was

15  actually probably the night before.  That's 12:20 a.m.  It's a

16  five-hour difference.

17          MR. HAMMERMAN:  It's probably on the 20th.

18          THE COURT:  Yeah, right.

19  BY MR. HAMMERMAN:

20  Q.  And did you respond okay?

21  A.  Yes.

22  Q.  Following that text message communication, where did you

23  send Dr. Kandala's patients when they needed to be

24  hospitalized?

25  A.  Jackson Park Hospital.

1    MR. HAMMERMAN:  Your Honor, in case I didn't do it,

2  the government would seek to admit 4269.

3         THE COURT:  Is there any objection to that one?

4         MR. POULOS:  No objection.

5         THE COURT:  4269 is admitted.

6    (Above-mentioned exhibit was received in evidence.)

7  BY MR. HAMMERMAN:

8  Q.  Ms. Huang, did you ever receive any money from Sacred

9  Heart Hospital?

10 A.  No.

11 Q.  Did Tony Puorro ever provide you with any money?

12 A.  No.

13 Q.  Did you ever personally receive any benefits from sending

14 patients to Sacred Heart Hospital?

15 A.  No.

16 Q.  From Sacred Heart?

17 A.  No.

18 Q.  Or from Tony Puorro?

19 A.  No.

20 Q.  Why did you send patients to Sacred Heart?

21 A.  Dr. Kandala asked me.

22 Q.  Ms. Huang, did you, to your knowledge -- I'm sorry.  Let

23 me try that again.

24        Ms. Huang, to your knowledge, was Dr. Kandala working

25 on a palliative care program at Sacred Heart?

1  A.  I don't know.

2  Q.  Do you have any knowledge of Dr. Kandala working on a

3  hospice care program at Sacred Heart?

4  A.  I don't know.

5  Q.  To your knowledge, did Dr. Kandala ever develop an

6  educational program at Sacred Heart?

7  A.  I don't know.

8  Q.  You don't know that?

9  A.  I do not know.

10  Q.  To your knowledge, was Dr. Kandala ever teaching staff or

11  patients at Sacred Heart Hospital?

12  A.  No.  I do not know.

13          MR. HAMMERMAN:  Just one moment, your Honor?

14          THE COURT:  Okay.

15    (Brief pause.)

16  BY MR. HAMMERMAN:

17  Q.  I want to just show you two additional text messages, and

18  I believe that will be my last two.

19          You mentioned before that at some point, you also had

20  group text messages; is that right, Ms. Huang?

21  A.  Yes.

22  Q.  I want to show you what has been marked as Government

23  Exhibit 7416.  Is this one of those group text messages

24  between you, Mr. Puorro, and Dr. Kandala?

25  A.  Yes.

1  Q.  Does it show you -- you sending a text message to

2  Dr. Kandala -- I'm sorry -- you sending a text message to

3  Dr. Kandala about a patient that was sent to Sacred Heart in

4  the morning for altered mental status?

5  A.  Yes.

6  Q.  And then there's a response from Mr. Puorro asking if it

7  was Kandala who was actually contacting him?

8  A.  Yes.

9  Q.  And then additional communications from Mr. Puorro saying,

10  Thank you, Doris.  Please continue to text me in advance.  I

11  really appreciate all of your help?

12  A.  Yes.

13  Q.  Is this one of those examples of you, Mr. Puorro, and

14  Dr. Kandala all included on the same communication?

15  A.  Yes.

16  Q.  And were these communications dated on August 3rd of 2012?

17  A.  Yes.

18  Q.  I want to show you another kind of example of the same

19  thing.  This is Government Exhibit 7417.  Is this a group chat

20  that involved Dr. Kandala, Mr. Puorro, and yourself?

21  A.  Yes.

22  Q.  Is this, once again, about sending patients to Sacred

23  Heart?

24  A.  Yes.

25  Q.  And was Dr. Kandala and Mr. Puorro included in these text

1 | message communications?

2 | A.  Yes.

3 |         MR. HAMMERMAN:  Your Honor, the government would seek

4 | to admit what's been marked as Government Exhibit 7417 and

5 | 7416.

6 |         MR. POULOS:  No objection.

7 |         THE COURT:  They are both admitted.

8 |   (Above-mentioned exhibits were received in evidence.)

9 |         MR. HAMMERMAN:  No further questions, your Honor.

10 |        THE COURT:  Okay.  We are stopping there.

11 |        So we can resume at 9:45 on Monday.

12 |        So aside from this witness and putting Dr. Noorlag to

13 | the side, how many more witnesses do you have?

14 |        MR. HAMMERMAN:  There's obviously the crosses of both

15 | this witness and Mr. Noorlag.

16 |        THE COURT:  That's what I was just saying.

17 |        MR. HAMMERMAN:  I will just tell you the names of the

18 | witnesses because then defense counsel knows who they are too,

19 | your Honor.

20 |        We have Leslie -- and I think there's now an argument

21 | of whether it's Thomas-Muldrow or Muldrow-Thomas.  They seem

22 | to be referred to both here.

23 |        Shurecca Baymon --

24 |        THE COURT:  Are you sure it's not two different

25 | people?

1    MR. HAMMERMAN:  I'm positive.

2    Ms. Thomas-Muldrow, Shurecca Baymon, who is a

3    relatively short witness, Michael Castro.  Those are the

4    remaining witnesses associated with Sacred Heart.

5    And then we have just agents, and they will be Ben

6    Folger from HHS, Alex Payne from FBI, Pete Theiler from HHS,

7    and then Rick Lexby, who is this financial analyst from the

8    U.S. Attorney's Office, who is a contractor with the U.S.

9    Attorney's Office.

10    THE COURT:  Okay.  I don't know what the subjects of

11    the agents' testimony is.  Is it -- I mean, Lexby is something

12    similar to what he did in the first trial?

13    MR. HAMMERMAN:  Bank records.

14    THE COURT:  Yeah, bank records.  Okay.

15    MR. HAMMERMAN:  The agents, your Honor, will --

16    THE COURT:  Well, just give me your best estimate.

17    Is it likely that we will get through all those people on

18    Monday, including the cross of Ms. Huang?

19    MR. HAMMERMAN:  We anticipate that there will be

20    probably one or two witnesses, two agents on Tuesday.  That's

21    what our cheat sheet on a yellow sticky note shows.

22    THE COURT:  Okay.  So just thinking ahead a little

23    bit, on the -- when you give me the exhibits, I am also going

24    to want a list.  And when you give me the list, I don't just

25    want numbers.  And I'm hoping that somebody has been keeping

1  track of the dates that they have been coming in.  If you can

2  give me just like a little contract between Dr. Kandala and

3  whatever or something like that so I don't have to kind of go

4  groping for things.

5      I mean, I can do searches within the realtime copy

6  that I get for exhibit numbers, but if I know where to look,

7  it's a little easier to do.

8      MR. HAMMERMAN:  For text messages, is it -- we'll

9  work with defense counsel --

10     THE COURT:  Just if you put a date range or something

11 like that.

12     MR. HAMMERMAN:  I was going to say, do you want

13 subject matters like diversion or room 200?

14     THE COURT:  Just put date ranges in, it's better,

15 because I have been keeping track of that.

16     I think there was one other thing.  What was the

17 other thing?

18     MR. HAMMERMAN:  Noorlag.

19     THE COURT:  Oh, yeah.  Well, just try to see what you

20 can get figured out on that over the weekend.

21     MR. HAMMERMAN:  I spoke to Mr. Shapiro after he came

22 and spoke to the Court, and I arranged to speak with him on

23 Sunday.

24     THE COURT:  Okay.

25     MR. HAMMERMAN:  Our hope is to find some resolution

1  where we can make this work.

2  THE COURT:  Okay.

3  All right.  See you on Monday at 9:45.  If you want

4  to leave stuff here --

5  THE INTERPRETER:  Your Honor, this is the

6  interpreter.  I have a prior commitment on Monday.

7  MR. HAMMERMAN:  When we arranged for the interpreter,

8  your Honor, it was my understanding that you were available

9  both this afternoon and Monday morning?

10  THE INTERPRETER:  Yeah, but that was before your

11  office confirmed with me.  Then I have a bench trial in the

12  state court on Monday morning.

13  THE COURT:  What time on Monday morning?

14  THE INTERPRETER:  9:00.

15  THE COURT:  What state court?

16  THE INTERPRETER:  Cook County.

17  THE COURT:  There is no judge in Cook County that

18  conducts bench trials at 9:00 o'clock.  I say this from

19  personal experience, and I know for a fact that that has not

20  changed in 16 years.  You might have to meet with somebody

21  at 9:00 o'clock in the morning, but there is no bench trial in

22  Cook County starting at 9:00 o'clock.

23  What courthouse is it?

24  THE INTERPRETER:  555 West Harrison.

25  THE COURT:  Yeah, it's Grand and Harrison.

1    MR. HAMMERMAN:  And I apologize, your Honor.  I
2  thought that we had arranged for both today and tomorrow
3  knowing that the cross could go --
4    THE COURT:  Not tomorrow.  You mean Monday.
5    MR. HAMMERMAN:  Monday.  I apologize.  If there was
6  some miscommunication --
7    THE COURT:  And, again, I mean, I have been to Grand
8  and Harrison.  There is nothing happening at Grand and
9  Harrison at 9:00 o'clock in the morning, and sure as heck
10  there is no bench trial happening at Grand and Harrison --
11    THE INTERPRETER:  No, no bench -- not Grand and
12  Harrison.  Just domestic violence call, 555 West Harrison.
13    THE COURT:  No, it's not -- which court?
14    THE INTERPRETER:  Domestic violence.
15    MR. CLAVELLI:  Judge, it's just off downtown.
16    THE COURT:  It's the newer one?
17    THE INTERPRETER:  Yes, new one, right by -- right
18  off 290.
19    MR. CLAVELLI:  The trials are put at the end of the
20  call.
21    THE COURT:  Duh.  They are.
22    Well, can I just talk to the lawyers at sidebar for a
23  second?
24    (Discussion off the record.)
25    (The following proceedings were had in open court:)

1    THE COURT:  All right.  We are done for the day,

2  unless there's anything anybody needs to bring up before we

3  go?

4    MR. HAMMERMAN:  No, your Honor.

5    THE COURT:  All right.  Take care.  Go Hawks.

6    (The trial was adjourned at 4:45 p.m. on June 5, 2015, until

7  9:45 a.m. on June 8, 2015.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25